IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 16-20032-JAR |
| | ) | |
| LORENZO BLACK, | ) | |
| KARL CARTER, | ) | |
| ANTHON AIONO, | ) | |
| ALICIA TACKETT, | ) | |
| CATHERINE ROWLETTE, | ) | |
| and | ) | |
| DAVID BISHOP, | ) | |
| | ) | |
| Defendants. | ) | |

UNITED STATES' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PROPOSED
ORDER TO APPOINT A SPECIAL MASTER, AND OFFER TO PRESENT EVIDENCE

The United States of America, by and through undersigned counsel, responds to the Federal

Public Defender Office's (FPD's) Memorandum in Support of Proposed Order to Appoint a

Special Master (doc. 119). The parties agree the Special Master should be given the following

duties:

- Excise and retain video recordings of attorney-client meetings at CCA;

- Provide copy of video recordings without attorney-client meetings to the government and

  Coordinating Discovery Counsel;

- Excise and retain audio[1] recordings of attorney-client telephone conversations at CCA;

_____

[1] In the government's Response to the FPD's Motion to Impound Additional Government
Evidence, the government suggested that because the recorded inmate calls are not privileged, they
should not be subject to review by a Special Master. (Doc. 121, at 8.) The government maintains
that those calls are not privileged. In the interest of resolving this matter in an efficient manner,

- Provide copy of audio recordings without attorney-client conversations to the government and Coordinating Discovery Counsel;

- Identify any privileged attorney-client communications in the computers seized from CCA's inmate law libraries and excise any such communications;[2] and

- Provide image of law library computers without attorney-client communications to the government and Coordinating Discovery Counsel.

The government opposes, however, the FPD's assertion that the unusual circumstances here give rise to exceptional conditions warranting a review by the Special Master of the policies and practices of the United States Attorney's Office.

With respect to the hearing scheduled for September 7, the government offers to present evidence through witnesses or by proffer.

The government also submits the attached proposed Order Appointing a Special Master for the Court's consideration.

## I. Request for an Opportunity to Present Evidence

The FPD acknowledges that this matter has been fast-moving. On Friday, August 5, 2016, the FPD filed a Motion for Return of Information pursuant to Fed. R. Crim. P. 41(g) as a movant in this case. (Doc. 82.) The FPD requested an emergency hearing, and the matter was set for hearing on Tuesday, August 9, 2016. Since joining this case as a movant, the FPD has filed the following additional motions: Motion for Access to Visitation Rooms at CCA (Doc. 83); Motion to Produce Witnesses pursuant to Fed. R. Crim. P. 17(b) (Doc. 84); Amended Motion for Fed. R.

---

however, the government now concurs with the FPD that any recorded inmate calls made to an attorney should be excised and retained by the Special Master.

[2] Based on discussions with defense counsel, the data retrieved from the law library computers has not been reviewed by anyone to date, and has not been sent out in discovery.

Crim. P. 41(g) Return of Information (Doc. 85); Motion to Produce Records from CCA Pursuant to Fed. R. Crim. P. 17(c) (Doc. 91); Motion for Court to Impound Additional Government Evidence (Doc. 105); Memorandum of Law in Support of Motion for a Special Master (Doc. 106); and Memorandum of Law in Support of Proposed Order to Appoint a Special Master (Doc. 119); and Reply to Government's Recommendations Related to Scope of Special Master and Government's Response to Motion to Impound Evidence (Doc. 130).    For instance, the government was provided only hours to review the FPD's Motion to Impound Additional Government Evidence before the FPD proceeded to argue the motion before the Court on August 16th.

The evening before the August 16th hearing, the government filed its initial response that reserved its right to present evidence (Doc. 110 at 13, 15).  In addition, at the outset of the August 16th hearing, AUSA Debra Barnett suggested that another hearing may be appropriate to address the FPD's Motion to Impound Additional Government Evidence (Doc. 105), as the motion was filed on the eve of the August 16th hearing.  In preparation for the September 7th hearing, the government issued subpoenas beginning September 1st to local and out-of-state witnesses and began meeting with several witnesses early on September 2nd in the event evidence is needed at the hearing.  The government believes this evidence will address some of the outstanding questions of fact and help the Court and any Special Master with their responsibilities.

As such, the government offers to present evidence in support of this Supplemental Memorandum, the Government's Recommendation Related to Scope of Special Master (Doc. 120), and the Government's Response to FPD's Motion to Impound Additional Government Evidence (Doc. 121).

## II. Background

In September 2015, the Kansas Bureau of Investigation (KBI) began an investigation into a large-scale conspiracy to introduce contraband and illegal drugs into CCA after a confidential informant provided information about an inmate selling synthetic cannabis inside the facility. Shortly thereafter, the United States Marshals Service (USMS), United States Secret Service (USSS), and Internal Revenue Service-Criminal Investigations (IRS) joined the investigation. During the investigation, agents learned through interviews of informants housed at CCA, that the contraband conspiracy involves numerous inmates, along with CCA guards, and other individuals outside of CCA.

### A. Potentially Privileged Material

#### 1. Documents and Legal Mail

On April 8, 2016, agents executed a search warrant inside the CCA facility in Leavenworth, Kansas and several residences in Missouri. In advance of executing the warrants, the U.S. Attorney's Office coordinated with law enforcement officers to designate a "taint team" consisting of an Assistant United States Attorney and several Internal Revenue Service Agents, who all were not part of the investigation. At each search location, a taint IRS agent was present to review any document or other evidence containing potential attorney-client communications.

While searching CCA, the government anticipated that inmates might have legal documents and written communications with their attorneys in their cells. Based on cooperator statements and recorded inmate calls, agents believed certain inmates were coordinating with associates outside the facility to send fake "legal mail" into CCA that contained paper sprayed with the chemicals commonly known as synthetic cannabis (K-2). The inmates then smoked the K-2 paper inside CCA. Given those circumstances, the taint agents were tasked with reviewing legal mail and documents in certain cells to verify whether the papers contained any contraband.

As such, the search warrant directed that "all legal mail shall be searched by a member of the 'taint team,' that is, an agent not directly involved in the investigation."

No potential attorney-client communications were seized by the agents during the searches of the inmates' cells.

## 2. The Law Library Computers

The same day, agents executed a second search warrant authorizing the search and seizure of several computers located in the law libraries within CCA. The government anticipated these computers may contain attorney-client communications in the form of letters, memoranda, or briefs drafted by inmates and sent to their respective attorneys. The search warrant authorized agents to seize certain data contained in the law library computers using a taint team to review the data for potential attorney-client communications. Agents seized the computers and placed them into evidence.

On May 24, 2016, the parties held a meet and confer to address the large volume of discovery in this case. During the meeting, SAUSA Erin Tomasic informed all counsel of record that the government was in the process of obtaining all video recordings from CCA from a particular time frame. In advance of the meet and confer, SAUSA Tomasic sent an email to all counsel of record explaining:

> Seven computers were seized and imaged from the "law libraries" inside CCA. Because the computers arguably may contain attorney/client material generated by the inmates, we should work together to exclude that material from the case agents' review. I suggest the following procedure:

> At the meet and confer, all attorneys should weigh in on search terms to identify potential attorney/client material. Once those search terms are generated, a "taint" team of agents will generate all data from the "law library" computers containing those terms. That data will be provided to defense counsel for review during an agreed upon time frame. Defense counsel should identify any documents they believe contain privileged attorney/client material. The "taint" team of agents will then review the privileged material identified by defense counsel as attorney/client

and verify the privilege for the government.  All information not identified by defense counsel as privileged will be reviewed by the case agents as part of discovery.

Please let me know if you disagree with the proposed procedure.

During the meet and confer, SAUSA Tomasic explained to opposing counsel, based on cooperator statements, it was believed that inmates used the law library computers to communicate with each other about drug and contraband trafficking inside the facility.  Defense counsel were particularly concerned that the law library computers could contain communications from defendants other than those charged in the case, including past clients of the attorneys of record and inmates represented by other attorneys.  The government agreed not to move forward with a taint team review until the defense attorneys had an opportunity to identify search terms for their initial review.  To date, the law library computers have been digitally imaged, and all data contained on the computers are ready for review.  No one has reviewed the data.[3]

### 3. Video Recordings from CCA

In early March 2016, law enforcement officers and SAUSA Tomasic conducted a lengthy proffer interview with an inmate regarding drug and contraband smuggling at CCA.  The inmate provided an inside view of a complex network in which a correctional officer smuggled drugs and contraband into the facility, and a web of inmates coordinated to distribute the contraband to various other distributors and customers through medical callouts, church, inmate job assignments, the twelve-step program, and law libraries.

At the conclusion of the proffer interview, the officers spoke at length with the inmate about the procedures that would be used to conduct a proposed controlled buy within CCA.  The

---

[3] As set forth below, the counsel for the government intended to revisit this issue during a meet and confer on July 21, 2016, but that meet-and-confer was cancelled in lieu of a status hearing regarding discovery in this case.

cooperator explained that he was very concerned about certain correctional officers and a unit manager being involved in the conspiracy, and he believed the unit manager was reporting to inmate co-conspirators exactly who was cooperating with the government.  Based on that information, officers determined that the inmate should not be transported again from CCA[4] in advance of any controlled buy.   Officers determined the cooperator's attorney would have to convey information to the cooperator pertaining to the controlled buy during legal visits at CCA. The cooperator reported to officers and SAUSA Tomasic that he believed the attorney-client rooms are video recorded, and the CCA staff can activate audio monitoring without an inmate's knowledge.  The inmate explained that for these reasons, he was uncomfortable communicating about the controlled buy at CCA.  The cooperator, his attorney, and the officers devised a plan to communicate during attorney visits at CCA.[5]

On April 12, 2016, the government served a subpoena on CCA's record custodian seeking "all video footage or still images currently retained by the Corrections Corporation of America (CCA) depicting any internal or external surveillance video or still image taken between July 2014 and April 12, 2016 at the CCA facility in Leavenworth, Kansas."  The subpoena was broadly drafted because the investigation revealed a widespread conspiracy to distribute drugs and contraband within the facility.  As set forth above, the investigation revealed that drugs and contraband were transferred between inmates in the law libraries, medical facility, twelve-step program, church, and various pods in which inmates are housed.  There have been no allegations

---

[4] The proffer interview in early March took place at the U.S. Attorney's Office in the District of Kansas.  The defendant was facing charges in another district.  It became clear that another inmate had observed this cooperator exit the CCA transport van in Kansas.  The cooperator was concerned that he would be identified as "snitching" about the drugs and contraband at CCA.

[5] Ultimately, the controlled buy did not take place, in large part due to concerns for the cooperator's safety.

that drugs or contraband were distributed in the attorney-client meeting rooms. SAUSA Tomasic, who signed the subpoena, did not expect or intend to obtain any attorney-client communications.

After the subpoena was served on CCA, an agent with the USSS engaged in protracted discussions with a representative of CCA regarding how to obtain the extraordinary volume of video recordings from CCA. Typically, when only particular and limited video recordings are requested, such as those depicting an assault or limited activity associated with contraband discovery, CCA burns those recordings to a disc and provides the disc to a law enforcement officer. CCA ultimately determined that it would provide CCA's original drives given the technological constraints and lengthy process associated with generating a copy of "all surveillance footage."

On or about May 17, 2016, CCA provided six drives, each three terabytes in size, to the USSS containing video recordings. The USSS generated a copy of the recordings for the U.S. Attorney's Office and placed the original set into an evidence vault. No employee of the USSS viewed any portion of the video recordings provided by CCA. On approximately June 1, 2016, a copy of the video recordings was delivered to a litigation support specialist at the U.S. Attorney's Office, who noticed that the video recordings were not accompanied with a player, so it was not possible for anyone within this office to view any of the video. On approximately June 6, 2016, the USSS identified the correct player to personnel within this office so the video recordings could be played/viewed.

### a. The Index to the Video Recordings was prepared by CCA.

On June 6, 2016, an attorney in another case[6] sent an email to SAUSA Tomasic stating:

---

[6] This attorney represents Richard Dertinger, who is charged in an unrelated case (*United States v. Rapp et. al.*, case number 14-20067-CM). The discovery in *Black* was provided to counsel for Dertinger beginning approximately May 23, 2016, because the government intends to seek sentencing enhancements at Dertinger's sentencing based on conduct contained in the *Black* discovery.

> [C]an you provide an index for each defendant to guide us concerning: (1) dates; (2) time ranges; (3) locations; and (4) camera views.  If so, how can the material be excised so we can review those portions in a timely manner.  We are eager to get through the discovery so we can move forward with sentencing.

SAUSA Tomasic responded that she was not in a position to provide an index, but the written discovery would assist in identifying the pertinent video recordings.  Recognizing that an index would be needed to effectively review the large volume of recordings, SAUSA Tomasic sought to coordinate with the U.S. Marshals Service and CCA to obtain an index of the video recordings provided by CCA.  On June 10, 2016, CCA provided the index to the U.S. Attorney's Office via email (*see* Government Ex. 9).

On June 29, 2016, SAUSA Tomasic received an email from Michael Jackson, counsel for Catherine Rowlette, requesting an overview of all the discovery in this case for case budgeting purposes.  The same day, SAUSA Tomasic provided an overview of the status of the discovery to all counsel, explaining in part:

> From defense counsel, I am waiting for 6 drives, each 3 TB in size on which I will download 18 total TB of surveillance footage.  The footage is divided by camera angle, and we coordinated with CCA to provide a chart showing what is depicted on each camera angle (ie, which pod, hallway, etc.).  ** If you intend to provide 1 single 18 TB drive, please let me know in advance.  I will check with our office litigation support specialist to verify that will work.

On July 13, 2016, counsel for the government emailed Mr. Jackson and asked that he coordinate with defense counsel to set up a meet and confer with all counsel of record to discuss discovery issues.  The parties agreed to meet and confer on July 21, 2016.  On July 13, 2016, this Court contacted all counsel of record *sua sponte* and set a hearing regarding discovery issues for July 21, 2016 (Doc. 71).

At the outset of the July 21, 2016 status hearing, the Court explained:

> So Ms. Shaneyfelt let me know that part of the discovery is quite a volume of surveillance videos from the CCA.  And Ms. Shaneyfelt advised that the AUSA

had said that each defense counsel needed to provide six three-terabyte hard drives in order to download these surveillance videos, which the video, as she understands, it's equivalent to about 200 movies. . . . [T]his is quite an expensive undertaking. [B]ut another concern is there's no index or directory or any means by which the video can be sorted, searched, or organized.

(Transcript of July 21, 2016 Hrg., at 4.)   In response to the Court's inquiry, SAUSA Tomasic explained:

We were not [initially] provided an index from CCA and the U.S. Attorney's Office *worked with* the Marshal Service and CCA and created an index, which is available to defense counsel and I believe is being provided apart from the surveillance footage to defense counsel.  So we—actually created the index for defense counsel, and for some time defense counsel has been aware that there was an index.

(*Id.*) (emphasis added.)  At the time this response was given, SAUSA Tomasic was uncertain who had prepared the index, but knew personnel in her office were securing the index through cooperation with the USMS and CCA personnel.

The FPD argues that SAUSA Tomasic's representation demonstrates the U.S. Attorney's Office—not CCA—created the index.  (*See* Transcript from Aug. 9, 2016 Hrg., at 14.)  However, SAUSA Tomasic's statement should be viewed against the backdrop of her communications with counsel for Mr. Dertinger.  SAUSA Tomasic's statement during the July 21st hearing was intended to rebut the concern that the government was not providing discovery in a usable format.  The purpose of SAUSA Tomasic's representation was to show that the government had taken the additional step, after CCA initially did not provide an index, to work with CCA and the USMS to create an index.

### b.  The government did not intend to obtain attorney-client video recordings from CCA.

Although SAUSA Tomasic heard the inmate's statement in early March that he believed CCA may be recording attorney-client meetings before the subpoena for "all video recordings" was served on CCA, she did not intend to obtain any such recordings in response to the subpoena.

Rather, the focus was on obtaining evidence of drug and contraband smuggling within CCA. The *only* indication SAUSA Tomasic had that CCA's video recordings contained attorney-client meetings was the inmate's statement of his belief. No CCA employee reported to the government that CCA recorded attorney-client meetings. SAUSA Tomasic did not view or have knowledge of the contents of the index until she learned the FPD had expressed concerns about the existence of the recordings in early August (which was after the meeting with Ms. Rokusek). At that point, SAUSA Tomasic first examined the CCA video index, at which time SAUSA Tomasic saw that attorney-client rooms were listed within the index.

In the context of the extraordinary volume of information involved in this large and complex case, SAUSA Tomasic was not initially mindful of the inmate's belief that the video recordings produced by CCA may contain recordings of attorney-client meetings. Near the time of the July 21, 2016 hearing,[7] SAUSA Tomasic considered for the first time the inmate's belief that the video recordings from CCA may contain attorney-client meetings. This consideration, which was premised solely on the inmate's earlier statement of belief, in connection with the manner in which CCA provided the video recordings to this office. Specifically, SAUSA Tomasic realized around the time of the July 21st hearing that CCA provided the video recordings in an unfiltered manner to this office because CCA provided the original drives. In hindsight, SAUSA Tomasic should have been more sensitive to the possibility that CCA footage may contain attorney-client meetings due to the inmate's statement and the unfiltered manner in which CCA provided the footage.

---

[7] SAUSA Tomasic is uncertain of the exact date on which she first recalled the inmate's belief that CCA recorded attorney-client meetings. SAUSA Tomasic is certain, however, that she first recalled that information near the time of the July 21st hearing, or possibly, in response to the Court's questioning during the July 21st hearing.

KBI Special Agent Jeff Stokes was tasked with viewing portions of the video in support of the investigation.  In mid-July 2016,[8] SAUSA Tomasic instructed Agent Stokes not to review any video recordings of attorney-client meetings, and to notify her immediately if he encountered attorney-client video recordings.  SAUSA Tomasic and Agent Stokes discussed who would be an appropriate agent to act as a "taint agent" given the enormous amount of time that would be associated with reviewing the CCA videos.  Agent Stokes did not conduct any in depth review of the video, and he did not encounter any attorney-client meetings during his review.[9]  SAUSA Tomasic and Agent Stokes did not discuss the review of the recordings again until after the FPD filed a Motion for Return of Property on August 5, 2016.[10]

During the status hearing on July 21st when SAUSA Tomasic publicly stated to the Court that the 18 terabytes of surveillance footage received from CCA contained recordings of attorney-client meeting rooms and visitation rooms, (*See* Transcript from July 21, 2016 Hrg., at 12.),  AUSA Chris Oakley and SAUSA Tomasic recall all counsel for defendants, as well as representatives of the FPD, Jacquelyn Rokusek, and several other defense attorneys present in the courtroom.[11]  No

---

[8] Again, SAUSA Tomasic is uncertain of the exact date on which she had this conversation with Agent Stokes.  She is certain that the conversation took place on the eve of the July 21, 2016 hearing or within a day after the hearing, as she was absent from work the following week, and Agent Stokes was absent from work the majority of the week thereafter.

[9] Agent Stokes briefly viewed a portion of the CCA recordings that contained approximately sixteen camera views on his screen at one time.  One of those sixteen camera views depicted an empty interview room, and he is certain there were no attorney-client meetings occurring at the time.

[10] SAUSA Tomasic was on medical leave between Monday, July 25 and Friday afternoon, July 29, 2016, and Agent Stokes was on vacation from Monday, August 1 to Friday, August 5, 2016.  Agent Stokes returned from out-of-town vacation on the afternoon of August 3, 2016 to testify at a contested sentencing hearing in *United States v. Huff* (case number 14-20067-CM).  Based on a scheduling issue, the hearing was continued before Agent Stokes was called to testify.  After the hearing was continued, Agent Stokes immediately returned to his vacation.

[11] In a previous pleading, the FPD incorrectly stated, "On August 5, 2016, the Federal Public Defender learned that our privileged communications with clients at CCA Leavenworth have been recorded by CCA staff and, at times, provided to the government upon request."  (Amended

one in the courtroom asked for clarification following this statement by SAUSA Tomasic regarding the video recordings available from CCA. During the hearing, SAUSA Tomasic spoke privately with John Jenab, counsel for Lorenzo Black, and asked whether she should address potential privilege issues regarding the law library computers. She and Mr. Jenab agreed the matter should first be addressed at the next meet-and-confer between the parties before bringing the matter to the Court's attention.

In sum, when SAUSA Tomasic recognized the video recordings likely contained attorney-client meetings, she notified Agent Stokes not to review any such footage, and explained to Agent Stokes that any review of the video would need to be conducted by a taint team. On July 21, 2016, SAUSA Tomasic stated to the Court, the FPD, Ms. Rokusek, and all parties in this case that the government had the recordings. On August 5, 2016, SAUSA Tomasic and AUSA Oakley met with Shazzie Naseem, who was appointed the previous day as the Coordinating Discovery Attorney in this case. During the meeting, AUSA Oakley and SAUSA Tomasic explained the scope of discovery at issue in this case; they identified the potential for privileged communications on the law library computers; they identified the potential for privileged communications on the CCA video recordings; and they explained that Ms. Rokusek was in the process of reviewing the

---

Motion for Return of Information, Doc. 85, at 1.) The FPD incorrectly represented during the August 9, 2016 hearing that the existence of the video recordings "came to light last week" after a meeting at the U.S. Attorney's Office. (Transcript from Aug. 9, 2016 Hrg., at 8.) Ms. Rokusek mistakenly testified, "the first time that I was made aware of it [the video recordings of attorney-client meetings] was in early August." (*Id.* at 41.) Ms. Rokusek made a similar misstatement in a pleading, "On August 2, 2016, [I] learned that the United States Attorney's Office for the District of Kansas had access to privileged communications with my clients at CCA Leavenworth. Specifically, attorney/client visits have been recorded by CCA staff and, at times, provided to the government upon request." (Motion to Join, Doc. 92, at 1.) However, SAUSA Tomasic had mentioned the existence of the recordings in court on July 21st, at least ten days earlier.

video recordings at the U.S. Attorney's Office to determine whether the recordings contained attorney-client meetings.

At the time SAUSA Tomasic met with Mr. Naseem, she was aware that CCA had recently represented that the attorney-client rooms were not video recorded. SAUSA Tomasic was also aware that the FPD, in light of CCA's representation, stated in an email to U.S. Attorney's Office supervisors, several defense attorneys, and others:

> So this is where we are: CCA and the USM say that the attorney/client meetings are not recorded and the USAO says that they have, in their custody, recordings of the attorney/client meetings at CCA that are to be distributed to counsel. Those two positions are irreconcilable.
>
> The first problem is that, as you noted, there have been changes to the security system in the last few months . . . .
>
> . . .
>
> So serious problems remain, although perhaps in a different context. These representations that the USAO has in its possession recordings of attorney/client meetings were made in court with two AUSAs and the USAO IT person. The out-of-court representations were made by an AUSA and her supervisor.
> If the USAO's repeated representations were inaccurate, please assure us, in writing, that your office has reviewed the videotapes from CCA and that they contain no attorney/client meetings. If that is done, we can then proceed to address the credibility issues.

Based on CCA's representations and the FPD's concerns, SAUSA Tomasic and AUSA Oakley began to doubt the existence of attorney-client video recordings and reported to Mr. Naseem that they were uncertain whether those recordings existed.

The FPD argues that the government could not have inadvertently obtained the video recordings from CCA. In support of this argument, the FPD relies on inaccurate representations and irreconcilable positions. First, at the August 9, 2016 hearing, Federal Public Defender Melody Brannon stated:

> We're never given notice of the recordings.  We're never given notice of the subpoenas.  It's by happen chance in this case because the U.S. Attorney was actually using the videotapes against counsel and against defendants that it really came to light and began to develop.

(Transcript from Aug. 9, 2016 Hrg., at 13.)

The government—not the FPD or any defense counsel—first brought the existence of the video recordings to the attention of the Court and the parties.

SAUSA Tomasic engaged defense counsel regarding how to handle the potentially privileged communications within the law library computers.  It is simply not logical to suggest that SAUSA Tomasic persisted in efforts to provide defense counsel with the CCA video recordings if she was mindful that those recordings contained footage of attorney-client meetings.  If, in fact, the government was hiding the existence of those recordings, or intended to use the recordings to gain a strategic advantage of some sort, the government would not have been so persistent in their efforts to turn over the recordings to defense counsel.

Rather, the inmate's prior statement regarding his belief of potential CCA attorney-inmate recordings just did not occur to SAUSA Tomasic until near the time of the July 21st hearing.  Around that same time, SAUSA Tomasic instructed Agent Stokes to avoid reviewing any video recordings of attorney-client meetings as review of those videos should be handled by a taint team.

### B.  August 2, 2016 Meeting with Jacquelyn Rokusek

On August 2, 2016, AUSA Kim Flannigan and SAUSA Tomasic met with Jacquelyn Rokusek, attorney for Richard Dertinger.  The purpose of the meeting was to discuss a potential conflict of interest that had come to the attention of the government.[12]  SAUSA Tomasic explained

---

[12] Before a hearing on February 9, 2016, in Richard Dertinger's case, AUSA Flannigan contacted Ms. Rokusek to explain that in her client's case, one of the case agents had been promoted and was now working directly subordinate to Ms. Rokusek's husband, who is a Captain at the Johnson County Sheriff's Office.  AUSA Flannigan explained that, in her own experience, she obtains a

to Ms. Rokusek that a motion to determine conflict had been prepared based on certain facts that had come to light. Government counsel believed a meeting to discuss the situation before filing any such motion was most appropriate to ensure crucial information was not overlooked, and based on the proactive outcome before the February 9, 2016 hearing in that case.

SAUSA Tomasic explained that two cooperators in the *Black* case had alleged Dertinger's attorney told Dertinger about a proffer statement against Dertinger regarding the CCA drug and contraband investigation. AUSA Flannigan explained that she and SAUSA Tomasic were not making any accusations against Ms. Rokusek. SAUSA Tomasic explained that the merits of the accusations do not bear on the conflict of interest analysis.

SAUSA Tomasic then showed Ms. Rokusek two cooperator statements. The first cooperator (C-1) stated that Dertinger told C-1 that he went to a meeting with his attorney where his attorney identified people who were under investigation for drug and contraband trafficking. According to C-1, another inmate dropped out of the conspiracy after Dertinger shared that this inmate was under investigation. The second cooperator (C-2) stated that Dertinger stated he met with his lawyer at a legal visit where Dertinger's lawyer told him that "John Doe"[13] was providing information to the government about the defendant, [Karl] Carter, and a few other inmates smuggling drugs into CCA. C-2 also stated that Dertinger reported his lawyer told him "they" (law enforcement officers) were looking into it.

---

waiver when handling cases with her ex-husband, defense attorney Robin Fowler, to avoid any issues of conflict in the proceedings. Ms. Rokusek agreed it would be prudent to present the information to her client and obtain a waiver on the record. At the February 9, 2016 hearing, Ms. Rokusek made such a record, and the client waived any potential conflict. At no point did the U.S. Attorney's Office attempt to disqualify Ms. Rokusek based on this matter. At the February 17, 2016 hearing in the same case, no one on behalf of the government asserted any type of conflict of interest for Ms. Rokusek.

[13] This moniker is used to protect the identity of the cooperator.

Ms. Rokusek read the two proffers and explained that she never gives out proffer reports. Ms. Rokusek explained that she had not even accessed the proffers provided in "the CCA case." (*United States v. Black et al.*). SAUSA Tomasic explained that the "John Doe" proffer report was disclosed to Ms. Rokusek as part of her representation of Petsamai Phommaseng (case numbers 14-20014-JAR; 15-20006-JAR; 15-20020-JAR). SAUSA Tomasic provided Ms. Rokusek with a copy of the discovery letter showing Ms. Rokusek received a copy of "John Doe's" proffer report on November 7, 2015. SAUSA Tomasic then showed Ms. Rokusek a copy of "John Doe's" September 2015 proffer report. SAUSA Tomasic explained that she reviewed Dertinger's discovery and did not identify "John Doe's" September 2015 proffer report as being distributed in that case. SAUSA Tomasic asked Ms. Rokusek to double-check that it was not sent out in Dertinger's case, and Ms. Rokusek agreed she would check.

As set forth in the September 2015 report, "John Doe" agreed to provide information to the government. John Doe stated that Dertinger was selling synthetic cannabis (K-2) inside CCA and explained in particularity how he did so.

Kan. R. Prof. R. 3.7 identifies when an attorney may have a conflict of interest when the attorney may also be a witness. SAUSA Tomasic explained that the commentary following Rule 3.7 suggests that the attorney who may have a conflict under this rule should first evaluate whether he/she has a conflict.

3.7 Advocate: Lawyer as Witness

(a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer may act as an advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Kan. R. Prof. R. 3.7.

*United States v. Evanson*, 584 F.3d 904, 909 (10th Cir. 2009), is a case on point to the issues here as it involved an attorney found to have a conflict of interest because he would be acting as an "unsworn witness" to the litigation even if he was not called as a witness. SAUSA Tomasic stated that because Ms. Rokusek would be placed in the untenable position of cross-examining the two cooperators making accusations against her, that gave rise to the potential conflict of interest. AUSA Flannigan and SAUSA Tomasic reiterated that that merits of whether she committed these acts was not going to be at issue in determining the conflict.

In evaluating next steps to analyze the situation, AUSA Flannigan suggested that Ms. Rokusek may wish to consult with Kansas Disciplinary Administrator Stan Hazlett.

With respect to an evaluation of the claims by the two inmates, SAUSA Tomasic explained that an agent was in the process of viewing CCA video recordings to corroborate the cooperators' statements. The agent intended to use CCA's visitation log to view footage of Dertinger within the inmate pod(s) after the time of Ms. Rokusek's visits with Dertinger. SAUSA Tomasic explained that the agent was looking at video recordings from inside CCA around the time of Ms. Rokusek's visits to see Dertinger's actions and the other inmates' actions *after* he met with Ms. Rokusek. It was never the government's intent to view Dertinger's meetings with Ms. Rokusek. SAUSA Tomasic explained that, thus far, the agent had only found video of Dertinger walking down the hall near the time of one of Ms. Rokusek's visits. SAUSA Tomasic explained that the agent was also tasked with locating attorney-client video recordings, which meant the agent was

to ascertain whether any such videos had been provided by CCA.[14]  Ms. Rokusek asked if she could have some time to decide on a course of action, and the parties agreed that a week was sufficient time.  The meeting was concluded in a collegial manner.  Contrary to Ms. Rokusek's testimony at the August 9, 2016 hearing on this matter,[15] neither SAUSA Tomasic nor AUSA Flannigan stated that they intended to view or have a case agent view the attorney-client room video, nor did they intend to view the attorney-client room video to see if Ms. Rokusek handed something to her client.

### C. United States v. Huff

In *United States v. Ashley Huff* (D. Kan. No. 14-20067-CM), the government made representations at the May 16, 2016 hearing that were not based on any direct attorney-client communications.  Ms. Huff's attorney would also be able to report that Ms. Huff repeatedly recounted her interactions with her attorney to friends and family on recorded inmate phone calls,

---

[14] This was the second time SAUSA Tomasic notified Ms. Rokusek that the government was in possession of CCA recordings including footage of attorney-client meetings.  Ms. Rokusek did not seek clarification at this time nor did she inquire about the procedure that would be used in handling the video recordings of attorney-client meetings.  And SAUSA Tomasic did not explain the taint team procedure that had been employed, and would have continued to be employed, in the *Black* case.  Specifically, SAUSA Tomasic did not explain that Agent Stokes was locating the relevant footage, after which the footage was to be turned over to a taint team.  Based on this undeveloped communication, Ms. Rokusek appears to have mistakenly assumed the agent was tasked with actually viewing video recordings of attorney-client meetings.

[15] Ms. Rokusek testified that she was told by AUSA Flannigan "[t]hat the case agent was reviewing the videos to determine whether or not I had provided the document and that all he had seen so far was me walking down the hall."  (Transcript from Aug. 9, 2016 Hrg., at 35 & 49.)  AUSA Flannigan, although a supervisor in the Kansas City U.S. Attorney's Office, was not involved in handling discovery in the *Black* case.  At the time AUSA Flannigan met with Ms. Rokusek, she was completely unaware that CCA may have or did produce any video recordings of any attorney-client meetings as part of the *Black* case.  AUSA Flannigan only became aware of the attorney-client videos after SAUSA Tomasic explained, during the meeting with Ms. Rokusek, that Agent Stokes was in the process of locating the videos.  Further, at the time of the meeting, AUSA Flannigan was generally aware of the issues surrounding the potential conflict, but she had not read C-1 and C-2's proffer reports.

knowing that those phone calls were recorded and monitored.  As far back as January 2016, SAUSA Tomasic informed both Ms. Huff's attorney and Tom Bartee, an Assistant Federal Public Defender who acts as a mentor to Ms. Huff's attorney, Ms. Huff repeatedly relayed communications to third parties about her communications with her attorney on recorded CCA inmate calls.  In other words, none of the information provided by the government during the May 16 hearing came from communications between Ms. Huff and her counsel.

Any use of the May 16, 2016 hearing to support a suggestion that SAUSA Tomasic listened to and used direct attorney-client communications is false.  However, the transcript from an August 3, 2016 hearing in Ms. Huff's case, again addressed these same recorded calls between Ms. Huff and third parties, which provides additional helpful information.  The August 3rd hearing clearly shows that the parties to these recorded inmate calls were Ms. Huff and an unidentified male friend. The transcript from the hearing reveals that Ms. Huff's attorney was aware the referenced inmate calls were between Ms. Huff and another individual, not Ms. Huff and her attorney.  Therefore, nothing in the *Huff* case was about recorded attorney calls, but rather Ms. Huff's statements in other calls recounting her conversations with her attorney to third parties.

### D.  Additional relevant facts related to CCA's recording of inmate phone calls[16]

When an inmate first arrives at CCA, the inmate goes through an intake process. During the process, the inmate is provided a handbook containing CCA's policies and procedures.  The handbook states:

> Your attorney may request of our facility that calls to their office not be recorded to ensure Attorney/Client privilege.  They may request this by way of sending CCA/LDC a fax on their office letterhead.  This request must include contact information and signature.  They may fax it to (913)727-[  ].  **IT IS YOUR**

---

[16] The government has, through CCA's counsel, learned of the following facts related to CCA's recording procedure.  It is the understanding of the government that that the FPD was notified of the majority of these facts by CCA counsel via email on August 19, 2016.

**RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF THIS PROCEDURE; THEIR TELEPHONE CALLS ARE SUBJECT TO BEING RECORDED IF THEY DO NOT REQUEST THEY BE RESTRICTED.**

(Doc. 121, Ex. A) (emphasis in original.)   Inmates are not allowed to provide an attorney's name and number at intake—the request must come from the attorney's office on letterhead to verify that the number actually belongs to an attorney.   After the intake process, each inmate signs an acknowledgment form.   (*See* Attach. Ex. 1).   The form requires the inmate to acknowledge that the inmate understands that phone calls may be monitored and recorded and, "A properly placed phone call to an attorney is not monitored.   You must contact your unit team to request an unmonitored attorney call." (*Id.*)

Even if an attorney has not requested that their phone number be blocked by the system, CCA allows an attorney to schedule an unrecorded phone call by contacting the facility and scheduling an unrecorded call with the inmate's corrections counselor.   Additionally, an inmate may request an unrecorded phone call from the inmate's corrections counselor.

When an inmate places an outgoing call from the facility, each call begins with a recorded preamble that notifies both parties, "this call is subject to recording and monitoring."   Additionally, signs located near the inmate phones, and on the phones themselves, advise inmates that the inmate telephone system is subject to monitoring and/or recording.   (*See* Attach. Exs. 2–6.)

In preparation for the September 7, 2016 hearing, the government met with two representatives of CCA.   If permitted to testify, the CCA representatives would testify as follows:

1. Sgt. Wayne Bigelow is the Security Threat Group Coordinator at CCA and is familiar with the facilities telephone monitoring and recording procedures.   He has been in this position since December 2015.   He would testify concerning the policies and procedures as set forth below

(See Sec. IV(1)(a)(i) "Additional relevant facts related to CCA's recording of inmate phone calls.").

Sgt. Bigelow will testify that an inmate's attorney is required, per CCA policy, to send a fax request to CCA asking that the attorney's phone number be blocked from recording. Once he receives such a fax, Sgt. Bigelow accesses the computer-based system and "blocks" the number. Once blocked, the number will not be recorded, no matter which inmate PIN number is used to initiate the call to that particular number. Sgt. Bigelow said that he believes this "block" is permanent until someone "unblocks" the number. Sgt. Bigelow does not know how to "unblock" the number. Once "blocked," the system does not record the phone call at all.

According to Sgt. Bigelow, every recorded outgoing call has an advisory statement telling both parties that the phone call is subject to monitoring and recording. However, since he has not listened to a non-recorded, "blocked" call, Sgt. Bigelow does not know whether the recording plays at the beginning of non-recorded calls.

Additionally, inmates or their attorneys can request a non-recorded attorney-client phone call. This unrecorded[17] call usually takes place in the counselor or unit team's office. Although CCA requests 24-hour notice before such a call, Sgt. Bigelow indicates CCA works to accommodate attorneys' requests. Sgt. Bigelow will also testify concerning signs near and on monitored and recorded telephones inside CCA.

2. Lori Harrison is a Receiving and Discharge Officer at CCA. In this capacity, she meets with inmates once they arrive at CCA. According to Ms. Harrison, each inmate is given a copy of the CCA handbook when they arrive at CCA. Additionally, during the intake process, each inmate

---

[17] Although the phone call is not recorded, Sgt. Bigelow indicates he believes a CCA employee is present during the call.

is provided with a form, which the inmate signs, concerning CCA's policy concerning the monitoring of inmate's phone calls.  (*See* Attach. Ex. 1.)  Ms. Harrison will testify that during the intake process the form is explained to each inmate.

## III.  Standard for Appointment of Special Master

Pursuant to Fed. R. Civ. P. 53(a)(1), a court may appoint a master only to:

(A) perform duties consented to by the parties;

(B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:
    (i) some exceptional condition; or
    (ii) the need to perform an accounting or resolve a difficult computation of damages;

(C) address pretrial or post-trial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.

Fed. R. Civ. P. 53(a)(1).

## IV.  Duties Consented to by the Parties

### A.  *Videos*

Both the FPD and the government agree the Special Master should excise the video recordings of CCA's attorney rooms from the remainder of the CCA video recordings.  (*See* FPD's Memorandum, doc. 119, at 5; Government's Memorandum, doc. 120, at 25.)  The FPD and the government also agree the Special Master should retain the video recordings of CCA's attorney rooms if review of those recordings become necessary at a later date.  In the government's memorandum, it also agreed not to seek such video without first filing a motion with the Court requesting the Special Master to first review the requested video of attorney-client meetings for privileged communications.  (Doc. 120, at 25.)  Should the FPD agree to first file a motion with the Court before seeking any video recordings of attorney-client meetings maintained by the Special Master, the parties are in full agreement regarding the parameters of the Special Master's

role and handling of the video recordings of attorney-client meetings obtained from CCA in this case.

Once the videos of attorney-client meetings have been excised, then the remaining videos should be provided to the government and Coordinating Discovery Counsel.

### B.  Phone Calls

The FPD and the government also agree the Special Master should excise any recorded inmate telephone calls to an attorney and retain those telephone calls should review of those recordings become necessary at a later date.

Once any recorded inmate-attorney calls have been excised, then the remaining calls should be provided to the government and Coordinating Discovery Counsel.

### C.  Law Library Computers

The FPD and the government agree the Special Master should review any data and identify privileged attorney-client communications on any computer seized from CCA's law libraries.  The Special Master should excise any privileged communications and retain them until further order of the Court, delivering non-privileged material to the government and Coordinating Discovery Counsel.

## V.    There are no exceptional conditions warranting an investigation by the Special Master into the United States Attorney's Office

The FPD also seeks to task the Special Master with determining how the U.S. Attorney's Office came into possession of video recordings of attorney-client rooms, audio recordings of inmate calls to attorneys, and several computers seized from the law libraries at CCA and "determine any policy or practice related to obtaining protected materials.  This should include identifying any specific cases or specific government attorneys or agents who have obtained protected material."  (FPD's Proposed Order, Doc. 119-1, at 4.)  In support of this request, the

FPD advances arguments for the Special Master to initiate an investigation into the policies and practices of the U.S. Attorney's Office.

### A. The FPD asks for extraordinary relief based on suspicions. Suspicions are not extraordinary conditions warranting an investigation by the Special Master.

At the August 16, 2016 hearing, the FPD acknowledged:

> We don't know the scope. We don't get it yet. We don't know how far this goes back. We know that CCA has recorded since 2008. We have a lot of suspicions, but we need a Special Master who has the authority and the power of the Court to come in and delve into these things and sort it out.

(Transcript of Aug. 16, 2016 Hrg., at 53–54.)  Similarly, in its Memorandum in Support of Proposed Order to Appoint a Special Master, (Doc. 119), the FPD acknowledges that its request to have a Special Master investigate the U.S. Attorney's Office is almost exclusively based on what is not known.

For example, without any support, the FPD insinuates the U.S. Attorney's Office may have engaged in widespread practice of obtaining and reviewing video recordings of attorney-client meetings.  (Doc. 119, at 2.) ("[T]he practice and purpose of these recordings, the time-span, the facilities that engaged in these recordings, and the distribution of these recordings to any USAO or agent . . . requires the broad inquiry and authority of a Special Master.")  In the Government's Recommendation Related to Scope of the Special Master, it made clear that the criminal coordinators for each of the offices for the United States Attorney for the District of Kansas have polled every prosecutor in the District, and no prosecutor in this District has, in any other case, viewed video of an attorney-client meeting from CCA or any other detention facility.  (Doc. 120, at 4.)  At the September 7, 2016 hearing, the U.S. Attorney's Office would proffer to the Court that no prosecutor in this District has, in any other case, viewed video of an attorney-client meeting from CCA or any other detention facility.

Here, the scope of the investigation rendered unique circumstances in which the U.S. Attorney's Office inadvertently came into possession of video recordings of attorney-client meetings. When the government recognized that it had the recordings, it alerted the parties and instructed the agent tasked with viewing the recordings not to view any video recordings of attorney-client meetings. From the outset, the government has been willing to meet with counsel and the Court, at any time and on a moment's notice, to address these unique issues and handle this evidence in a thoughtful and considered manner. There has not been a moment of hesitation on the government's part to discuss these issues and this evidence with the Court and counsel. Any suggestion to the contrary is wrong.

Next, the FPD argues that the government "used" the recordings of attorney-client videos to "force a defense attorney to withdraw from two cases." (Doc. 119, at 3.) That representation is simply false. The government has not viewed and never intended to view attorney-client videos. Further, AUSA Flannigan and SAUSA Tomasic repeatedly stated during their August 2nd meeting with Ms. Rokusek that the merits of the accusations made against her did not bear on the potential conflict.

**B. The FPD assumes that the video recordings and audio recordings are privileged although there has been no evidence submitted in support of that assertion.**

The FPD's arguments rely on assumptions and misinformation and do not constitute an exceptional condition warranting an investigation into the U.S. Attorney's Office. First, in its pleadings and argument, the FPD assumes that where any privileged communications come into the possession of the government, a Sixth Amendment violation has occurred.[18]   Because

---

[18] *See* Amended Motion for Return of Information, Doc. 85, at 3; Memorandum in Support of Proposed Order to Appoint a Special Master, Doc. 119, at 1; Transcript of Aug. 9, 2016 Hrg., at 15; Transcript of Aug. 16, 2016 Hrg., at 48, 51.

intrusions into the attorney-client relationship are not *per se* unconstitutional, establishing a Sixth Amendment violation requires some showing of prejudice in terms of injury to the defendant or benefit to the prosecution. *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977). In *Weatherford*, the Court held that a government informant's attendance at several attorney-client strategy sessions did not violate the defendant's Sixth Amendment rights because there was "no tainted evidence [at trial], no communication of defense strategy to the prosecution, and no purposeful intrusion" by the informant into the lawyer-client relationship. *Id.*

Where, however, "the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate reason for doing so, a prejudicial effect on the reliability of the trial process must be presumed." *Shillinger v. Haworth*, 70 F.3d 1132, 1138 (10th Cir. 1995). This per se rule "in no way affect the analysis to be undertaken in cases in which the state has a legitimate law enforcement purpose for its intrusion." *Id.* Thus, where the government obtains recorded jail calls and incidentally obtains recorded attorney-client conversations, no Sixth Amendment violations has occurred because the calls were obtained for a legitimate law enforcement purpose. *United States v. Zajac*, No. 2:06CR811DAK, 2008 WL 1808701, at *3 (D. Utah April 21, 2008).

In *Zajac*, the District Court addressed a defendant's claim that a per se violation of the Sixth Amendment occurred when the government obtained jail-house calls he had made to his attorney. The government obtained a subpoena to gather evidence of calls about incriminating statements the defendant made through jail-house calls. *See id.* Because the County jail did not separate telephone calls, it produced all of the calls the defendant had made in response to the subpoena. *See id.* The United States Attorney's Office and the investigating agents identified the calls the defendant had made to his attorney (no taint team was used), and they "purposefully did

not review or listen to the telephone calls made to attorneys because they could have contained attorney-client communications." Id. at *4.  Then, to fully comply with discovery rules, the government provided the incriminating calls as well as the other calls made by the defendant.  The government provided to [d]efendant's counsel the entire record in discovery because the jail had provided the entire record to it.  While the government took care not to review any privileged material, it did not exclude those potentially privileged conversations from defense counsel when it provided discovery.  *Id.*  In *Zajac*, the Court concluded, the defendant "provides conclusory and speculative accusations that the government engaged in egregious and outrageous illegal conduct. There are no specific facts to support Defendant's allegations that there was an intrusion of the attorney-client privilege or that such intrusion was purposeful."  *Id.* at *5; *see also United States v. Johnson*, No. 2:11-CR-501 DN, 2016 WL 332042, at *5 (D. Utah Jan. 12, 2016), report and recommendation adopted, No. 2:11-CR-501-DN-PMW, 2016 WL 369699 (D. Utah Jan. 27, 2016) (finding no Sixth Amendment violation where government obtained attorney-client emails in response to a search warrant to Google.  In so holding, the Court noted the defendant "failed to demonstrate that the Government's Google search warrant was a purposeful intrusion into attorney-client communications or that it was obtained without a legitimate law enforcement purpose.").

Here, the government did not intentionally obtain video recordings of attorney-client meetings, and no employee of the U.S. Attorney's Office or law enforcement officer has viewed those recordings.  Further, the government did not intentionally obtain any audio recordings of any attorney-client telephone conversations.  And while those recordings are not privileged, law enforcement officers have, as a matter of course, stopped reviewing any inmate call when they determine an inmate is calling his attorney.  Further, when a law enforcement officer inadvertently listened to between ten and fifteen seconds of a call, SAUSA Tomasic contacted the defense

attorney and let him know his client's calls were being recorded. (*See* Attach. Ex. 10.) SAUSA Tomasic also explained that an officer inadvertently listened to a small portion of the call, and the government did not intend to listen to any attorney-client calls. (*Id.*) Thus, the FPD has failed to show that the government has intentionally intruded into any attorney-client relationship, let alone benefitted from any alleged intrusion.

Further, there can be no doubt that the government had a legitimate law enforcement purpose in seeking the video and audio recordings from CCA. The video recordings were sought to support charges stemming from widespread drug and contraband trafficking. Although the government has not viewed the recordings in any depth, they could arguably show inmates meeting and exchanging items, using contraband inside the facility, and meeting with co-conspirators in certain locations. Similarly, though review of recorded inmate calls, agents identified calls outlining the importation of K-2 inside the facility through fake "legal mail," the movement of wire transfers from individuals outside the facility to pay for contraband inside the facility, the timing of shipments of drugs and contraband inside the facility, the use of drugs and contraband inside the facility. Further, the recorded CCA calls have aided agents in identifying co-conspirators both inside and outside of CCA.

Accordingly, there is no Sixth Amendment violation, and consequently, no need for a broad investigation by a Special Master into the policies and practices of the U.S. Attorney's Office.

### C. There has been no inadvertent waiver/ inadvertent disclosure of phone calls.

Federal Rule of Evidence 502(b) covers inadvertent disclosures of otherwise privileged communication and is inapplicable here. The case law cited in the government's response (Doc. 121) stands for the proposition that, when a client makes a phone call to an attorney knowing the phone call is subject to recording and monitoring, there is no privilege because there is no

reasonable expectation of a confidential communication.  Rule 502 applies only where an otherwise privileged communication was inadvertently disclosed to opposing parties during the discovery process.  Rule 502 does not change the requirement that, in order to be privileged, there must be a reasonable expectation that the communication will be confidential.

Moreover, the attorney-client privilege belongs to the client not the attorney.  See *United States v. Merida*, ___ F.3d ___, 2016 WL 3741867 *5 (10th Cir. July 12, 2016). ("And 'for purposes of the attorney-client privilege, the 'client' is 'the actual recipient of the services.'" (Quoting 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 503.11[2] (2d ed. 1998)); *see also In re Vargas*, 723 F.2d 1461, 1466 (10th Cir. 1983) ("[A]n attorney cannot waive the attorney-client privilege without the client's consent…")

Regardless of whether the attorneys knew the process to block recording of attorney-client calls, each inmate-client is advised at the intake process, both verbally and in writing, of CCA's policies.  As the United States made clear in its response to the motion to impound additional evidence (Doc. 121), the inmates waived privilege by conducting phone calls with their attorneys on telephones they knew were subject to recording and monitoring.

Therefore, when a client made a phone call on a phone he/she knew was being recorded, without having followed CCA's policies related to obtaining a non-recorded telephone conversation, the conversation was not made "under circumstances from which it may reasonably be assumed that the communication will remain in confidence."  *In re Qwest Communications Inten Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006), quoting United States v. Lopez, 777 F.2d 543, 552 (10th Cir. 1985).

Here, however, each inmate was clearly informed how to place a call to his attorney on a line not subject to recording.  Further, each inmate was provided notice that the inmate phones

were subject to recording and monitoring.  This notice was provided in the inmate handbook (*see* Attach. Ex. 2, at 10), on an acknowledgment form supplied to inmates during the intake process (*see* Attach. Ex. 1), and on various signs throughout the facility.  (*see* Attach. Ex. 3–6.)  By contacting their attorney on the recorded and monitored lines at CCA, the inmates waived their privilege.[19]

### 1.  Regardless of the fact that the phone calls are not privileged, the United States does not object to the Special Master's excise of the recorded calls.

The United States has shown that an inmate waives privilege by not advising his attorney to request that CCA "block" the attorney's number from its recording system and by making a phone call to his attorney on a telephone he knows is subject to recording.   Although the law is clear that these calls are not privileged, agents involved in the review of recorded telephone calls have taken steps to cease review once it became apparent that the phone call involved a law office, and when she learned that an agent had inadvertently listened to between ten and fifteen seconds of a call, SAUSA Tomasic contacted the defense attorney.[20]  Thus, even assuming the recorded inmate calls are privileged, the government did not intentionally obtain them and did not access any attorney-client communications.

Therefore, if the Court is so inclined, the United States does not oppose tasking the Special Master with excising phone calls between an attorney and client.  If so ordered, the Court should direct the Special Master to order defense counsel to provide the Special Master with all known

---

[19] "*Sedillos v. Bd. of Educ. of Sch. Dist. No. 1*, 313 F. Supp. 2d 1091, 1093 (D. Colo. 2004) ("the attorney-client privilege can be waived by [a]ny voluntary disclosure by the client of an otherwise privileged confidential communication").

[20] "In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client." *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998).

phone numbers of the attorneys representing the defendants involved in the recorded calls to aid the Special Master.

### D.  Video Recordings

As stated in the Government's Recommendation Related to Scope of Special Master and Proposal Not to Retain Certain Evidence (Doc. 120), no prosecutor nor agent has viewed any video of attorney-client meetings in the video provided by CCA in this case, or any other case.  (Doc. 120, at 3-4).   Therefore, the FPD's statement in their suggestions that "the practice and purpose of these recordings, the time-span, the facilities that engaged in these recordings, and the distribution of these recordings to any USAO or agent, present an exceptional condition" is inaccurate.

### E.  Rule 6(e)

During the August 9, 2016 hearing, questions were raised of potential violations of Federal Rule of Criminal Procedure 6(e), as a result of certain disclosures of discovery in this case.  (*See* Transcript from Aug. 9, 2016 Hrg., at 99-100.)   In the Tenth Circuit, Rule 6(e) protects what actually transpired before the Grand Jury room or what is likely to transpire before the Grand Jury.

Federal Rule of Criminal Procedure 6(e)(2)(B) provides, in relevant part, that "[u]nless these rules provide otherwise, the following persons must not disclose **a matter occurring before the grand jury**: . . . (vi) an attorney for the government[.]"  Fed. R. Crim. P. 6(e)(2)(B) (emphasis added).   Rule 6(e)(3) provides exceptions to the rule of secrecy.   In relevant part, the rule states that:

(A)  Disclosure of **a grand-jury matter**—other than the grand jury's deliberations or any grand juror's vote—may be made to:

(i) an attorney for the government for use in performing that attorney's duty[.]

Fed. R. Crim. P. 6(e)(3)(A)(i) (emphasis added).

The interchangeable terms "a matter occurring before the grand jury" and "a grand-jury matter" are not defined in Rule 6.  However, several courts, including the Tenth Circuit, have interpreted the terms to prohibit the disclosure of what transpired or is likely to transpire in the grand jury room, such as the identity of witnesses, witness testimony, exhibits presented to the grand jury, or the views expressed by members of the grand jury.  *See, e.g., Anaya v. United States*, 815 F.2d 1373, 1379 (10th Cir. 1987) ("When documents or other material will not reveal what actually has transpired before a grand jury, their disclosure is not an invasion of the protective secrecy of its proceedings, nor is it an interference with the grand jury as a principal tool of criminal accusation."); *United States v. Phillips*, 843 F.2d 438, 441 (11th Cir. 1988) ("The term 'matters occurring before a grand jury' has been defined to include anything that will reveal what transpired during the grand jury proceedings."); *Fund for Constitutional Government v. National Archives*, 656 F.2d 856, 869 (D.C. Cir. 1981) (the scope of the secrecy "encompasses not only the direct revelation of grand jury transcripts but also the disclosure of information which would reveal the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the like.") (internal quotation marks omitted); *In re Grand Jury Investigation*, 630 F.2d 996, 1000-01 (3d Cir. 1980) ("Rule 6(e) shields solely 'matters occurring before the grand jury.'  It is designed to protect from disclosure only the essence of what takes place in the grand jury room, in order to preserve the freedom and integrity of the deliberative process."); *In re Grand Jury Investigation*, 610 F.2d 202, 216 (5th Cir. 1980) ("Courts have interpreted the secrecy requirement imposed by Rule 6(e) to apply not only to information drawn from transcripts of grand jury proceedings, but also to anything which may tend to reveal what transpired before the grand jury.") (internal quotation marks omitted)); *United*

*States v. Stanford*, 589 F.2d 285, 290-91 (7th Cir. 1978) ("Unless information reveals something about the grand jury proceedings, secrecy is unnecessary."); *United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir. 1960) (noting that Rule 6(e)(2) "is intended only to protect against disclosure of what is said or what takes place in the grand jury room").[21]

In *Anaya*, the Tenth Circuit considered—in an appeal of a district court's order denying the taxpayers' motion to quash an IRS summons—whether information provided by FBI agents to IRS agents concerning an FBI investigation constituted grand jury material. 815 F.2d at 1378. The taxpayers contended that enforcement of the summons would be an abuse of the court's process because the summons were based on improper disclosures of grand jury material, in violation of Rule 6(e). *Id*. at 1378.

The Tenth Circuit set forth the relevant factual background as follows. FBI agents disclosed to the IRS information about Anaya's income, obtained during the FBI investigation. *Id*. at 1375. During a meeting, FBI agents advised IRS agents "in general terms" that Anaya, then Governor of the State of New Mexico, had received income from "payoffs" made in connection with the award of contracts and that he had likely not reported that income on his personal income tax returns. *Id*. While the FBI and IRS decided against joining their investigations into Anaya, an IRS agent examined FBI files developed during the investigation. *Id*. at 1376. The files contained memoranda of interviews and summaries of the investigation made by FBI agents. *Id*. None of the substantive documents contained in those FBI files were presented to the grand jury. *Id*. (noting also that, in accordance with FBI policy, all grand jury evidence was kept segregated in a locked safe and not examined by the IRS). At a subsequent meeting, the U.S. Attorney shared additional

---

[21]  Note that the Sixth Circuit takes a broader view and has found that subpoenaed documents are covered by Rule 6(e). *See In re Grand Jury Proceedings*, 851 F.2d 860 (6th Cir. 1988) (discussing the coercive nature of the production of subpoenaed documents).

information with IRS agents concerning real estate transactions involving Anaya and allegations of payoffs he received.  *Id*.  The subject of the real estate transactions had not been presented to the grand jury, but the subject of some of the payoff allegations had been presented to the grand jury.  *Id*.  The Tenth Circuit noted that the U.S. Attorney did not tell the IRS agents that the grand jury had considered these matters.  *Id*.

In its analysis, the Tenth Circuit noted that "the use of the term 'grand jury materials' in connection with Rule 6(e) disclosures has become misleading and shibbolithic.  What we must be concerned with is whether the information given to the IRS actually subverted the secrecy veiling what took place before the grand jury."  *Id*. at 1378.  The Tenth Circuit determined that none of the materials examined by the IRS had been presented to the grand jury and rejected the taxpayers' argument that the material was "so closely related" to what was presented to the grand jury that "it must fall within the shadow of 6(e)."  *Id*. at 1379.

The Tenth Circuit explained:

> ***When documents or other material will not reveal what actually has transpired before a grand jury, their disclosure is not an invasion of the protective secrecy of its proceedings***, nor is it an interference with the grand jury as a principal tool of criminal accusation. Indeed, the test of whether disclosure of information will violate Rule 6(e) depends upon "whether revelation in the particular context would in fact reveal what was before the grand jury." *Fund*, 656 F.2d at 871. ***As we perceive the proper inquiry, a reviewing court must find that disclosure is certain to destroy the protections of Rule 6(e) before it finds a violation of the rule.*** In contrast, revelation of information that has not been submitted to the grand jury does not vitiate those protections for the simple reason that the information was not part of what transpired in the grand jury room.

*Id*. (emphasis added).  Simply put, "it is not the information itself, but the fact that the grand jury was considering that information which is protected by Rule 6(e)."  *Id*.[22]  *See also United States*

---

[22]  Note that the Tenth Circuit *did* find the disclosure of a cover letter indicating names of persons to be subpoenaed to be "inadvertent and problematic."  *Id*. at 1380 n.12.

*v. Dynavac, Inc.*, 6 F.3d 1407, 1412 (9th Cir. 1993) (business records previously submitted to grand jury as part of criminal investigation but created for purposes independent of grand jury proceeding were not matters occurring before the grand jury); *Phillips*, 843 F.2d at 441 (financial documents obtained via grand jury subpoena but not submitted to grand jury and not indicating "pattern of the grand jury investigation" were not matters occurring before grand jury).

Thus, under *Anaya*, the production of Rule 16 discovery, or discovery related to sentencing issues, which might include documents, records, and other evidence obtained via grand jury subpoena, would not violate Rule 6(e), as long as the discovery reveals nothing about what actually transpired before the grand jury or what is likely to transpire before the grand jury. Therefore, there is no need for the Special Master to examine whether any violation of Rule 6 occurred.

## VI. Additional tasks the Court may want to assign to the Special Master

### A. Computers from CCA's law libraries

Agents copied hard drives from computers located in the law libraries at CCA pursuant to the April 8, 2016, search warrant. Based upon information revealed during the investigation, it appears that inmates were coordinating the exchange of contraband by leaving "notes" on the computers discussing the delivery and location of contraband. However, since the computers were located in the law libraries, it is possible that an inmate used the computer to draft a letter to counsel. It is the understanding of the United States that the computers did not have internet access, so no email communications should be present on the drives, however, if an inmate chose to type a letter to counsel using the computer available to all inmates in the law libraries, that letter and/or data associated with the data may be on the computer. The manner in which an inmate creates and saves data on the computers is unclear. For example, the parties are not certain whether

the data may be saved under user-specific or password-protected space, or whether the files may only be saved in a general space, accessible to all inmates and CCA staff.

Prior to the FPD's motion, government counsel had discussed with attorneys assigned to the *Black* defendants, proposed methodology in searching the computers to make sure no privileged information was revealed to government investigators.  However, since the parties are requesting the Court to appoint a Special Master, it may be appropriate to assign the Special Master the task of reviewing the data from the law libraries drives to ensure that there are no protected communications on the law libraries computers.

### B.  Other possible locations where attorney-client communications could be located

During the search of CCA, agents utilized a taint team in case searching agents encountered any attorney-client communication while searching inmates' cells.  Therefore, the United States does not believe that any attorney-client communications were seized from inmates' cells.


Respectfully submitted,

THOMAS E. BEALL
Acting United States Attorney

s/ *Debra Barnett*
Debra Barnett
Assistant United States Attorney
1200 Epic Center
301 N. Main
Wichita, KS  67202-4812
(316) 269-6481 (telephone)
(316) 268-6484 (facsimile)


/s/*Erin S. Tomasic*
Erin S. Tomasic
Special Assistant U.S. Attorney
District of Kansas
500 State Avenue, Suite 360

Kansas City, Kansas  66101
(913) 551-6730 (telephone)
(913) 551-6541 (facsimile)
D. Kan. No. 78430


*s/ D. Christopher Oakley*
D. Christopher Oakley, 19248
Assistant United States Attorney
500 State Avenue; Suite 360
Kansas City, Kansas 66101
Telephone: 913-551-6730
Facsimile: 913-551-6541
E-mail: chris.oakley@usdoj.gov
Attorneys for Plaintiff

**<u>Certificate of Service</u>**

I hereby certify that on the 6th day of September, 2016, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

*<u>s/ Erin S. Tomasic</u>*
Special Assistant United States Attorney