16CR20032K-ord(AudioAnalysis3).wpd

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 16-CR-20032** |
|     **Plaintiff** | : | |
| | : | |
|     **v.** | : | **SPECIAL MASTER DAVID R. COHEN** |
| | : | |
| **LORENZO BLACK, *et al.*,** | : | **REPORT REGARDING** |
|     **Defendants** | : | **OTHER ISSUES RELATED TO** |
| | : | **RECORDINGS AT** |
| | : | **CCA-LEAVENWORTH** |

At the direction of the Court, the Special Master has earlier filed three Reports addressing audio- and video-recording of attorney-client communications at CCA-Leavenworth.  *See* docket nos. 183, 187, & 193.  In addition to reviewing the materials seized from CCA-Leavenworth by the Government, the Special Master has: (1) visited CCA-Leavenworth several times and interviewed personnel there; (2) ordered CCA-Leavenworth and Securus to produce various materials, *see* docket nos. 180, 184, & 186 (*Preservation Order* and *Production Orders*); and (3) requested additional information from the Office of the United States Attorney for the District of Kansas ("OUSA").

As of this writing, Securus has responded to its *Production Order*, and CCA-Leavenworth is in the process of doing so.  Both have been laudably cooperative.  For example, the Special Master has received: (1) unfettered access to the CCA-Leavenworth facility and its personnel; (2)

permission to use the online Securus Call Platform;[1] and (3) numerous spreadsheet reports containing various details about calls made by CCA-Leavenworth inmates on Securus telephones for the last five years.  The OUSA has also produced some of the requested information.

In an effort to provide answers to some of the questions raised by the parties in their submissions to the Court, and in response to the Court's earlier directives, this Report documents various matters related to audio- and video-recording at CCA-Leavenworth, as revealed by the information so far obtained by the Special Master.

**The Video Recordings Do Not Include Audio.**

As noted in the *First Report Regarding Video Recordings*, the Government obtained from CCA-Leavenworth video-recordings made between November 24, 2015, and May 16, 2016.  These recordings included video of over 700 attorney-inmate meetings.  To be clear, however, ***none*** of the thousands of hours of video-recordings (including the recordings of the 700-plus attorney-inmate meetings) include audio.  Put differently, CCA-Leavenworth's PELCO multi-camera video system *records only video*; it does not record audio.  The Special Master's earlier Report did not make this clear.

---

[1] The Securus Call Platform is a web-based interface that allows users to obtain access to information related to calls made on Securus telephones.  Users located at a given prison normally have access only to information regarding Securus telephones at that site.  Thus, for example, even though Securus has telephones installed at both CCA-Leavenworth and the Shawnee County, Kansas Adult Detention Center, the Securus Call Platform allows guards at CCA-Leavenworth access only to information connected to their own location.  The Special Master was afforded the same level of access to the Securus Call Platform as CCA-Leavenworth's Warden, Linda Thomas. *See also* footnote 11.

•    **The CCA-Leavenworth Intercom System Has No Recording Capacity, And Is Not Used to Monitor Conversations.**[2]

CCA-Leavenworth has a "Master Control Room," known as "Unit 4," where prison personnel sit and oversee movement through the prison. This oversight occurs using both video and audio. As noted above, however, the video and audio are not integrated – the video cameras in the prison do not transmit (or record) any audio. Rather, the video cameras transmit only video images. Prison guards in Unit 4 use computer monitors to view "live-video-feed" from the various cameras around the prison, and the guards can choose which cameras to view. The photo below shows a Guard in Unit 4 using these computer monitors.



---

[2] In this Report and others previously filed, the Special Master has been careful to use the terms "monitor" and "record" to mean different things. When video or audio is "monitored," a person is watching or listening to an activity "live," as it occurs; the activity being monitored may or may not also be recorded. When video or audio is "recorded," an activity is documented and preserved; a person may or may not later watch or listen to this recorded activity. For example, the vast majority of phone calls made by inmates at CCA-Leavenworth on Securus telephones are recorded, but only a very small portion are monitored live, or later reviewed.

Separately, an intercom system inside the prison is designed to transmit audio. For the most part, intercom speakers are located on either side of locked prison access points, such as doors and sally-ports. The Special Master explains below how the intercom system works generally, and also how it works specifically in relation to the attorney-client meeting rooms.

•   ***The Intercom System Generally***

The following example illustrates how the intercom system works generally. If Joe is inside the prison and wants to move from one area to another through a locked gate or door – say, from the Vehicle Sally-Port to outside of the prison, or from the Inmate Medical Holding Cell into the Medical Department – then Joe must press a button on an intercom located next to the locked door. The intercom sends a signal to Unit 4, causing an icon to flash on a computer touchscreen. In response, a guard in Unit 4 touches the icon to "select" the signaling intercom, which establishes a walkie-talkie-type audio link between the guard and Joe. At the same time, the computer monitor displays video from one or more cameras near the intercom, allowing the guard to view Joe and his surroundings.

The guard then depresses a button on a microphone to speak to Joe, and the guard must release the button to hear Joe's response. Once the guard is satisfied that allowing passage to Joe is appropriate, the guard presses an icon on the computer screen to remotely unlock the door associated with the intercom.[3] The guard in Unit 4 can also activate a remote intercom *sua sponte* – that is, not in response to a signal from that intercom – and listen to whatever is happening in the

---

[3] Some doors in the facility are unlocked with keys only, and cannot be unlocked remotely. These doors do not have intercoms.

vicinity, or initiate audio communication with persons nearby.  The redacted photo below shows the

touchscreen in Unit 4 that activates the intercom audio-links and associated video-camera feeds.



Theoretically, the guard in Unit 4 could leave open the link to Joe's intercom indefinitely,

even after having allowed Joe passage, thereby continuing to monitor conversation near the

intercom.  As a practical matter, however, this is virtually impossible, because the guard can

maintain an audio link to only one intercom location at a time.  In other words, the guard must

terminate the link to Joe's intercom in order to converse with another person located at a different

intercom – and there are many dozens of intercom locations,[4] and a lot of individuals seeking passage through various prison doors and sally-ports. In practice, it is unusual for a guard to maintain an audio link to a given intercom for more than 10 seconds.[5]

It must also be noted there is no mechanism allowing for recording of intercom communications. Thus, the conversation that includes the passage request from Joe to the guard in Unit 4, and the guard's acknowledgment to Joe, is almost always very short, and always unchronicled.

• *Intercoms in the Attorney-Client Meeting Rooms.*

CCA-Leavenworth has nine attorney-client meeting rooms. The workings of the intercom system connected to these meeting rooms is slightly different than the general system described

---

[4] There are easily over 200 intercom locations throughout CCA-Leavenworth that Unit 4 controls. Some of these intercoms, however, are in the inmate housing units (known as Pods), and different Control Rooms co-control, and have primary responsibility for, answering these Pod intercoms. For example, Unit 7 co-controls the 20 intercoms in Pods J and K. Unit 4 retains sole control of about 50 intercoms that are outside of the Pods and control passage into, out of, and through all other areas of the facility.

[5] During visits to Unit 4, the Special Master observed guards operate the computerized system that controls the intercoms, video cameras, and door-locks for the entire facility. The speed with which these guards connect and disconnect the intercoms, and change camera views, and unlock and re-lock doors, was remarkable. It was not unusual for Unit 4 to receive several intercom requests for passage at the same time, forcing the guards working the system to speak and to press various buttons with great dispatch.

The point is this: it is inconceivable that a Unit 4 guard would use intercoms to monitor conversations between attorneys and inmates in the attorney-client meeting rooms; the guards are, by necessity, moving their attention far too quickly to do so. Moreover, even if the guards could keep an audio-link open for more than a few seconds, the quality of the sound over the intercom is often quite poor. Specifically, while in Unit 4, the Special Master experimented with listening via intercom to conversations of assistants inside an attorney-client room, and about half of the conversation was unintelligible. Moreover, as discussed in footnote 7, prison guards know that monitoring attorney-client conversation is not allowed, even if it was technically possible.

6

above.  Moreover, the intercom system connected to these meeting rooms changed in June or July of 2016.  An historical description follows.

Before mid-2016, there were two separate intercom links – one connected only to attorney-client meeting rooms 1 and 3, and another connected only to attorney-client meeting rooms 2 and 4-9.  The intercoms in meeting rooms 1 and 3 were connected with Unit 4 as described above.  If an attorney in one of these meeting rooms pressed the intercom button, a guard in Unit 4 would respond.

The intercoms in meeting rooms 2 and 4-9, however, were not connected to Unit 4; rather, they were connected to an intercom in CCA-Leavenworth's main lobby.  Thus, if an attorney inside one of meeting rooms 2 or 4-9 pressed the intercom button, it was the guard in the main lobby who would respond, and not a guard in Unit 4.

In mid-2016, CCA-Leavenworth upgraded the intercoms in rooms 2 and 4-9, and also installed new, additional intercoms in meeting rooms 1 and 3.  Thus, there is now an intercom in all nine attorney-client meeting rooms that connects with the main lobby.  For some reason, however, CCA-Leavenworth did not remove from meeting rooms 1 and 3 the older intercoms that connect with Unit 4.  Thus, meeting rooms 1 and 3 now each contain *two* intercoms, one connecting with the main lobby and one with Unit 4.  This current situation is summarized in the following chart.

| Location | Intercom Connections | Used for Attorney Meetings? |
|---|---|---|
| Attorney-Client Meeting Room 1 | Main Lobby & Unit 4 | Yes |
| Attorney-Client Meeting Room 2 | Main Lobby | Yes |
| Attorney-Client Meeting Room 3 | Main Lobby & Unit 4 | Yes |
| Attorney-Client Meeting Room 4 | Main Lobby | No |

| Location | Intercom Connections | Used for Attorney Meetings? |
|---|---|---|
| Attorney-Client Meeting Room 5 | Main Lobby | No |
| Attorney-Client Meeting Room 6 | Main Lobby | Yes |
| Attorney-Client Meeting Room 7 | Main Lobby | Yes |
| Attorney-Client Meeting Room 8 | Main Lobby | Yes |
| Attorney-Client Meeting Room 9 | Main Lobby | Yes |

The photo below shows the two intercoms in attorney-client meeting room 3; the Unit 4 intercom is on the left, and the lobby intercom is on the right.



The nine intercoms in the attorney-client meeting rooms that connect with the main lobby are less sophisticated than the two intercoms that connect with Unit 4. When an attorney presses a button on one of the nine intercoms that connect to the lobby, an icon flashes on a touchscreen in

8

the lobby – this is similar to the two intercoms that connect to Unit 4. But the guard in the lobby cannot then use the touchscreen to remotely unlock the door to the attorney-client meeting room; rather, the lobby guard must send an assistant to manually unlock the door. Also, the touchscreen in the lobby is not capable of displaying video from remote cameras;[6] all it does is show which intercom button was pressed, and allow activation of an audio link. The quality of the audio from the nine meeting room intercoms to the lobby, however, is better than from the two meeting room intercoms to Unit 4. The photo below shows the lobby touchscreen (on the right) and the microphone / speakers the lobby guard uses to communicate walkie-talkie-style over the intercom. The screen for the X-ray security scanner is on the left.



---

[6] Pursuant to Court Order, video cameras inside the attorney-client meeting rooms were removed in August of 2016. The touchscreen in the lobby, however, has always been incapable of displaying video, unlike the touchscreen in Unit 4.

9

As with the guards in Unit 4, it is theoretically possible for the guard in the lobby to leave open indefinitely an audio link to an intercom inside an attorney-client meeting room, thereby monitoring an attorney's conversation with an inmate.  Again, however, doing so would be extremely impractical, for the simple reason that the lobby is a public space – everyone present would also be privy to the conversation.  And, of course, the lobby guard is principally occupied with checking in visitors, scanning their bags with the X-ray security scanner, and so on.

A final note is that, like the two meeting room intercoms that connect to Unit 4, there is no mechanism allowing for *recording* of conversations between the nine meeting room intercoms that connect to the main lobby.

What all of this means is that the Special Master has found no evidence that any individuals used the intercom system at CCA-Leavenworth to monitor or record conversations between attorneys and inmates in the attorney-client meeting rooms.[7]

• **Inmates Who Confer With Their Attorneys Using CCA's Own Telephones (as opposed to Securus Telephones) Do Not Have Private Conversations.**

Inmates at CCA-Leavenworth are provided with a total of 121 pay-telephones.  The inmates can use these telephones to contact individuals outside the prison, including their attorneys.  Pursuant to contract, the hardware and software for these pay-telephones is installed and maintained

---

[7]  It should go without saying, but the Special Master adds that all prison guards and other CCA-Leavenworth personnel with whom he spoke, including lobby guards and Unit 4 guards, stated they knew it was inappropriate to listen to attorney-client conversations, had never done so, and had never seen any other persons attempt to do so.  The discussion above makes clear that, even if, *contrary to consistent witness statements*, an individual attempted to use the intercom system to listen to communications taking place in an attorney-client meeting room, it would be extremely difficult to succeed.

by Securus.  Normally, any call made by an inmate on a Securus telephone is recorded.  As discussed further below, however, telephone numbers belonging to attorneys may be designated as "Private;" Securus is supposed to refrain from recording calls to these "Private" numbers.

For various reasons, some attorneys prefer their inmate-client not use the Securus telephones located in the inmate housing Pods, so they contact CCA-Leavenworth to arrange for the inmate to use a CCA telephone instead of a Securus telephone.  When this occurs, a prison guard, known as a Unit Team Manager, allows the inmate to use a CCA telephone located in a Unit Team Office.  The redacted photo below shows the CCA telephone available in the Unit Team Office.



The inmate, however, is normally not left alone in the Unit Team Office; rather, *for valid security reasons*, the Unit Team Manager remains in the Office with the inmate during the call.  Thus, even though the CCA telephones in the Unit Team Offices are not remotely monitored or

recorded,[8] it cannot be said that an inmate using one of these CCA telephones enjoys a truly private conversation – the Unit Team Manager can hear at least the inmate's side of the call.

• **The Inmate Video-Teleconference Option at CCA-Leavenworth Has No Monitoring or Recording Capacity.**

In addition to (1) the Securus pay-telephones in the inmate housing Pods, and (2) the CCA telephones in the Unit Team Offices, there is one other mechanism inmates can use to communicate with outsiders – CCA-Leavenworth also has (3) a Polycom Videoconferencing Telephone.[9]  Known simply as a "Polycom," this device resides in attorney-client meeting room 3 and allows an inmate to engage in a video-teleconference with persons outside the prison.

For the video-teleconference to work, the inmate's call must be connected to a similar Polycom, or to a computer that has Polycom software.  Thus, inmates in CCA-Leavenworth have communicated via the Polycom with: (a) attorneys using a similar Polycom located in Room 653 in the Kansas City United States District Court House; (b) probation officers using a similar Polycom located in the Probation Office within the Kansas City Court House; and (c) attorneys using software-enabled computers in their own offices.  Inmates are only allowed to *receive* incoming video-teleconference calls on the Polycom, not to make outgoing calls.

The photos below show the Polycoms in attorney-client meeting room 3 (on left) and in Room 653 of the Kansas City Court House (on right).

_____

[8] Counsel for CCA-Leavenworth confirmed the facility does not have the ability to monitor or record calls made using CCA's own telephones.

[9] The formal name for the device is "Polycom RealPresence Videoprotect 500," and it is also marketed as the "Judiciary Secure Unit."  The Polycom in CCA-Leavenworth's attorney-client meeting room 3 is owned by this United States District Court.





In order for an attorney to use the Polycom to speak with an inmate-client at CCA-Leavenworth, the attorney must pre-arrange an appointment. At the appropriate time, the inmate is brought to attorney-client meeting room 3 and the incoming call is received on the Polycom.

Notably, the inmate is normally left alone in the meeting room during the video-teleconference. Unlike when an inmate uses a CCA telephone in a Unit Team Office, with the Unit Team Manager standing by, an inmate using the Polycom is not chaperoned and can have an entirely private conversation. Further, the Polycom in CCA-Leavenworth does not have any mechanism that would allow an outsider to monitor or record the conversation.[10]

---

[10] The Special Master confirmed this fact with Court personnel who oversaw purchase and installation of the Polycoms.

• **Calls Made by Inmates on Securus Pay-Telephones Can Be Monitored and Recorded.**

The Securus telephone system normally records all telephone calls made by inmates from Securus phones. These recorded calls are preserved for some period of time, during which a person with access to the Securus Call Platform may, among other things: (1) extend the time the call is preserved on the Securus system; (2) listen to the recorded call; and/or (3) download the call, thereby preserving it outside of the Securus system.[11] If downloaded, a call can be shared with other individuals who do not have direct access to the Securus system. Thus, for example, a guard at CCA-Leavenworth with access to the Securus system can: (a) locate and download all recorded telephone calls made by inmate John Doe between January 1-10, 2017; (b) locate and download all recorded telephone calls made by any inmate between January 1-10, 2017 to telephone number 913-555-5555; and (c) then transmit all of these recorded telephone calls to a law enforcement officer.[12]

The example above discusses the circumstance that inmate phone calls may be *recorded* and then listened to *at a later time*. The Special Master also examined whether calls made on Securus telephones may be *monitored live*, as they occur. The Securus system does allow for live monitoring. Specifically, a person who has access to the Securus Call Platform can: (1) view a list of all calls currently in progress; (2) listen live to an ongoing call; and (3) remotely terminate an

---

[11] Pursuant to request, CCA gave the Special Master access to its Securus Call Platform, which allows the Special Master to, among other things: (1) view lists of all calls made by inmates, with details regarding recipient, time of call, duration, and so on; (2) identify when and whether CCA marked a recipient's telephone number as "Private," so that it should not be recorded; (3) live-monitor an ongoing inmate call (unless the telephone number the inmate called was marked "Private"); (4) listen to any calls that were earlier recorded; and (5) determine whether anyone at CCA or Securus listened to or downloaded recorded calls (and if so, who did so).

[12] As discussed below, the Special Master has identified numerous real-life examples of this sort of event. The Special Master has requested (but not yet fully received) from CCA-Leavenworth and from the OUSA documents that would disclose details of these occurrences.

ongoing call. The Securus database maintains information regarding the monitoring of inmate calls, including the date, who monitored it, and so on.

The Special Master has requested from Securus, but not yet received, a spreadsheet setting out detailed information regarding inmate calls that were monitored. Accordingly, the Special Master will set out findings of fact in a future Report addressing the extent to which attorney-inmate calls were monitored.

- **Calls Made by Inmates on Securus Pay-Telephones are Recorded, Sometimes Even After the Recipient's Telephone Number Has Been Marked "Private."**

As noted above, CCA-Leavenworth provides its inmates with a total of 121 Securus Pay-Telephones, which inmates can use to make calls to individuals outside the prison. Inmates are warned that their calls on these Securus phones may be recorded. This warning is delivered several different ways.

First, when inmates are initially received at CCA-Leavenworth, they are presented with an "Intake Booking Packet." This Packet includes about eight forms, which the inmates must review and sign. One of these forms is titled "MONITORING OF INMATE/DETAINEE TELEPHONE CALLS." This form states:

> Corrections Corporation of America reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public. An inmate's use of institutional telephones constitutes consent to this monitoring. A properly placed phone call to an attorney is not monitored. You must contact your unit team to request an unmonitored attorney call.
>
> I have read or had read to me (cross out one) the above notification on the monitoring of inmate telephone calls. I understand that telephone calls I make from

15

institution telephones may be monitored and recorded.

Government exhibit 1.[13]

Second, within a few days of arrival at CCA-Leavenworth, inmates are issued an "Inmate

Handbook." The Handbook states:

> **Access to telephone**: Telephones are provided for inmates/detainees in the housing
> unit dayroom. Dayroom telephones are subject to monitoring. * * *
> Procedures for telephone use include:
> * * *
> 6. Your attorney may request of our facility that calls to their office not be recorded
> to ensure Attorney/Client privilege. They may request this by way of sending
> CCA/LDC a fax on their office letterhead. This request must include contact
> information and signature. They may fax it to (913)727-2231. **IT IS YOUR
> RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF
> THIS PROCEDURE; THEIR TELEPHONE CALLS ARE SUBJECT TO
> BEING RECORDED IF THEY DO NOT REQUEST THEY BE
> RESTRICTED**.

---

[13] See generally the testimony of Laurie Harrison, hearing tr. at 102-115 (Sept. 17, 2016), discussing the intake booking packet and the inmate handbook. As noted earlier in this Report, despite the suggestion in this form, inmate calls to attorneys made from the Unit Team Office are not truly "unmonitored."

Government exhibit 2 (emphasis in original).[14]

Third, there is a small sign on each Securus telephone entitled "Dialing Instructions." Among other things, this sign states: "Calls are subject to monitoring and recording."  *See* government exhibits 4, 5, & 6 (photographs of Securus telephones; some, but not all, of the Securus telephone signs set out the same warning in Spanish).

Fourth, CCA has posted its own signs near at least some of the Securus telephones.  One example is an engraved plastic sign that says "ALL CALLS MAY BE RECORDED/MONITORED."  *See* government exhibit 3 (photograph of sign, which also sets out the same warning in Spanish).

The photos below show Securus phones and associated signage in CCA-Leavenworth's G-Pod.

---

[14]    In early 2017, CCA-Leavenworth amended its procedures regarding attorney-client telephone calls.  Inmates are now given an "Attorney Verification Form," on which they can list their attorneys' names, addresses, and telephone numbers.  The Form explains:

> Attorney telephone calls can be placed through the inmate telephone system. Telephone calls between inmates and their attorneys are privileged and should not be recorded or monitored.  To ensure attorney telephone calls placed on the inmate telephones in the units are not recorded and monitored, inmates must submit all attorney telephone numbers for authorization.  The attorney information will be verified for accuracy.  If the attorney telephone number is verified as a valid attorney, the attorney telephone number will be marked within the inmate telephone system as "privileged/do not record."

It is unclear to what extent the newer "Attorney Verification Form" procedure supercedes the requirements set out in the Inmate Handbook.







 

And fifth, the Securus telephones play a pre-recorded message when an inmate makes a call. Specifically, when a recipient answers an inmate's call from a Securus telephone, the following message is played automatically:

> Hello.  This is a prepaid collect call from [inmate's self-recorded name], an inmate at CCA-Leavenworth Detention Center.  This call is subject to recording and monitoring.  To accept charges, press 1.  To refuse charges, press 2.  If you would like to permanently block your number from receiving calls from this facility, press 6.  For balance and rate quotes, press 7.

This message is audible to both the call recipient and the inmate.[15, 16]

The Securus telephone system allows individual telephone numbers to be designated as: (1) "Blocked," so that a call from CCA-Leavenworth will not be connected to that number; or (2) "Private," so that a call to that number will not be recorded.[17]  It is CCA-Leavenworth, not Securus,

---

[15]  The pre-recorded message is slightly different, depending on whether the inmate calls collect or uses a prepaid calling card, but the statement that the "call is subject to recording and monitoring" is the same.  If the inmate earlier chose to hear dialing instructions in Spanish, the pre-recorded message is played in Spanish.  The Special Master transcribed the pre-recorded message above from a random inmate's outgoing call made on February 21, 2017.

[16]  In addition to using the Securus Call Platform to listen to the pre-recorded message that accompanies previously-recorded inmate calls, the Special Master also used Securus telephones inside CCA-Leavenworth to listen "live" to the pre-recorded message.  The Special Master placed calls from these Securus telephones to numbers that were and were not marked "Private."  For calls made to numbers marked "Private," it appeared the pre-recorded message did *not* state the call may be monitored or recorded.  For calls made to numbers not marked "Private," the pre-recorded message was sometimes the one detailed in the text above (stating the call may be monitored or recorded), and sometimes instead only asked the called party whether she wanted to set up an account to pay for and receive future calls – the call itself was never actually connected.  Partly because of lack of time, the Special Master was unable to come to a full understanding of which pre-recorded message was played for which type of phone call.  The Special Master has asked Securus to provide a "message script catalog" that answers this question.

[17]  Various CCA documents refer to designating an attorney's telephone number as "restricted," "privileged," "private," or some other term.  The Securus Call Platform uses the designation "Private," so the Special Master does also.

that applies these designations.[18]  The Special Master's review of Securus Data[19] reveals, however, that the designation of a telephone number as "Private" does not necessarily prevent calls to that number from being recorded or listened to.  This is true for two reasons.

First, if a telephone number is marked "Private," that does not work to erase, or otherwise change the status of, any ***previously-recorded*** calls made to that number.  Thus, the following sequence of events could occur: (1) an inmate calls his attorney and the call is recorded; (2) the attorney's number is *later* marked as "Private;" and (3) someone then listens to the earlier-recorded call.  The Special Master refers to this type of recorded call as a "Status-Change Call."  Review of the Securus Data shows that, between November 26, 2012 and December 15, 2016, the Securus Call

---

[18]    In other words, as a general matter, Securus provides the telephone hardware and software, and CCA-Leavenworth then uses the software to control, among other things, which calls are not recorded.  When CCA-Leavenworth receives a request that a telephone number be marked "Private," it sometimes uses a third-party administrator known as Praeses to: (1) confirm the number belongs to an attorney, and (2) designate the number as "private" in Securus's system.

[19]  Securus provided to the Special Master several spreadsheets containing data regarding certain calls made by inmates at CCA-Leavenworth.  In this Report, the Special Master refers to the information contained in these spreadsheets as "Securus Data."

Notably, the Securus Data do *not* list all calls from CCA-Leavenworth inmates that were recorded and are still in Securus's database.  There are probably millions of such calls.  Rather, the Securus Data provided to the Special Master includes only those calls that: (1) were recorded, (2) are still in Securus's database, *and* (3) were later "selected" in some way.  "Selected" generally means: (a) downloaded by a CCA-Leavenworth employee for the purpose of being listened to by a law enforcement officer, and/or a government attorney; or (b) downloaded by a Securus employee in response to a subpoena, which may have been issued by a government attorney or by defense counsel.  The Securus Data itself denominates this selecting activity as "save to folder," "playback," or "CD burning."

The Securus Data contains a total of about 182,084 telephone calls.  Of course, the great majority are calls from inmates to friends and loved-ones, not to attorneys.  Also, the Securus Data includes very short calls where nothing meaningful occurred, such as calls where: (1) the recipient refused the call after hearing the Securus pre-recorded message; (2) the recipient attempted to join a third party to the call, which normally leads to immediate call termination; or (3) the inmate terminated the call after learning the intended recipient was not present (such as when a receptionist answers the phone and informs the inmate his attorney is unavailable).

Platform was used to access about 134 inmate Status-Change Calls.

Second, even though a telephone number is marked "Private," that designation apparently does not always work to prevent even **subsequent** calls to that number from being recorded. Thus, the following sequence of events could occur: (1) the attorney's number is marked as "Private;" (1) an inmate later calls his attorney and the call is recorded; and (3) someone then listens to the recorded call. In other words, marking an attorney's telephone number as "Private" does not always guarantee that calls to that number will not thereafter be recorded. The Special Master refers to this type of recorded call as a Private-But-Recorded Call. Review of the Securus Data shows that, between November 26, 2012 and December 15, 2016, the Securus Call Platform was used to access about 54 Private-But-Recorded Calls.[20]

It is not clear why there are any Private-But-Recorded Calls. One possible reason is that the Securus Call Platform allows CCA-Leavenworth the options of marking a telephone number as "Private" for: (1) all inmates in the facility; or (2) only certain sub-groups of inmates. Thus, it may be that a Private-But-Recorded Call was made to a telephone number that was marked "Private" for a sub-group that the inmate was not a part of. That said, the Special Master can discern no reason why CCA-Leavenworth would mark an attorney telephone number as "Private" for only a sub-group of inmates; perhaps it happens by mistake. Regardless, review of the Securus Data shows it does happen – there are 37 Private-But-Recorded Calls to attorney telephone numbers that were marked

---

[20] The Court heard evidence of the existence of Private-But-Recorded-Calls at the Sept. 7, 2016 hearing in this case. *See* hearing tr. at 99 (discussing exhibit 451, affidavit of attorney Gary Hart).

"Private" only for an inmate sub-group.[21]

A second possible reason – and this is simply conjecture – is that Securus made an update to its system and the update somehow mistakenly changed the "Private" status of an attorney telephone number, restoring its susceptibility to being recorded.  In any event, regardless of why or how it occurred, the Securus Data shows there are 17 additional Private-But-Recorded Calls to attorney telephone numbers that were marked "Private" for *all* inmates (not just a sub-group).

Thus, the Securus Data contains a total of about 188 recorded inmate calls to attorneys, where: (1) the attorney's telephone number was marked "Private," and (2) thereafter, the call was "selected," either for the purpose of review by a law enforcement officer or in response to a

---

[21]  To explain further: the Securus Call Platform allows an attorney telephone number to be marked "Private" for: (1) "All Sites," which means that calls from *any* inmate to that number will not be recorded; or (2) only for certain "Sites" – such as "County," or "MD DOC" [Maryland Department of Corrections] – which means that calls from inmates within that particular sub-group will not be recorded.  Thus, for example, if a telephone number is marked "Private" for the "County" Site (instead of "All Sites"), then a "County" inmate's call to that telephone number would not be recorded, but a call to that same number from any other inmate would be recorded.  The photo below shows a partial screen-shot of the Securus Call Platform interface, with the "County" Site highlighted.



subpoena.[22]

- **CCA-Leavenworth Lists 528 Known Attorney Telephone Numbers.**

It is CCA-Leavenworth, not Securus, that creates and maintains the list of attorney telephone numbers marked "Private." If a telephone number is marked "Private" by CCA-Leavenworth, then the Securus system is designed not to record any call from any inmate *housed in CCA-Leavenworth* to that telephone number.

Notably, however, CCA-Leavenworth's list of "Private" telephone numbers is "site-specific;" this means the same inmate could call the same telephone number from a Securus telephone in the Shawnee County, Kansas Adult Detention Center, and the call would normally be recorded (unless the number was also independently marked "Private" by the SCKADC). For various technical and contractual reasons, the Securus system cannot treat a telephone number as "Private" across all Securus telephones at all of the facilities Securus serves.

As of December 15, 2016, CCA-Leavenworth's list contains 528 telephone numbers marked "Private." This compares with the roughly 18,500 "Known Attorney Telephone Numbers" belonging to attorneys in the Kansas / Missouri / Nebraska area that were compiled by the Special

---

[22] As explained in footnote 19: (1) there are certainly other Status-Change Calls and Private-But-Recorded Calls in Securus's database that have not been "selected," and are therefore not in the Securus Data examined by the Special Master; and (2) it is likely that some of the Status-Change Calls and Private-But-Recorded Calls that *are* in the Securus Data are very short calls where nothing meaningful occurred.

Master.  *See First Report Regarding Video Recordings* at 3 (docket no. 183).[23]  There does not

appear to be any limit on the length of the list of telephone numbers that CCA-Leavenworth may

designate as "Private."

**Conclusion**

In this case, the Court appointed the undersigned after a spark lit a flame.  The spark was the

revelation in August of 2016 that, three months earlier, the Office of the United States Attorney for

the District of Kansas had obtained video-recordings of attorneys meeting with their inmate-clients

at CCA-Leavenworth.  This spark quickly ignited a passionate response from the defense bar,

including demands for investigation regarding whether the OUSA had viewed the video-recordings

of attorney-inmate meetings, and the extent to which the OUSA had obtained access to other

recordings (both video and audio) of inmate-attorney interactions – whether in this case or

otherwise.

In the course of pursuing the Court's directives so far, the Special Master has met and spoken

with many attorneys in the Kansas City area.  It appears to the undersigned that one reason the

defense bar's response has been so ardent – that is, one reason the spark lit a high flame, instead of

flaring and dying out – is that there is a widespread undergrowth of mistrust between the Office of

---

[23]   In the *First Report Regarding Video Recordings*, the Special Master invited "[a]ny attorney who may have received a telephone call from an inmate at CCA for the purpose of obtaining legal advice . . . to provide me with the telephone numbers those inmates may have called (including the attorney's direct-dial, home, and cell numbers, if applicable)." *Id.* at 4.  The Special Master added these numbers to his inventory of "Known Attorney Telephone Numbers," but did NOT provide these numbers to CCA-Leavenworth for inclusion in its list of "Private" numbers.  It remains each individual attorney's responsibility to contact CCA-Leavenworth and request that their telephone numbers be marked "Private."

25

the United States Attorney for the District of Kansas and defense counsel. This level of mistrust is not typical; indeed, it appears to exist more in Kansas City, Kansas than Kansas City, Missouri, or even Topeka or Wichita.

The Special Master is hopeful that this Report helps to tamp down the flames. The August, 2016 disclosure that the OUSA had seized video-recordings of attorney-inmate meetings raised suspicions of regular incursion into attorney-client communications. But the Special Master is confident most of these suspicions are groundless. Specifically: (1) no individuals used the CCA-Leavenworth video system to monitor attorney-inmate meetings; (2) no individuals used the CCA-Leavenworth intercom system to monitor or record attorney-inmate meetings; (3) calls between inmates and their attorneys using CCA-Leavenworth telephones (as opposed to Securus telephones) are not recorded; (4) to the extent calls between inmates and their attorneys using CCA-Leavenworth telephones (as opposed to Securus telephones) are monitored by a Unit Team Manager, this monitoring is not hidden – it is obvious to the inmate; and (5) calls between inmates and their attorneys using the Polycom video-telephones are not monitored or recorded.

Moreover, the Special Master tentatively concludes that: (1) neither the OUSA nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized from CCA-Leavenworth in May of 2016; and (2) neither the OUSA nor any law enforcement officer have ever before obtained (much less actually viewed) video-recordings of attorney-client

meetings at CCA-Leavenworth.[24]

This leaves the question of the extent to which the OUSA or law enforcement officers obtained recordings of telephone calls made by inmates to attorneys from Securus telephones – and more particularly, the extent to which the government was not entitled to obtain those recordings. The parties have touched on these issues in their submissions to the Court.[25]  The Court has not asked the Special Master to issue a Report on these questions.  Accordingly, this Report is drafted only to provide a better factual background regarding the nature and scope of recording of Securus telephone calls; the Special Master hopes the information set out herein will lead to a better distillation and quicker resolution of these remaining issues.

Fundamentally, however, even after the issue of access to Securus telephone call recordings is resolved, the underlying mistrust between the prosecution and defense bars in Kansas City is corrosive and must be fixed.  Mutual suspicion not only makes it harder for counsel to work together; it manifests itself in the squandering of scarce judicial resources, increased expense and

---

[24]  The Special Master would need to conduct additional investigation to become fully confident in these last two conclusions.  Information obtained so far, however, suggests that: (1) those in possession of the video-recordings seized in May of 2016 viewed very few of them, and did not view any video of attorney-client meetings; and (2) none of the CCA-Leavenworth video-recordings obtained by the OUSA or law enforcement officers before May of 2016 included attorney-client meetings.  Even if the defense bar is correct that the OUSA's actions in distributing attorney-client information in discovery in this case were inappropriate, or that the OUSA's responses to the Court's inquiries have been inconsistent and dissembling, it cannot be said that the OUSA and law enforcement officers have used an array of tactics to intentionally obtain attorney-client communications.

[25]  *See, e.g.*, docket no. 121 at 1 (OUSA's assertion that, "[b]ecause the inmates and attorneys knew their [Securus telephone] conversations were being recorded, any privilege has been waived."); docket no. 130 at (Federal Public Defender's contention that "[defense] counsel had every reason to believe that the attorney-client communications were confidential" and the "waiver defense" fails on the facts).

frustration of all parties, and ultimately a diminished quality of justice for the entire community.

Accordingly, the Special Master concludes this Report with a list of actions the Court may want to consider, all of which are directed at reaching full and final conclusions of fact, and mending the parties' relationships:

• authorize further investigation by the Special Master into his tentative conclusions that: (1) neither the OUSA nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized from CCA-Leavenworth in May of 2016; and (2) neither the OUSA nor any law enforcement officer have ever before obtained (much less actually viewed) video-recordings of attorney-client meetings at CCA-Leavenworth.

• authorize further investigation into the extent to which the government's receipt of recorded inmate calls on Securus telephones was inappropriate; and if it was, how that circumstance should be addressed and rectified;

• authorize further investigation into the circumstances surrounding the after-hours entry into the Court's chambers by a member of the OUSA;

• request recommended rulings on the issues raised by the parties in their currently-pending motions and other, related submissions;[26] and

_____

[26] These motions and submissions include, but are not necessarily limited to: (1) the Governments' response to the motion to impound evidence (docket no. 121); (2) the Federal Public Defender's reply to the Governments' response to the motion to impound evidence (docket no. 130); (3) the Federal Public Defender's response to the Master's second report regarding telephone-call audio recordings (docket no. 188); (4) the Governments' objections to the Master's first report regarding video recordings (docket no. 197); and (5) the Federal Public Defender's motion for production of grand jury materials (docket no. 202).

- request recommendations of global mechanisms to mitigate the underlying problem of mistrust between the prosecution and defense bars.

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**DATED**: March 16, 2017