

**United States Department of Justice**

*United States Attorney*
*Northern District of New York*

---

| | |
|---|---|
| *100 South Clinton Street, P.O. Box 7198* | *Tel.: (315) 448-0672* |
| *James M. Hanley Federal Building* | *Fax: (315) 448-0658* |
| *Syracuse, New York 13261-7198* | |

September 12, 2017

**By Electronic Mail Only**

David R. Cohen
Federal Special Master
24400 Chagrin Boulevard
Reflections Bldg., Suite 300
Cleveland, Ohio  44122
david@specialmaster.law

Re:     *United States v. Black, et al.*, Case No. 16-CR-20032

Dear Mr. Cohen:

I write in response to your letter dated July 10, 2017, to United States Attorney Thomas Beall in the District of Kansas.[1]   Your letter requests disclosure of information and production of documents related to defense claims in *United States v. Black, et al.*, Case No. 16-CR-20032, of government violations of the Sixth Amendment right to counsel.  For sake of simplicity, I will refer to these requests, along with your related request that the United States Attorney's Office ["USAO"] conduct certain word searches through electronically-stored data and produce the results to you, collectively as the "RFI."  As you know, pursuant to 28 U.S.C. § 515, I have been appointed as a Special Attorney to the United States Attorney General to respond to the RFI, which is based on the district court's Phase III Order, Docket #253.

Preliminarily, I want to express appreciation for your investigative efforts and the informative, detailed, and measured reports you have issued.  The Department of Justice understands the critical importance of the attorney-client privilege, values your involvement in the *Black* litigation, and is heartened by the results of your investigation to date, which disprove contentions of violations of

---

[1] Because your letter appears to be *ex parte* and the district court's appointment order authorizes you to "communicate *ex parte* with any party or his attorney, as the Special Master deems appropriate, for the purposes of ensuring the efficient administration and management and oversight of this case," Docket #146 at p. 9, I am responding *ex parte*.  Without conceding that anyone other than the named defendants and their counsel are properly involved in the *Black* litigation, the government does not oppose you providing a copy of this letter to the defendants and their attorneys, along with the "interested parties" and the "intervenor."

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 2

the Sixth Amendment and the attorney-client privilege. It is my understanding that USAO personnel have provided information and documentation to you during your investigation and that this assistance has been useful.

My response to the RFI is governed by federal law, which I describe below. I also will explain why this legal authority compels me to respectfully decline to provide most of the information and documents sought in the RFI.

A.     **The *Touhy* Regulations**: Because the RFI seeks "production or disclosure of . . . material contained in the files of the Department [of Justice], . . . information relating to material contained in the files of the Department, [and] information acquired by [persons] while [employed by] the Department as a part of the performance of [their] official duties or because of [their] official status," 28 C.F.R. § 16.21(a), my response is governed by the so-called "*Touhy* regulations," located at 28 C.F.R. §§ 16.21 through 16.29.[2]  These regulations, which are based on federal law empowering an administrative agency to make "housekeeping rules" governing "the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property," 5 U.S.C. § 301, "provide a set of procedures for the United States Attorney to follow when considering . . . demands [for documents and information]." *Kwan Fai Mak v. F.B.I.*, 252 F.3d 1089, 1092 (9th Cir. 2001).  Because the RFI arises from a federal criminal case in which the United States is a party, 28 C.F.R. § 16.23 applies. Among other things, that regulation sets out two directives that govern my response to the RFI: first, I must "consider, with respect to any disclosure, the factors set forth in § 16.26(a)."  Second, I must "not reveal or furnish any material, documents, testimony or information when, in [my] judgment, any of the factors specified in § 16.26(b) exists."  *See* 28 C.F.R. § 16.23(a).

Section 16.26(a) provides as follows:

> In deciding whether to make disclosures pursuant to a demand, Department officials and attorneys should consider:
>> (1) Whether such disclosure is appropriate under the rules of procedure governing the case or matter in which the demand arose, and
>> (2) Whether disclosure is appropriate under the relevant substantive law concerning privilege.

---

[2] Named after the Supreme Court's decision in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). *Touhy* involved an FBI agent held in contempt because, pursuant to a Department of Justice regulation, he refused to produce certain documents subpoenaed by a state prisoner in a federal habeas corpus proceeding. The Supreme Court affirmed the reversal of the contempt citation, concluding that the FBI agent's regulation-based refusal was lawful, and that the regulation was a valid exercise of Executive authority under a housekeeping statute. *Id.* at 467-68. Thus, such regulations became known as "*Touhy* regulations."

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 3

Section 16.26(b) provides in pertinent part as follows:

> Among the demands in response to which disclosure will not be made by any Department official are those demands with respect to which any of the following factors exist:
>
> > (1) Disclosure would violate a statute, such as the income tax laws, 26 U.S.C. 6103 and 7213, or a rule of procedure, such as the grand jury secrecy rule, F.R.Cr.P., Rule 6(e) . . .
> >
> > (5) Disclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired . . . .

It is well-established that the DOJ *Touhy* regulations are valid. *See, e.g., United States v. Allen*, 554 F.2d 398, 406 (10th Cir. 1977) ("We feel that the regulation controlling such disclosures by Department of Justice employees is valid."). A government employee who, when relying on the *Touhy* regulations, refuses a court order to produce documents and/or disclose information cannot be compelled to do so by a contempt citation.[3]  *See Touhy*, 340 U.S. at 467-70; *Boron Oil Co. v. Downie*, 873 F.2d 67, 69 (4th Cir. 1989) ("*Touhy* is part of an unbroken line of authority which directly supports Downie's contention that a federal employee may not be compelled to obey a subpoena contrary to his federal employer's instructions under valid agency regulations."); *Edwards v. United States Dep't of Justice*, 43 F.3d 312, 317 (7th Cir. 1994) ("*Touhy* is part of an unbroken chain of authority that supports the Department's contention that a federal employee cannot be compelled to obey a subpoena, even a federal subpoena, that acts against valid agency regulations."); *In re Boeh*, 25 F.3d 761, 766 (9th Cir. 1994) ("We conclude that, in the absence of a direct challenge to the Attorney General's decision to withhold permission and a ruling that permission was improperly withheld, Boeh cannot be held in contempt for refusing to testify without permission, pursuant to 28 C.F.R. § 16.22(a).") (footnote omitted); *Massock v. Superior Court*, No. C99-3713 SC, 2000 WL 10240, at *3 (N.D. Cal. Jan. 4, 2000) ("In the landmark case *United States ex. rel. Touhy v. Ragen*, 340 U.S. 462, 469 (1951), the Supreme Court held that a subordinate federal officer could not be held in contempt for refusing to obey a subpoena when

---

[3] I am aware that the district court's Appointment Order, Docket #146, provides in pertinent part that "[a]ll Relevant Parties [which includes the government] shall all provide full cooperation to the Special Master, and any staff or consultant employed by the Special Master," Appointment Order at p. 13; and that "[a]ll Relevant Parties will make readily available to the Special Master any and all individuals, information, documents, materials, programs, files, databases, services, facilities, and premises under their control that the Special Master requires to perform his duties" and "all facilities, files, databases, computer programs, and documents necessary to fulfill the Special Master's functions under this Order," *id.* at p. 13-14, and that the district court's Phase III order reiterates the requirements that "[a]ll Relevant Parties provide full cooperation to the Special Master" and "All Relevant Parties" . . . provide the Special Master with Access to Information." Docket #253 at p. 7 (internal quotation marks omitted).

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 4

such refusal was in accordance with valid federal regulations governing the release of official documents.").

As one federal court has explained:

> Under what is known as the "*Touhy* doctrine," not only is a court prohibited from holding a federal officer in contempt for non-compliance with a subpoena when following a regulation to the contrary but a court cannot even investigate the appropriateness of the federal officer's reliance on the regulation in question. The Ninth Circuit has explained that, "the *Touhy* doctrine is jurisdictional and precludes a contempt action regardless of whether [the regulation relied upon] is ultimately determined to protect the requested testimony." Accordingly, if a federal officer is relying (correctly or incorrectly) upon a properly promulgated regulation as a defense for non-compliance with a subpoena then the court is powerless to hold that officer in contempt. Thus, under the *Touhy* doctrine a court simply does not have jurisdiction to hold a federal officer following a proper regulation in contempt and a consideration on the merits cannot play a part in the court's decision.

*Massock*, 2000 WL 10240, at *3 (citations omitted).

The DOJ *Touhy* regulations apply without regard to whether a demand for covered information or documents originates from a court, a criminal defendant, or another source, and when a district court orders *in camera* disclosure.[4]  *In re Boeh*, *supra*, 25 F.3d 761.  In *Boeh*, the Ninth Circuit vacated a district court's contempt citation when an FBI agent, relying on *Touhy* regulations, refused to testify both publicly and *in camera*:

> The district court attempted to draw a distinction between its order requiring Boeh to reveal the contents of his prospective testimony *in camera* and its order compelling Boeh's testimony in open court.  For the purposes of the *Touhy* doctrine, we see no distinction.  Both orders are infirm.  The district court cannot confer authority on Boeh to testify or reveal information *in camera* when the Attorney General has withdrawn that authority.  Section 16.22(a) clearly reserves to the Attorney General or the properly designated official the authority to make the threshold determination whether to resist disclosure of official information in the hands of the Department. *Touhy's* point that the department head is entitled to enforce centralized decisionmaking applies without regard to the setting in which the information will be divulged.

---

[4] It is not clear from your letter to United States Attorney Beall whether and to what extent any information or documents provided to you will be made available to the defense (or the extent to which they will be described in either a special master report or a court order).

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 5

*Id.* at 466-67 (footnote omitted).

**B.    Substantive Law Identified in Relevant *Touhy* Factors:**    Subsections 16.26(a) and 16.26(b) require that I consider and abide by the following substantive law governing disclosure of information and documents.

      **1.    28 C.F.R. § 16.26(a) factor - "Rules of Procedure":**    With respect to 28 C.F.R. § 16.26(a)(1), there are two relevant "rules of procedure governing the case or matter in which the demand arose," specifically two Federal Rules of Criminal Procedure that generally obligate the government to disclose or produce certain information and documents in connection with criminal cases: (a) Rule 16(a)(1), which governs the government's disclosure to the defendant of specified categories of information, documents, and other tangible items in criminal cases; and (b) Rule 26.2, which mirrors 18 U.S.C. § 3500, the so-called "*Jencks* Act," and governs production of a witness's "statement" (as defined in the rule).[5]    I will refer to these rules collectively as "discovery rules."

      **2.    28 C.F.R. § 16.26(a) factor - "Substantive Law Concerning Privilege":**    With respect to 28 C.F.R. § 16.26(a)(2), there are four relevant privileges here, each of which is described below:

First, federal appellate courts recognize a "**law enforcement privilege**" (also known as the "investigative techniques privilege"), the purpose of which "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988).  This privilege, which prevents disclosures that "would . . . jeopardize future criminal investigations," is a "qualified privilege" and "is subject to balancing the federal government's interest in preserving the confidentiality of sensitive law enforcement techniques against the requesting party's interest in disclosure." *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 64 (1st Cir. 2007).  This privilege "is based primarily on the harm to law enforcement efforts which might arise from public disclosure of . . . investigatory files . . . and bars disclosure of facts."  *United States v. Winner*, 641 F.2d 825, 831 (10th Cir. 1981) (citation and internal quotation marks omitted) (first ellipses in original).

Second, there is a "long-recognized privilege," *N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975), known as the "**deliberative process privilege,**" which safeguards internal agency

---

[5] The Jencks Act governs witness statements only at trial, 18 U.S.C. § 3500(a), whereas Rule 26.2 applies in other contexts as well, such as suppression hearings. *See id.* at 26.2(g).  Rule 26.2 also makes the witness statement disclosure rule applicable to the defendant.

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 6

deliberations. This privilege "prevent[s] injury to the quality of agency decisions" by exempting from disclosure "communications received by the decisionmaker on the subject of the decision prior to the time the decision is made." *Id.* This privilege "allows the government to withhold documents and other materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citations and internal quotation marks omitted); *see also United States v. W.R. Grace*, 455 F. Supp. 2d 1140, 1143 (D. Mont. 2006) ("Under the common law deliberative process privilege, government agencies or departments may refuse to disclose information related to intra-governmental opinions, recommendations, proposals, etc., which are related to their decisional or policymaking functions. In recognizing the privilege, courts have relied on the commonly proffered rationale that unfettered access to agency decision making processes would chill debate or discussion by agency employees, and therefore degrade the ability of agencies to function effectively."). "The deliberative process privilege is a qualified privilege and can be overcome by a sufficient showing of need." *In re Sealed Case*, 121 F.3d at 737.

Third, there is a "**work-product doctrine**." The Supreme Court has described this qualified privilege as follows:

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*United States v. Nobles*, 422 U.S. 225, 238–39 (1975) (footnote omitted).

When a federal prosecutor "prepares a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party, [she] has litigation sufficiently 'in mind' for that document to qualify as attorney work-product." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1203 (D.C. Cir. 1991).

Fourth, the **attorney-client privilege** applies to certain internal government communications, such as when government attorneys are providing legal advice or strategy to other government officials. *See, e.g., United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169-70 (2011) (recognizing that the government can invoke the attorney-client privilege); *United States v. Zingsheim*, 384 F.3d 867, 871 (7th Cir. 2004) ("The attorney-client privilege covers conversations between the prosecutors (as attorneys) and client agencies within the government.").

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 7

    **3.**    <u>**28 C.F.R. § 16.26(b)(1) factor - Grand Jury Secrecy Rule**</u>**:** Fed. R. Crim. P. 6(e)(2)(B)(vi) imposes on government attorneys an obligation of secrecy with respect to "a matter occurring before the grand jury." Thus, federal prosecutors can disclose grand jury matters only under circumstances permitted by law, including, as relevant here, "preliminarily to or in connection with a judicial proceeding," *id*. at (E)(i), but only if there is a "particularized need" for the disclosure. *Bary v. United States*, 292 F.2d 53, 56 (10th Cir. 1961) (requiring "some basis for the belief that particular need for disclosure exists and outweighs the policy of secrecy"). Even when these circumstances are present, a court order is required. Fed. R. Crim. P. 6(e)(3)(E).

    **4.**    <u>**28 C.F.R. § 16.26(b)(1) factor – The Privacy Act of 1974, 5 U.S.C. § 552a**</u>**:** The Privacy Act generally provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." "The Privacy Act generally prohibits the federal government from disclosing personal information about an individual without the individual's consent . . . ." *U.S. Dep't of Navy, Navy Exch., Naval Training Station, Naval Hosp., Great Lakes, Ill. v. Fed. Labor Relations Auth.*, 975 F.2d 348, 350 (7th Cir. 1992).

    **5.**    <u>**28 C.F.R. § 16.26(b)(5) factor - Law Enforcement Sensitive Information**</u>**:** Obviously, there is substantial overlap between the privileges described above and the *Touhy* factor set out in 28 C.F.R. § 16.26(b)(5) limiting production of "investigatory records compiled for law enforcement purposes, [the disclosure of which] would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired."

Before turning to the specific requests in the RFI, some general observations are in order.

**C.**    **Federal Discovery Rules Provide No Basis for the Requested Disclosures:** Neither of the above-described federal criminal discovery rules, made relevant by 28 C.F.R. § 16.26(a)(1), provides a basis for the disclosure or production of the information and documents set out in the RFI. The only category of information described by Rule 16(a)(1) that arguably could encompass the RFI demands is subsection (E)(i), which provides:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . (i) the item is material to preparing the defense . . . .

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 8

But, when interpreting this provision, which previously appeared in subsection (C), the Supreme Court has made clear that "material to the defense" relates to whether a listed item is responsive to the government's case-in-chief during a criminal trial, not whether it supports a defendant's claim of government misconduct raised in a pretrial motion. *United States v. Armstrong*, 517 U.S. 456, 462 (1996) ("we conclude that in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief. While it might be argued that as a general matter, the concept of a 'defense' includes any claim that is a 'sword,' challenging the prosecution's conduct of the case, the term may encompass only the narrower class of 'shield' claims, which refute the Government's arguments that the defendant committed the crime charged. Rule 16(a)(1)(C) tends to support the 'shield-only' reading."); *see also United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000) ("Because Rashed's defense here relates not to refutation of the government's case in chief but to establishment of an independent constitutional bar to the prosecution, Rule 16(a)(1)(C) of the Fed. R. Crim. P. is inapplicable.").

Further, Rule 16(a)(2) makes clear that, subject to exceptions not relevant here, "this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." *See Armstrong*, 517 U.S. at 463 (explaining that under Rule 16(a)(2), a criminal defendant "may not examine Government work product in connection with his case"); *United States v. Maranzino*, 860 F.2d 981, 985-86 (10th Cir. 1988) ("[I]nternal government documents made in connection with a prosecution are exempt from discovery."). In addition, Rule 16 does not "authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. §3500," Fed. R. Crim. P. 16(a)(2), and "does not apply to the discovery or inspection of a grand jury's recorded proceedings," except under circumstances not present here. *Id*. at 16(a)(3).

Rule 26.2 requires disclosure of witness statements, as defined in subsection (f), but only after the witness has given testimony at trial or other specified proceedings.

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Fed. R. Crim. P. 26.2(a).

A district court lacks authority to compel early disclosure of witness statements. *See, e.g., United States v. Smaldone*, 544 F.2d 456, 461 (10th Cir. 1976) ("The Jencks Act prohibits the pretrial discovery of statements made by prospective government witnesses, and it narrowly defines 'statements' as writings signed or adopted by the witness and accounts which are 'a substantially

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 9

verbatim recital' of a witness' oral statements."); *United States v. Nevels*, 490 F.3d 800, 803 (10th Cir. 2007) ("The Jencks Act entitles a federal criminal defendant to obtain any pretrial statement and report made by a government witness, but only *after* the witness has testified on direct examination at trial.") (emphasis in original); *United States v. Lewis*, 35 F.3d 148, 151 (4th Cir. 1994) (The district court may not require the government to produce Jencks Act material relating to one of its witnesses until after the witness has testified.").

**D.     *United States v. Armstrong* and the Required Showing for Discovery Outside the Federal Rules to Support a Claimed Constitutional Violation:** The *Armstrong* decision, cited above twice, is instructive for an additional reason.  In *Armstrong*, like here, there were claims of pervasive prosecutorial violations of criminal defendants' constitutional rights, specifically the Fifth Amendment right to equal protection.  Armstrong alleged unconstitutionally selective prosecution of African-Americans for cocaine base ("crack") trafficking crimes, which offenses triggered statutory mandatory minimum imprisonment terms based on drug quantities that were disproportionately lower than quantities applicable to powder cocaine, resulting in longer sentences for cocaine base offenders. 517 U.S. at 458-60.   The district court ordered the government to produce discovery, including a list of cases in which it charged both cocaine base and firearms offenses, the race of the defendants in those cases, and an explanation of its criteria for deciding to prosecute those defendants for federal cocaine base offenses.  *Id*. at 459.  The government refused to comply and the district court dismissed the charges.  The government sought review, first in the Ninth Circuit and then in the Supreme Court.  *Id*. at 459-60.

The Supreme Court recognized that there are circumstances under which a district court can order the government to produce discovery related to a claim of selective prosecution, but held that a substantial threshold showing is required.  It noted that "A selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive" and that "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws." *Id*. at 464 (citations and internal quotation marks omitted).  The Court explained that:

> If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim. Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy. The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim.

*Id*. at 468.

The Court acknowledged "a concern not to unnecessarily impair the performance of a core executive constitutional function" and that "[e]xamining the basis of a prosecution delays the

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 10

criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* at 465 (citations and internal quotation marks omitted). Thus, it concluded that a defendant seeking discovery is obligated to first present "some evidence of differential treatment of similarly situated members of other races or protected classes." *Id.* at 470. As explained by the Tenth Circuit, "[a]lthough defendants seeking discovery need not establish a *prima facie* case of selective prosecution, they must satisfy a rigorous standard. They must produce some evidence of both discriminatory effect and discriminatory intent." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (citation and internal quotation marks omitted).

Both *Armstrong* and the qualified nature of the privileges discussed above suggest that the government's obligation in a criminal case to disclose information and produce documents beyond that which the federal criminal discovery rules require depends in part on whether there is a sufficient showing that the defendant's constitutional rights have been violated. Thus, it is appropriate to consider whether there has been some showing in *Black* of violations of the Sixth Amendment right to counsel through infringement of the attorney-client privilege or otherwise.

**E.    The Record is Devoid of Evidence of Sixth Amendment Violations:** Claims of attorney-client privilege and Sixth Amendment right-to-counsel violations have been raised in *Black* based on the government's receipt and alleged review and use of (a) soundless video of meetings between CCA inmates and attorneys; and (b) audio files of recordings of outgoing CCA inmate telephone calls to attorneys. In addition, the district court has expressed concern about the government's assertions of attorney conflicts of interest and its investigation of the sources of attorney fees for possible forfeiture. The record related to the defense claims and the court's concerns consists of publicly-filed documents in the *Black* case, including your reports and transcripts of three court hearings, the transcript of a hearing in *United States v. Dertinger*, Case No. 14-CR-20067, on June 20-21, 2017 ["DHT"], and various filings in *Dertinger* and other cases in the District of Kansas. I am aware that you have conducted additional investigation, including interviews, the results of which are not yet reflected in a publicly-available report.

Based on information known to me, which I describe in detail below, it appears that there is no evidence of any Sixth Amendment right-to-counsel violations arising from the investigation at the CCA-Leavenworth detention facility ["CCA"] that resulted in the charges in *United States v. Black*. More importantly, there is no evidence that any defendant indicted in the *Black* case suffered a violation of his or her Sixth Amendment right to counsel or infringement of his or her attorney-client privilege. Indeed, it is my understanding that only one of the six indicted defendants in *Black*, Karl Carter, was housed at CCA during the investigation, and there is no evidence known to me suggesting that the government viewed or used any video of Carter meeting with an attorney or listened to or used any audio file of a telephone call involving Carter and his lawyer. (Indeed, I know of no evidence showing that such video or audio files were obtained by

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 11

the government.)  Similarly, as far as I know, there is no evidence of government efforts to seek disqualification or forfeit the fees of any attorney in the *Black* case.[6]

The bases for these conclusions are set out in detail below.  <u>If you believe that any of the preceding or following assertions are inaccurate or incomplete, or there is material information that I have not but should consider, please let me know.</u>  It is my understanding that:

1.  <u>There is no evidence that the recording at CCA of either soundless video of attorney-inmate meetings or outgoing inmate telephone calls to attorneys was conducted at the direction of the USAO.</u>  Indeed, the evidence demonstrates that the capture of these meetings and telephone calls was incidental to CCA efforts to videotape inmate conduct throughout the detention facility and to record outgoing inmate telephone calls generally.  *See* Docket #193 at p. 2 (describing CCA video system as including "154 cameras in the facility" that record to six different hard drives and that only seven of these cameras are located in attorney-inmate meeting rooms); Docket #214 at p. 14 ("The Securus telephone system normally records all telephone calls made by inmates from Securus phones").

As to the soundless video of attorney-inmate meetings at CCA that was produced to the government:

2.  Although (a) former Special Assistant United States Attorney [SAUSA] Erin Tomasic was told by a cooperating inmate that cameras in CCA attorney-inmate conference rooms capture video; (b) Tomasic and her investigative team explored the possibility of an undercover operation within CCA;[7] and (c) all of this occurred before a federal grand jury subpoena was served on CCA for video evidence that included soundless video of attorney-inmate meetings, *see* Docket #253 at pp. 27-28 (Phase III Order's description of these events), <u>there is no evidence that it was the intent of Tomasic, any USAO employee, or any law enforcement official to obtain video of CCA attorney-inmate meetings by use of subpoena or other means.</u>  *See* Docket #214 at p. 27, n.24 (special master's conclusion that "it cannot be said that the OUSA [Office of the United States Attorney] and law enforcement officers have used an array of tactics to intentionally obtain attorney-client communications"); *see also* Docket #135 at pp. 12-15 (former SAUSA Tomasic's statement to the court that the subpoena to CCA for video evidence was "not intended in any way to get attorney-client

---

[6] As far as I know, the only claims of an improper government assertion of an attorney-client conflict of interest and an improper effort to forfeit attorney fees involve Richard Dertinger, a defendant in an unrelated case (cited above in the text), and his former attorney, Jackie Rokusek.  Dertinger has moved to withdraw his guilty plea based on claimed violations of his Sixth Amendment rights.

[7] The investigative team did not intend to rely on the inmate's information about cameras in the interview rooms for the considered-but-never-executed undercover operation.  As one agent testified, he did not contemplate making use of CCA recording capabilities.  DHT at pp. 218-22.

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 12

video-recordings"); DHT at pp. 75-76 (Special Agent Seubert's testimony that obtaining videos of attorney-client meeting rooms "wasn't intentional").

3.  The only evidence that Tomasic or any other USAO employee or law enforcement official viewed any video of any attorney-inmate meeting at CCA arises from oral and written interaction involving Tomasic, AUSA Kim Flannigan, and attorney Jackie Rokusek on August 2-5, 2016, concerning a meeting between Rokusek and her then-client, CCA inmate Richard Dertinger. The parties involved in that interaction and in the *Black* litigation disagree about what occurred during this interaction and what it tends to prove. Both SAUSA Tomasic and AUSA Flannigan deny viewing a soundless video of the Dertinger-Rokusek meeting at CCA. Docket #135 at p. 21 (Tomasic explaining that she first learned of a video of the meeting after Rokusek watched it and reported it to the Federal Public Defender); DHT at pp. 388-89 (Flannigan's testimony that neither she nor Tomasic had access to the computer needed to view the Rokusek meeting with Dertinger); *see also* DHT at pp. 299-321, 377-85 (additional Flannigan testimony about her interaction with Rokusek). The district court's Phase III order describes but does not resolve this dispute. Docket #253 at pp. 33-38.

4.  Despite the dispute concerning the interaction involving Tomasic, Flannigan, and Rokusek, <u>it is almost certain that no USAO employee or law enforcement official viewed any CCA video of an attorney-inmate meeting.</u> After a single copy, consisting of six hard drives, was made, the original video evidence was stored in a locked evidence vault where it remained until impounded by the district court. DHT at pp. 68-70, 89-92. The copy of the hard drives was provided to an employee of the USAO, Pauletta Boyd, in June 2016. She gave the drives to a Kansas Bureau of Investigation Special Agent named Jeff Stokes in July. Stokes had the drives at his home until early August, when another agent retrieved and returned them to the USAO, where they stayed with Boyd until the district court's clawback order. *Id.* at pp. 120-22, 134-35, 230-31, 238-39, 243-44, 256-57. Special software was required to view the videos, *id*. at pp. 121, 231-32, and only Boyd and Stokes had access to both the software, which was on their password-protected computers, and the hard drives. *Id*. at pp. 134, 237-38, 245, 247-48. Stokes and Boyd did not view video of attorney-inmate meetings. *Id.* at 127, 233, 236-37. There was no evidence that Tomasic, Flannigan, or other prosecutors or law enforcement officials watched any video of any attorney-inmate meeting. *Id*. at 133-34 (Stokes testimony that only his wife and children had access to his secure office where his password-protected computer and the drives were located); 237-38 (Boyd's testimony that the only person who was given access to the hard drives, computer hardware, and software needed to view the video was Stokes); 247-48 (Boyd testimony that she was needed to facilitate access and never did so for Tomasic or Flannigan).

5.  <u>Even before the above-described testimony at the hearing in *Dertinger*, you had "tentatively" concluded that "(1) neither the OUSA nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized [sic] from CCA-Leavenworth</u>

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 13

in May of 2016; and (2) neither the OUSA nor any law enforcement officer have ever before obtained (much less actually viewed) video-recordings of attorney-client meetings at CCA-Leavenworth."  Docket #214 at p. 26-27.  Obviously, this means you were aware of no evidence of such viewing.

6.  Even had a government official viewed the video of an attorney-inmate meeting at CCA, soundless video of an attorney-inmate meeting cannot, standing alone, reveal attorney-client privileged information unless a participant is using sign language or the viewer can read lips. Although communication can be non-verbal, *see, e.g.*, Fed. R. Evid. 801(a) (defining "statement" for purposes of the hearsay rule to include "nonverbal conduct, if the person intended it as an assertion"), non-verbal, non-written communicative conduct (other than sign language), standing alone without accompanying verbal or written context or later explanation from a participant is too rudimentary to enable a viewer to discern either (a) whether the involved parties are exchanging information for the purpose of obtaining legal advice or strategy or (b) the content of any such exchange.  *See, e.g., United States v. Merida*, 828 F.3d 1203, 1209 (10th Cir.), *cert. denied*, 137 S. Ct. 325 (2016) ("In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client.") (citation and emphasis omitted).

7.  When viewing a video of the Rokusek-Dertinger meeting, the district court "could easily observe non-verbal communications, including the communicants' use of their hands, fingers, and other body language," causing it to explain that "[c]ommunication, needless to say, can be verbal and non-verbal; and non-verbal communication is at times highly communicative and easily subject to understanding through observation."  Docket #253 at p. 24.  In oral remarks, the district court judicially noticed that "one could read body language, facial expressions. One could determine whether there was − you know, one could make some sorts of determinations about the dynamics between − and the relationship between the attorney and client."  DHT at pp. 43-44. The court also opined that "all communication, verbal and non-verbal, falls within the ambit of privileged, confidential attorney-client communications" and that "*confidential* non-verbal communications between an inmate and the defense team must be protected as much as verbal communications."  *Id.* at p. 25 (emphasis supplied).  However, the district court properly refrained from finding that the soundless video of the Rokusek-Dertinger meeting revealed attorney-client privileged information or that any soundless video could, standing alone without accompanying verbal or written context or a later description by a participant, be privileged.  Further, there has been no showing by Dertinger in the *Black* case or his own case that the video of his meeting with Rokusek revealed privileged information.  "The party seeking to invoke the attorney-client privilege has the burden of establishing its applicability," *F.D.I.C. v. United Pacific Ins. Co.*, 152 F.3d 1266, 1276 n.6 (10th Cir.1998).

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 14

As to the audio files of recordings of outgoing CCA inmate telephone calls to attorneys that were produced to the government:

8.  <u>There is no evidence that it was the specific intent of any USAO employee or any law enforcement official involved in the *Black* investigation to obtain recordings of CCA attorney-inmate telephone calls by use of subpoena or other means.</u>  *See* Docket #214 at p. 27, n.24 (special master's conclusion concerning absence of such intent); Docket #135 at pp. 30-31 (Tomasic's explanation that she was unaware that there were audio files of inmate-attorney telephone calls until an agent told her about such a call); Docket #135 at pp. 83-84 (testimony of CCA employee Wayne Bigelow that no USAO employee or law enforcement personnel sought the recording of "private" calls).

9.  Inmates making outgoing telephone calls from CCA received multiple warnings that the calls would be monitored and recorded.  This was done through an inmate handbook and a signed form upon their arrival at the facility, signage on the walls and telephones, and an audible recorded warning to the caller and recipient involved in each outgoing call.  Docket #214 at pp. 15-20 (special master's report); Docket #135 at pp. 67-101 and 102-15 (testimony of CCA employees Wayne Bigelow and Laurie Harrison during September 7 hearing).  <u>There is strong, perhaps unanimous consensus among federal courts that participants in telephone calls made under these circumstances have no reasonable expectation of privacy and that any privilege that otherwise might apply to the content of the call is waived.</u>[8]  Although the

---

[8] *See United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003) (finding no attorney-client privilege attached to calls between inmates and attorneys because "the parties to these conversations were aware that they were being recorded by the prison" and "[t]he presence of the prison recording device destroyed the attorney-client privilege"; further noting: "Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private.  The presence of the recording device was the functional equivalent of the presence of a third party.");  *United States v. Mejia*, 655 F.3d 126, 132-34 (2d Cir. 2011) (holding that a prisoner's communication that the prisoner knows is being recorded by prison authorities is not covered by the attorney-client privilege because the prisoner could not intend such call to be confidential; further declaring that "[t]he fact that the call was being recorded amounts essentially to the presence of an unsympathetic third party—[Bureau of Prisons]—listening in"); *United States v. Lentz*, 419 F. Supp. 2d 820, 827-28 (E.D. Va. 2005) (concluding, based on well-settled principles involving privilege, "that an inmate's telephone conversations with counsel are not protected by the attorney-client privilege where, as here, the inmate is notified at the outset that the calls are recorded and subject to monitoring" because the inmate "could not reasonably have assumed that his conversations with [counsel] would be confidential," and the inmate's decision to proceed with conversation despite notification "is no different from [defendant] electing to proceed with these conversations notwithstanding the known presence of a third party within earshot of the conversation").  *See also Watson v. Albin*, 2008 WL 2079967 at *5 (N.D. Cal. May 12, 2008) (finding attorney-client privilege waived where inmate placed calls from jail on a monitored phone line); *United States v. Eye*, 2008 WL 1701089 at *13 (W.D. Mo. Apr. 9, 2008) (finding defendant waived his attorney-client privilege by calling his attorney when he well knew that the calls could be monitored and recorded by CCA).

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 15

district court, in its Phase III order, criticized the process by which CCA inmates and their inmates were informed of the recording policy and the process by which they could have "private" telephone calls with their legal counsel, it did not reject the notion that CCA inmates had waived the privilege with respect to any telephone calls to attorneys at numbers not designated as private. Docket #253 at pp. 14-20 ("the Court does not rule in this Order upon the issues of privilege, waiver, and Sixth Amendment violations").

10.  CCA had a process by which an attorney could have his or her office telephone number designated as "private" within the CCA/Securus telephone system. That process was supposed to prevent the recording of any and all outgoing inmate telephone calls to that telephone number for as long as the line was marked private. Docket #214 at pp. 11, 16, 20-21. Your investigation revealed that from November 26, 2012 to December 15, 2016, there were 54 outgoing inmate telephone calls that were (a) made to an attorney telephone number that was then designated as "private"; (b) nonetheless recorded; and (c) later "selected" for production to a prosecutor, law enforcement official, or defense attorney. *Id*. at pp. 21-22.[9] The database from which those 54 erroneously-recorded telephone calls were identified contains approximately 182,084 calls. *Id*. at p. 12, n. 19. There is no evidence that the party who "selected" any one of those calls was either a government official or aware that the telephone number to which the call had been placed had been marked as "private."

---

Courts have applied this principle in analogous contexts. *See United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir. 1996) (finding, in Fourth Amendment context, that defendant had no expectation of privacy in jailhouse calls he made to non-attorney associates and consented to the taping of such calls "because he (1) signed a form warning him of monitoring and taping; (2) read signs above the phones warning of taping; and (3) read a prisoner's manual warning of the recordings"); *United States v. Footman*, 215 F.3d 145, 154-55 (1st Cir. 2000) (finding, for purposes of Title III's consent requirement, that defendant-inmate consented to monitoring and recording of his calls to non-attorney associates, where, in order to use phones, inmates are required to sign a form stating that they understand that their calls will be monitored and recorded, stickers on the phones stated that calls are being recorded, and at the start of each call a pre-recorded message advises both parties to the call that all calls will be recorded except approved attorney calls); *United States v. Faulkner*, 439 F.3d 1221, 1222-25 (10th Cir. 2006) (finding, for purposes of Title III's consent requirement, that defendant-inmate "impliedly consented to recording" of his calls with non-attorney associates while being detained at CCA, where: (1) defendant-inmate received an orientation manual upon arrival, which stated that the "[t]elephones are subject to recording and monitoring," (2) inmates are advised during orientation that their calls "could be" recorded, (3) inmates receive an inmate handbook warning that "[t]elephone conversations may be monitored and/or recorded for security reasons," (4) signs posted over the phones announce that calls are subject to monitoring, and (5) "it appears that when a call is placed from CCA, a recorded voice states, 'This call is subject to monitoring and recording'") (internal quotation marks omitted; alterations in *Faulkner*).

[9] The term "selected" in this context is defined in footnote 19, page 21 of the special master report at Docket #214.

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 16

11.   There is no evidence that the USAO or any law enforcement official involved in the investigation that resulted in charges in *Black* "selected" or listened to a recording of an inmate telephone call made to a telephone number that was marked private at the time of the call.  Indeed, although your investigation disclosed that the government had received 229 audio files of CCA inmate outgoing telephone calls to known attorney telephone numbers, Docket #187 at p. 3, there is no evidence that any of those attorney telephone numbers were marked private when those calls were placed, that any of the calls were made by an inmate for the purpose of obtaining legal advice, or that any government official listened to any of the calls.  Further, as the district court recently concluded, other than these 229 calls to "32 different known attorney numbers," out of a total of 48,802 audio files of recorded outgoing CCA inmate telephone calls produced to the government, "the rest of the recorded calls were ***not*** made to a known attorney number; and no calls were recorded to any ***other*** of the known attorney telephone numbers."  Docket #289 at p. 3 (emphasis in original).[10]

12.   Former SAUSA Tomasic belatedly acknowledged listening to an outgoing CCA inmate-attorney telephone call received by the USAO in July 2016, involving Juan Herrera-Zamora and his attorney.  There is no evidence that this telephone call was made to an attorney telephone number designated as "private," which suggests that even if the call was made for the purpose of discussing legal advice and/or strategy, it was not privileged.  Herrera-Zamora was convicted and sentenced in Case No. 14-20049 and has filed a notice of appeal.  On August 4, 2017, he filed in the district court a motion to vacate his judgment of conviction based on Tomasic having listened to his telephone conversation with counsel. The appeal was ordered abated.  Herrera-Zamora is not a defendant in the *Black* case.

13.   Former SAUSA Tomasic also belatedly acknowledged listening to an outgoing CCA inmate telephone call to a third party, during which it was possible to overhear another third party in the room speaking on a telephone line to Ashley Huff's attorney.  AUSA Flannigan may have been present when this recorded call was played in preparation for a sentencing hearing.  *See* D. Kan. No. 14-20067-09-CM, doc. 536 at p. 2.  Huff has been convicted by guilty plea and sentenced.  She has not claimed a violation of the attorney-client privilege.  Huff is not a defendant in the *Black* case.

14.   Other than the telephone conversation described in ¶ 12, there is no evidence that any USAO employee or law enforcement agent listened to any CCA inmate-attorney telephone call obtained during the Black investigation more than necessary to "spot check" or "minimize" the call as involving an attorney.

---

[10] The "known attorney numbers" were identified from lists provided by the Federal Public Defender Offices in the District of Kansas, the Western District of Missouri, and the District of Nebraska, the Criminal Justice Act lists from those districts, and all attorneys admitted to practice in Kansas, including by *pro hac vice* status and reciprocity from the Western District of Missouri.  *Id.* at 2.

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 17

**********

15.   Even if, contrary to all of the evidence and legal authority described above, it somehow was
      the case that (a) some or all the soundless videos of CCA inmate-attorney meetings reveals
      attorney-client privileged information; (b) CCA outgoing inmate telephone calls to attorneys
      are protected by the attorney-client privilege despite the warnings at CCA about the
      monitoring and recording of those calls; (c) USAO employees and law enforcement officials
      purposefully and knowingly obtained video of attorney-inmate meetings and audio files of
      outgoing inmate telephone calls to attorneys from CCA; and (d) USAO employees viewed
      those videos and listened to those audio files and used what they saw and heard to the
      detriment of the interceptees (none of which has been proven), *the record remains devoid of
      evidence that any defendant named in the* Black *case suffered a violation of his or her Sixth
      Amendment right to counsel*.  Indeed, as noted above, of the *Black* defendants, only Karl
      Carter was an inmate at CCA during the investigation and he has not alleged, much less
      established, any violation of his attorney-client privilege or Sixth Amendment rights.

16.   Nor is there evidence of any effort to forfeit the fees or seek the disqualification of any
      attorney representing a defendant in *Black*.

**F.    The Requests in the RFI:**  I now will turn to the requests in the RFI and your related
request for word searches through electronically-stored data.

      **1.    Requests 1 through 6, 8, & 10 - Government Access to and Use of Recordings:**
These requests seek information concerning investigative activities of United States Attorney's
Office employees during a 40-month period from January 1, 2014 through May 1, 2017, related to
audio and video recordings of both detainees at CCA and elsewhere and attorneys, without
restriction as to detainee, attorney, case or matter, or USAO employee.  The requests require the
government to assemble and disclose information that would reveal, among other things, the
method of investigation used to obtain each recording, the reason for obtaining the recording, and
details about the nature of the investigative demand employed and linkage to the person or persons
under investigation, as well as the identity of counsel.  These questions also seek internal USAO
and DOJ reporting about each instance of such access, the mental state of the employee who
accessed the recording, the investigative use of each recording, the identity of other law
enforcement agencies and officials who also accessed each recording, and "copies of all documents
discussing in any way each instance of access," including, but not limited to, by subpoena, e-mail
messages, and memorandum.

Acquisition of inmate recordings is an essential law enforcement technique used to support
investigations and prosecutions.  This method of investigation is used, for example, to establish
factual predication for judicial process (such as search warrants) and criminal charges, supplement

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 18

the proof in existing cases, and ensure the safety of individuals who have provided incriminating information about criminal activity and who may testify at trial. RFI Requests 1-6, 8, and 10 seek information that 28 C.F.R. § 16.26(b)(5) safeguards because, if provided, it would "disclose investigative techniques and procedures the effectiveness of which would thereby be impaired."

Similarly, these requests seek information protected by the law enforcement privilege, which protects access to law enforcement techniques. Further, to the extent that these requests seek access to documentation and internal reporting, they run afoul of the work-product doctrine and possibly the deliberative process privilege. In addition, to the extent that access was obtained in connection with a grand jury investigation, these requests implicate grand jury secrecy concerns and thus trigger the prohibition on disclosure in 28 C.F.R. § 16.26(b)(1).

There is no evidence that any instance of access during the specified time period violated the Sixth Amendment right to counsel. Among other things, preindictment and pre-complaint access is outside the scope of the Sixth Amendment entirely because it "does not attach until adversarial proceedings begin." *United States v. Williston*, 862 F.3d 1023, 1034 (10th Cir. 2017). Further, as explained above, the soundless video recordings of attorney-inmate meetings and audio recordings of outgoing inmate calls to attorneys to which the government had access are not privileged. Further, there is no evidence of the existence of, much less government access to or use of, any such video or audio recording involving any defendant in the *Black* case and an attorney. As a result, even if 28 C.F.R. § 16.26(b)(5) did not prohibit disclosure, there would be an insufficient showing to overcome the above-described privileges. I must respectfully decline to comply with these requests.

      **2.**    <u>**Request 7 - Government Taint Teams:**</u> This request seeks information and documentation concerning so-called "taint team" policies during the same 40-month time period, as well as information concerning the actual use of taint teams to review materials obtained by specified grand jury subpoenas; personnel assigned to such taint teams; protocols and guidance issued to each such team; and "any analyses, reports, or conclusions" each taint team "produced or reached." The request concludes by asking for "copies of all documents evidencing these statements," but there is no mention of "statements" elsewhere in the request. Thus, I interpret "statements" to include "policies," "protocols," "guidance," "analyses," "reports," and "conclusions" as listed elsewhere in this request.

Taint teams are an investigative technique used during investigations and prosecutions to safeguard from disclosure to investigative and trial teams information and documents that are potentially privileged or legally inaccessible under other doctrines (such as immunity law). This technique also is used to ensure that investigations and prosecutions are not jeopardized by prosecutors, investigators, or witnesses becoming "tainted" by privileged information. The documentation and information you seek is protected by the work-product doctrine, the law enforcement privilege, and the deliberative process privilege. It also comes within the scope of 28

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 19

C.F.R. § 16.26(b)(5). As explained above, there is no showing of a constitutional violation here or in connection with the *Black* case or the government investigation concerning CCA that would provide a need sufficient to overcome the qualified privileges. Further, it is my understanding that United States Attorney Beall has already provided you with a copy of the most recent District of Kansas USAO Taint Team policy with an agreement that it will not be shared with defense counsel or otherwise disseminated. Beyond that, I must respectfully decline to provide the requested information and documentation concerning government use of taint teams.

3. **Request 9 - Grand Jury Matters:** This request seeks grand jury matters and thus triggers the prohibition on disclosure set out in 28 C.F.R. § 16.26(b)(1). To my knowledge, there is no evidence in the record that the requested grand jury material would reveal any violations of the constitutional rights of any defendant in the *Black* case or, more broadly, any subject or target of the investigation into contraband smuggling at CCA. As a result, to my knowledge, there is not "particularized need" in this case or any other for the requested production of grand jury matters. Further, no court order has been issued.[11] Accordingly, I must respectfully decline to comply with this request.

4. **Request 11 - "Controlled Buys":** Request 11 seeks copies of any DOJ and USAO policy concerning "controlled buys" and whether there is an obligation to record them. It also seeks documentation concerning a request for approval, and denial of approval for a specific planned-but-never-executed controlled purchase at CCA Leavenworth, as well as any other documentation concerning that proposed law enforcement activity.

Controlled purchases of contraband by undercover operatives are an important and potentially dangerous law enforcement investigative technique. The Attorney General's Guidelines on the use of undercover activities and operations by the Federal Bureau of Investigation (FBI) are publicly available. *See* https://www.justice.gov/archives/ag/undercover-and-sensitive-operations-unit-attorney-generals-guidelines-fbi-undercover-operations. Any additional DOJ and/or USAO guidance and policy directives concerning controlled purchases that have not been placed in the public domain fall within the law enforcement privilege and/or the work-product doctrine. Similarly, this request triggers the *Touhy* factor described in 28 C.F.R. § 16.26(b)(5). Further, if not otherwise discoverable under the federal criminal discovery rules, documentation concerning a proposed-but-never-executed law enforcement operation would be within the ambit of the same protections. There is no evidence that the proposed controlled purchase involved any defendant

---

[11] There is a pending contested motion in *Black* for "production of grand jury materials." *See* Docket #202, #218, and #224. On May 10, 2017, the district court issued a minute order stating: "The Court takes under advisement 202 Motion to Compel as to Karl Carter (2), Anthon Aiono (3), David Bishop (6). If the Court determines that it should consider all or part of the Grand Jury materials referenced in the motion, the Court will order the government to produce the materials to the Court (not the Special Master) for the Court's *in camera* review. For now, the motion is under advisement." Docket #249.

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 20

in the *Black* case or that it was illegal or unconstitutional in any way. Even if a portion of the requested information might have some evidentiary value with respect to former SAUSA Tomasic's knowledge of the recording of attorney-inmate meeting rooms at CCA, this would not constitute a sufficient basis to overcome the privileges, especially in light of the prohibition in 28 C.F.R. § 16.26(b)(5). Accordingly, these authorities, which the *Touhy* regulations direct me to consider, compel that I respectfully decline this request as well.

     **5.**     **Request 12 - Communication Between the USAO and DOJ:** Without identifying the specific DOJ components that have communicated with the Kansas USAO regarding the *Black* litigation, which identification may itself be an improper disclosure, I note that your request for "opinions, notices, instructions, regulations, or guidance from DOJ or OPR to the USAO regarding the obtaining, possession, review, or use of any attorney-client communications,"[12] as well as your associated request for USAO requests to DOJ for such documentation, seek information and records protected by the deliberative process privilege, the work-product doctrine, and/or the attorney-client privilege, depending on the nature of the documentation requested from and provided by DOJ, and the DOJ component to which the USAO request was made and from which the response was provided. Your related request for such documentation regarding "whether any person employed by the USAO (including lawyers, staff, and contractors) engaged in any unethical conduct, or a violation of any rule of professional conduct or the U.S. Attorney's Manual, relating to the obtaining, possession, review, or use of any attorney-client communications" also seeks information and records protected by these privileges and, depending on the DOJ component involved and the nature of the documentation requested and provided, may also run afoul of the Privacy Act.

     **6.**     **Request 13 - Rokusek-Dertinger Meetings:** This request seeks documents that were sent or received by USAO employees, including those constituting communications, concerning meetings between attorney Jackie Rokusek and inmate Richard Dertinger. Any documentation, including written communications, prepared by government employees on this topic fall within the work-product doctrine, especially in light of the ongoing litigation involving Dertinger. *See* 28 C.F.R. § 16.26(a)(2). Among other reasons, disclosure is unwarranted because neither Rokusek nor Dertinger is a party in the *Black* case.[13] To the extent that this request seeks

---

[12] The RFI refers to the Department of Justice's Office of Professional Responsibility ["OPR"] but, in context, it appears that you may mean to refer to the Professional Responsibility Advisory Office ["PRAO"]. Because your references to OPR are not exhaustive, but instead are subsumed within your more general request for USAO requests to and responses from DOJ, this letter pertains to all DOJ components, including OPR and PRAO.

[13] Any requests or demands for government testimony, documents, or other information made in the *Dertinger* litigation are beyond the scope of my authority. As a result, this letter should not be interpreted as comment on whether certain government production or disclosures are permitted by the *Touhy* regulations in that case. I note that such requests or demands by Dertinger would be made by a named defendant who alleges that there were violations of his own constitutional rights.

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 21

written communications *sent to* USAO employees by non-law enforcement third parties, such as defense counsel, I can ask the USAO to attempt to identify and locate such documentation. Because it is not clear that you seek non-government-or-law-enforcement-generated communications, I will await a specific request from you.

       **7.**   **Request 14 - Forfeiture and Conflict Information:** I interpret subsection (a) of this request to seek a list of instances in which the USAO in the District of Kansas initiated legal proceedings in federal court to forfeit a criminal defense attorney's fees. I interpret subsection (b) of this request to seek a list of instances in which the USAO either (i) filed a motion in court seeking to have an attorney disqualified due to a conflict of interest or (ii) communicated to an attorney orally or in writing that he or she had a disqualifying conflict of interest that required that the attorney withdraw from representation. With respect to each such instance, you request certain identifying information, as well as "a summary of the reason for pursuing forfeiture and/or for assertion of the conflict."

First, if the above description misconstrues this request, please let me know. Second, to the extent that your request for the government's "reason" for seeking forfeiture or conflict-of-interest-based disqualification seeks something other than what is reflected in the government's court filings or expressed in communications with defense counsel, please let me know so I can better assess the propriety of the request. It is not clear to me whether you seek the legal basis for forfeiture actions and disqualification motions or some other presumed "reason." Third, be advised that I have asked the USAO to gather the information necessary to create the requested lists except for the "reasons" for the actions.

       **8.**   **Request for Word Searches:** As I understand it, you also request that the USAO conduct "word searches" through electronic data stored on government servers to identify and produce to you documents that contain instances of specified searched-for words and names. The scope of your request is unclear. Your e-mail communications with USAO officials in June 2017 suggest you are interested only in documents in former-SAUSA Tomasic's "repository." Your more recent e-mail message to me on August 2, 2017 suggests (but does not clearly delineate) a broader sweep, possibly including all "OUSA documents" in order to identify "which custodians to search, with the goal of a production of E-discovery."

Without clarity about the nature and scope of your request, I cannot provide a definitive response. Preliminarily, however, upon consideration of the search terms that apparently were under consideration in June and the understanding that you propose that these terms will be used to identify government documents that are stored in electronic form on USAO servers (or on "cloud" servers under contract with the USAO), it is very likely that the results will consist largely of (a) documents that already have been produced to the defense in the *Black* case; (b) already-filed pleadings; or (c) documents protected by the work-product doctrine and/or the disclosure

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 22

prohibition in 28 C.F.R. § 16.21(b)(5). Nonetheless, I am available to discuss this aspect of the RFI with you.

**********

In addition to the *Touhy* analysis, I would like to bring to your attention authority demonstrating that wide-ranging investigations like this one − particularly in the absence of any evidence that the government has violated the *Black* defendants' constitutional or statutory rights – trigger separation of powers concerns. A district court lacks constitutional and supervisory authority to investigate the operations and decisions of an executive-branch agency like a United States Attorney's Office. This principle was well explained in *In re United States*, 503 F.3d 638 (7th Cir. 2007), a case involving a far more limited judicial inquiry, and one more closely linked to the defendant before the district court, than the wide-ranging investigation here, which seeks information concerning unproven allegations of infringement of the rights of non-parties. In *In re United States*, the district court was unwilling to accept the guilty plea of a cooperating defendant facing a mandatory twenty-year term of imprisonment without advance information about the government's possible departure motion at sentencing. Accordingly, the district court propounded a set of interrogatories to the government, which prompted it to file for a writ of mandamus. *Id.* at 639-40.

The Court of Appeals granted the writ. Noting that there was no *prima facie* showing of a constitutional violation (as is the case here), the appellate court explained that the judicial inquiry was improper:

> The judge's interrogatories seek the names of case agents and witnesses, ask the prosecutor to disclose the status of ongoing investigations, and direct the prosecutor to reveal tentative conclusions such as whether Heath has so far provided "enough" assistance and how the prosecutor thinks that Heath would react to a lower sentence imposed before her cooperation has been completed. These are questions a United States Attorney might well ask of an Assistant United States Attorney; they are not appropriate questions for the Judicial Branch to ask of the Executive Branch. Multiple privileges cover the internal deliberations of the Executive Branch, just as they do for the Judicial Branch's internal deliberations. As we explained in *In re United States*, 398 F.3d 615, 618 (7th Cir.2005), "[h]ow the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate. The Judicial Branch is limited to assessing counsel's public deeds."

*Id.* at 641.

When judicial action reaches beyond resolving the claims made by the parties in the matter before it, and extends to conducting investigation designed to prompt or dictate change in the internal

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 23

workings of the Executive Branch, serious separation-of-powers concerns arise. *See Laird v. Tatum*, 408 U.S. 1, 15 (1972) (explaining that plaintiffs' effort to use civil litigation to launch "a broad-scale investigation, conducted by themselves as private parties armed with the subpoena power of a federal district court and the power of cross-examination, to probe into the Army's intelligence-gathering activities, with the district court determining at the conclusion of that investigation the extent to which those activities may or may not be appropriate to the Army's mission . . . would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the 'power of the purse'; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action"); *United States v. Bolden*, 353 F.3d 870, 875 (10th Cir. 2003) ("Disqualifying the entire USA's office from representing the government raises important separation of powers issues."); *United States v. Silva-Rosa*, 275 F.3d 18, 22 (1st Cir. 2001) (for a court to "dictate to the executive branch whom it can appoint to serve as its prosecutors" would "trigger weighty separation of powers concerns").

Nor can a district court rely on its supervisory powers to justify investigation or other intrusion into the operations of the Executive Branch. *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983) ("[T]he federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all."). "A district court does not have general supervisory powers over the co-equal executive branch of government." *United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992). "[G]iven the constitutionally-based independence of each of the three actors court, prosecutor and grand jury . . . a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the other two unless there is a clear basis in fact and law for doing so." *United States v. Chanen*, 549 F.2d 1306, 1313 (9th Cir. 1977).[14]

---

[14] Indeed, a decision that addresses a realm that a district court may properly investigate – the operation of the federal grand jury – reveals the limits on federal courts' investigative powers. In *In re United States*, 441 F.3d 44, 48 (1st Cir. 2006), the defendant alleged that government agents leaked grand jury information to the media and eavesdropped on grand jury deliberations. The DOJ referred the leak allegations to the Office of the Inspector General (OIG) and OPR, and later told the court that the DOJ had found "no misconduct by government agents" and no eavesdropping. *Id*. at 49. Nevertheless, the district court continued its own investigation into possible government misconduct. *Id*.

The government sought a writ of mandamus, which the First Circuit granted. *In re United States*, 441 F.3d at 68. The First Circuit observed that "the federal courts in the American criminal justice system generally do not have the power to act as investigators or prosecutors of misconduct, including misconduct by government prosecutors." *Id*. at 58. But Federal Rule of Criminal Procedure 6 "and the court's inherent supervisory authority undoubtedly provided some authority to investigate misconduct as to the grand jury proceedings, subject, of course, to the broader constitutional principle of the separation of powers." *Id*. There must be "some reasonable basis" for the inquiry and "there are limits on who should investigate and how the investigation should be done." *Id*. If there was reason to believe a crime had been committed, the

David R. Cohen, Federal Special Master
*U.S. v. Black, et al.*, Case No. 16-CR-20032
September 12, 2017
Page 24


Although the district court has authority to remedy any constitutional, statutory, or rule-based violations that are proven to have occurred in this criminal case, it lacks authority to investigate and supervise the internal operations and decisions of the United States Attorney's Office. My response to your requests therefore is not only required by the *Touhy* regulations and the substantive law that they command me to consider, it is consistent with constitutional limits on a district court's authority to demand information from a co-equal branch of government.


Very truly yours,


Steven D. Clymer
Special Attorney to the United States Attorney General

cc:      Thomas Beall, United States Attorney, District of Kansas

---

matter "could have been referred to a different branch of the Department of Justice for investigation and prosecution," which would have "reduc[ed] the involvement of the district judge and thus the risk of presenting the appearance that the court has improperly become an investigator and prosecutor of the parties before it." *Id*. at 59.

The First Circuit concluded that the district court's continued investigation was inappropriate. *In re United States*, 441 F.3d. at 61. As to the alleged leaks, "the government had twice referred the matter to independent DOJ officials for investigation, and they had found nothing." *Id*. And there was no evidence to support the claim of government eavesdropping. *Id*. at 62. Accordingly, the First Circuit ordered that the court's investigation be terminated and that the district judge recuse himself. *Id*. at 68.