CLOSED,APPEAL,COMPLEX,ETT–7D,LC1,PROTO

# U.S. District Court
## DISTRICT OF KANSAS (Kansas City)
## CRIMINAL DOCKET FOR CASE #: <u>2:16–cr–20032–JAR</u> All Defendants

Case title: USA v. Black et al
Other court case number:  18–3007 10CCA
Magistrate judge case number:  2:16–mj–08080–TJJ

Date Filed: 05/04/2016
Date Terminated: 08/13/2019

---

**<u>Special Master</u>**

**David R. Cohen**
David R. Cohen Co., LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216–831–0001

represented by **Alleen C. VanBebber**
VanBebber Law Firm, LLC
2029 West 95th Street
Leawood, KS 66206
913–384–5359
Alternative Phone:
Cell Phone:
Email: vanbebber@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 10214*
*Bar Status: Active*

**David R. Cohen**
David R. Cohen Co., LPA
24400 Chagrin Blvd., Suite 300
Cleveland, OH 44122
216–831–0001
Fax: 866–357–3535
Alternative Phone:
Cell Phone:
Email: david@specialmaster.biz
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Number:*
*Bar Status: **MDL***

---

Assigned to: District Judge Julie A.
Robinson

Appeals court case number:
19–3193 10CCA

**Defendant (1)**

**Lorenzo Black**                                 represented by   **John Jenab**
*28002−031*                                                       Jenab Law Firm, PA
*Release*                                                         7431 Broadway, Suite 9
*TERMINATED: 07/30/2018*                                          Kansas City, MO 64114
                                                                  816−759−8686
                                                                  Fax: 816−759−8685
                                                                  Alternative Phone:
                                                                  Cell Phone: 913−526−6042
                                                                  Email: john.jenab@gmail.com
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  *Designation: CJA Appointment*
                                                                  *Bar Number: 18069*
                                                                  *Bar Status: Active*

**Pending Counts**                                                **Disposition**

18:666(a)(2) and 2 GIVING,                                        Defendant sentenced to Time Served, followed by
OFFERING, ACCEPTING OR                                            1 year supervised release. The time served in this
AGREEING TO ACCEPT A                                              case is concurrent with the time served in Douglas
BRIBE (Indictment filed 5/4/16)                                   County, Kansas Case No. 2014CR299, which the
(9)                                                               defendant has already completed. No fine
                                                                  imposed; $100 special assessment.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                             **Disposition**

21:846 and 18:2 CONSPIRACY TO
DISTRIBUTE AND POSSESS
WITH INTENT TO DISTRIBUTE                                         Dismissed on Govts motion.
A CONTROLLED SUBSTANCE
(Indictment filed 5/4/16)
(1)

18:179(a)(1)(b)(1) and 2
PROVIDING OR POSSESSING
CONTRABAND IN PRISON                                             Dismissed on Govts motion.
(Indictment filed 5/4/16)
(2−4)

**Highest Offense Level
(Terminated)**

Felony

**Complaints**                                                   **Disposition**

21:841(a)(1),(b)(1)(C) and 846 –
Count 1: Conspiracy to distribute
and posses with intent to distribute
methamphetamine and 18:2 – aiding
and abetting. Count 2:
18:791(a)(1),(b)(1) – Providing or
possessing contraband in prison and
18:2 – aiding and abetting. Count 3
and 4: 18:791(a)(1),(b)(5) –
Providing or possessing contraband
in prison and 18:2 – aiding and
abetting. (COMPLAINT FILED
4/9/16)

---

Assigned to: District Judge Julie A.
Robinson

Appeals court case number:
19–3193 10CCA

**Defendant (2)**

| | | |
|---|---|---|
| **Karl Carter** | represented by | **David J. Guastello** |
| *12835–045* | | The Guastello Law Firm, LLC |
| *CUSTODY* | | 811 Grand Blvd., Suite 101 |
| *TERMINATED: 08/13/2019* | | Kansas City, MO 64106 |
| *also known as* | | 816–753–7171 |
| KC | | Alternative Phone: |
| *TERMINATED: 08/13/2019* | | Cell Phone: 816–256–0835 |
| | | Email: david@guastellolaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: CJA Appointment* |
| | | *Bar Number: 22525* |
| | | *Bar Status: Active* |

**Pending Counts**                          **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                       **Disposition**

21:846 and 18:2 CONSPIRACY
TO DISTRIBUTE AND POSSESS
WITH INTENT TO DISTRIBUTE          Dismissed.
A CONTROLLED SUBSTANCE
(Indictment filed 5/4/16)
(1)

18:666(a)(1)(B) –– Bribery.
Forfeiture Allegation II.
(Superseding Indictment Filed
03/16/2017.)
(2s)

Dismissed.

18:1956(h) and 1956(a)(1)(B)(i) ––
Money Laundering Conspiracy.
Forfeiture Allegation I.
(Superseding Indictment Filed
03/16/2017.)
(3s)

Dismissed.

18:179(a)(1)(b)(1) and 2
PROVIDING OR POSSESSING
CONTRABAND IN PRISON
(Indictment filed 5/4/16)
(5–7)

Dismissed.

18:666(a)(2) and 2 GIVING,
OFFERING, ACCEPTING OR
AGREEING TO ACCEPT A
BRIBE (Indictment filed 5/4/16)
(9)

Dismissed.

18:1791(a)(2)–– Possession of
Contraband. (Superseding
Indictment Filed 03/16/2017.)
(9s)

Dismissed.

**Highest Offense Level
(Terminated)**

Felony

**Complaints**                                    **Disposition**

21:841(a)(1),(b)(1)(C) and 846 –
Count 1: Conspiracy to distribute
and posses with intent to distribute
methamphetamine and 18:2 –
aiding and abetting. Count 5:
18:791(a)(2),(b)(1) – Providing or
possessing contraband in prison and
18:2 – aiding and abetting. Count 6
and 7: 18:791(a)(2),(b)(5) –
Providing or possessing contraband
in prison and 18:2 – aiding and
abetting. (COMPLAINT FILED
4/9/16)

Assigned to: District Judge Julie A.
Robinson

Appeals court case number:
19–3193 10CCA

## Defendant (3)

**Anthon Aiono**                    represented by    **Jason P. Hoffman**
*28005–031*                                            Hoffman & Hoffman
*RELEASE*                                              CoreFirst Bank & Trust Bldg.
*TERMINATED: 08/01/2018*                               100 E. 9th St. Third Floor East
*also known as*                                        Topeka, KS 66612
The Samoan                                             785–233–5887
*TERMINATED: 08/01/2018*                               Fax: 785–233–2173
                                                       Alternative Phone:
                                                       Cell Phone:
                                                       Email: jphoffman@sbcglobal.net
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*
                                                       *Designation: CJA Appointment*
                                                       *Bar Number: 17637*
                                                       *Bar Status: Active*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:666(a)(1)(B) –– Bribery. Forfeiture Allegation II. (Superseding Indictment Filed 03/16/2017.) (1s) | The defendant is sentenced to probation for a term of 2 years. $100.00 special assessment. |

## Highest Offense Level (Opening)

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 21:846 and 18:2 CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE A CONTROLLED SUBSTANCE (Indictment filed 5/4/16) (1) | Dismissed on the motion of the United States. |
| 18:179(a)(1)(b)(1) and 2 PROVIDING OR POSSESSING CONTRABAND IN PRISON (Indictment filed 5/4/16) (2–4) | Dismissed on the motion of the United States. |
| 18:666(a)(1)(B) GIVING, OFFERING, ACCEPTING OR AGREEING TO ACCEPT A BRIBE (Indictment filed 5/4/16) (8) | Dismissed on the motion of the United States. |

18:1952(a)(3) –– Unlawful Use of
Facility in Interstate Commerce.
(Superseding Indictment Filed               Dismissed on the motion of the United States.
03/16/2017.)
(11s)

**Highest Offense Level
(Terminated)**

Felony

**Complaints**                             **Disposition**

21:841(a)(1),(b)(1)(C) and 846 –
Count 1: Conspiracy to distribute
and possess with intent to distribute
methamphetamine and 18:2 –
aiding and abetting. Count 2:
18:791(a)(1),(b)(1) – Providing or
possessing contraband in prison and
18:2 – aiding and abetting. Count 3
and 4: 18:791(a)(1),(b)(5) –
Providing or possessing contraband
in prison. and 18:2 – aiding and
abetting. (COMPLAINT FILED
4/9/16)

Assigned to: District Judge Julie A.
Robinson

Appeals court case number:
19–3193 10CCA

**Defendant (4)**

**Alicia Tackett**                  represented by   **Kathleen A. Ambrosio**
*28003–031*                                          Morris, Laing, Evans, Brock & Kennedy,
*RELEASE*                                            Chtd.––Topeka
*TERMINATED: 05/31/2017*                             800 SW Jackson, Suite 1310
*also known as*                                      Topeka, KS 66612–1216
Alicia Stanfield                                     785–232–2662
*TERMINATED: 05/31/2017*                             Fax: 785–232–9983
*also known as*                                      Alternative Phone:
Alicia Rowlette                                      Cell Phone:
*TERMINATED: 05/31/2017*                             Email: kambrosio@morrislaing.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: CJA Appointment*
                                                     *Bar Number: 16174*
                                                     *Bar Status: **Deceased***

**Pending Counts**                                   **Disposition**

18:1956(h) CONSPIRACE TO
ENGAGE IN MONEY
LAUNDERING (Indictment filed
5/4/16)
(10)

The defendant is hereby committed to the custody
of the United States Bureau of Prisons to be
imprisoned for a total term of 12 months and 1
day . Execution of this sentence is stayed until no
earlier than September 6, 2017. Upon release from
imprisonment, you will be on supervised release
for a term of 3 years. $100.00 Assessment Fee

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:179(a)(1)(b)(1) and 2 PROVIDING OR POSSESSING CONTRABAND IN PRISON (Indictment filed 5/4/16) (3–4) | Dismissed |
| 18:666(a)(2) and 2 GIVING, OFFERING, ACCEPTING OR AGREEING TO ACCEPT A BRIBE (Indictment filed 5/4/16) (9) | Dismissed |
| 18:1028(a)(7)(b)(3)(A)and 2 INDENTITY THEFT (Indictment filed 5/4/16) (11) | Dismissed |

**Highest Offense Level
(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| Count 3 and 4: 18:791(a)(1),(b)(5) – Providing or possessing contraband in prison and 18:2 – aiding and abetting. (COMPLAINT FILED 4/9/16) | |

---

Assigned to: District Judge Julie A.
Robinson

Appeals court case number:
19–3193 10CCA

**Defendant (5)**

**Catherine Rowlette**                    represented by  **Michael M. Jackson**

*28000−031*
*RELEASE*
**TERMINATED: 03/15/2017**
*also known as*
Cathy
**TERMINATED: 03/15/2017**

727 South Kansas Avenue, Suite 2
Topeka, KS 66603
785−234−6553
Fax: 785−234−8715
Alternative Phone:
Cell Phone:
Email: jacksonmm@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*
*Bar Number: 10642*
*Bar Status: Active*

**Pending Counts**

18:179(a)(1)(b)(1) and 2
PROVIDING OR POSSESSING
CONTRABAND IN PRISON
(Indictment filed 5/4/16)
(4)

**Disposition**

The defendant is hereby sentenced to probation
for a term of 2 years. Assessment−$10.00

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

21:846 and 18:2 CONSPIRACY TO
DISTRIBUTE AND POSSESS
WITH INTENT TO DISTRIBUTE
A CONTROLLED SUBSTANCE
(Indictment filed 5/4/16)
(1)

18:179(a)(1)(b)(1) and 2
PROVIDING OR POSSESSING
CONTRABAND IN PRISON
(Indictment filed 5/4/16)
(2−3)

18:666(a)(2) and 2 GIVING,
OFFERING, ACCEPTING OR
AGREEING TO ACCEPT A
BRIBE (Indictment filed 5/4/16)
(9)

**Disposition**

Dismissed on the motion of the United States.

Dismissed on the motion of the United States.

Dismissed on the motion of the United States.

**Highest Offense Level
(Terminated)**

Felony

**Complaints**

**Disposition**

21:841(a)(1),(b)(1)(C) and 846 –
Count 1: Conspiracy to distribute
and possess with intent to
distribute methamphetamine and 18:2 – aiding
and abetting. Count 2:
18:791(a)(1),(b)(1) – Providing or
possessing contraband in prison and
18:2 – aiding and abetting. Count 3
and 4: 18:791(a)(1),(b)(5) –
Providing or possessing contraband
in prison and 18:2 – aiding and
abetting.(COMPLAINT FILED
4/9/16)

---

Assigned to: District Judge Julie A. Robinson

Appeals court case number: 19–3193 10CCA

**Defendant (6)**

| | |
|---|---|
| **David Bishop** | represented by **Cynthia Marie Dodge** |
| *28001–031* | Cynthia M. Dodge, LLC |
| *RELEASE* | 312 SW Greenwich Drive, #10 |
| *TERMINATED: 05/18/2018* | Lee's Summit, MO 64082 |
| *also known as* | 816–246–9200 |
| Mr. Green | Fax: 816–246–9201 |
| *TERMINATED: 05/21/2018* | Alternative Phone: 816–246–9200 |
| | Cell Phone: |
| | Email: cindy@cdodgelaw.com |
| | *LEAD ATTORNEY* |
| | *ATTORNEY TO BE NOTICED* |
| | *Designation: CJA Appointment* |
| | *Bar Number: 78371* |
| | *Bar Status: WDMO Active* |

**Pending Counts**                                   **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                                **Disposition**

21:846 and 18:2 CONSPIRACY TO          Dismissed upon motion of USA. See 478 Order.
DISTRIBUTE AND POSSESS
WITH INTENT TO DISTRIBUTE
A CONTROLLED SUBSTANCE
(Indictment filed 5/4/16)

(1)

18:179(a)(1)(b)(1) and 2
PROVIDING OR POSSESSING
CONTRABAND IN PRISON                    Dismissed upon motion of USA. See 478 Order.
(Indictment filed 5/4/16)
(2–4)

18:1956(h) and 1956(a)(1)(B)(i) ––
Money Laundering Conspiracy.
Forfeiture Allegation I.                 Dismissed upon motion of USA. See 478 Order.
(Superseding Indictment Filed
03/16/2017.)
(3s)

18:1956(a)(1)(B)(i) –– Money
Laundering Conspiracy. Forfeiture
Allegation I. (Superseding             Dismissed upon motion of USA. See 478 Order.
Indictment Filed 03/16/2017.)
(4s–8s)

18:666(a)(2) and 2 GIVING,
OFFERING, ACCEPTING OR
AGREEING TO ACCEPT A                    Dismissed upon motion of USA. See 478 Order.
BRIBE (Indictment filed 5/4/16)
(9)

18:1952(a)(3)–– Unlawful Use of
Facility in Interstate Commerce.
(Superseding Indictment Filed          Dismissed upon motion of USA. See 478 Order.
03/16/2017.)
(10s)

**Highest Offense Level
(Terminated)**

Felony

**Complaints**                                          **Disposition**

21:841(a)(1),(b)(1)(C) and 846 –
Count 1: Conspiracy to distribute
and posses with intent to distribute
methamphetamine and 18:2 – aiding
and abetting. Count 2:
18:791(a)(1),(b)(1) – Providing or
possessing contraband in prison and
18:2 – aiding and abetting. Count 3
and 4: 18:791(a)(1),(b)(5) –
Providing or possessing contraband
in prison and 18:2 – aiding and
abetting. (COMPLAINT FILED
4/9/16)

**Movant**

**Federal Public Defender**                    represented by    **Kirk C. Redmond**
Office of Federal Public Defender –
Topeka
117 SW 6th Avenue, Suite 200
Topeka, KS 66603
785–232–9828
Alternative Phone:
Cell Phone: 7858407514
Email: kirk_redmond@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*
*Bar Number: 18914*
*Bar Status: Active*

**Melody J. Brannon**
Office of Federal Public Defender –
Topeka
117 SW 6th Avenue, Suite 200
Topeka, KS 66603
785 232 9828
Fax: 785–232–9886
Alternative Phone:
Cell Phone: 7854389040
Email: melody_brannon@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*
*Bar Number: 17612*
*Bar Status: Active*

**Richard Federico**
Office of Federal Public Defender –
Topeka
117 SW 6th Avenue, Suite 200
Topeka, KS 66603
785–232–9828
Alternative Phone:
Cell Phone:
Email: rich_federico@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 22111*
*Bar Status: Active*

**Branden A. Bell**
Morgan Pilate, LLC
926 Cherry Street

Kansas City, MO 64106
816−471−6694
Fax: 816−472−3516
Alternative Phone:
Cell Phone:
Email: bbell@morganpilate.com
*TERMINATED: 05/21/2019*
*Designation: Retained*
*Bar Number: 22618*
*Bar Status: Active*

---

**Movant**

**Tanya Treadway**
*(Electronic−filing and noticing privileges
in this case have been terminated; See
#[682].)*
*TERMINATED: 11/05/2018*

represented by **Tanya Treadway**
5914 Longleaf Drive
Lawrence, KS 66049
785−550−3109
Email:
PRO SE
*Bar Number:*
*Bar Status:*

---

**Movant**

**Ethics Bureau at Yale, The**

represented by **Cheryl A. Pilate**
Morgan Pilate, LLC
926 Cherry Street
Kansas City, MO 64106
816−471−6694
Fax: 816−472−3516
Alternative Phone:
Cell Phone: 913−558−6811
Email: cpilate@morganpilate.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Number: 14601*
*Bar Status: Active*

---

**Movant**

**Debra L. Barnett**

represented by **Debra L. Barnett**
Office of United States Attorney − Wichita
301 North Main Street, Suite 1200
Wichita, KS 67202−4812
316−269−6481
Fax: 316−269−6484
Alternative Phone:
Cell Phone:
Email: Debra.Barnett@usdoj.gov

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Waived or Self (Pro Se)*
*Bar Number: 12729*
*Bar Status: Active*

---

**Movant**

**Sheri Catania**                              represented by   **Sheri Catania**
Office of United States Attorney – KCKS
500 State Avenue, Suite 360
Kansas City, KS 66101
913–551–6670
Fax: 913–551–6541
Alternative Phone:
Cell Phone:
Email: sheri.catania@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Waived or Self (Pro Se)*
*Bar Number: 17097*
*Bar Status: Active*

---

**Movant**

**Kim I. Flannigan**                           represented by   **Kim I. Flannigan**
Office of United States Attorney – KCKS
500 State Avenue, Suite 360
Kansas City, KS 66101
913–551–6730
Fax: 913–551–6541
Alternative Phone:
Cell Phone:
Email: Kim.Flannigan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Waived or Self (Pro Se)*
*Bar Number: 13407*
*Bar Status: Active*

---

**Movant**

**Emily B. Metzger**                           represented by   **Emily B. Metzger**
Office of United States Attorney – Wichita
301 North Main Street, Suite 1200
Wichita, KS 67202–4812
316–269–6685
Fax: 316–269–6484
Alternative Phone:
Cell Phone: 316–648–8547

Email: emily.metzger@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Waived or Self (Pro Se)*
*Bar Number: 10750*
*Bar Status: Active*

---

**Movant**

**Terra D. Morehead**                    represented by   **Terra D. Morehead**
Office of United States Attorney – KCKS
500 State Avenue, Suite 360
Kansas City, KS 66101
913–551–6730
Fax: 913–551–6541
Alternative Phone:
Cell Phone:
Email: Terra.Morehead@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Waived or Self (Pro Se)*
*Bar Number: 12759*
*Bar Status: Active*

---

**Movant**

**Donald Christopher Oakley**            represented by   **Donald Christopher Oakley**
Office of United States Attorney – KCKS
500 State Avenue, Suite 360
Kansas City, KS 66101
913–551–6730 ext 6604
Alternative Phone:
Cell Phone:
Email: chris.oakley@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Waived or Self (Pro Se)*
*Bar Number: 19248*
*Bar Status: Active*

---

**Movant**

**Scott C. Rask**                        represented by   **Scott C. Rask**
Office of United States Attorney – KCKS
500 State Avenue, Suite 360
Kansas City, KS 66101
913–551–6730
Fax: 913–551–6541
Alternative Phone:
Cell Phone: 913–433–4074

Email: Scott.Rask@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Waived or Self (Pro Se)*
*Bar Number: 15643*
*Bar Status: Active*

---

**Movant**

**Jabari Wamble**                    represented by     **Jabari B. Wamble**
Office of United States Attorney – KCKS
500 State Avenue, Suite 360
Kansas City, KS 66101
913–551–6608
Alternative Phone:
Cell Phone:
Email: jabari.wamble@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Waived or Self (Pro Se)*
*Bar Number: 22730*
*Bar Status: Active*

---

**Movant**

**David P. Zabel**                   represented by     **David Paxton Zabel**
Office of United States Attorney – KCKS
500 State Avenue, Suite 360
Kansas City, KS 66101
913–551–6730
Fax: 913–551–6541
Alternative Phone:
Cell Phone:
Email: david.zabel@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Waived or Self (Pro Se)*
*Bar Number: 17887*
*Bar Status: Active*

---

**Interested Party**

**Shazzie Naseem**                   represented by     **Shazzie Naseem**
*COORDINATING DISCOVERY*                                Berkowitz Oliver LLP – KCMO
*ATTORNEY (CDA)*                                        2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
816–561–7007 ext 264
Fax: 816–561–1888
Alternative Phone:
Cell Phone:

Email: snaseem@berkowitzoliver.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Number: 24954*
*Bar Status: Active*

**Interested Party**

**Richard Dertinger**                      represented by   **Erin C. Thompson**
*(Criminal Case: #14−cr−20067−CM−6)*                      Office of Federal Public Defender −
                                                          KCKS
                                                          500 State Avenue, Suite 201
                                                          Kansas City, KS 66101−2400
                                                          913−551−6900
                                                          Alternative Phone: 913−387−9175
                                                          Cell Phone: 913−307−6073
                                                          Email: erin_thompson@fd.org
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: CJA Appointment*
                                                          *Bar Number: 22117*
                                                          *Bar Status: Active*

                                                          **Jacquelyn E. Rokusek**
                                                          Rokusek Law, LLC
                                                          11658 W. 75th Street
                                                          Shawnee, KS 66214
                                                          913−948−9311
                                                          Fax: 913−273−1890
                                                          Alternative Phone:
                                                          Cell Phone: 913−238−1281
                                                          Email: jackie@rs−lawfirm.com
                                                          ***TERMINATED: 05/02/2017***
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Retained*
                                                          *Bar Number: 16308*
                                                          *Bar Status: Active*

**Interested Party**

**David Lougee**                           represented by   **Catherine A. Zigtema**
*(Criminal Case: #14−cr−20068−CM−5)*                      Zigtema Law Office LC
***TERMINATED: 04/24/2018***                             11660 West 75th Street
                                                          Shawnee, KS 66214
                                                          913−647−7567
                                                          Fax: 913−227−4415
                                                          Alternative Phone:
                                                          Cell Phone: 913−221−7063

Email: kate@zigtemalaw.com
*TERMINATED: 09/02/2016*
*LEAD ATTORNEY*
*Designation: CJA Appointment*
*Bar Number: 23299*
*Bar Status: Active*

**Jonathan L. Laurans**
The 1609 Law Building
1609 West 92nd Street
Kansas City, MO 64114
816–421–5200
Alternative Phone:
Cell Phone:
Email: jlaurans@msn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Number: 15807*
*Bar Status: Active*

---

**Interested Party**

**Corrections Corporation of America**          represented by          **Alyssa C. Brockert**
Wallace Saunders Austin Brown & Enochs
Chartered – OP
10111 West 87th Street
Overland Park, KS 66212
913–888–1000
Fax: 913–888–1065
Alternative Phone:
Cell Phone:
Email: abrockert@wallacesaunders.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 24627*
*Bar Status: Active*

**Hal D. Meltzer**
Baker, Sterchi, Cowden & Rice, LLC – OP
51 Corporate Woods
9393 W. 110th Street, Suite 500
Overland Park, KS 66210
816–471–2121
Fax: 816–472–0288
Alternative Phone:
Cell Phone:
Email: meltzer@bscr–law.com
*TERMINATED: 01/28/2019*
*LEAD ATTORNEY*
*Designation: Retained*

*Bar Number: 10121*
*Bar Status: Active*

---

**Interested Party**

**Michelle Reulet**                    represented by    **Melanie S. Morgan**
*TERMINATED: 11/28/2016*                                 Morgan Pilate, LLC
                                                         926 Cherry Street
                                                         Kansas City, MO 64106
                                                         816–471–6694
                                                         Fax: 816–472–3516
                                                         Alternative Phone:
                                                         Cell Phone:
                                                         Email: mmorgan@morganpilate.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         *Bar Number: 16088*
                                                         *Bar Status: Active*

---

**Interested Party**

**Charles Hall**                       represented by    **Frederick A. Duchardt , Jr.**
*TERMINATED: 08/19/2017*                                 Frederick A. Duchardt, Jr. Attorney at
                                                         Law
                                                         P.O. Box 216
                                                         Trimble, MO 64492
                                                         816–213–0782
                                                         Fax: 816–635–5155
                                                         Alternative Phone:
                                                         Cell Phone:
                                                         Email: fduchardt@yahoo.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         *Designation: Retained*
                                                         *Bar Number: 77878*
                                                         *Bar Status: WDMO Active*

---

**Interested Party**

**Jerry Scott**                        represented by    **Frederick A. Duchardt , Jr.**
*TERMINATED: 08/19/2017*                                 (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         *Designation: Retained*
                                                         *Bar Number: 77878*
                                                         *Bar Status: WDMO Active*

---

**Interested Party**

**Montgomery Carl Akers**                    represented by    **Montgomery Carl Akers**
*02866−081*                                                   02866−081
*TERMINATED: 03/05/2019*                                      MARION − USP
                                                             U.S. Penitentiary
                                                             Inmate Mail/Parcels
                                                             PO Box 1000
                                                             Marion, IL 62959
                                                             Email:
                                                             PRO SE
                                                             *Bar Number:*
                                                             *Bar Status:*

---

**Interested Party**

**Juan Duarte−Tello**                        represented by    **Clinton W. Lee**
                                                             The Law Office of Clinton W. Lee
                                                             400 North Main Street
                                                             Lansing, KS 66043
                                                             913−250−1600
                                                             Fax: 913−727−1550
                                                             Alternative Phone:
                                                             Cell Phone:
                                                             Email: clintonlee@att.net
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*
                                                             *Bar Number: 18877*
                                                             *Bar Status: Active*

---

**Interested Party**

**Michael A. Garrett**                       represented by    **Michael A. Garrett**
*06202−045*                                                   06202−045
*TERMINATED: 08/15/2019*                                      LOMPOC − USP
                                                             3901 Klein Blvd.
                                                             Lompoc, CA 93436
                                                             Email:
                                                             PRO SE
                                                             *Bar Number:*
                                                             *Bar Status:*

---

**Interested Party**

**Tywan A. Poole**                           represented by    **Tywan A. Poole**
*25194−045*                                                   25194−045
*TERMINATED: 08/15/2019*                                      FORREST CITY − FCI − LOW
                                                             PO Box 9000
                                                             Forrest City, AR 72336
                                                             Email:
                                                             PRO SE
                                                             *Bar Number:*

*Bar Status:*

**Interested Party**

**Juan Ramirez–Gonzalez**                    represented by    **Mark A. Thomason**
                                                               Law Office of Mark Thomason, LLC
                                                               929 Walnut Street, Suite 101
                                                               Kansas City, MO 64106
                                                               816–229–8686
                                                               Fax: 816–229–9494
                                                               Alternative Phone:
                                                               Cell Phone: 816–225–4321
                                                               Email: mthomasonlaw@yahoo.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*
                                                               *Designation: Retained*
                                                               *Bar Number: 22227*
                                                               *Bar Status: Active*

**Plaintiff**

**USA**                                      represented by    **Annette B. Gurney**
                                                               Office of United States Attorney – Wichita
                                                               301 North Main Street, Suite #1200
                                                               Wichita, KS 67202–4812
                                                               316–269–6481
                                                               Fax: 316–269–6484
                                                               Alternative Phone:
                                                               Cell Phone: 316–250–8393
                                                               Email: annette.gurney@usdoj.gov
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*
                                                               *Bar Number: 11602*
                                                               *Bar Status: Active*

                                                               **Debra L. Barnett**
                                                               Office of United States Attorney – Wichita
                                                               301 North Main Street, Suite #1200
                                                               Wichita, KS 67202–4812
                                                               316–269–6481
                                                               Fax: 316–269–6484
                                                               Alternative Phone:
                                                               Cell Phone:
                                                               Email: Debra.Barnett@usdoj.gov
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*
                                                               *Designation: Retained*
                                                               *Bar Number: 12729*
                                                               *Bar Status: Active*

**Donald Christopher Oakley**
Office of United States Attorney – Kansas City
500 State Avenue, Suite 360
Kansas City, KS 66101
913–551–6730 ext 6604
Alternative Phone:
Cell Phone:
Email: chris.oakley@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Number: 19248*
*Bar Status: Active*

**Duston J. Slinkard**
Office of United States Attorney – Topeka
290 US Courthouse
444 SE Quincy
Topeka, KS 66683–3592
785–295–2850
Fax: 785–295–2853
Alternative Phone:
Cell Phone: 785–633–8059
Email: duston.slinkard@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Number: 21294*
*Bar Status: Active*

**Erin S. Tomasic**
Office of United States Attorney – Kansas City
500 State Avenue, Suite 360
Kansas City, KS 66101
913–551–6730
Fax: 913–551–6541
Alternative Phone:
Cell Phone:
Email: erin.tomasic@usdoj.gov
*TERMINATED: 10/17/2016*
*LEAD ATTORNEY*
*Designation: Retained*
*Bar Number: 78430*
*Bar Status: WDMO Termed 83.5.3*

**James A. Brown**
Office of United States Attorney – Topeka
290 US Courthouse
444 SE Quincy
Topeka, KS 66683–3592

785–295–2850
Fax: 785–295–2853
Alternative Phone:
Cell Phone: 785–312–0710
Email: james.brown2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 14254*
*Bar Status: Active*

**Steve Clymer**
Department of Justice – USAO
Lrm Eckert, William
100 S Clinston Street, Suite 9000
Syracuse, NY 13261
315–448–0672
Alternative Phone:
Cell Phone:
Email: steven.d.clymer@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*
*Bar Number:*
*Bar Status:* **Government Atty**

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 04/09/2016 | 1 | | COMPLAINT as to Lorenzo Black (1), Karl Carter (2), Stephen Rowlette (3), Anthon Aiono (4), Alicia Tackett (5), Catherine Rowlette (6), David Bishop (7). (hw) (Main Document 1 replaced with redacted version on 4/26/2016) (hw). Modified on 4/26/2016 (hw). [2:16–mj–08080–TJJ] (Entered: 04/11/2016) |
| 04/11/2016 | 2 | | NOTICE OF HEARING as to Defendants Lorenzo Black, Karl Carter, Stephen Rowlette, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Initial Appearance set for 4/11/2016 at 01:30 PM in Topeka Courtroom 470 (KGS) before Magistrate Judge K. Gary Sebelius. (sg) [2:16–mj–08080–TJJ] (Entered: 04/11/2016) |
| 04/11/2016 | | | ARREST of Lorenzo Black, Karl Carter, Stephen Rowlette, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (hw) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 4 | | ARREST WARRANT returned executed on 4/11/16 as to Karl Carter. (hw) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | | | ARRESTS of defendants Lorenzo Black, Karl Carter, Stephen Rowlette, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |

| 04/11/2016 | 13 | | MINUTE ENTRY of RULE 5 proceedings held 4/11/16 before Magistrate Judge K. Gary Sebelius as to defendant Karl Carter: Attorney David J. Guastello present. Defendant remanded to custody. Detention & Preliminary Hearings set for 4/14/2016 at 02:30 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. (Tape #NETWORK @ 2:40 p.m.) (msb) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
|---|---|---|---|
| 04/11/2016 | 14 | | FINANCIAL AFFIDAVIT by defendant Karl Carter (msb) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 15 | | ORDER APPOINTING CJA ATTORNEY David J. Guastello as to defendant Karl Carter. Signed by Magistrate Judge K. Gary Sebelius on 4/11/16. (msb) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 8 | | ARREST WARRANT returned executed on 4/11/16 as to Catherine Rowlette. (hw) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 26 | | MINUTE ENTRY of RULE 5 proceedings held 4/11/16 before Magistrate Judge K. Gary Sebelius as to defendant Catherine Rowlette: Attorney Michael M. Jackson present. Defendant remanded to custody. Detention & Preliminary Hearings set for 4/14/2016 at 02:30 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. (Tape #NETWORK @ 2:14 p.m.) (msb) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 27 | | FINANCIAL AFFIDAVIT by defendant Catherine Rowlette (msb) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 28 | | ORDER APPOINTING CJA ATTORNEY Michael M. Jackson as to defendant Catherine Rowlette. Signed by Magistrate Judge K. Gary Sebelius on 4/11/16. (msb) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 3 | | ARREST WARRANT returned executed on 4/11/16 as to Lorenzo Black. (hw) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 10 | | MINUTE ENTRY of RULE 5 proceedings held 4/11/16 before Magistrate Judge K. Gary Sebelius as to defendant Lorenzo Black: Attorney John Jenab present. Defendant remanded to custody. Detention & Preliminary Hearings set for 4/14/2016 at 02:30 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. (Tape #NETWORK @ 2:14 p.m.) (msb) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 11 | | FINANCIAL AFFIDAVIT by defendant Lorenzo Black (msb) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 12 | | ORDER APPOINTING CJA ATTORNEY John Jenab as to defendant Lorenzo Black. Signed by Magistrate Judge K. Gary Sebelius on 4/11/16. (msb) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 6 | | ARREST WARRANT returned executed on 4/11/16 as to Anthon Aiono. (hw) [2:16−mj−08080−TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 19 | | MINUTE ENTRY of RULE 5 proceedings held 4/11/16 before Magistrate Judge K. Gary Sebelius as to defendant Anthon Aiono: Attorney Jason P. Hoffman present. Defendant remanded to custody. Detention & Preliminary Hearings set for 4/14/2016 at 02:30 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. (Tape #NETWORK @ 3:06 p.m.) (msb) |

| | | | |
|---|---|---|---|
| | | | [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 20 | | FINANCIAL AFFIDAVIT by defendant Anthon Aiono (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 21 | | ORDER APPOINTING CJA ATTORNEY Jason P. Hoffman as to defendant Anthon Aiono. Signed by Magistrate Judge K. Gary Sebelius on 4/11/16. (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 7 | | ARREST WARRANT returned executed on 4/11/16 as to Alicia Tackett. (hw) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 22 | | MINUTE ENTRY of Rule 5 proceedings held 4/11/16 before Magistrate Judge K. Gary Sebelius as to defendant Alicia Tackett: Attorney Kathleen A. Ambrosio present. Defendant on conditional release with no financial bond requirement. (Tape #NETWORK @ 3:42 p.m.) (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 23 | | FINANCIAL AFFIDAVIT by defendant Alicia Tackett (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 24 | | ORDER APPOINTING CJA ATTORNEY Kathleen A. Ambrosio as to defendant Alicia Tackett. Signed by Magistrate Judge K. Gary Sebelius on 4/11/16. (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 25 | | ORDER SETTING CONDITIONS OF RELEASE as to defendant Alicia Tackett (5); No financial bond requirement. Signed by Magistrate Judge K. Gary Sebelius on 4/11/16. (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 9 | | ARREST WARRANT returned executed on 4/11/16 as to David Bishop. (hw) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 30 | | MINUTE ENTRY of RULE 5 proceedings held 4/11/16 before Magistrate Judge K. Gary Sebelius as to defendant David Bishop: Attorney Cynthia M. Dodge present. Defendant remanded to custody. Detention & Preliminary Hearings set for 4/14/2016 at 02:30 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. (Tape #NETWORK @ 3:06 p.m..) (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 31 | | FINANCIAL AFFIDAVIT by defendant David Bishop (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/11/2016 | 32 | | ORDER APPOINTING CJA ATTORNEY Cynthia M. Dodge as to defendant David Bishop. Signed by Magistrate Judge K. Gary Sebelius on 4/11/16. (msb) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/12/2016 | 29 | | ENTRY OF APPEARANCE: by attorney Michael M. Jackson appearing for Catherine Rowlette (Jackson, Michael) [2:16–mj–08080–TJJ] (Entered: 04/12/2016) |
| 04/14/2016 | 36 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: DETENTION HEARING as to Karl Carter waived on 4/14/2016. PRELIMINARY HEARING as to Karl Carter held on 4/14/2016. Status Conference set for 5/10/2016 at 02:00 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. Defendant remanded to custody. Detention ordered. (Court Reporter Kim Greiner.) (Attachments: # 1 Exhibit List and |

| | | | |
|---|---|---|---|
| | | | Witness List) (hw) [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 37 | | ORDER OF DETENTION PENDING TRIAL as to Karl Carter. Signed by Magistrate Judge Teresa J. James on 4/14/16. (hw) [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 38 | | WAIVER OF DETENTION HEARING by Karl Carter. (hw) [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 45 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: DETENTION and PRELIMINARY HEARING as to Catherine Rowlette held on 4/14/2016. Status Conference set for 5/10/2016 at 02:00 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. Release order executed. (Court Reporter Kim Greiner.) (hw) (# 1 Exhibit List and Witness List) (hw). [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 46 | | ORDER SETTING CONDITIONS OF RELEASE as to Catherine Rowlette. Signed by Magistrate Judge Teresa J. James on 4/14/16. (hw) [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 34 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: DETENTION and PRELIMINARY HEARING as to Lorenzo Black held on 4/15/2016. Status Conference set for 5/10/2016 at 02:00 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. Defendant remanded to custody. Detention ordered. (Court Reporter Kim Greiner.) (Attachments: # 1 Exhibit List and Witness List) (hw) [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 35 | | ORDER OF DETENTION as to Lorenzo Black. Signed by Magistrate Judge Teresa J. James on 4/14/16. (hw) [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 43 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: DETENTION and PRELIMINARY HEARING as to Anthon Aiono held on 4/14/2016. Status Conference set for 5/10/2016 at 02:00 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. Release order executed. (Court Reporter Kim Greiner.) (Attachments: # 1 Exhibit List and Witness List) (hw) [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 44 | | ORDER SETTING CONDITIONS OF RELEASE as to Anthon Aiono. Signed by Magistrate Judge Teresa J. James on 4/14/16. (hw) [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 33 | | NOTICE OF HEARING as to Defendant Alicia Tackett  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Status Conference set for 5/10/2016 at 02:00 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. (ck) [2:16–mj–08080–TJJ] (Entered: 04/14/2016) |
| 04/14/2016 | 47 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: DETENTION and PRELIMINARY HEARING as to David Bishop held on 4/14/2016. Status Conference set for 5/10/2016 at 02:00 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. Release order executed. (Court Reporter Kim Greiner.) (hw) ( # 1 Exhibit List and Witness List) (hw). [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 04/14/2016 | 48 | | |

| | | | |
|---|---|---|---|
| | | | ORDER SETTING CONDITIONS OF RELEASE as to David Bishop. Signed by Magistrate Judge Teresa J. James on 4/14/16. (hw) [2:16–mj–08080–TJJ] (Entered: 04/15/2016) |
| 05/03/2016 | 50 | | NOTICE REGARDING PASSPORT as to Catherine Rowlette. DEFENDANT IS NOT PERMITTED TO APPLY FOR THE ISSUANCE OF A PASSPORT DURING PEDENCY OF THIS ACTION. (ydm) [2:16–mj–08080–TJJ] (Entered: 05/03/2016) |
| 05/03/2016 | 51 | | NOTICE REGARDING PASSPORT as to David Bishop. DEFENDANT IS NOT PERMITTED TO APPLY FOR THE ISSUANCE OF A PASSPORT DURING THE PENDENCY OF THIS ACTION. (ydm) [2:16–mj–08080–TJJ] (Entered: 05/03/2016) |
| 05/04/2016 | 52 | | INDICTMENT as to Lorenzo Black (1) count(s) 1, 2–4, 9, Karl Carter (2) count(s) 1, 5–7, 9, Anthon Aiono (3) count(s) 1, 2–4, 8, Alicia Tackett (4) count(s) 3–4, 9, 10, 11, Catherine Rowlette (5) count(s) 1, 2–4, 9, David Bishop (6) count(s) 1, 2–4, 9. (mm) (Entered: 05/05/2016) |
| 05/10/2016 | 53 | | NOTICE REGARDING PASSPORT as to Alicia Tackett. Defendant is not permitted to apply for the issuance of a passport during the pendency of this action.(mm) (Entered: 05/10/2016) |
| 05/10/2016 | 54 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: ARRAIGNMENT as to Lorenzo Black (1) on Counts 1, 2–4, and 9 of the 52 Indictment held on 5/10/2016. Meet and Confer on or before 5/18/2016. Speedy Trial Motion Filing Deadline 6/7/2016. Status Conference set for 6/14/2016 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Defendant remanded to custody. (Tape #2:11.) (mg) (Entered: 05/11/2016) |
| 05/10/2016 | 55 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: ARRAIGNMENT as to Karl Carter (2) on Counts 1, 5–7, and 9 of the 52 Indictment held on 5/10/2016. Meet and Confer on or before 5/18/2016. Speedy Trial Motion Filing Deadline 6/7/2016. Status Conference set for 6/14/2016 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Defendant remanded to custody. (Tape #2:00.) (mg) (Entered: 05/11/2016) |
| 05/10/2016 | 56 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: ARRAIGNMENT as to Anthon Aiono (3) on Counts 1, 2–4, and 8 of the 52 Indictment held on 5/10/2016. Meet and Confer on or before 5/18/2016. Speedy Trial Motion Filing Deadline 6/7/2016. Status Conference set for 6/14/2016 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Release order continued in effect. (Tape #2:00.) (mg) (Entered: 05/11/2016) |
| 05/10/2016 | 57 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: ARRAIGNMENT as to Alicia Tackett (4) on Counts 3–4, 9, 10, and 11 of the 52 Indictment held on 5/10/2016. Meet and Confer on or before 5/18/2016. Speedy Trial Motion Filing Deadline 6/7/2016. Status Conference set for 6/14/2016 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Release order continued in effect. (Tape #2:00.) (mg) (Entered: 05/11/2016) |

| 05/10/2016 | 58 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: ARRAIGNMENT as to Catherine Rowlette (5) on Counts 1, 2–4, and 9 of the 52 Indictment held on 5/10/2016. Meet and Confer on or before 5/18/2016. Speedy Trial Motion Filing Deadline 6/7/2016. Status Conference set for 6/14/2016 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Release order continued in effect. (Tape #2:00.) (mg) (Entered: 05/11/2016) |
| --- | --- | --- | --- |
| 05/10/2016 | 59 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: ARRAIGNMENT as to David Bishop (6) on Counts 1, 2–4, and 9 of the 52 Indictment held on 5/10/2016. Meet and Confer on or before 5/18/2016. Speedy Trial Motion Filing Deadline 6/7/2016. Status Conference set for 6/14/2016 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Release order continued in effect. (Tape #2:00.) (mg) (Entered: 05/11/2016) |
| 05/10/2016 | 60 | | PRETRIAL ORDER NO. 1 ENTERED as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tacket, Catherine Rowlette, and David Bishop: Meet and Confer conference in the Office of US Attorney scheduled for 5/18/2016 at a mutually agreed upon time. Motion to extend speedy trial deadline due by 6/7/2016. Status Conference set for 6/14/2016 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Signed by Magistrate Judge Teresa J. James on 5/10/2016. (mg) (Entered: 05/11/2016) |
| 05/20/2016 | 61 | | Unopposed MOTION for Entry of a Protective Order Governing Disclosure of Personal Identity Information by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Tomasic, Erin) (Entered: 05/20/2016) |
| 05/23/2016 | 62 | | PROTECTIVE ORDER sustaining the government's 61 Unopposed Motion for Entry of a Protective Order as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), and David Bishop (6). Signed by District Judge Julie A. Robinson on 5/23/2016. (mg) (Entered: 05/23/2016) |
| 05/24/2016 | 63 | | Joint MOTION to Designate as Complex Case by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Tomasic, Erin) (Entered: 05/24/2016) |
| 05/26/2016 | 64 | | ORDER DESIGNATING AS COMPLEX CASE AND CONTINUING DEADLINES granting the 63 Joint Motion for Designation of Excludable Time as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), and David Bishop (6). The Court finds that for the reasons set forth, that this matter shall be and is hereby finds that pursuant to 18 U.S.C. § 3161(h)(7)(B) that this is a complex case and further deadlines for Motions and for the setting of the Trial Dates should be extended beyond the Speedy Trial limitations. The parties will reconvene in approximately 90 days from the 6/14/2016 status hearing to determine whether they are in a position to set pretrial deadlines and trial setting. The Court continues status conference to 9/19/2016 at 9:00 AM. Signed by District Judge Julie A. Robinson on 5/26/2016. (mg) (Entered: 05/27/2016) |
| 06/13/2016 | 65 | | ORDER REGARDING CJA CASE BUDGETING as to Lorenzo Black. Signed by District Judge Julie A. Robinson on 6/13/2016. (mg) (Entered: |

| | | |
|---|---|---|
| | | 06/14/2016) |
| 06/13/2016 | 66 | ORDER REGARDING CJA CASE BUDGETING as to Karl Carter. Signed by District Judge Julie A. Robinson on 6/13/2016. (mg) (Entered: 06/14/2016) |
| 06/13/2016 | 67 | ORDER REGARDING CJA CASE BUDGETING as to Anthon Aiono. Signed by District Judge Julie A. Robinson on 6/13/2016. (mg) (Entered: 06/14/2016) |
| 06/13/2016 | 68 | ORDER REGARDING CJA CASE BUDGETING as to Alicia Tackett. Signed by District Judge Julie A. Robinson on 6/13/2016. (mg) (Entered: 06/14/2016) |
| 06/13/2016 | 69 | ORDER REGARDING CJA CASE BUDGETING as to Catherine Rowlette. Signed by District Judge Julie A. Robinson on 6/13/2016. (mg) (Entered: 06/14/2016) |
| 06/13/2016 | 70 | ORDER REGARDING CJA CASE BUDGETING as to David Bishop. Signed by District Judge Julie A. Robinson on 6/13/2016. (mg) (Entered: 06/14/2016) |
| 07/13/2016 | 71 | NOTICE OF HEARING as to Defendants Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Status Conference set for 7/21/2016 at 03:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (bw) (Entered: 07/13/2016) |
| 07/18/2016 | 72 | WAIVER of Appearance at Status Conference by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 07/18/2016) |
| 07/19/2016 | 73 | WAIVER of Appearance at Discovery Conference by Anthon Aiono. (Hoffman, Jason) (Entered: 07/19/2016) |
| 07/21/2016 | 74 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: CASE BUDGET STATUS CONFERENCE as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop held on 7/21/2016. (Court Reporter Kelli Stewart.) (bw) (Entered: 07/22/2016) |
| 07/25/2016 | 75 | TRANSCRIPT of Case Budgeting Status Conference (45 pgs) held 07/21/2016 as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Debra Barnett. <br><br> NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below. <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of |

| | | | |
|---|---|---|---|
| | | | Transcript Restriction set for 10/24/2016. (ks) (Entered: 07/25/2016) |
| 08/03/2016 | 76 | | SEALED MOTION for Leave to File Under Seal by Catherine Rowlette. (Attachments: # 1 Proposed Sealed Document, # 2 Proposed Sealed Document)(Jackson, Michael) (Entered: 08/03/2016) |
| 08/03/2016 | 77 | | ORDER granting 76 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Catherine Rowlette (5) Signed by District Judge Julie A. Robinson on 8/3/2016. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/03/2016) |
| 08/03/2016 | 78 | | SEALED MOTION by Catherine Rowlette. (Attachments: # 1 Declaration)(Jackson, Michael) (Entered: 08/03/2016) |
| 08/04/2016 | 79 | | SEALED ORDER (Unsealed; See 81 Text Order.) regarding 78 Sealed Motion. Signed by District Judge Julie A. Robinson on 8/4/2016. (mg) (Entered: 08/04/2016) |
| 08/04/2016 | 80 | | MOTION to Unseal Order (Doc. 79 ) by Catherine Rowlette. (Jackson, Michael) (Entered: 08/04/2016) |
| 08/04/2016 | 81 | | ORDER granting 80 Motion to Unseal Order. Signed by District Judge Julie A. Robinson on 8/4/2016. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/04/2016) |
| 08/05/2016 | 82 | | MOTION for Fed. R. Crim. P. 41(g) Return of Information by Movant Federal Public Defenders Office as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (mg) (Entered: 08/05/2016) |
| 08/07/2016 | 83 | | MOTION For Access to Visitation Rooms at CCA by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 08/07/2016) |
| 08/07/2016 | 84 | | MOTION to Produce Witnesses Pursuant to Fed.R.Crim.P. 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 08/07/2016) |
| 08/07/2016 | 85 | | Amended MOTION for Fed. R. Crim. P. 41(g) Return of Information by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Exhibit Transcript)(Brannon, Melody) (Entered: 08/07/2016) |
| 08/08/2016 | 86 | | NOTICE OF HEARING ON MOTION as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. 83 MOTION For Access to Visitation Rooms at CCA, 82 MOTION for Fed. R. Crim. P. 41(g) Return of Information, 85 Amended MOTION for Fed. R. Crim. P. 41(g) Return of Information: (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Motion Hearing set for 8/9/2016 at 01:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (bw) (Entered: 08/08/2016) |
| 08/08/2016 | 87 | | |

| | | |
|---|---|---|
| | | ORDER granting 84 Motion to Produce as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by District Judge Julie A. Robinson on 8/8/2016. (bw) (Entered: 08/08/2016) |
| 08/08/2016 | 88 | ORDER granting 83 Motion Access to CCA Legal Visitation Rooms as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by District Judge Julie A. Robinson on 8/8/2016. (bw). Modified on 8/8/2016 (bw) to add document. (Entered: 08/08/2016) |
| 08/08/2016 | 89 | MOTION to Adopt and Join in Pretrial Motions regarding 85 Ameded Motion for Fed. R. Crim. P. 41(g) Return of Information and all other pretrial motions that are of benefit to defendant Catherine Rowlette by Catherine Rowlette. (Jackson, Michael) (Entered: 08/08/2016) |
| 08/08/2016 | 90 | ENTRY OF APPEARANCE on behalf of USA by Debra L. Barnett as Co−Counsel. (Barnett, Debra) (Entered: 08/08/2016) |
| 08/08/2016 | 91 | MOTION to Produce Records from CCA Pursuant to Fed.R.Crim.P. 17(c) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 08/08/2016) |
| 08/08/2016 | 92 | MOTION to Join 82 Amended Motion for Fed. R. Crim. P. 41(g) Return of Information by Richard Dertinger as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (mg) (Entered: 08/08/2016) |
| 08/08/2016 | 93 | ORDER granting 91 Motion to Produce as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by District Judge Julie A. Robinson on 8/8/2016. (bw) (Entered: 08/08/2016) |
| 08/08/2016 | 94 | MOTION to Join 82 Motion for Fed. R. Crim. P. 41(g) Return of Information by David Lougee as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (mg) (Entered: 08/08/2016) |
| 08/08/2016 | 95 | ENTRY OF APPEARANCE on behalf of USA by Duston J. Slinkard as Co−Counsel. (Slinkard, Duston) (Entered: 08/08/2016) |
| 08/08/2016 | 96 | Joint MOTION Join Pretrial Motions by Lorenzo Black as to Lorenzo Black, David Bishop. (Jenab, John) (Entered: 08/08/2016) |
| 08/08/2016 | 97 | MOTION to Join Pretrial Motions by Karl Carter. (Guastello, David) (Entered: 08/08/2016) |
| 08/09/2016 | 98 | WAIVER of Appearance at Motion Hearing by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 08/09/2016) |
| 08/09/2016 | 99 | MOTION to Preserve Objections by David Bishop. (Dodge, Cynthia) (Entered: 08/09/2016) |
| 08/09/2016 | 100 | WAIVER of Appearance at Motion Hearing by Anthon Aiono. (Hoffman, Jason) (Entered: 08/09/2016) |
| 08/09/2016 | 101 | |

| | | | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: taking under advisement <u>85</u> Motion for Return of Property as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). (Court Reporter Kelli Stewart.) (Attachments: # <u>1</u> Defendant Exhibit List 1, # <u>2</u> Defendant Exhibit List 2, # <u>3</u> Defendant Witness List) (bw) (Main Document 101 replaced on 10/11/2016 to add additional text: "The Federal Public Defender requested a Special Master and Government agreed one should be appointed.") (bw). Modified on 10/11/2016 (bw). (Entered: 08/10/2016) |
| 08/10/2016 | <u>102</u> | | MEMORANDUM AND ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (See Order for details.) In Court Hearing set for 8/16/2016 at 01:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Signed by District Judge Julie A. Robinson on 8/10/2016. (bw) (Entered: 08/10/2016) |
| 08/11/2016 | <u>103</u> | | ENTRY OF APPEARANCE: by attorney Jonathan L. Laurans on behalf of Interested Party David Lougee. (Laurans, Jonathan) (Entered: 08/11/2016) |
| 08/11/2016 | <u>104</u> | | TRANSCRIPT of Motion for Return of Property Hearing (118 pgs) held 08/09/2016 as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 11/9/2016. (ks) (Entered: 08/11/2016) |
| 08/15/2016 | <u>105</u> | | MOTION for Court to Impound Additional Government Evidence by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 08/15/2016) |
| 08/15/2016 | <u>106</u> | | MEMORANDUM OF LAW by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop in Support of Motion for Special Master. (Brannon, Melody) (Additional attachment added on 8/15/2016: # <u>1</u> Proposed Order) (bw) and regenerated. (Main Document 106 replaced with a correct document on 8/16/2016. Notice regenerated.) (mg)) (Entered: 08/15/2016) |
| 08/15/2016 | <u>107</u> | | WAIVER of Appearance by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 08/15/2016) |
| 08/15/2016 | <u>108</u> | | |

| | | | |
|---|---|---|---|
| | | | MOTION to Join Pretrial Motions by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 08/15/2016) |
| 08/15/2016 | 109 | | MOTION Join in Pretrial Motions by Anthon Aiono. (Hoffman, Jason) (Entered: 08/15/2016) |
| 08/15/2016 | 110 | | RESPONSE TO MOTION by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re: 82 MOTION for Fed. R. Crim. P. 41(g) Return of Information, 85 Amended MOTION for Fed. R. Crim. P. 41(g) Return of Information. (Barnett, Debra) (Entered: 08/15/2016) |
| 08/16/2016 | 111 | | WAIVER of Appearance at Motion Hearing by Anthon Aiono. (Hoffman, Jason) (Entered: 08/16/2016) |
| 08/16/2016 | 112 | | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson. (See Minute Sheet for details.) (Court Reporter Kelli Stewart.) (bw) (Entered: 08/17/2016) |
| 08/18/2016 | 113 | | ORDER granting 105 Motion for Court to Impound Additional Government Evidence as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by District Judge Julie A. Robinson on 8/18/2016. (bw) (Entered: 08/18/2016) |
| 08/18/2016 | 114 | | ORDER: CCA shall, forthwith, provide to the United States Marshal Service, any and all video recordings, both originals and copies, of the attorney–client visitation rooms, including, without limitation, video recordings from May 1, 2016, to August 16, 2016. CCA shall also provide written confirmation of whether these recordings have been disseminated to, or viewed by, any person or entity. The USMS shall immediately deliver those recordings, and CCA's written confirmation, to the Court. Signed by District Judge Julie A. Robinson on 8/17/2016. (bw) (Entered: 08/18/2016) |
| 08/18/2016 | 115 | | ORDER setting briefing deadline. In anticipation of the Court closing the record on this matter, the Court sets a deadline for the submission of any additional briefs in relation to the Oral Motion for Appointment of Special Master. The parties shall submit to the Court any additional briefing regarding the Motion by no later than August 23, 2016. Signed by District Judge Julie A. Robinson on 8/18/2016. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (gt) (Entered: 08/18/2016) |
| 08/19/2016 | 116 | | ENTRY OF APPEARANCE: by attorney Kirk C. Redmond on behalf of Federal Public Defender. (Redmond, Kirk) (Entered: 08/19/2016) |
| 08/19/2016 | 117 | | AMENDED ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (See Order for details.) Signed by District Judge Julie A. Robinson on 8/19/2016. (bw) (Entered: 08/19/2016) |
| 08/22/2016 | 118 | | TRANSCRIPT of Motions Hearing (73 pgs) held 08/16/2016 as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Debra Barnett. |

| | | | |
|---|---|---|---|
| | | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 11/21/2016. (ks) (Entered: 08/22/2016) |
| 08/23/2016 | 119 | | MEMORANDUM OF LAW by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Proposed Order)(Brannon, Melody) (Entered: 08/23/2016) |
| 08/23/2016 | 120 | | MEMORANDUM OF LAW by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Oakley, Donald) (Entered: 08/23/2016) |
| 08/23/2016 | 121 | | RESPONSE TO MOTION by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re: 105 MOTION for Court to Impound Additional Government Evidence. (Attachments: # 1 Attach. A)(Tomasic, Erin) (Entered: 08/23/2016) |
| 08/24/2016 | 122 | | NOTICE of Intent to File Reply by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 08/24/2016) |
| 08/30/2016 | 123 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. Hearing set for 9/7/2016 at 01:30 PM in KC Courtroom 427 (JAR)before District Judge Julie A. Robinson. Signed by District Judge Julie A. Robinson on 8/30/2016. (bw) (Entered: 08/30/2016) |
| 08/30/2016 | 124 | | RESPONSE (form of letter) re: 114 Order and 117 Amended Order filed by Crow & Associates, Attorneys for Corrections Corporation of America.(bw) (Entered: 08/30/2016) |
| 08/30/2016 | 125 | | WAIVER of Appearance by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 08/30/2016) |
| 08/31/2016 | 126 | | WAIVER of Appearance by Lorenzo Black. (Jenab, John) (Entered: 08/31/2016) |
| 09/02/2016 | 127 | | WAIVER of Appearance by Anthon Aiono. (Hoffman, Jason) (Entered: 09/02/2016) |
| 09/02/2016 | 128 | | MOTION to Withdraw Catherine A. Zigtema as Attorney by Interested Party David Lougee as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Zigtema, Catherine) (Entered: 09/02/2016) |
| 09/02/2016 | 129 | | ORDER ALLOWING WITHDRAWAL OF COUNSEL sustaining Interested Party David Lougee's 128 Motion to Withdraw as Attorney. Attorney Catherine Zigtema is withdrawn as counsel for Interested Party David Lougee. |

| | | Signed by District Judge Julie A. Robinson on 9/2/2016. (mg) (Entered: 09/02/2016) |
|---|---|---|
| 09/02/2016 | 130 | MEMORANDUM OF LAW – REPLY by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop to 105 Motion to Impound Evidence. (Attachments: # 1 Exhibit)(Brannon, Melody) (Entered: 09/02/2016) |
| 09/05/2016 | 131 | WAIVER of Appearance at the Hearing on Oral Motion to Appoint Special Master by Karl Carter. (Guastello, David) (Entered: 09/05/2016) |
| 09/06/2016 | 132 | SUPPLEMENT to 130 Memorandum of Law by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Attachments: # 1 Exhibit 451)(Brannon, Melody) (Attachment 1 replaced on 9/7/2016 with redacted copy) (hw). Modified on 9/7/2016 (hw). (Entered: 09/06/2016) |
| 09/06/2016 | 133 | MEMORANDUM OF LAW by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Attachments: # 1 Exhibit 1–7)(Tomasic, Erin) (Entered: 09/06/2016) |
| 09/07/2016 | 134 | ENTRY OF APPEARANCE: by attorney Branden A. Bell on behalf of Federal Public Defender (Bell, Branden) (Entered: 09/07/2016) |
| 09/07/2016 | 137 | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: MOTION HEARING as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop held on 9/9/2016. (Court Reporter Kelli Stewart.) (Attachments: # 1 Government Exhibit List, # 2 Defendants' Exhibit List, # 3 Witness List) (bw) (Entered: 09/09/2016) |
| 09/09/2016 | 135 | TRANSCRIPT of Oral Motion to Appoint Special Master Hearing (165 pgs) held 09/07/2016 as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Debra Barnett.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 12/8/2016. (ks) (Entered: 09/09/2016) |
| 09/09/2016 | 136 | SEALED TRANSCRIPT as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (ks) (Entered: 09/09/2016) |
| 09/14/2016 | 138 | MOTION to Continue Status Conference by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 09/14/2016) |

| 09/14/2016 | 139 | | MOTION to Produce *Video* by David Lougee as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Laurans, Jonathan) (Entered: 09/14/2016) |
|---|---|---|---|
| 09/14/2016 | 140 | | ORDER granting 138 Motion to Continue. Time excluded from 9/19/2016 until 10/17/2016 as to Alicia Tackett (4) Status Conference is continued to 10/17/2016 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. Signed by District Judge Julie A. Robinson on 9/14/2016. (bw) (Entered: 09/14/2016) |
| 09/14/2016 | 141 | | ORDER granting 139 Motion to Produce as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6) Signed by District Judge Julie A. Robinson on 9/14/2016. (bw) (Entered: 09/14/2016) |
| 09/15/2016 | 142 | | NOTICE of No Responsive Material by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Oakley, Donald) (Entered: 09/15/2016) |
| 10/11/2016 | 143 | | AMENDED NOTICE OF HEARING as to Defendants Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) EX PARTE CASE BUDGET STATUS CONFERENCE previously set for 10/17/2016 at 9:00 a.m. has been moved to 10:30 AM in KC Courtroom 476 (KHV) before District Judge Julie A. Robinson. (bw) (Entered: 10/11/2016) |
| 10/11/2016 | 144 | | NOTICE OF HEARING as to Defendants Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Motion Hearing for APPOINTMENT OF SPECIAL MASTER set for 10/28/2016 at 10:30 AM in KC Courtroom 476 (KHV) before District Judge Julie A. Robinson. (bw) (Entered: 10/11/2016) |
| 10/11/2016 | 145 | | WAIVER of Appearance by Alicia Tackett (Ambrosio, Kathleen) (Entered: 10/11/2016) |
| 10/11/2016 | 146 | | APPOINTMENT ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. The Court concludes that appointment of a Special Master is appropriate in this case.Accordingly, the Court hereby enters this Order of Appointment. The Court appoints David R. Cohen as Special Master. Signed by District Judge Julie A. Robinson on 10/11/2016. (hl) (Additional attachment(s) added on 10/12/2016: # 1 Affidavit) (hl). (Entered: 10/12/2016) |
| 10/12/2016 | 147 | | WAIVER of Appearance at Status Conference by Anthon Aiono (Hoffman, Jason) (Entered: 10/12/2016) |
| 10/14/2016 | 148 | | WAIVER of Appearance by Alicia Tackett (Ambrosio, Kathleen) (Entered: 10/14/2016) |
| 10/17/2016 | 149 | | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Erin S. Tomasic as to USA (Tomasic, Erin) (Entered: 10/17/2016) |
| 10/17/2016 | 150 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: EX PARTE CASE BUDGETING CONFERENCE as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop held on 10/17/2016. (Court Reporter Kelli Stewart.) (bw) (Entered: 10/17/2016) |
| 10/17/2016 | 151 | | ENTRY OF APPEARANCE: by attorney Erin C. Thompson on behalf of Richard Dertinger (Thompson, Erin) (Entered: 10/17/2016) |
| 10/20/2016 | 152 | | WAIVER of Appearance at Motion Hearing by Anthon Aiono (Hoffman, Jason) (Entered: 10/20/2016) |
| 10/25/2016 | 153 | | UNOPPOSED MOTION for Release from Custody by Lorenzo Black. (Jenab, John) Modified on 10/25/2016 – The event selected for this document was Motion for Bond. The event type has been modified/recategorized as a Motion for Release from Custody. (Entered: 10/25/2016) |
| 10/25/2016 | 155 | | DISCOVERY CONFERENCE ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop Signed by David R. Cohen, Special Master on 10/25/2016. (bw) (Entered: 10/25/2016) |
| 10/25/2016 | 156 | | NOTICE OF HEARING as to Defendant Lorenzo Black  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Hearing on 153 UNOPPOSED MOTION for Release from Custody set for 10/26/2016 at 03:00 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. (ck) (Entered: 10/25/2016) |
| 10/25/2016 | 157 | | MOTION for Extension of Time to File *Motion for Reconsideration of Court's Appointment Order (Doc. 146) and Objections* by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Barnett, Debra) (Entered: 10/25/2016) |
| 10/25/2016 | 158 | | ORDER granting 157 United States of America's Motion for Extension of Time to File Motion for Reconsideration of Court's Appointment Order (Doc. 146) and Objections. The deadline for the United States to file a motion for reconsideration and objections to the Court's Appointment Order is extended until October 27, 2016. The previously scheduled hearing set for October 28, 2016 at 10:30 a.m. will proceed as scheduled. Signed by District Judge Julie A. Robinson on 10/25/2016. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 10/25/2016) |
| 10/26/2016 | 159 | | MOTION for Joinder *as Interested Party in all Motions Related to Rule 41(g) Seeking Return of Information* by Michelle Reulet as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Exhibit 1)(Morgan, Melanie) (Entered: 10/26/2016) |
| 10/26/2016 | 160 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: granting 153 Motion for Release from Custody as to Lorenzo Black (1); MOTION HEARING as to Lorenzo Black held on 10/26/2016. Release Order –Executed (ydm) (Entered: 10/27/2016) |
| 10/26/2016 | 161 | | ORDER grants as to Lorenzo Black re 153 MOTION for Release from Custody filed by Lorenzo Black. The defendant shall be released from the custody of the U.S. Marshal, subject to the Order Setting Conditions of |

| | | | |
|---|---|---|---|
| | | | Release also entered today. Signed by Magistrate Judge Teresa J. James on 10/26/2016. (ydm) (Entered: 10/27/2016) |
| 10/26/2016 | 162 | | ORDER SETTING CONDITIONS OF RELEASE Signed by Magistrate Judge Teresa J. James on 10/26/2016. (ydm) (Entered: 10/27/2016) |
| 10/27/2016 | 163 | | MOTION for Reconsideration re 146 Order, *And Objections* by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Barnett, Debra) (Entered: 10/27/2016) |
| 10/27/2016 | 164 | | NOTICE OF COURTROOM CHANGE. Hearing will be held in Courtroom 643 as to Defendants Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 10/27/2016) |
| 10/28/2016 | 165 | | WAIVER of Appearance by Lorenzo Black (Jenab, John) (Entered: 10/28/2016) |
| 10/28/2016 | 166 | | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: MOTION HEARING as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop held on 10/28/2016: granting 159 Pretrial Detainee Michelle Reulet's Motion for Joinder. As to 163 MOTION for Reconsideration re 146 Order, *And Objections* filed by USA, the Court sets a Response deadline of 11/14/2016 and no reply is necessary. (Court Reporter Kim Greiner.) (ses) (Entered: 10/28/2016) |
| 10/31/2016 | 167 | | NOTICE OF INTENT TO CHANGE PLEA and NOTICE OF HEARING. The defendant Catherine Rowlette has notified the court on 10/26/2016 that she intends to change her plea. The time from this notice until the change of plea hearing (including any continuances) is excludable time for speedy trial purposes. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Change of Plea Hearing set for 11/3/2016 at 10:30 AM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James. (Defendant is agreeable to have this heard before a magistrate. Waiver to follow on 11/3/2016). (ck) (Entered: 10/31/2016) |
| 11/03/2016 | 168 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J. James: CHANGE OF PLEA HEARING as to Catherine Rowlette held on 11/3/2016 Sentencing set for 1/30/2017 at 01:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson.. Plea of Guilty as to Counts 4 Accepted. PSI ordered. Continued on Present Bail. Defendant remains on release. (ydm) (Entered: 11/03/2016) |
| 11/03/2016 | 169 | | PETITION TO ENTER PLEA OF GUILTY AND ORDER ENTERING PLEA as to Catherine Rowlette (5) Count 4 Signed by District Judge Julie A. Robinson on 11/3/2016. (ydm) (Entered: 11/03/2016) |
| 11/03/2016 | 170 | | PLEA AGREEMENT as to Catherine Rowlette re 169 Petition and Order to Enter Plea of Guilty (ydm) (Entered: 11/03/2016) |
| 11/03/2016 | 171 | | CONSENT TO PROCEED WITH GUILTY PLEA BEFORE US MAGISTRATE JUDGE IN A MISDEMEANOR CASE as to Catherine Rowlette Signed by Magistrate Judge Teresa J. James on 11/3/2016. (ydm) (Entered: 11/03/2016) |

| 11/10/2016 | 172 | | TRANSCRIPT of Discovery Conference held October 28, 2016 as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop before Judge Julie A. Robinson, Court Reporter Kim Greiner, 913–735–2314, kim_greiner@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender. <br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 2/8/2017. (kg) (Entered: 11/10/2016) |
| 11/14/2016 | 173 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. Signed by District Judge Julie A. Robinson on 11/14/2016. (Attachments: # 1 Summary Billing Statement/Order) (bw) (Entered: 11/14/2016) |
| 11/14/2016 | 174 | | RESPONSE TO MOTION by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 163 MOTION for Reconsideration re 146 Order, *And Objections* (Redmond, Kirk) (Entered: 11/14/2016) |
| 11/14/2016 | 175 | | MOTION for Reconsideration re 159 MOTION for Joinder *as Interested Party in all Motions Related to Rule 41(g) Seeking Return of Information* filed by Michelle Reulet by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Barnett, Debra) (Entered: 11/14/2016) |
| 11/14/2016 | 176 | | REPORT by Special Master David R. Cohen (bw) (Entered: 11/14/2016) |
| 11/15/2016 | 177 | | REPORT by Special Master David R. Cohen (bw) (Entered: 11/15/2016) |
| 11/15/2016 | 178 | | NOTICE REGARDING PASSPORT as to Lorenzo Black. Defendant is not permitted to apply for the issuance of a passport during pendency of this action. (hw) (Entered: 11/15/2016) |
| 11/16/2016 | 179 | | MINUTE ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 176 Progress Report filed by David R. Cohen, 177 Progress Report filed by David R. Cohen The Court directs Special Master David R. Cohen to proceed with the PHASE II scope of work defined in Appointment Order, Doc. 146, now that he has completed the work described in his Feasibility Report, Doc. 176, and the work described in his Report Regarding Seized Inmate Documents, Doc. 177. The Court finds that the scope of work in PHASE II is consistent with the scope of work the government consented to prior to Mr. Cohen's appointment. The Court will issue a separate order on the government's motion to reconsider the appointment. Accordingly, Special Master Cohen is ordered to proceed with |

| | | | |
|---|---|---|---|
| | | | the PHASE II scope of work. Signed by District Judge Julie A. Robinson on 11/16/2016. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (Robinson, Julie) (Entered: 11/16/2016) |
| 11/18/2016 | 180 | | PRESERVATION ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. Signed by Special Master David R. Cohen on 11/18/2016. (bw) (Entered: 11/18/2016) |
| 11/28/2016 | 181 | | ORDER granting re 175 MOTION for Reconsideration re 159 MOTION for Joinder *as Interested Party in all Motions Related to Rule 41(g) Seeking Return of Information* filed by Michelle Reulet filed by USA as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). I have conferred with Judge Crabtree, who is assigned to Ms. Reulet's criminal case and who is considering her motion to transfer her case to me. I have also considered the pleadings filed in Ms. Reulet's case, as well as the instant motion for reconsideration, including the government's ex parte submissions and have determined that the issues raised in Ms. Reulet's Rule 41 motion are distinct from the issues raised in the Rule 41 motions raised by the parties in the instant case. Judge Crabtree is better situated to decide the issues within the context of Ms. Reulet's criminal case pending before Judge Crabtree. It is therefore ORDERED that the Motion for Reconsideration is GRANTED and Ms. Reulet's Motion for Intervention in this case is DENIED. Signed by District Judge Julie A. Robinson on 11/28/2016. (This is a TEXT ENTRY ONLY. There is no .pdf document associated with this entry.) (Robinson, Julie) (Entered: 11/28/2016) |
| 11/29/2016 | 182 | | MEMORANDUM AND ORDER denying 163 Motion for Reconsideration of the Court's Appointment Order and Objections as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by District Judge Julie A. Robinson on 11/29/16. (hw) (Entered: 11/29/2016) |
| 12/06/2016 | 183 | | REPORT OF THE SPECIAL MASTER *First Report Regarding Telephone Call Audio Recordings* (Cohen, David) (Entered: 12/06/2016) |
| 12/16/2016 | 184 | | REPORT OF THE SPECIAL MASTER *Order of Production Directed to Securus* (Cohen, David) (Entered: 12/16/2016) |
| 12/20/2016 | 185 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. Signed by District Judge Julie A. Robinson on 12/20/2016. (Attachments: # 1 Summary Billing Statement/Order) (bw) (Entered: 12/20/2016) |
| 12/21/2016 | 186 | | REPORT OF THE SPECIAL MASTER *Order of Production Directed to CCA* (Cohen, David) (Main Document 186 replaced and regenerated to parties.) (bw) (Entered: 12/21/2016) |
| 12/21/2016 | 187 | | REPORT OF THE SPECIAL MASTER *Second Report Regarding Telephone−Call Audio Recordings* (Cohen, David) (Entered: 12/21/2016) |
| 01/04/2017 | 188 | | RESPONSE re 187 Report of the Special Master by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Brannon, Melody) (Entered: 01/04/2017) |
| 01/06/2017 | 189 | | |

| | | |
|---|---|---|
| | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. Signed by District Judge Julie A. Robinson on 1/6/2017. (Attachments: # 1 Summary Billing Statement/Order) (bw) (Entered: 01/06/2017) |
| 01/11/2017 | 190 | PRESENTENCE INVESTIGATION REPORT as to Catherine Rowlette<br><br>**(NOTE: Access to this document is restricted to the USA and this defendant.)**<br><br>(USPO) (Entered: 01/11/2017) |
| 01/19/2017 | 191 | NOTICE OF HEARING as to Defendant Catherine Rowlette  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)Due to a conflict with the Court's schedule, and in agreement of the parties, Sentencing is reset to 3/15/2017 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (bw) (Entered: 01/19/2017) |
| 01/19/2017 | 192 | RESPONSE re 183 Report of the Special Master, 187 Report of the Special Master, 188 Response (Other) by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Barnett, Debra) (Entered: 01/19/2017) |
| 01/31/2017 | 193 | REPORT OF THE SPECIAL MASTER *First Report Regarding Video Recordings* (Cohen, David) (Entered: 01/31/2017) |
| 02/01/2017 | 194 | NOTICE of change of address by David J. Guastello as to Karl Carter (email to Attorney Admission) (Guastello, David) (Entered: 02/01/2017) |
| 02/08/2017 | 195 | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. Signed by District Judge Julie A. Robinson on 2/8/2017. (Attachments: # 1 Summary Billing Statement/Order) (bw) (Entered: 02/08/2017) |
| 02/14/2017 | 196 | REVISED PRESENTENCE INVESTIGATION REPORT as to Catherine Rowlette<br><br>**(NOTE: Access to this document is restricted to the USA and this defendant.)**<br><br>(USPO) (Entered: 02/14/2017) |
| 02/14/2017 | 197 | OBJECTION(S) to 193 Report of the Special Master by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Barnett, Debra) (Entered: 02/14/2017) |
| 02/15/2017 | 198 | ENTRY OF APPEARANCE: by attorney Richard Federico on behalf of Federal Public Defender (Federico, Richard) (Entered: 02/15/2017) |
| 02/16/2017 | 199 | NOTICE OF INTENT TO CHANGE PLEA and NOTICE OF HEARING. The defendant Alicia Tackett has notified the court as of this date that he/she intends to change his/her plea. The time from this notice until the change of plea hearing (including any continuances) is excludable time for speedy trial purposes. (This is a TEXT ENTRY ONLY. There is no.pdf document |

| | | | |
|---|---|---|---|
| | | | associated with this entry.) Change of Plea Hearing set for 3/13/2017 at 01:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (bw) (Entered: 02/16/2017) |
| 02/28/2017 | 202 | | MOTION to Compel *Production of Grand Jury Materials to Special Master* by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 02/28/2017) |
| 03/03/2017 | 203 | | NOTICE OF INTENT TO CHANGE PLEA and NOTICE OF HEARING. The defendant Lorenzo Black has notified the court as of this date that he/she intends to change his/her plea. The time from this notice until the change of plea hearing (including any continuances) is excludable time for speedy trial purposes. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Change of Plea Hearing set for 3/13/2017 at 01:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (bw) (Entered: 03/03/2017) |
| 03/13/2017 | 205 | | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: finding as moot 82 Motion as to Alicia Tackett (4); finding as moot 85 Motion for Return of Property as to Alicia Tackett (4); finding as moot 202 Motion to Compel as to Alicia Tackett (4); CHANGE OF PLEA HEARING as to Alicia Tackett held on 3/13/2017. Sentencing set for 5/30/2017 at 01:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (Court Reporter Kelli Stewart.) (bw) (Entered: 03/13/2017) |
| 03/13/2017 | 206 | | PETITION TO ENTER PLEA OF GUILTY AND ORDER ENTERING PLEA as to Alicia Tackett (4) Count 10. Signed by District Judge Julie A. Robinson on 3/13/2017. (bw) (Entered: 03/13/2017) |
| 03/13/2017 | 207 | | PLEA AGREEMENT as to Alicia Tackett re 206 Petition and Order to Enter Plea of Guilty (bw) (Entered: 03/13/2017) |
| 03/13/2017 | 208 | | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: finding as moot 82 Motion as to Lorenzo Black (1); finding as moot 85 Motion for Return of Property as to Lorenzo Black (1); finding as moot 202 Motion to Compel as to Lorenzo Black (1); CHANGE OF PLEA HEARING as to Lorenzo Black held on 3/13/2017. Sentencing set for 5/30/2017 at 01:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (Court Reporter Kelli Stewart.) (bw) (Entered: 03/13/2017) |
| 03/13/2017 | 209 | | PETITION TO ENTER PLEA OF GUILTY AND ORDER ENTERING PLEA as to Lorenzo Black (1) Count 9. Signed by District Judge Julie A. Robinson on 3/13/2017. (bw) (Entered: 03/13/2017) |
| 03/13/2017 | 210 | | PLEA AGREEMENT as to Lorenzo Black re 209 Petition and Order to Enter Plea of Guilty (bw) (Entered: 03/13/2017) |
| 03/15/2017 | 211 | | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: finding as moot 82 Motion as to Catherine Rowlette (5); finding as moot 85 Motion for Return of Property as to Catherine Rowlette (5); finding as moot 202 Motion to Compel as to Catherine Rowlette (5); SENTENCING HEARING held on 3/15/2017 as to defendant Catherine Rowlette. (Court Reporter Kelli Stewart.) (bw) (Entered: 03/15/2017) |

| 03/15/2017 | 212 | | PETTY OFFENSE JUDGMENT –The defendant is hereby sentenced to probation for a term of 2 years. Assessment–$10.00 Signed by District Judge Julie A. Robinson on 3/15/2017. (ydm) (Entered: 03/15/2017) |
| --- | --- | --- | --- |
| 03/15/2017 | 215 | | NOTICE OF INTENT TO CHANGE PLEA and NOTICE OF HEARING. The defendant Anthon Aiono has notified the court as of this date that he/she intends to change his/her plea. The time from this notice until the change of plea hearing (including any continuances) is excludable time for speedy trial purposes. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Change of Plea Hearing set for 4/5/2017 at 09:00 AM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (bw) (Entered: 03/17/2017) |
| 03/15/2017 | | | ***JS–3 Closing Information as to Catherine Rowlette per 212 Judgment. (hl) (Entered: 05/04/2018) |
| 03/16/2017 | 213 | | SUPERSEDING INDICTMENT (With Forfeiture Allegations) as to Karl Carter (2) on counts 2s, 3s, and 9s; as to Anthon Aiono (3) on counts 1s, and 11s; and as to David Bishop (6) on counts 3s, 4s–8s, and 10s. (mg) (Entered: 03/16/2017) |
| 03/16/2017 | 214 | | REPORT OF THE SPECIAL MASTER *Regarding Other Issues Related to Recordings at CCA–Leavenworth* (Cohen, David) (Entered: 03/16/2017) |
| 03/17/2017 | 216 | | NOTICE OF HEARING as to Defendants Karl Carter (02), Anthon Aiono (03) and David Bishop (06)   THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is no.pdf document associated with this entry.) Arraignment on Superseding Indictment 213 set for 3/28/2017 at 02:00 PM in KC Courtroom 236 (TJJ) before Magistrate Judge Teresa J. James (ck) (Entered: 03/17/2017) |
| 03/17/2017 | 217 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop Signed by District Judge Julie A. Robinson on 3/17/2017. (bw) (Entered: 03/17/2017) |
| 03/17/2017 | 218 | | RESPONSE TO MOTION by USA as to Karl Carter, Anthon Aiono, David Bishop re 202 MOTION to Compel *Production of Grand Jury Materials to Special Master* (Barnett, Debra) (Entered: 03/17/2017) |
| 03/20/2017 | 219 | | MOTION for leave to File A Reply *re: Motion for Production of Grand Jury Materials* by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 03/20/2017) |
| 03/22/2017 | 220 | | Federal Public Defender's Resposne to 214 Report of the Special Master by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Brannon, Melody) Modified text on 4/18/2017 (bw). (Entered: 03/22/2017) |
| 03/24/2017 | 221 | | TRANSCRIPT of Plea Hearing (24 pgs) held 03/13/2017 as to Lorenzo Black before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/22/2017. (ks) (Entered: 03/24/2017) |
| 03/24/2017 | 222 | TRANSCRIPT of Plea Hearing (22 pgs) held 03/13/2017 as to Alicia Tackett before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/22/2017. (ks) (Entered: 03/24/2017) |
| 03/27/2017 | 223 | ORDER granting 219 Federal Public Defender's Motion for Leave to File a Reply re: Motion for Production of Grand Jury Materials. The Government does not oppose the motion. The Court grants the motion for leave to file a reply. The Federal Public Defender shall file any reply by no later than Monday, April 3, 2017. Signed by District Judge Julie A. Robinson on 3/27/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 03/27/2017) |
| 03/27/2017 | 224 | REPLY TO RESPONSE TO MOTION by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 202 MOTION to Compel *Production of Grand Jury Materials to Special Master* (Brannon, Melody) (Entered: 03/27/2017) |
| 03/28/2017 | 225 | NOTICE OF HEARING (TIME CHANGE ONLY) as to Defendant Anthon Aiono  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Change of Plea Hearing IS RESET FOR 4/5/2017 at 09:30 AM (previously set at 9:00 a.m.) in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (bw) (Entered: 03/28/2017) |
| 03/28/2017 | 226 | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J James: ARRAIGNMENT as to Karl Carter (2) Count 2s,3s,9s held on |

| | | | |
|---|---|---|---|
| | | | 3/28/2017. Plead not guilty to Counts 2,3,9. Defendant remanded to custody. (Tape #2:06 TJJ.) (ydm) (Entered: 03/29/2017) |
| 03/28/2017 | 227 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J James: ARRAIGNMENT as to Anthon Aiono (3) Count 1s,11s held on 3/28/2017. Release order continued in effect. Plead not guilty to counts 1,11 (Tape #2:06 TJJ.) (ydm) Modified on 4/3/2017 (ydm). (Entered: 03/29/2017) |
| 03/28/2017 | 228 | | MINUTE ENTRY for proceedings held before Magistrate Judge Teresa J James : ARRAIGNMENT as to David Bishop (6) Count 3s,4s–10s held on 3/28/2017. Plead not guilty to counts 3,4–8,10. Release Order continued in effect. (Tape #2:06 TJJ.) (ydm) . (Entered: 03/29/2017) |
| 03/29/2017 | 229 | | Federal Public Defender's Objections to 214 Report of the Special Master by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Brannon, Melody) Modified on 4/18/2017 (bw). (Entered: 03/29/2017) |
| 03/30/2017 | 230 | | Federal Public Defender Proposed Findings of Fact and Supplemental Request to Expand the Special Master's Investigation (Brannon, Melody) Modified to modify text on 4/18/2017 (bw). (Entered: 03/30/2017) |
| 03/31/2017 | 231 | | MOTION for leave To Respond *to the Federal Public Defenders Response (Doc. 220), Objection (Doc. 229) and Proposed Findings of Fact and Supplemental Request to Expand the Special Masters Investigation (Doc. 230)* by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Barnett, Debra) (Entered: 03/31/2017) |
| 04/03/2017 | 232 | | ORDER regarding 231 Motion for Leave as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6) United States shall file responses to the Federal Public Defender's Response to Special Master's Report Regarding Other Issues Related to Recordings at CCA–Leavenworth (Doc. 220), Objection to the Special Master's Report Regarding Other Issues Related to Recordings at CCA–Leavenworth (Doc. 229) and Proposed Findings of Fact and Supplemental Request to Expand theSpecial Master's Investigation (Doc. 230), no later than 14 days from the dateof this Order. Signed by District Judge Julie A. Robinson on 4/3/2017. (ydm) (Entered: 04/03/2017) |
| 04/05/2017 | 233 | | MINUTE ENTRY for proceedings held before District Judge Julie A. Robinson: CHANGE OF PLEA HEARING as to Anthon Aiono held on 4/5/2017. Sentencing set for 7/10/2017 at 01:30 PM in KC Courtroom 427 (JAR) before District Judge Julie A. Robinson. (Court Reporter Kelli Stewart.) (bw) (Entered: 04/05/2017) |
| 04/05/2017 | 234 | | PETITION TO ENTER PLEA OF GUILTY AND ORDER ENTERING PLEA as to Anthon Aiono (3) Count 1s Signed by District Judge Julie A. Robinson on 4/5/2017. (bw) (Entered: 04/05/2017) |
| 04/05/2017 | 235 | | PLEA AGREEMENT as to Anthon Aiono re 234 Petition and Order to Enter Plea of Guilty (bw) (Entered: 04/10/2017) |
| 04/11/2017 | 236 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. Signed by District Judge Julie A. Robinson on 4/11/2017. (bw) (Entered: 04/11/2017) |

| 04/17/2017 | 237 | | Response by United States of America re 230 Federal Public Defender's Proposed Findings of Fact and Supplemental Request, 229 Federal Public Defender's Objections to Report of Special Master, and 220 Federal Public Defender's Response to Report of Special Master (Barnett, Debra) Modified text on 4/18/2017 (bw). (Entered: 04/17/2017) |
|---|---|---|---|
| 04/19/2017 | 238 | | MOTION for leave to File a Reply to Government's Consolidated Response (D.E. 237) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 04/19/2017) |
| 04/19/2017 | 239 | | ORDER regarding 238 Motion for Leave as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, David Bishop IT IS HEREBY ORDERED that the Federal Public Defender's shall file responses to the government's consolidated response (D.E. 237), not later than 7 days from the date of this Order. Signed by District Judge Julie A. Robinson on 4/19/2017. (ydm) (Entered: 04/20/2017) |
| 04/26/2017 | 240 | | Federal Public Defender's Reply to 237 Response of the United States re 230 Federal Public Defender's Proposed Findings of Fact and Supplemental Request, 229 Federal Public Defender's Objections to Report of Special Master, and 220 Federal Public Defender's Response to Report of Special Master by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) Modified title on 4/27/2017 (kao). (Entered: 04/26/2017) |
| 05/02/2017 | 241 | | MOTION to Withdraw Jacquelyn E. Rokusek as Attorney by Richard Dertinger as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Rokusek, Jacquelyn) (Entered: 05/02/2017) |
| 05/02/2017 | 242 | | ORDER granting 241 Motion to Withdraw as Attorney as to Interested Party, Richard Dertinger. Signed by Chief Judge Julie A. Robinson on 5/2/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 05/02/2017) |
| 05/04/2017 | 243 | | MOTION for Writ of Habeas Corpus ad prosequendum by USA as to Lorenzo Black. (Oakley, Donald) (Entered: 05/04/2017) |
| 05/04/2017 | 244 | | *PLEASE DISREGARD FILED IN ERROR* MOTION for Writ of Habeas Corpus ad prosequendum by Lorenzo Black. (ydm) Modified on 5/4/2017 (ydm). (Entered: 05/04/2017) |
| 05/04/2017 | 245 | | ORDER granting 243 Motion for Writ of Habeas Corpus ad prosequendum as to Lorenzo Black (1) Signed by Chief Judge Julie A. Robinson on 5/4/2017. (ydm) (Entered: 05/04/2017) |
| 05/04/2017 | 246 | | WRIT OF HABEAS CORPUS AD PROSEQUENDUM ISSUED as to Lorenzo Black for 5/4/2017 (ydm) (Entered: 05/04/2017) |
| 05/05/2017 | 247 | | MOTION for leave File Sur–Reply by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Sur–Reply)(Barnett, Debra) (Entered: 05/05/2017) |
| 05/10/2017 | 248 | | ORDER granting government's 247 Motion for Leave to file surreply, as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), |

| | | | |
|---|---|---|---|
| | | | Catherine Rowlette (5), David Bishop (6) Signed by Chief District Judge Julie A Robinson on 05/10/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Robinson, Julie) (Entered: 05/10/2017) |
| 05/10/2017 | 249 | | ORDER The Court takes under advisement 202 Motion to Compel as to Karl Carter (2), Anthon Aiono (3), David Bishop (6). If the Court determines that it should consider all or part of the Grand Jury materials referenced in the motion, the Court will order the government to produce the materials to the Court (not the Special Master) for the Court's in camera review. For now, the motion is under advisement. Signed by Chief District Judge Julie A Robinson on 05/10/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Robinson, Julie) (Entered: 05/10/2017) |
| 05/11/2017 | 250 | | SURREPLY re 240 Federal Public Defender's Reply to the United States' Consolidated Response by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Barnett, Debra) Modified text on 5/12/2017 (hw). (Entered: 05/11/2017) |
| 05/16/2017 | 251 | | PRESENTENCE INVESTIGATION REPORT as to Lorenzo Black<br><br>**(NOTE: Access to this document is restricted to the USA and this defendant.)**<br><br>(USPO) (Entered: 05/16/2017) |
| 05/16/2017 | 252 | | PRESENTENCE INVESTIGATION REPORT as to Alicia Tackett<br><br>**(NOTE: Access to this document is restricted to the USA and this defendant.)**<br><br>(USPO) (Entered: 05/16/2017) |
| 05/17/2017 | 253 | | MEMORANDUM AND ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. See Order for details. Signed by Chief District Judge Julie A Robinson on 5/17/2017. (bw) (Entered: 05/17/2017) |
| 05/18/2017 | 254 | | MOTION for Writ of Habeas Corpus ad prosequendum by USA as to Lorenzo Black. (Oakley, Donald) (Entered: 05/18/2017) |
| 05/18/2017 | 255 | | AMENDED ORDER granting 254 Motion for Writ of Habeas Corpus ad prosequendum as to Lorenzo Black (1) Signed by Chief District Judge Julie A Robinson on 5/18/2017. (ydm) (Entered: 05/18/2017) |
| 05/18/2017 | 256 | | AMENDED WRIT OF HABEAS CORPUS AD PROSEQUENDUM ISSUED as to Lorenzo Black for 5/18/2017 (ydm) (Entered: 05/18/2017) |
| 05/25/2017 | 257 | | NOTICE OF HEARING as to Defendant Lorenzo Black  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)On the Court's own motion and at the request of the parties, the Court continues Sentencing to 7/19/2017 at 01:30 PM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. (bw) (Entered: 05/25/2017) |
| 05/25/2017 | 258 | | |

| | | | |
|---|---|---|---|
| | | | MOTION for Forfeiture of Property by USA as to Lorenzo Black. (Gurney, Annette) (Entered: 05/25/2017) |
| 05/25/2017 | 259 | | MOTION for Forfeiture of Property by USA as to Anthon Aiono. (Gurney, Annette) (Entered: 05/25/2017) |
| 05/25/2017 | 260 | | MOTION for Forfeiture of Property by USA as to Alicia Tackett. (Gurney, Annette) (Entered: 05/25/2017) |
| 05/30/2017 | 261 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: SENTENCING HEARING held on 5/30/2017 as to defendant Alicia Tackett. Granting 260 Motion for Forfeiture of Property as to Alicia Tackett (4); (Court Reporter Kelli Stewart.) (yh) Judgment and Commitment to follow. (Entered: 05/30/2017) |
| 05/30/2017 | 262 | | MOTION for order to Expand the Special Master's Investigation by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 05/30/2017) |
| 05/30/2017 | 263 | | SEALED MOTION for Leave to File Under Seal by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Proposed Sealed Document)(Brannon, Melody) (Entered: 05/30/2017) |
| 05/31/2017 | 264 | | JUDGMENT as to Alicia Tackett (4), Count(s) 10, The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 12 months and 1 day. Execution of this sentence is stayed until no earlier than September 6, 2017. Upon release from imprisonment, you will be on supervised release for a term of 3 years. $100.00 Assessment Fee; Count(s) 11, 3–4, 9, Dismissed Signed by Chief District Judge Julie A Robinson on 5/31/2017. (ydm) (Entered: 06/01/2017) |
| 05/31/2017 | 265 | | STATEMENT OF REASONS as to Alicia Tackett re 264 Judgment, <br><br>**(NOTE: Access to this document is restricted to the USA and this defendant.)**<br><br>(ydm) (Entered: 06/01/2017) |
| 06/01/2017 | 266 | | PRELIMINARY ORDER OF FORFEITURE re: 258 Motion for Forfeiture of Property as to Lorenzo Black (1) Signed by Chief District Judge Julie A Robinson on 6/1/2017. (ydm) (Entered: 06/01/2017) |
| 06/01/2017 | 267 | | PRELIMINARY ORDER OF FORFEITURE re: 259 Motion for Forfeiture of Property as to Anthon Aiono (3) Signed by Chief District Judge Julie A Robinson on 6/1/2017. (ydm) (Entered: 06/01/2017) |
| 06/02/2017 | 268 | | NOTICE of change of address by Erin C. Thompson as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (email to Attorney Admission) (Thompson, Erin) (Entered: 06/02/2017) |
| 06/12/2017 | 269 | | ORDER granting 263 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop |

| | | |
|---|---|---|
| | | (6) Signed by Chief District Judge Julie A Robinson on 6/12/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 06/12/2017) |
| 06/12/2017 | 270 | SEALED EXHIBITS by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Brannon, Melody) (Entered: 06/12/2017) |
| 06/12/2017 | 271 | SEALED MOTION for Leave to File Under Seal by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Proposed Sealed Document)(Barnett, Debra) (Entered: 06/12/2017) |
| 06/12/2017 | 272 | ORDER granting 271 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by Chief District Judge Julie A Robinson on 6/12/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 06/12/2017) |
| 06/12/2017 | 273 | SEALED RESPONSE by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 262 MOTION for order to Expand the Special Master's Investigation (Barnett, Debra) (Entered: 06/12/2017) |
| 06/13/2017 | 274 | ORDER to Pay Summary Billing Statement for period April and May, 2017 as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop Signed by Chief District Judge Julie A Robinson on 6/13/2017. (bw) (Entered: 06/13/2017) |
| 06/15/2017 | 275 | PRESENTENCE INVESTIGATION REPORT as to Anthon Aiono<br><br>**(NOTE: Access to this document is restricted to the USA and this defendant.)**<br><br>(USPO) (Entered: 06/15/2017) |
| 06/19/2017 | 276 | NOTICE of Record Correction by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Attachments: # 1 Ex. 1)(Barnett, Debra) (Entered: 06/19/2017) |
| 06/27/2017 | 277 | NOTICE OF CANCELLED HEARING: Sentencing set for July 19, 2017 at 1:30 p.m. as to Defendant Lorenzo Black is continued to a date to be determined by the Court. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 06/27/2017) |
| 06/27/2017 | 278 | Unopposed MOTION to Continue Sentencing Hearing by Anthon Aiono. (Hoffman, Jason) (Entered: 06/27/2017) |
| 06/27/2017 | 279 | NOTICE OF CANCELLED HEARING: Sentencing set for July 10, 2017 at 1:30 p.m. as to Defendant Anthon Aiono is continued to a date to be determined by the Court. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 06/27/2017) |
| 06/27/2017 | 280 | |

| | | | |
|---|---|---|---|
| | | | ORDER granting 278 Motion to Continue as to Anthon Aiono (3). A new sentencing date will be determined by the court at a later date. Signed by Chief District Judge Julie A Robinson on 6/27/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 06/27/2017) |
| 07/15/2017 | 281 | | MOTION for information from Special Master, with suggestions by Jerry Scott as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Duchardt, Frederick) (Entered: 07/15/2017) |
| 07/15/2017 | 282 | | MOTION for information from Special Master, with suggestions by Charles Hall as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Duchardt, Frederick) (Entered: 07/15/2017) |
| 07/17/2017 | 283 | | ORDER to Pay Summary Billing Statement for period June, 2017 as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop Signed by Chief District Judge Julie A Robinson on 7/7/2017. (bw) (Entered: 07/17/2017) |
| 08/04/2017 | 284 | | ORDER to Pay Summary Billing Statement for period of July, 2017 as to Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop. Signed by Chief District Judge Julie A Robinson on 8/4/2017. (bw) (Entered: 08/04/2017) |
| 08/16/2017 | 287 | | ORDER finding as moot 262 Motion for Order as to Alicia Tackett (4), Catherine Rowlette (5); finding as moot 281 Motion as to Alicia Tackett (4), Catherine Rowlette (5); finding as moot 282 Motion as to Alicia Tackett (4), Catherine Rowlette (5). Defendant Tackett was sentenced and Judgment entered on 5/31/2017. Defendant Rowlette was sentenced and Judgment entered on 3/15/2017. Signed by Chief District Judge Julie A Robinson on 8/16/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/16/2017) |
| 08/16/2017 | 288 | | NOTICE OF HEARING as to Defendants Karl Carter, David Bishop THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Status Conference set for 9/12/2017 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. (bw) (Entered: 08/16/2017) |
| 08/19/2017 | 289 | | MEMORANDUM AND ORDER denying 281 Motion as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), David Bishop (6); denying 282 Motion as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), David Bishop (6) Signed by Chief District Judge Julie A Robinson on 8/19/2017. (ydm) (Entered: 08/21/2017) |
| 08/23/2017 | 290 | | Unopposed SEALED MOTION for Leave to File Under Seal by Alicia Tackett. (Attachments: # 1 Sealed Motion for Delay)(Ambrosio, Kathleen) (Entered: 08/23/2017) |
| 08/27/2017 | 291 | | ORDER granting 290 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Alicia Tackett (4) Signed by Chief District Judge Julie A Robinson on 8/27/2016. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: |

| | | | |
|---|---|---|---|
| | | | 08/27/2017) |
| 08/28/2017 | 292 | | Unopposed SEALED MOTION *To Delay Self–Surrender Date* by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 08/28/2017) |
| 08/28/2017 | 293 | | ORDER granting 292 Sealed Motion as to Alicia Tackett (4) Signed by Chief District Judge Julie A Robinson on 8/28/2017. (ydm) (Entered: 08/28/2017) |
| 09/08/2017 | 294 | | ORDER to Pay Summary Billing Statement for period of August, 2017 as to Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop Signed by Chief District Judge Julie A Robinson on 9/8/2017. (ydm) (Entered: 09/08/2017) |
| 09/12/2017 | 295 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: STATUS CONFERENCE as to Karl Carter, David Bishop held on 9/12/2017. (Court Reporter Kelli Stewart.) (bw) (Entered: 09/13/2017) |
| 09/13/2017 | 296 | | SCHEDULING ORDER: estimated trial time 6–7 days as to Karl Carter, David Bishop. Motions due by 12/18/2017. Response deadline 1/16/2018. Motion Hearing set for 2/27/2018 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. Jury Trial set for 5/14/2018 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. Excludable started as to Karl Carter, David Bishop. Signed by Chief District Judge Julie A Robinson on 9/13/2017. (bw) (Entered: 09/13/2017) |
| 10/06/2017 | 297 | | ORDER to Pay Summary Billing Statement for period of September, 2017. Signed by Chief District Judge Julie A Robinson on 10/6/2017. (bw) (Entered: 10/06/2017) |
| 10/20/2017 | 298 | | REPORT OF THE SPECIAL MASTER *First Status Report Regarding Phase III Investigation* (Attachments: # 1 Exhibit A – 12/17/16 OUSA email, # 2 Exhibit B – 1/26/17 OUSA email, # 3 Exhibit C – 5/18/17 OUSA email, # 4 Exhibit D – 6/5/17 OUSA email, # 5 Exhibit E – DOJ letter, # 6 Exhibit F – Agency Doct search letter, # 7 Exhibit G – RFIs to OUSA, # 8 Exhibit H – USSS email, # 9 Exhibit I – AUSA Clymer letter)(Cohen, David) (Entered: 10/20/2017) |
| 10/25/2017 | 299 | | MOTION for order to Supplement Record and Produce Jencks Materials by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 10/25/2017) |
| 10/25/2017 | 300 | | ORDER setting hearing with the parties to discuss the Special Master's findings concerning the Phase III investigation. Briefing Deadline set for 11/14/2017. Response deadline 11/21/2017. In Court Hearing set for 11/28/2017 at 09:00 AM in KC Courtroom 427 (JAR)before Chief District Judge Julie A Robinson. Signed by Chief District Judge Julie A Robinson on 10/25/2017. (bw) (Entered: 10/25/2017) |
| 10/25/2017 | 301 | | MOTION for Order to Show Cause by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 10/25/2017) |
| 11/03/2017 | 302 | | ENTRY OF APPEARANCE on behalf of USA by Steve Clymer (Clymer, Steve) (Entered: 11/03/2017) |
| 11/03/2017 | 303 | | |

| | | | MOTION for Hearing *to be rescheduled* by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Affidavit)(Clymer, Steve) (Entered: 11/03/2017) |
|---|---|---|---|
| 11/03/2017 | 304 | | OBJECTION(S) to 298 Report of the Special Master, by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Brannon, Melody) (Entered: 11/03/2017) |
| 11/04/2017 | 305 | | OBJECTION(S) to 303 MOTION for Hearing *to be rescheduled* by Federal Public Defender as to Lorenzo Black, Karl Carter, David Bishop (Brannon, Melody) (Entered: 11/04/2017) |
| 11/06/2017 | 306 | | RESPONSE re 300 Order,, Set Deadlines,, Set Hearings, 298 Report of the Special Master, by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Clymer, Steve) (Entered: 11/06/2017) |
| 11/07/2017 | 307 | | MEMORANDUM AND ORDER granting in part and denying in part 202 Motion to Compel as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). The Government is ordered to produce to the Court and the Special Master by no later than November 21, 2017, any grand jury transcripts from this case in which a prosecutor either requested the issuance of a grand jury subpoena or reported the results of the subpoena to the grand jury. The motion is otherwise denied. Signed by Chief District Judge Julie A Robinson on 11/6/2017. (ydm) (Entered: 11/07/2017) |
| 11/09/2017 | 308 | | ORDER granting 303 Motion to Reschedule Hearing. Special Attorney for the Government Steven Clymer is required to appear before the United States Court of Appeals for the Second Circuit on November 28, 2017, the date currently set for the hearing with the parties to discuss the Special Master's findings concerning the Phase III investigation. Thus, for good cause, the Court grants the United States' motion and reschedules the hearing for January 18, 2018 at 9:00 a.m. In Court Hearing set for 1/18/2018 at 09:00 AM in KC Courtroom 427 (JAR)before Chief District Judge Julie A Robinson. Signed by Chief District Judge Julie A Robinson on 11/9/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 11/09/2017) |
| 11/13/2017 | 309 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette Signed by Chief District Judge Julie A Robinson on 11/10/2017. (ydm) (Entered: 11/13/2017) |
| 11/13/2017 | 310 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. The Court previously rescheduled the hearing to discuss the Special Master's findings concerning the Phase III investigation to January 18, 2018. The Court now extends the briefing deadlines associated with that hearing. The deadline for the parties to submit briefs addressing any issues concerning the Special Master's Report is extended to December 8, 2017. The deadline for the parties to file responses is extended to December 22, 2017. Signed by Chief District Judge Julie A Robinson on 11/13/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 11/13/2017) |
| 11/21/2017 | 311 | | |

|  |  |  | NOTICE of Ex Parte and Under Seal Filing of a Grand Jury Matter by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) (Entered: 11/21/2017) |
|---|---|---|---|
| 11/27/2017 | 313 |  | Unopposed SEALED MOTION for Leave to File Under Seal by Alicia Tackett. (Attachments: # 1 Motion To Delay)(Ambrosio, Kathleen) (Entered: 11/27/2017) |
| 11/27/2017 | 314 |  | ORDER granting 313 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith an event from the SEALED DOCUMENTS category as to Alicia Tackett (4) Signed by Chief District Judge Julie A Robinson on 11/27/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 11/27/2017) |
| 11/27/2017 | 315 |  | Unopposed SEALED MOTION *To Delay Self−Surrender Date* by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 11/27/2017) |
| 11/27/2017 | 316 |  | SEALED ORDER granting 315 Sealed Motion as to Alicia Tackett (4). Signed by Chief District Judge Julie A Robinson on 11/27/2017. (hl) (Entered: 11/28/2017) |
| 12/04/2017 | 317 |  | REPORT OF THE SPECIAL MASTER *Order of Production to AUSA Clymer* (Cohen, David) (Entered: 12/04/2017) |
| 12/04/2017 | 318 |  | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 12/04/2017) |
| 12/05/2017 | 320 |  | ORDER granting 318 Motion Pursuant to Rule 17b as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. Signed by Chief District Judge Julie A Robinson on 12/5/17. (hw) (Entered: 12/05/2017) |
| 12/05/2017 | 322 |  | ORDER finding as moot 299 Motion to Supplement Record and Produce Jencks Materials as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). The Federal Public Defender's motion seeks to supplement the Record in this case with Jencks Act materials at issue in a separate case. The Court has since entered a judgment in that separate case, and all remaining motions and issues related to Jencks Act materials in that case are moot. Accordingly, the Court finds the Federal Public Defender's motion moot. Signed by Chief District Judge Julie A Robinson on 12/5/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 12/05/2017) |
| 12/05/2017 | 323 |  | ORDER granting 262 Motion to Expand the Special Master's Investigation as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), David Bishop (6). The Court grants the Federal Public Defender's motion and directs the Special Master to inquire into the issues identified in the motion. Signed by Chief District Judge Julie A Robinson on 12/5/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 12/05/2017) |
| 12/06/2017 | 328 |  | MOTION to Produce *pursuant to Fed. R. Crim. P. 17(c)*, MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, |

| | | | |
|---|---|---|---|
| | | | Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 12/06/2017) |
| 12/06/2017 | 329 | | ORDER re: 328 Motion to Produce as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6); re: 328 Motion Pursuant to Rule 17b as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6) Signed by Chief District Judge Julie A Robinson on 12/6/2017. (ydm) (Entered: 12/06/2017) |
| 12/15/2017 | 330 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Touhy request)(Brannon, Melody) (Entered: 12/15/2017) |
| 12/15/2017 | | | **Set Deadlines/Hearings of the Same Type – Public: In Court Hearing set for 1/19/2018 at 09:00 AM in KC Courtroom 427 (JAR)before Chief District Judge Julie A Robinson. (added an additional day for this hearing) (bw)** (Entered: 12/15/2017) |
| 12/15/2017 | 331 | | ORDER FOR PRODUCTION OF WITNESSES granting 330 Motion Pursuant to Rule 17b as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by Chief District Judge Julie A Robinson on 12/15/2017. (tvn) (Entered: 12/15/2017) |
| 12/18/2017 | 332 | | MOTION for order to Set Deadlines by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 12/18/2017) |
| 12/18/2017 | 333 | | MOTION to Dismiss Indictment by Karl Carter. (Attachments: # 1 Exhibit Attorney Visitation Log, # 2 Exhibit CCA Surveillance Still, # 3 Exhibit Grand Jury Subpoena)(Guastello, David) (Entered: 12/18/2017) |
| 12/18/2017 | 334 | | MOTION to Quash *Subpoena Issued by the Federal Public Defender* by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) (Entered: 12/18/2017) |
| 12/18/2017 | 335 | | MOTION to Quash *the Special Master's Subpoena* by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) (Entered: 12/18/2017) |
| 12/18/2017 | 336 | | MOTION Terminate "Phase III" of the Special Master's Investigation by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Exhibit, # 2 Affidavit)(Clymer, Steve) (Entered: 12/18/2017) |
| 12/18/2017 | 337 | | MOTION join pretrial motions re 318 MOTION pursuant to Rule 17(b) , 330 MOTION pursuant to Rule 17(b) *319 MOTION, 324 MOTION, and 325 MOTION* by Karl Carter. (Guastello, David) (Entered: 12/18/2017) |
| 12/18/2017 | 338 | | MOTION to Suppress by David Bishop. (Dodge, Cynthia) (Entered: 12/18/2017) |
| 12/18/2017 | 339 | | MOTION join pretrial motions re 328 MOTION to Produce *pursuant to Fed. R. Crim. P. 17(c)* MOTION pursuant to Rule 17(b) , 330 MOTION pursuant to |

| | | | |
|---|---|---|---|
| | | | Rule 17(b) , <u>318</u> MOTION pursuant to Rule 17(b) , <u>320</u> Order on Motion Pursuant to Rule 17b by David Bishop. (Dodge, Cynthia) (Entered: 12/18/2017) |
| 12/19/2017 | <u>340</u> | | MOTION to Quash *: Corrected Motion to Quash Subpoenas Issued by the Federal Public Defender* by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) Modified on 7/31/2018 (bw). (Entered: 12/19/2017) |
| 12/19/2017 | <u>341</u> | | MOTION to Quash *: Corrected Motion to Quash the Special Master's Subpoena* by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) Modified on 7/31/2018 (bw). (Entered: 12/19/2017) |
| 12/20/2017 | 342 | | ORDER setting response deadline as to <u>334</u> Government's Motion to Quash Subpoena Issued by the Federal Public Defender. The Federal Public Defender may file a response to the Government's motion to quash by no later than December 27, 2017. Signed by Chief District Judge Julie A Robinson on 12/20/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 12/20/2017) |
| 12/21/2017 | 343 | | ORDER granting <u>337</u> Motion to Join Pretrial Motions as to Karl Carter (2). Defendant Carter moves to join docket entries 318, 319 324, 325 and 330, which are motions for witness subpoenas and subpoenas duces tecum filed by the Federal Public Defender. For good cause, the Court grants Defendant's motion to join. Signed by Chief District Judge Julie A Robinson on 12/21/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 12/21/2017) |
| 12/21/2017 | 344 | | ORDER granting <u>339</u> Motion to Join Pretrial Motions as to David Bishop (6). Defendant Bishop moves to join docket entries 318, 319 324, 325 and 330, which are motions for witness subpoenas and subpoenas duces tecum filed by the Federal Public Defender. For good cause, the Court grants Defendant's motion to join. Signed by Chief District Judge Julie A Robinson on 12/21/2017. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 12/21/2017) |
| 12/21/2017 | <u>345</u> | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop Signed by Chief District Judge Julie A Robinson on 12/21/2017. (ydm) (Entered: 12/21/2017) |
| 12/22/2017 | <u>346</u> | | RESPONSE IN OPPOSITION by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re <u>301</u> MOTION for Order to Show Cause (Attachments: # <u>1</u> Exhibit)(Clymer, Steve) (Entered: 12/22/2017) |
| 12/22/2017 | <u>347</u> | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 12/22/2017) |
| 12/27/2017 | <u>349</u> | | ORDER re: <u>347</u> Motion Pursuant to Rule 17b as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6) Signed by Chief District Judge Julie A Robinson on 12/27/2017. (ydm) (Entered: 12/27/2017) |

| 12/28/2017 | 350 | | RESPONSE TO MOTION by David R. Cohen as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 341 MOTION to Quash : *Corrected Motion to Quash the Special Master's Subpoena −− SPECIAL MASTER'S RESPONSE TO GOVERNMENT'S CORRECTED MOTION TO QUASH* (Cohen, David) (Entered: 12/28/2017) |
|---|---|---|---|
| 12/28/2017 | 351 | | RESPONSE TO MOTION by David R. Cohen as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 336 MOTION Terminate "Phase III" of the Special Master's Investigation *SPECIAL MASTER'S RESPONSE TO GOVERNMENT'S MOTION TO TERMNATE PHASE III INVESTIGATION* (Cohen, David) (Entered: 12/28/2017) |
| 12/29/2017 | 353 | | RESPONSE TO MOTION by USA as to Karl Carter re 333 MOTION to Dismiss Indictment (Attachments: # 1 WDMO Docket Sheet)(Brown, James) (Entered: 12/29/2017) |
| 12/29/2017 | 354 | | RESPONSE TO MOTION by USA as to Karl Carter re 337 MOTION join pretrial motions re 318 MOTION pursuant to Rule 17(b) , 330 MOTION pursuant to Rule 17(b) *319 MOTION, 324 MOTION, and 325 MOTION* (Brown, James) (Entered: 12/29/2017) |
| 12/29/2017 | 355 | | RESPONSE TO MOTION by USA as to David Bishop re 339 MOTION join pretrial motions re 328 MOTION to Produce *pursuant to Fed. R. Crim. P. 17(c)* MOTION pursuant to Rule 17(b) , 330 MOTION pursuant to Rule 17(b) , 318 MOTION pursuant to Rule 17(b) , 320 Order (Brown, James) (Entered: 12/29/2017) |
| 12/29/2017 | 356 | | ORDER to Pay Summary Billing Statement for period of November−December, 2017. Signed by Chief District Judge Julie A Robinson on 12/29/2017. (hl) (Modified on 12/29/2017 to add description of Order in docket text. (hl)) (Entered: 12/29/2017) |
| 12/29/2017 | 357 | | RESPONSE IN OPPOSITION by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 340 MOTION to Quash : *Corrected Motion to Quash Subpoenas Issued by the Federal Public Defender* (Brannon, Melody) (Entered: 12/29/2017) |
| 12/29/2017 | 358 | | RESPONSE IN OPPOSITION by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 336 MOTION Terminate "Phase III" of the Special Master's Investigation (Brannon, Melody) (Entered: 12/29/2017) |
| 01/03/2018 | 359 | | Amended ORDER for Production of Witnesses Fed. R. Crim. P. 17(b) as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 331 Order on Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 1/3/2018. (hl) (Entered: 01/03/2018) |
| 01/04/2018 | 360 | | MOTION to Quash by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) (Entered: 01/04/2018) |
| 01/05/2018 | 361 | | |

|  |  |  | REPLY TO RESPONSE TO MOTION by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 336 MOTION Terminate "Phase III" of the Special Master's Investigation , 340 MOTION to Quash : *Corrected Motion to Quash Subpoenas Issued by the Federal Public Defender*, 341 MOTION to Quash : *Corrected Motion to Quash the Special Master's Subpoena* (Clymer, Steve) (Entered: 01/05/2018) |
| 01/05/2018 | 362 |  | REPLY TO RESPONSE TO MOTION by Karl Carter re 333 MOTION to Dismiss Indictment (Guastello, David) (Entered: 01/05/2018) |
| 01/08/2018 | 363 |  | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, and David Bishop. (Brannon, Melody) (Additional attachments added: # 1 Corrected Main Document) # 2 2018–01–08 to Clymer re Touhy request USMS Cook) (mls) (Entered: 01/08/2018) |
| 01/09/2018 | 364 |  | WAIVER of Appearance *at Hearing* by Anthon Aiono (Hoffman, Jason) (Entered: 01/09/2018) |
| 01/09/2018 | 365 |  | NOTICE of In Camera Document to be reviewed by Judge Robinson only. Paper document is filed under seal and kept in the Clerk's office vault for safekeeping. (bw) (Entered: 01/09/2018) |
| 01/09/2018 | 366 |  | Amended ORDER for Production of Witnesses Fed. R. Crim. P. 17(b) as to Karl Carter, David Bishop re: 343 ORDER granting 337 Motion to Join Pretrial Motions, 344 ORDER granting 339 Motion to Join Pretrial Motions. Signed by Chief District Judge Julie A Robinson on 1/9/2018. (hl) (Entered: 01/09/2018) |
| 01/09/2018 | 367 |  | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Attachment – Touhy letter)(Brannon, Melody) (Entered: 01/09/2018) |
| 01/10/2018 | 368 |  | ORDER for Production of Witnesses Fed. R. Crim. P. 17(b) granting 363 Motion Pursuant to Rule 17b as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by Chief District Judge Julie A Robinson on 1/10/2018. (hl) (Entered: 01/10/2018) |
| 01/10/2018 | 369 |  | ORDER for Production of Witnesses Fed. R. Crim. P. 17(b) granting 367 Motion Pursuant to Rule 17b as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by Chief District Judge Julie A Robinson on 1/10/2018. (hl) (Entered: 01/10/2018) |
| 01/11/2018 | 370 |  | MOTION to Quash by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) (Entered: 01/11/2018) |
| 01/12/2018 | 371 |  | MOTION to Bifurcate January 18, 2018 Hearing by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) (Entered: 01/12/2018) |
| 01/12/2018 | 372 |  | MEMORANDUM AND ORDER – IT IS THEREFORE ORDERED BY THE COURT that the Government's Motion to Terminate Phase III of the Special |

| | | | |
|---|---|---|---|
| | | | Master's Investigation <u>336</u> is denied. IT IS FURTHER ORDERED BY THE COURT that the Government's Corrected Motion to Quash Subpoenas Issued by the Federal Public Defender <u>340</u> is denied as it relates to subpoenas ad testificandum. The Government's original Motion to Quash Subpoena issued by the Federal Public Defender <u>334</u> is denied as moot. IT IS FURTHER ORDERED BY THE COURT that the Government's Corrected Motion to Quash the Special Master's Subpoena Duces Tecum and Subpoenas Ad Testificandum to USAO Employees and Motion to Vacate Special Master's Order of Production <u>341</u> is denied as it relates to subpoenas ad testificandum. The Government's original Motion to Quash the Special Master's Subpoena Duces Tecum and Subpoenas Ad Testificandum to USAO Employees and Motion to Vacate Special Master's Order of Production <u>335</u> is denied as moot. IT IS FURTHER ORDERED BY THE COURT that the Government's Motion to Quash Additional Subpoena Issued by the Federal Public Defender <u>360</u> is denied. IT IS FURTHER ORDERED BY THE COURT that the Government's Motion to Quash Additional Subpoenas Issued by the Federal Public Defender and Subpoenas Issued by Defendants Carter and Bishop <u>370</u> is denied. Signed by Chief District Judge Julie A Robinson on 1/12/2018. (hl) (Entered: 01/12/2018) |
| 01/14/2018 | <u>373</u> | | Joint MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 01/14/2018) |
| 01/14/2018 | <u>374</u> | | RESPONSE TO MOTION by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re <u>371</u> MOTION to Bifurcate (Brannon, Melody) (Entered: 01/14/2018) |
| 01/15/2018 | <u>375</u> | | WAIVER of Appearance by Lorenzo Black (Jenab, John) (Entered: 01/15/2018) |
| 01/16/2018 | <u>376</u> | | WAIVER of Appearance *for Interested Party David Lougee* by Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Laurans, Jonathan) (Entered: 01/16/2018) |
| 01/16/2018 | <u>377</u> | | RESPONSE TO MOTION by USA as to David Bishop re <u>338</u> MOTION to Suppress (Attachments: # <u>1</u> Attachment A, # <u>2</u> Attachment B)(Oakley, Donald) (Entered: 01/16/2018) |
| 01/16/2018 | <u>378</u> | | ORDER for Production of Witnesses Fed. R. Crim. P. 17(b) granting <u>373</u> Motion Pursuant to Rule 17b as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by Chief District Judge Julie A Robinson on 1/16/2018. (hl) (Entered: 01/16/2018) |
| 01/16/2018 | <u>379</u> | | ORDER denying as moot <u>371</u> Motion to Bifurcate January 18, 2018 Hearing as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by Chief District Judge Julie A Robinson on 1/16/2018. (hl) (Entered: 01/16/2018) |
| 01/17/2018 | <u>380</u> | | PROBATION JURISDICTION TRANSFERRED TO WESTERN DISTRICT OF MISSOURI as to Catherine Rowlette. Probation transfer electronically sent. (hl) (Entered: 01/17/2018) |
| 01/17/2018 | <u>381</u> | | |

| | | | |
|---|---|---|---|
| | | | NOTICE to Western District of Missouri of a Transfer of Jurisdiction as to Catherine Rowlette. Your case number is: 4:17–00398–01–CR–W–BP. Docket sheet and documents attached. If you require a copy of the financial ledger, please email your request to ksd_clerks_kansascity@ksd.uscourts.gov (If you require certified copies of any documents, please send a request to ksd_clerks_kansascity@ksd.uscourts.gov. If you wish to designate a different email address for future transfers, send your request to InterDistrictTransfer_TXND@txnd.uscourts.gov.) (hl) (Entered: 01/17/2018) |
| 01/17/2018 | 382 | | LETTER FROM 10CCA stating petition for extraordinary writ of mandamus was docketed. (Appeal No. 18–3007) (kao) (Entered: 01/17/2018) |
| 01/17/2018 | 383 | | MOTION for order for Access to Securus Data by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 01/17/2018) |
| 01/17/2018 | 384 | | ORDER granting 383 Motion for Order for Access to Securus Data. Signed by Chief District Judge Julie A Robinson on 1/17/2018. (bw) (Entered: 01/17/2018) |
| 01/17/2018 | 385 | | MEMORANDUM OF LAW by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Brannon, Melody) (Entered: 01/17/2018) |
| 01/18/2018 | 386 | | NOTICE OF CANCELLED HEARING: Pursuant to the Order of the US Court of Appeals for the Tenth Circuit filed on 1/17/2018 in Case No. 18–3007, the hearing set for 1/18/2018 and 1/19/2018 as to Defendants Lorenzo Black, et al is cancelled. The order grants the United States's motion to stay the hearing pending additional briefing and consideration of the mandamus petition. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 01/18/2018) |
| 01/18/2018 | 387 | | ORDER of 10CCA – The emergency motion for stay pending a decision on the petition for writ of mandamus is granted to the extent that the hearing scheduled to begin Thursday, January 18, 2018, is stayed pending a ruling on the mandamus petition. See Order for deadlines and details. (Appeal No. 18–3007) (kao) (Entered: 01/18/2018) |
| 01/18/2018 | 389 | | MOTION to Produce *In Camera Document* by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 01/18/2018) |
| 01/18/2018 | 390 | | ORDER Setting Response Deadline to 389 MOTION to Produce In Camera Document, filed by Federal Public Defender. The Court sets a deadline for any response to be filed on or before 1/23/2018. Signed by Chief District Judge Julie A Robinson on 01/18/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Robinson, Julie) (Entered: 01/18/2018) |
| 01/23/2018 | 392 | | RESPONSE TO MOTION by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re: 389 MOTION to Produce In Camera Document. (Barnett, Debra) (Entered: 01/23/2018) |
| 01/24/2018 | 393 | | NOTICE OF EX PARTE HEARING on government's Response (207) to Motion filed by Federal Public Defender in Case No. 14–20049–CM, and |

| | | | |
|---|---|---|---|
| | | | government's Response <u>392</u> to Motion filed by Federal Public Defender in Case No. 16–20032–JAR.  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Ex Parte Oral Hearing set for <u>1/26/2018 at 11:00 AM</u> by telephone before District Judge Carlos Murguia and Chief Judge Julie A Robinson. AUSA Scott Rask and AUSA Debra Barnett shall appear at this hearing and are directed to provide the Court with a telephone number that you can be reached for this telephone conference. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 01/24/2018) |
| 01/26/2018 | 394 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. After an ex parte hearing with the government today, the Court takes the Motion to Produce (Doc. 389) Under Advisement. The government is ordered to produce, ex parte, under seal, on or before January 31, 2018, a summary of the interview of the witness that was discussed during today's hearing. Signed by Chief District Judge Julie A Robinson on 1/26/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 01/26/2018) |
| 01/26/2018 | <u>395</u> | | MOTION for order to Supplement the Record by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # <u>1</u> Exhibit 521, # <u>2</u> Exhibit 537)(Brannon, Melody) (Entered: 01/26/2018) |
| 02/01/2018 | <u>396</u> | | STIPULATED PROTECTIVE ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. Signed by Chief District Judge Julie A Robinson on 2/1/2018. (hl) (Entered: 02/01/2018) |
| 02/12/2018 | <u>397</u> | | ORDER to Pay Summary Billing Statement for period January 2018. Signed by Chief District Judge Julie A Robinson on 2/12/18. (hw) (Entered: 02/12/2018) |
| 02/26/2018 | <u>398</u> | | ORDER of 10CCA re <u>382</u> Filing of petition for writ of mandamus. Petition granted in limited part. See Order for details. (Appeal No. 18–3007) (kao) (Entered: 02/26/2018) |
| 02/26/2018 | <u>399</u> | | RESPONSE TO MOTION by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re <u>82</u> MOTION for Fed. R. Crim. P. 41(g) Return of Information, <u>94</u> MOTION to Join 82 Motion for Fed. R. Crim. P. 41(g) Return of Information, 97 MOTION to Join Pretrial Motions, <u>85</u> Amended MOTION for Fed. R. Crim. P. 41(g) Return of Information, <u>96</u> Joint MOTION Join Pretrial Motions , 109 MOTION Join in Pretrial Motions (Slinkard, Duston) (Entered: 02/26/2018) |
| 02/27/2018 | <u>400</u> | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: finding as moot <u>338</u> Motion to Suppress as to David Bishop (6); MOTION HEARING as to David Bishop held on 2/27/2018. (Court Reporter Kim Greiner.) (bw) (Entered: 02/27/2018) |
| 02/28/2018 | 401 | | NOTICE OF HEARING as to Defendants Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. The Court sets hearing regarding Special Master David R. Cohen's First Status Report Regarding the Phase III Investigation <u>298</u> for <u>4/4/2018 at 09:00 AM</u>, <u>4/5/2018 at 09:00 AM</u>, and <u>4/6/2018 at 09:00 AM</u> in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. |

| | | | |
|---|---|---|---|
| | | | Friday, April 6 is reserved for the Federal Public Defender to present their evidence. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 02/28/2018) |
| 03/09/2018 | 403 | | ***WITHDRAWN – SEE 422 ORDER*** MOTION for order Prohibiting Further Prosecutorial Interference with Defense Investigation by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) Modified on 3/26/2018 (hl). (Entered: 03/09/2018) |
| 03/12/2018 | 404 | | Motion for Extension of Time to File Response (Originally filed as NOTICE of Intent to Respond to Federal Public Defender's Motion ) by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette re 403 MOTION for order Prohibiting Further Prosecutorial Interference with Defense Investigation (Oakley, Donald) (Modified on 3/13/2018 to change event type to a motion per chambers. (hl)) (Entered: 03/12/2018) |
| 03/12/2018 | 405 | | RESPONSE to 404 Notice of Intent to Respond by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Brannon, Melody) (Modified on 3/13/2018 to add link to Notice. (hl)) (Entered: 03/12/2018) |
| 03/13/2018 | 406 | | ORDER denying 404 Motion for Extension of Time to File Response/Reply as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5) (originally filed as NOTICE of Intent to Respond to Federal Public Defender's Motion). The Court finds that good cause does not exist to grant the extension of time to file a response as requested in the Government's motion. Accordingly, the Government's motion is denied. The Government shall file any response to 403 the Federal Public Defender's Motion for Order Prohibiting Further Prosecutorial Interference with Defense Investigation by no later than March 19, 2018. Signed by Chief District Judge Julie A Robinson on 3/13/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 03/13/2018) |
| 03/15/2018 | 407 | | MOTION for order Staying Briefing and Ruling by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 03/15/2018) |
| 03/19/2018 | 408 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 03/19/2018) |
| 03/19/2018 | 409 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Touhy Letter)(Brannon, Melody) (Entered: 03/19/2018) |
| 03/19/2018 | 410 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 03/19/2018) |
| 03/19/2018 | 411 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Touhy Request)(Brannon, Melody) (Entered: 03/19/2018) |

| 03/19/2018 | 412 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Touhy Request)(Brannon, Melody) (Entered: 03/19/2018) |
|---|---|---|---|
| 03/19/2018 | 413 | | ORDER granting 407 Motion for Order as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). The Federal Public Defender ("FPD") moves for a stay of briefing and any ruling regarding 403 the FPD's Motion for order Prohibiting Further Prosecutorial Interference with Defense Investigation. The FPD states that the parties are discussing a possible resolution of the motion. For good cause, the Court grants the motion and stays briefing on the FPD's motion. If the parties are unable to reach a resolution, the FPD shall advise the Court of the status of the motion by April 2, 2018. Signed by Chief District Judge Julie A Robinson on 3/19/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 03/19/2018) |
| 03/20/2018 | 414 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 03/20/2018) |
| 03/20/2018 | 415 | | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17(b) (Kinney) re: 408 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 3/20/2018. (hl) (Entered: 03/20/2018) |
| 03/20/2018 | 416 | | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17(b) (Beall) re: 409 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 3/20/2018. (hl) (Entered: 03/20/2018) |
| 03/20/2018 | 417 | | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17(b) (Thomas) re: 410 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 3/20/2018. (hl) (Entered: 03/20/2018) |
| 03/20/2018 | 418 | | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17(b) (Cook) re: 411 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 3/20/2018. (hl) (Entered: 03/20/2018) |
| 03/20/2018 | 419 | | ORDER for Production of Witness Pursuant to Fed. R. Crim. P. 17(b) (Seubert) re: 412 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 3/20/2018. (hl) (Entered: 03/20/2018) |
| 03/20/2018 | 420 | | ORDER for Production of Witness Pursuant to Fed. R. Crim. P. 17(b) (Stokes) re: 414 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 3/20/2018. (hl) (Entered: 03/20/2018) |
| 03/23/2018 | 421 | | MOTION to Withdraw Document 403 MOTION for order Prohibiting Further Prosecutorial Interference with Defense Investigation by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 03/23/2018) |
| 03/26/2018 | 422 | | ORDER granting 421 Motion to Withdraw Document 403 as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Signed by Chief District Judge Julie A Robinson on 3/26/2018. (hl) (Entered: 03/26/2018) |
| 03/26/2018 | 423 | | |

|  |  |  | ORDER – IT IS THEREFORE ORDERED BY THE COURT that the April 4, 2018 hearing is continued to a date to be determined later. Signed by Chief District Judge Julie A Robinson on 3/26/2018. (hl) (Entered: 03/26/2018) |
|---|---|---|---|
| 03/28/2018 | 424 |  | MOTION for Status Conference by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) (Entered: 03/28/2018) |
| 04/06/2018 | 426 |  | ORDER to Pay Summary Billing Statement for period of February and March, 2018. Signed by Chief District Judge Julie A Robinson on 4/6/2018. (hl) (Entered: 04/09/2018) |
| 04/10/2018 | 427 |  | Unopposed MOTION to Continue Jury Trial by Karl Carter. (Guastello, David) (Entered: 04/10/2018) |
| 04/16/2018 | 428 |  | ORDER sustaining 427 Motion to Continue Jury Trial. Time excluded from 5/14/18 until 8/13/18. Jury Trial re–set for 8/13/2018 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. Signed by Chief District Judge Julie A Robinson on 4/16/18. (kao) (Entered: 04/16/2018) |
| 04/16/2018 | 429 |  | NOTICE OF HEARING as to Defendants Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop.  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. The Court resets hearing re Special Master David R. Cohen's Investigation for 5/15/2018 at 09:00 AM and 5/16/2018 at 09:00 AM in KC Courtroom 427 (JAR)before Chief District Judge Julie A Robinson. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 04/16/2018) |
| 04/18/2018 | 430 |  | ORDER granting 395 Motion to Supplement the Record. Exhibits 521 and 537 are admitted into the record in this case. Signed by Chief District Judge Julie A Robinson on 4/18/2018. (hl) (Entered: 04/18/2018) |
| 04/18/2018 | 431 |  | ORDER granting 389 Motion to Produce in Camera Document. The named and interested parties to this case shall submit to the Court by no later than April 25, 2018 a protective order governing the use of the document at issue. Signed by Chief District Judge Julie A Robinson on 4/18/2018. (hl) (Entered: 04/18/2018) |
| 04/23/2018 | 432 |  | Unopposed MOTION for leave To File Document Under Seal by Alicia Tackett. (Attachments: # 1 Proposed Sealed Document Motion to Delay)(Ambrosio, Kathleen) (Entered: 04/23/2018) |
| 04/23/2018 | 433 |  | ORDER granting 432 Motion for Leave as to Alicia Tackett (4). Signed by Chief District Judge Julie A Robinson on 4/23/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 04/23/2018) |
| 04/23/2018 | 434 |  | Unopposed SEALED MOTION *To Delay Self–Surrender Date* by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 04/23/2018) |
| 04/24/2018 | 435 |  | NOTICE of Withdrawal of Motion (Document 94) by David Lougee as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 94 MOTION to Join 82 Motion for Fed. R. Crim. P. 41(g) Return of Information (Laurans, Jonathan) (Entered: 04/24/2018) |
| 04/24/2018 | 436 |  |  |

| | | | |
|---|---|---|---|
| | | | SEALED ORDER re 434 Sealed Motion as to Alicia Tackett (4). Signed by Chief District Judge Julie A Robinson on 4/24/18. (kao) (Entered: 04/24/2018) |
| 04/25/2018 | 437 | | SEALED STIPULATED PROTECTIVE ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop. Signed by Chief District Judge Julie A Robinson on 4/25/2018. (hl) (Modified on 4/26/2018 to remove terminated defendants Alicia Tackett and Catherine Rowlette from docket text. They were selected in error when order was filed. (hl)) (Entered: 04/25/2018) |
| 04/26/2018 | 438 | | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17. Signed by Chief District Judge Julie A Robinson on 4/26/2018. (hl) (Entered: 04/26/2018) |
| 04/30/2018 | 439 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 04/30/2018) |
| 04/30/2018 | 440 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 04/30/2018) |
| 04/30/2018 | 441 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 04/30/2018) |
| 04/30/2018 | 442 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 04/30/2018) |
| 04/30/2018 | 443 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 04/30/2018) |
| 04/30/2018 | 444 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 04/30/2018) |
| 04/30/2018 | 445 | | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17(b) (Thomas) re: 439 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 4/30/2018. (hl) (Entered: 04/30/2018) |
| 04/30/2018 | 446 | | ORDER for Production of Witness Pursuant to Fed. R. Crim. P. 17(b) (Stokes) re: 440 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 4/30/2018. (hl) (Entered: 04/30/2018) |
| 04/30/2018 | 447 | | ORDER for Production of Witness Pursuant to Fed. R. Crim. P. 17(b) (Kinney) re: 441 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 4/30/2018. (hl) (Entered: 04/30/2018) |
| 04/30/2018 | 448 | | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17(b) (Beall) re: 442 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 4/30/2018. (hl) (Entered: 04/30/2018) |
| 04/30/2018 | 449 | | ORDER for Production of Witness Pursuant to Fed. R. Crim. P. 17(b) (Cook) re: 443 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 4/30/2018. (hl) (Entered: 04/30/2018) |

| | | | |
|---|---|---|---|
| 04/30/2018 | 450 | | ORDER for Production of Witness Pursuant to Fed. R. Crim. P. 17(b) (Seubert) re: 444 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 4/30/2018. (hl) (Entered: 04/30/2018) |
| 05/02/2018 | 451 | | MOTION for order Lifting Stay by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 05/02/2018) |
| 05/02/2018 | 452 | | MOTION TO JOIN IN MOTION FOR ORDER TO LIFT STAY by David Bishop. (Dodge, Cynthia) (Modified on 5/4/2018 to modify title of document in docket text and add link to 451 . (hl)) (Entered: 05/02/2018) |
| 05/02/2018 | 453 | | MOTION TO JOIN IN MOTIONS PURSUANT TO RULE 17(b) by David Bishop. (Dodge, Cynthia) (Modified on 5/4/2018 to modify title of document in docket text. (hl)) (Entered: 05/02/2018) |
| 05/02/2018 | 454 | | MOTION TO JOIN MOTION FOR ORDER LIFTING STAY by Karl Carter. (Guastello, David) (Modified on 5/4/2018 to modify title of document in docket text and add link to 451 . (hl)) (Entered: 05/02/2018) |
| 05/02/2018 | 455 | | MOTION TO JOIN MOTIONS PURSUANT TO RULE 17(b) by Karl Carter. (Guastello, David) (Modified on 5/4/2018 to modify title of document in docket text. (hl)) (Entered: 05/02/2018) |
| 05/02/2018 | 456 | | NOTICE OF COURTROOM CHANGE. Hearing re Special Master David R. Cohen's Investigation for 5/15/2018 at 09:00 AM and 5/16/2018 at 09:00 AM in KC will be held in Courtroom 643. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 05/02/2018) |
| 05/04/2018 | 457 | | WAIVER of Appearance at Hearing by Anthon Aiono (Hoffman, Jason) (Entered: 05/04/2018) |
| 05/07/2018 | 460 | | RESPONSE TO MOTION by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 451 MOTION for order Lifting Stay (Clymer, Steve) (Entered: 05/07/2018) |
| 05/07/2018 | 461 | | MOTION to Quash *the Special Master's Subpeona Duces Tecum dated April 23, 2018* by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Exhibit)(Clymer, Steve) (Entered: 05/07/2018) |
| 05/07/2018 | 462 | | ORDER granting 452 Defendant David Bishop's Motion to Join in Motion for Order to Lift Stay. Defendant moves to join in 451 the Federal Public Defender's Motion for Order Lifting Stay. For good cause, the Court grants Defendant's motion. Signed by Chief District Judge Julie A Robinson on 5/7/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 05/07/2018) |
| 05/07/2018 | 463 | | ORDER granting 453 Defendant David Bishop's Motion to Join in Motions Pursuant to Rule 17(b). Defendant moves to join the Federal Public Defender's Motions for Production of Witnesses, docket entries 439 , 440 , 441 , 442 , 443 , and 444 , which this Court previously granted. For good cause, the Court grants Defendant's motion to join. Signed by Chief District Judge Julie A Robinson on 5/7/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 05/07/2018) |

| 05/07/2018 | 464 | | ORDER granting 454 Defendant Karl Carter's Motion to Join Motion for Order Lifting Stay. Defendant moves to join in 451 the Federal Public Defender's Motion for Order Lifting Stay. For good cause, the Court grants Defendant's motion. Signed by Chief District Judge Julie A Robinson on 5/7/2013. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 05/07/2018) |
| --- | --- | --- | --- |
| 05/07/2018 | 465 | | ORDER granting 455 Defendant Karl Carter's Motion to Join Motions Pursuant to Rule 17(b). Defendant moves to join the Federal Public Defender's Motions for Production of Witnesses, docket entries 439 , 440 , 441 , 442 , 443 , and 444 , which this Court previously granted. For good cause, the Court grants Defendant's motion to join. Signed by Chief District Judge Julie A Robinson on 5/7/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 05/07/2018) |
| 05/10/2018 | 466 | | NOTICE of Government's Notice to the Court Concerning Authorization of Department of Justice Witnesses to Disclose Information by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Attachments: # 1 Exhibit)(Clymer, Steve) (Entered: 05/10/2018) |
| 05/10/2018 | 467 | | WAIVER of appearance by Karl Carter (Guastello, David) (Entered: 05/10/2018) |
| 05/11/2018 | 468 | | ORDER to Pay Summary Billing Statement for period of April, 2018. Signed by Chief District Judge Julie A Robinson on 5/11/18. (Attachments: # 1 Summary Billing Statement/Order) (hw) (Modified on 5/15/2018 to correct title of document in docket text. (hl)) (Entered: 05/11/2018) |
| 05/11/2018 | 469 | | NOTICE that Hearing on May 15 and 16 will proceed as scheduled, as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop The Court has received an email from AUSA Steven Clymer, copied to all parties, advising that a family health matter may prevent or interrupt his appearance at the long−scheduled hearing on May 15 and 16. The Court is sympathetic to Mr. Clymer's family circumstances, but will not continue the hearing if the government moves to continue. As the parties are aware, more than 20 witnesses are subpoenaed from near and far, this hearing has been continued twice because of government filings and the defendants in this case have Speedy Trial rights. Therefore, the hearing will proceed as scheduled, whether the government appears by Mr. Clymer, by a representative of the Department of Justice or by one or more of the many government attorneys who have entered appearances in this case. (Robinson, Julie) (Entered: 05/11/2018) |
| 05/11/2018 | 470 | | MOTION to Quash *Suboenas ad Testificandum* by Corrections Corporation of America as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brockert, Alyssa) (Entered: 05/11/2018) |
| 05/14/2018 | 471 | | WAIVER of Appearance by Lorenzo Black (Jenab, John) (Entered: 05/14/2018) |
| 05/14/2018 | 472 | | MEMORANDUM AND ORDER denying Linda Thomas and Wayne Bigelow's 470 Motion to Quash Subpoenas. Signed by Chief District Judge Julie A Robinson on 5/14/2018. (hl) (Entered: 05/14/2018) |

| 05/14/2018 | 473 | | ENTRY OF APPEARANCE: by attorney Alyssa C. Brockert on behalf of Corrections Corporation of America (Brockert, Alyssa) (Entered: 05/14/2018) |
| 05/15/2018 | 474 | | ENTRY OF APPEARANCE: by attorney Hal D. Meltzer on behalf of Corrections Corporation of America (Meltzer, Hal) (Entered: 05/15/2018) |
| 05/15/2018 | 476 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: finding as moot 340 Motion to Quash as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), David Bishop (6); finding as moot 341 Motion to Quash as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), David Bishop (6); MOTION HEARING as to Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop held on 5/15/2018. Hearing to reconvene on May 16, 2018 at 8:45 a.m. (Court Reporter Kelli Stewart.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 05/17/2018) |
| 05/16/2018 | 477 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: MOTION HEARING as to Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop held on 5/16/2018. Status Conference set for 6/12/2018 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. (Court Reporter Kelli Stewart.) (Attachments: # 1 FPD Exhibit List, # 2 Witness List) (bw) (Entered: 05/17/2018) |
| 05/17/2018 | 475 | | WAIVER of Appearance by David Bishop (Dodge, Cynthia) (Entered: 05/17/2018) |
| 05/18/2018 | 478 | | ORDER as to Karl Carter, David Bishop. For the reasons stated fully on the record at the May 16, 2018 hearing in this case, the Government's Oral Motion to Dismiss Charges Against David Bishop is granted. The Government's Oral Motion to Dismiss Charges Against Karl Carter is held in abeyance. Signed by Chief District Judge Julie A Robinson on 5/18/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 05/18/2018) |
| 05/22/2018 | 479 | | SPECIAL MASTER EXHIBIT LIST for the hearing held on 5/15/2018 and 5/16/2018 (see Minute Entry 477 dated 5/16/2018. (bw) (Entered: 05/22/2018) |
| 05/23/2018 | 480 | | ORDER as to Karl Carter and David Bishop. This is a pdf Order memorializing text order 478 filed on May 18, 2018, requested by the US Marshal's Service. Signed by Chief District Judge Julie A Robinson on 5/23/2018. (bw) (This document was modified to correct signature and regenerated to parties.) (Entered: 05/23/2018) |
| 05/30/2018 | 481 | | SEALED TRANSCRIPT as to Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop (ks) (Original document contained typographical errors; corrected document added on 7/31/2018: # 1 Main Document – Corrected) (kao). (Entered: 05/30/2018) |
| 05/30/2018 | 482 | | TRANSCRIPT of Motion Hearing (Redacted) Volume 1 (Pgs 1–315) (315 pgs) held 05/15/2018 as to Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Mr. Michael Hodgson. Volume: 1. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 8/28/2018. (ks) (Original document contained typographical errors; corrected document added on 7/31/2018: # 1 Main Document – Corrected) (kao). (Entered: 05/30/2018) |
| 05/30/2018 | 483 | TRANSCRIPT of Motion Hearing Volume 2 (Pgs 316–397) (82 pgs) held 05/16/2018 as to Lorenzo Black, Karl Carter, Anthon Aiono, David Bishop before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Mr. Michael Hodgson. Volume: 2.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 8/28/2018. (ks) (Original document contained typographical errors; corrected document added on 7/31/2018: # 1 Main Document – Corrected) (kao). (Entered: 05/30/2018) |
| 06/04/2018 | 484 | MOTION for Protective Order by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 06/04/2018) |
| 06/05/2018 | 485 | ORDER setting briefing deadline as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. The Federal Public Defender has filed a motion for protective order (Doc. 484). The Government shall file any response to the motion by no later than Friday, June 8, 2018. Signed by Chief District Judge Julie A Robinson on 6/5/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (gt) (Entered: 06/05/2018) |
| 06/07/2018 | 486 | WAIVER of Appearance by Anthon Aiono (Hoffman, Jason) (Entered: 06/07/2018) |
| 06/07/2018 | 487 | ORDER granting 484 Federal Public Defender's Notice of Invocation of Rights and Motion for Protective Order. Signed by Chief District Judge Julie |

| | | | |
|---|---|---|---|
| | | | A Robinson on 6/7/2018. (hl) (Entered: 06/07/2018) |
| 06/07/2018 | 488 | | WAIVER of appearance by Karl Carter (Guastello, David) (Entered: 06/07/2018) |
| 06/07/2018 | 489 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop – Because of conflicts with the Court's schedule, the status conference set for 6/12/2018 at 9:00 am is CONTINUED to 6/15/2018 at 01:30 PM in KC Courtroom 440 (JWL) before Chief District Judge Julie A Robinson. Signed by Chief District Judge Julie A Robinson on 06/07/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ses) (Entered: 06/07/2018) |
| 06/07/2018 | 490 | | AMENDED ORDER. The Court amends its previous Order (Doc. 487 ) to reflect that the United States Attorney's Office for the District of Kansas and its agents are prohibited, effective immediately, from requesting or accessing recorded calls between the Federal Public Defender and clients through CoreCivic Leavenworth Detention Center; Securus Technologies, Inc.; Praeses, LLC; or any third party that may have access to the protected communications described in the Federal Public Defender's motion. Signed by Chief District Judge Julie A Robinson on 6/7/2018. (hl) (Entered: 06/07/2018) |
| 06/12/2018 | 491 | | MOTION for order Granting Access to Special Master Investigation by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 06/12/2018) |
| 06/14/2018 | 492 | | WAIVER of Appearance by Lorenzo Black (Jenab, John) (Entered: 06/14/2018) |
| 06/14/2018 | 493 | | ORDER granting 491 FPD's Motion for Access to Special Master's Investigation. Signed by Chief District Judge Julie A Robinson on 6/14/2018. (hl) (Entered: 06/14/2018) |
| 06/15/2018 | 494 | | ORDER to Pay Summary Billing Statement for period of May, 2018. Signed by Chief District Judge Julie A Robinson on 6/15/2018. (hl) (Entered: 06/15/2018) |
| 06/15/2018 | 495 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: STATUS CONFERENCE as to Lorenzo Black, Karl Carter, Anthon Aiono held on 6/15/2018. (Court Reporter Kim Greiner.) (bw) (Entered: 06/15/2018) |
| 06/15/2018 | 496 | | NOTICE OF HEARING as to Defendants Lorenzo Black, Karl Carter, Anthon Aiono  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING Evidentiary hearing set for 7/18/2018 at 09:00 AM, and 7/19/2018 at 09:00 AM in KC Courtroom 427 (JAR)before Chief District Judge Julie A Robinson. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 06/15/2018) |
| 07/02/2018 | 497 | | NOTICE OF TELEPHONE CONFERENCE.  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Telephone Conference set for 7/5/2018 at 09:00 AM before Chief District Judge Julie A Robinson. All parties who wish to participate in this telephone conference are instructed to dial into the conference line. The CONFERENCE LINE is 1–888–363–4749 and the |

| | | | |
|---|---|---|---|
| | | | ACCESS CODE is 4697748#. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 07/02/2018) |
| 07/05/2018 | 498 | | Petition for Action on Conditions of Pretrial Release. Signed by Chief District Judge Julie A Robinson on 7/5/2018. (hl) (Modified on 7/11/2018 – Unsealed upon arrest. (hl)) (Entered: 07/05/2018) |
| 07/05/2018 | 501 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: STATUS CONFERENCE as to Lorenzo Black, Karl Carter, Anthon Aiono held on 7/5/2018. See Minute Sheet for details. (Court Reporter Kelli Stewart.) (hl) (Entered: 07/06/2018) |
| 07/06/2018 | 499 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 07/06/2018) |
| 07/06/2018 | 502 | | TRANSCRIPT of Status Conference held June 15, 2018 as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop before Judge Julie A. Robinson, Court Reporter Kim Greiner, 913–735–2314, kim_greiner@ksd.uscourts.gov. Transcript purchased by: Federal Public Defender. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/4/2018. (kg) (Entered: 07/06/2018) |
| 07/10/2018 | 503 | | Order for Production of Witness Pursuant to Fed. R. Crim. P. 17(b) (Thomas) re: 499 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 7/10/2018. (hl) (Entered: 07/10/2018) |
| 07/11/2018 | | | ARREST of Lorenzo Black (hl) (Entered: 07/11/2018) |
| 07/11/2018 | 505 | | NOTICE OF HEARING as to Defendant Lorenzo Black  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING Defendant shall appear and show cause why his bond should not be revoked. Initial Revocation Proceedings set for 7/11/2018 at 03:00 PM in KC Courtroom 223 (JPO) before Magistrate Judge James P. O'Hara. (ck) (Entered: 07/11/2018) |
| 07/11/2018 | 506 | | ARREST WARRANT returned executed on 7/11/2018 as to Lorenzo Black (hl) (Entered: 07/11/2018) |
| 07/11/2018 | 507 | | ORDER to Pay Summary Billing Statement for period of June, 2018. Signed by Chief District Judge Julie A Robinson on 7/11/2018. (hl) (Entered: 07/11/2018) |
| 07/11/2018 | 508 | | |

| | | | |
|---|---|---|---|
| | | | WAIVER of Appearance at Hearing by Anthon Aiono (Hoffman, Jason) (Entered: 07/11/2018) |
| 07/11/2018 | 509 | | MINUTE ENTRY for proceedings held before Magistrate Judge James P. O'Hara: INITIAL APPEARANCE re Revocation of Pretrial Release as to Lorenzo Black held on 7/11/2018. Release Ordered. (Tape #3:40 FTR/JPO.) (hl) (Entered: 07/12/2018) |
| 07/12/2018 | 510 | | ORDER re: release from custody as to Lorenzo Black (1). The previous conditions of release shall remain in effect. Signed by Magistrate Judge James P. O'Hara on 7/11/2018. (hl) (Entered: 07/12/2018) |
| 07/13/2018 | 511 | | NOTICE OF HEARING as to Defendant Lorenzo Black  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING Sentencing set for 7/30/2018 at 01:30 PM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 07/13/2018) |
| 07/16/2018 | 512 | | NOTICE OF CANCELLED HEARING: In Court Hearing set for 7/18/2018 and 7/19/2018 beginning at 9:00 a.m. as to Defendants Lorenzo Black, Karl Carter, and Anthon Aiono cancelled. NOTICE OF HEARING as to Defendants Lorenzo Black, Lorenzo Black, Karl Carter, Anthon Aiono  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING NOTICE OF STATUS CONFERENCE: The Court sets a Status Conference in this case for 7/17/2018 at 02:00 PM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. Counsel who wish to participate by telephone are instructed to dial into the conference line. CONFERENCE LINE is 1–888–363–4749 and the ACCESS CODE is 4697748#. Please file a waiver of appearance if defendants do not intend to appear at this hearing. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 07/16/2018) |
| 07/16/2018 | 513 | | WAIVER of Appearance by Lorenzo Black (Jenab, John) (Entered: 07/16/2018) |
| 07/16/2018 | 514 | | WAIVER of appearance by Karl Carter (Guastello, David) (Entered: 07/16/2018) |
| 07/16/2018 | 515 | | WAIVER of Appearance by Anthon Aiono (Hoffman, Jason) (Entered: 07/16/2018) |
| 07/17/2018 | 516 | | REVISED PRESENTENCE INVESTIGATION REPORT as to Lorenzo Black  (NOTE: Access to this document is restricted to the USA and this defendant.)  (USPO) (Entered: 07/17/2018) |
| 07/17/2018 | 517 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: STATUS CONFERENCE as to Lorenzo Black, Karl Carter, and Anthon Aiono held on 7/17/2018. (Court Reporter Kelli Stewart.) (bw) (Entered: 07/17/2018) |
| 07/18/2018 | 518 | | TRIAL ORDER as to Karl Carter. Estimated trial time 6–7 days; Jury Trial set for 8/13/2018 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District |

| | | | |
|---|---|---|---|
| | | | Judge Julie A Robinson. See Order for further details. Signed by Chief District Judge Julie A Robinson on 7/18/2018. (hl) (Entered: 07/18/2018) |
| 07/20/2018 | 519 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 07/20/2018) |
| 07/20/2018 | 520 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 07/20/2018) |
| 07/23/2018 | 521 | | SEALED MOTION for Leave to File Under Seal by USA as to Lorenzo Black. (Attachments: # 1 Proposed Sealed Document)(Oakley, Donald) (Entered: 07/23/2018) |
| 07/23/2018 | 522 | | ORDER granting 521 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Lorenzo Black (1). Signed by Chief District Judge Julie A Robinson on 7/23/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 07/23/2018) |
| 07/23/2018 | 523 | | SEALED MOTION by USA as to Lorenzo Black. (Oakley, Donald) (Entered: 07/23/2018) |
| 07/23/2018 | 524 | | ORDER for Production of Documents and Objects Pursuant to Fed. R. Crim. P. 17(b) and (c) re: 519 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 7/23/2018. (hl) (Entered: 07/23/2018) |
| 07/23/2018 | 525 | | ORDER for Production of Documents and Objects Pursuant to Fed. R. Crim. P. 17(b) and (c) re: 520 Motion Pursuant to Rule 17b. Signed by Chief District Judge Julie A Robinson on 7/23/2018. (hl) (Entered: 07/23/2018) |
| 07/24/2018 | 526 | | SEALED MOTION for Leave to File Under Seal by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Proposed Sealed Document, # 2 Proposed Sealed Document)(Brannon, Melody) (Entered: 07/24/2018) |
| 07/24/2018 | 527 | | ORDER granting 526 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono. Signed by Chief District Judge Julie A Robinson on 7/24/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 07/24/2018) |
| 07/24/2018 | 528 | | SEALED MOTION by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 07/24/2018) |
| 07/24/2018 | 529 | | SEALED MOTION by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 07/24/2018) |
| 07/24/2018 | 530 | | SEALED ORDER granting 528 Sealed Motion. Signed by Chief District Judge Julie A Robinson on 7/24/2018. (hl) (Entered: 07/24/2018) |

| 07/24/2018 | 531 | | SEALED ORDER granting 529 Sealed Motion. Signed by Chief District Judge Julie A Robinson on 7/24/2018. (hl) (Entered: 07/24/2018) |
| 07/25/2018 | 532 | | SEALED MOTION for Leave to File Under Seal by Alicia Tackett. (Attachments: # 1 Proposed Sealed Document Delay Self–Surrender)(Ambrosio, Kathleen) (Entered: 07/25/2018) |
| 07/25/2018 | 533 | | ORDER granting 532 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Alicia Tackett (4) Signed by Chief District Judge Julie A Robinson on 7/25/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 07/25/2018) |
| 07/25/2018 | 534 | | SEALED MOTION *to Delay Self–Surrender* by Alicia Tackett. (Ambrosio, Kathleen) (Entered: 07/25/2018) |
| 07/26/2018 | 535 | | NOTICE OF HEARING as to Defendants Lorenzo Black, Karl Carter, Anthon Aiono  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING Status Conference set for 8/1/2018 at 02:00 PM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. Counsel who wish to participate by telephone are instructed to dial into the conference line. CONFERENCE LINE is 1–888–363–4749 and the ACCESS CODE is 4697748#. Please file a waiver of appearance if defendants do not intend to appear at this hearing. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 07/26/2018) |
| 07/30/2018 | 536 | | MOTION for Hearing by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Brannon, Melody) (Entered: 07/30/2018) |
| 07/30/2018 | 537 | | TRANSCRIPT of Status Conference (18 pgs) held 07/17/2018 as to Lorenzo Black, Karl Carter, Anthon Aiono before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/29/2018. (ks) (Original document contained typographical errors; corrected document added on 7/31/2018: # 1 Main Document – Corrected) (kao). (Entered: 07/30/2018) |
| 07/30/2018 | 538 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: SENTENCING HEARING held on 7/30/2018 as to defendant Lorenzo Black. (Court Reporter Kelli Stewart.) (bw) (Entered: 07/30/2018) |

| | | | |
|---|---|---|---|
| 07/30/2018 | 539 | | ORDER granting 523 Sealed Motion as to Lorenzo Black (1). Signed by Chief District Judge Julie A Robinson on 7/30/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 07/30/2018) |
| 07/30/2018 | 540 | | JUDGMENT as to Lorenzo Black (1). Count 9: Defendant sentenced to Time Served, followed by 1 year supervised release. The time served in this case is concurrent with the time served in Douglas County, Kansas Case No. 2014CR299, which the defendant has already completed. No fine imposed; $100 special assessment. Counts 1–4: dismissed on Govts motion. Signed by Chief District Judge Julie A Robinson on 7/30/2018. (hl) (Entered: 07/30/2018) |
| 07/30/2018 | 541 | | STATEMENT OF REASONS as to Lorenzo Black re 540 Judgment <br><br> **(NOTE: Access to this document is restricted to the USA and this defendant.)** <br><br> (hl) (Entered: 07/30/2018) |
| 07/31/2018 | 542 | | TRANSCRIPT of Sentencing (Excerpt – Court's closing remarks) (4 pgs) held 07/30/2018 as to Lorenzo Black before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Mr. Duston Slinkard. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/29/2018. (ks) (Entered: 07/31/2018) |
| 07/31/2018 | | | DOCKET ANNOTATION: The original transcripts attached to docket entries 481, 482, 483, and 537 contained typographical errors; corrected documents have been added to those entries. (kao) (Entered: 07/31/2018) |
| 07/31/2018 | 543 | | WAIVER of appearance by Karl Carter (Guastello, David) (Entered: 07/31/2018) |
| 07/31/2018 | 544 | | WAIVER of Appearance *at Hearing* by Anthon Aiono (Hoffman, Jason) (Entered: 07/31/2018) |
| 07/31/2018 | 545 | | REVISED PRESENTENCE INVESTIGATION REPORT as to Anthon Aiono <br><br> **(NOTE: Access to this document is restricted to the USA and this defendant.)** <br><br> (USPO) (Entered: 07/31/2018) |

| 07/31/2018 | 546 | | NOTICE OF HEARING as to Defendant Anthon Aiono  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING Sentencing set for 8/1/2018 at 01:30 PM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 07/31/2018) |
|---|---|---|---|
| 07/31/2018 | 547 | | ORDER finding as moot the Government's March 28, 2018 424 Motion for Status Conference as to Lorenzo Black (1), Karl Carter (2), Anthon Aiono (3), Alicia Tackett (4). Signed by Chief District Judge Julie A Robinson on 7/31/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ams) (Entered: 07/31/2018) |
| 07/31/2018 | 548 | | SEALED MOTION for Leave to File Under Seal by USA as to Anthon Aiono. (Attachments: # 1 Proposed Sealed Document)(Oakley, Donald) (Entered: 07/31/2018) |
| 07/31/2018 | 549 | | ORDER granting 548 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Anthon Aiono (3) Signed by Chief District Judge Julie A Robinson on 7/31/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 07/31/2018) |
| 07/31/2018 | 550 | | SEALED DOCUMENT by USA as to Anthon Aiono (Oakley, Donald) (Entered: 07/31/2018) |
| 07/31/2018 | 551 | | SEALED MOTION for Leave to File Under Seal by USA as to Alicia Tackett. (Attachments: # 1 Proposed Sealed Document)(Oakley, Donald) (Entered: 07/31/2018) |
| 07/31/2018 | 552 | | ORDER granting 551 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Alicia Tackett (4). Signed by Chief District Judge Julie A Robinson on 7/31/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 07/31/2018) |
| 07/31/2018 | 553 | | SEALED DOCUMENT by USA as to Alicia Tackett (Oakley, Donald) (Entered: 07/31/2018) |
| 08/01/2018 | 554 | | RESPONSE TO MOTION by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop re 536 MOTION for Hearing (Clymer, Steve) (Entered: 08/01/2018) |
| 08/01/2018 | 555 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: SENTENCING HEARING held on 8/1/2018 as to defendant Anthon Aiono. (Court Reporter Kelli Stewart.) (bw) (Entered: 08/01/2018) |
| 08/01/2018 | 556 | | JUDGMENT as to Anthon Aiono (3): Counts 1, 11s, 2–4, 8 are Dismissed on the motion of the United States. Count 1s – The defendant is sentenced to probation for a term of 2 years. $100.00 special assessment. Signed by Chief District Judge Julie A Robinson on 8/1/18. (hw) (Entered: 08/01/2018) |
| 08/01/2018 | 557 | | STATEMENT OF REASONS as to Anthon Aiono re 556 Judgment. |

| | | |
|---|---|---|
| | | **(NOTE: Access to this document is restricted to the USA and this defendant.)** <br><br> (hw) (Entered: 08/01/2018) |
| 08/01/2018 | 558 | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: taking under advisement 536 Motion for Hearing as to Karl Carter (2); MOTION HEARING as to Karl Carter held on 8/2/2018. (Court Reporter Kelli Stewart.) (Attachments: # 1 FPD Exhibit List) (bw) (Modified on 8/7/2018 to correct date filed in ECF to 8/1/18. (hl)) (Entered: 08/02/2018) |
| 08/02/2018 | 560 | TRANSCRIPT of Motion Hearing (78 pgs) held 08/01/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Mr. Duston Slinkard. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/31/2018. (ks) (Entered: 08/02/2018) |
| 08/06/2018 | 561 | NOTICE OF CANCELLED HEARING: jury trial date set for 8/13/2018 as to Defendant Karl Carter is vacated until further notice by the Court. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/06/2018) |
| 08/06/2018 | 562 | MEMORANDUM AND ORDER granting 536 Motion to Reconvene Evidentiary Hearing. Signed by Chief District Judge Julie A Robinson on 8/6/2018. (hl) (Entered: 08/06/2018) |
| 08/06/2018 | 563 | ORDER FOR THE DEPARTMENT OF JUSTICE TO RETURN DEFENSE DOCUMENTS as to Karl Carter. Signed by Chief District Judge Julie A Robinson on 8/6/2018. (hl) (Entered: 08/06/2018) |
| 08/06/2018 | 564 | NOTICE OF HEARING as to Defendant Karl Carter  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING Status Conference set for 8/14/2018 at 09:00 AM in KC Courtroom 427 (JAR) before Chief District Judge Julie A Robinson. Counsel who wish to participate by telephone are instructed to dial into the conference line. CONFERENCE LINE is 1–888–363–4749 and the ACCESS CODE is 4697748#. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 08/06/2018) |
| 08/07/2018 | 565 | SEALED ORDER re: 534 Sealed Motion as to Alicia Tackett (4). Signed by Chief District Judge Julie A Robinson on 8/6/2018. (hl) (Entered: 08/07/2018) |
| 08/10/2018 | 566 | GOVERNMENT'S AFFIRMATION RE DOCUMENTS AND INFORMATION by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, |

| | | | |
|---|---|---|---|
| | | | Alicia Tackett, Catherine Rowlette, David Bishop. (Clymer, Steve) (Modified on 8/14/2018 to correct title of document in docket text. (hl)) (Entered: 08/10/2018) |
| 08/13/2018 | 567 | | WAIVER of appearance by Karl Carter (Guastello, David) (Entered: 08/13/2018) |
| 08/14/2018 | 568 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: STATUS CONFERENCE held on 8/14/2018. Scheduling Order will follow. (Court Reporter Kelli Stewart.) (bw) (Entered: 08/14/2018) |
| 08/15/2018 | 569 | | ORDER TO PRESERVE EVIDENCE as to Karl Carter. Signed by Chief District Judge Julie A Robinson on 8/15/2018. (hl) (Entered: 08/15/2018) |
| 08/16/2018 | 570 | | TRANSCRIPT of Status Conference held 08/14/2018 (51 pgs) as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Mr. Duston Slinkard.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 11/14/2018. (ks) (Entered: 08/16/2018) |
| 08/17/2018 | 571 | | ORDER: The Court will reconvene the evidentiary hearing that began on May 15, 2018, on all matters that were set for hearing on that date, including but not limited to: the Special Master's Phase III Report, the FPD's Motion to Show Cause, and all pending Rule 41 motions. Evidentiary Hearing set for 10/2/2018 at 09:00 AM, 10/3/2018 at 09:00 AM, 10/4/2018 at 09:00 AM, 10/9/2018 at 09:00 AM, 10/10/2018 at 09:00 AM, 10/11/2018 at 09:00 AM, and 10/12/2018 at 09:00 AM in KC Room 643 before Chief District Judge Julie A Robinson. Signed by Chief District Judge Julie A Robinson on 8/17/2018. (bw) (Entered: 08/17/2018) |
| 08/20/2018 | 572 | | MOTION for Discovery by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 08/20/2018) |
| 08/24/2018 | 573 | | MOTION for Discovery by Federal Public Defender as to Karl Carter. (Attachments: # 1 Exhibit)(Brannon, Melody) (Entered: 08/24/2018) |
| 08/28/2018 | 574 | | ENTRY OF APPEARANCE: by attorney Alleen C. VanBebber on behalf of David R. Cohen (VanBebber, Alleen) (Entered: 08/28/2018) |
| 08/28/2018 | 575 | | ORDER to Pay Summary Billing Statement for period of July, 2018. Signed by Chief District Judge Julie A Robinson on 8/28/2018. (hl) (Entered: 08/28/2018) |

| 08/29/2018 | 576 | | SEALED MOTION for Leave to File Under Seal by Federal Public Defender as to Karl Carter. (Attachments: # 1 Proposed Sealed Document)(Brannon, Melody) (Entered: 08/29/2018) |
| 08/29/2018 | 577 | | ORDER granting 576 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Karl Carter (2). Signed by Chief District Judge Julie A Robinson on 8/29/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/29/2018) |
| 08/29/2018 | 578 | | SEALED MOTION by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 08/29/2018) |
| 08/29/2018 | 579 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 08/29/2018) |
| 08/30/2018 | 580 | | ORDER for Production of Witness Pursuant to Fed. R. Crim. P. 17(b) (Martin) granting 579 Motion Pursuant to Rule 17b as to Karl Carter (2). Signed by Chief District Judge Julie A Robinson on 8/29/2018. (hl) (Entered: 08/30/2018) |
| 08/30/2018 | 582 | | MOTION to Stay Special Master's Subpoena Duces Tecum by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Exhibit)(Clymer, Steve) (Entered: 08/30/2018) |
| 08/30/2018 | 583 | | SEALED ORDER re: 578 Sealed Motion as to Karl Carter (2). Signed by Chief District Judge Julie A Robinson on 8/29/2018. (hl) (Entered: 08/30/2018) |
| 08/31/2018 | 585 | | Supplemental MOTION for Order to Show Cause by Federal Public Defender as to Karl Carter re 301 MOTION for Order to Show Cause by Federal Public Defender as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Brannon, Melody) Modified on 9/27/2018 (bw). (Entered: 08/31/2018) |
| 08/31/2018 | 586 | | ORDER granting 582 Government's Motion to Stay Special Master's Subpoena Duces Tecum Dated August 17, 2018. The Government shall produce on a rolling basis any documents responsive to the Special Master's August 17, 2018 subpoena duces tecum up to and including September 21, 2018. No further extensions will be granted. Signed by Chief District Judge Julie A Robinson on 8/31/2018. (hl) (Entered: 08/31/2018) |
| 09/04/2018 | 587 | | RESPONSE TO MOTION by USA as to Karl Carter re 585 Supplemental MOTION for Order to Show Cause (Clymer, Steve) (Entered: 09/04/2018) |
| 09/04/2018 | 588 | | REPLY TO RESPONSE TO MOTION by Federal Public Defender as to Karl Carter re 573 MOTION for Discovery , 572 MOTION for Discovery (Brannon, Melody) (Entered: 09/04/2018) |
| 09/05/2018 | 589 | | MOTION for Leave to File a Sur–Reply to Federal Public Defender's Reply to the Government's Response to Discovery Motions by USA as to Karl Carter. (Clymer, Steve) (Modified on 9/6/2018 to correct event used and correct title. (hl)) (Entered: 09/05/2018) |

| 09/05/2018 | 590 | NOTICE of Errata by Federal Public Defender as to Karl Carter re 588 Reply to Response to Motion (Brannon, Melody) (Entered: 09/05/2018) |
|---|---|---|
| 09/07/2018 | 593 | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 09/07/2018) |
| 09/07/2018 | 594 | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17(b) and (c) granting 593 Motion Pursuant to Rule 17b as to Karl Carter (2). Signed by Chief District Judge Julie A Robinson on 9/7/18. (kao) (Entered: 09/07/2018) |
| 09/10/2018 | 595 | MOTION for leave to Join Compulsory Process by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 09/10/2018) |
| 09/12/2018 | 596 | RESPONSE TO MOTION by USA as to Karl Carter re 585 Supplemental MOTION for Order to Show Cause (Clymer, Steve) (Entered: 09/12/2018) |
| 09/12/2018 | 597 | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 09/12/2018) |
| 09/13/2018 | 599 | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17(b) granting 597 Motion Pursuant to Rule 17b as to Karl Carter (2). Signed by Chief District Judge Julie A Robinson on 9/13/2018. (hl) (Entered: 09/13/2018) |
| 09/14/2018 | 600 | MOTION for order for Production of Documents Pursuant to Rule 17(c) by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 09/14/2018) |
| 09/17/2018 | 601 | MOTION for order for Production of Documents Pursuant to Rule 17 by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 09/17/2018) |
| 09/17/2018 | 602 | ORDER for Production of Documents and Objects Pursuant to Fed. R.Crim. P. 17(b) and (c) granting 601 Motion for Order for Production of Documents as to Karl Carter (2). Signed by Chief District Judge Julie A Robinson on 9/17/2018. (hl) (Entered: 09/17/2018) |
| 09/17/2018 | 603 | ORDER for Production of Documents and Objects Pursuant to Fed. R.Crim. P. 17(b) and (c) granting 600 Motion for Order for Production of Documents as to Karl Carter (2). Signed by Chief District Judge Julie A Robinson on 9/17/2018. (hl) (Entered: 09/17/2018) |
| 09/21/2018 | 605 | MOTION for Discovery *of Impeachment Information* by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 09/21/2018) |
| 09/21/2018 | 606 | NOTICE OF EXPERT TESTIMONY pursuant to Rule 16(a)(1)(G) by Federal Public Defender as to Karl Carter (Attachments: # 1 Ex Attachment A)(Brannon, Melody) (Entered: 09/21/2018) |
| 09/25/2018 | 608 | Unopposed SEALED MOTION for Leave to File Under Seal by USA as to Karl Carter. (Attachments: # 1 Proposed Sealed Document, # 2 Exhibit Ex. 1)(Slinkard, Duston) (Entered: 09/25/2018) |
| 09/25/2018 | 609 | ORDER granting 608 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Karl Carter (2) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) |

| | | | |
|---|---|---|---|
| | | | (Entered: 09/25/2018) |
| 09/25/2018 | 610 | | SEALED DOCUMENT by USA (Attachments: # 1 Exhibit Ex. 1)(Slinkard, Duston) Modified on 9/25/2018 to show correct filer (bw). (Entered: 09/25/2018) |
| 09/25/2018 | 611 | | SUPPLEMENTAL FUNDING ORDER. Signed by Chief District Judge Julie A Robinson on 9/25/2018. (bw) (Entered: 09/25/2018) |
| 09/26/2018 | 612 | | Unopposed SEALED MOTION for Leave to File Under Seal by USA as to Karl Carter. (Attachments: # 1 Exhibit Certificate of Service, # 2 Proposed Sealed Document, # 3 Proposed Sealed Document)(Slinkard, Duston) (Entered: 09/26/2018) |
| 09/26/2018 | 613 | | ORDER granting 612 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Karl Carter (2). Signed by Chief District Judge Julie A Robinson on 9/26/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 09/26/2018) |
| 09/26/2018 | 614 | | ORDER to Pay Summary Billing Statement for period of August, 2018. Signed by Chief District Judge Julie A Robinson on 9/26/2018. (hl) (Entered: 09/26/2018) |
| 09/26/2018 | 615 | | SEALED DOCUMENT by USA as to Karl Carter (Attachments: # 1 Exhibit, # 2 Exhibit) (Slinkard, Duston) (Entered: 09/26/2018) |
| 09/27/2018 | 616 | | ORDER finding as moot 451 Motion for Order Lifting Stay by Federal Public Defender; finding as moot 461 Motion to Quash the Special Master's Subpeona Duces Tecum dated April 23, 2018 by USA. Signed by Chief District Judge Julie A Robinson on 9/27/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 09/27/2018) |
| 09/27/2018 | 617 | | RESPONSE TO MOTION by USA as to Karl Carter re 605 MOTION for Discovery *of Impeachment Information* (Clymer, Steve) (Entered: 09/27/2018) |
| 09/27/2018 | 618 | | ORDER granting 595 Motion for Leave to Join Compulsory Process. Signed by Chief District Judge Julie A Robinson on 9/27/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 09/27/2018) |
| 09/27/2018 | 619 | | MOTION for Relief Government's Motion re: Limited Contacts with Sequestered Witnesses by USA as to Karl Carter. (Clymer, Steve) (Entered: 09/27/2018) |
| 09/28/2018 | 622 | | MEMORANDUM OF LAW by Federal Public Defender as to Karl Carter *re: Touhy* (Attachments: # 1 Attachment A)(Brannon, Melody) (Entered: 09/28/2018) |
| 09/28/2018 | 623 | | MOTION pursuant to Rule 17(b) by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 09/28/2018) |
| 09/28/2018 | 624 | | ORDER for Production of Witnesses Pursuant to Fed. R. Crim. P. 17(b) granting 623 Motion Pursuant to Rule 17b as to Karl Carter (2). Signed by |

| | | | Chief District Judge Julie A Robinson on 9/28/2018. (hl) (Entered: 09/28/2018) |
|---|---|---|---|
| 09/28/2018 | 625 | | WAIVER of appearance by Karl Carter (Guastello, David) (Entered: 09/28/2018) |
| 10/01/2018 | 626 | | ORDER granting 619 Government's Motion re: Limited Contacts with Sequestered Witnesses. Signed by Chief District Judge Julie A Robinson on 10/1/2018. (hl) (Entered: 10/01/2018) |
| 10/01/2018 | 627 | | MOTION to Quash *Subpoena and Memorandum in Support* by Tanya Treadway as to Karl Carter. (Treadway, Tanya) (Entered: 10/01/2018) |
| 10/01/2018 | 628 | | EXHIBIT LIST by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Slinkard, Duston) (Entered: 10/01/2018) |
| 10/01/2018 | 629 | | WITNESS LIST by Federal Public Defender as to Karl Carter (Brannon, Melody) (Entered: 10/01/2018) |
| 10/02/2018 | 631 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: (2); EVIDENTIARY HEARING as to Karl Carter held on 10/2/2018. Evidentiary hearing commences. The Court denies 605 Motion for Discovery as to Karl Carter. The Court denies 627 Motion to Quash filed by Tanya Treadway. The Court will issue order re Motion to Quash. Opening statements. Examination of witness, Erin Tomasic. Court recesses at 5:05 p.m. and will reconvene on October 3, 2018 at 8:30 a.m. (Court Reporter Kelli Stewart.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 10/03/2018) |
| 10/03/2018 | 630 | | ORDER denying 627 Movant Tanya Treadway's Motion to Quash Subpoena. Signed by Chief District Judge Julie A Robinson on 10/3/2018. (hl) (Entered: 10/03/2018) |
| 10/03/2018 | 632 | | MOTION for Protective Order by USA as to Karl Carter. (Slinkard, Duston) (Entered: 10/03/2018) |
| 10/03/2018 | 633 | | PROTECTIVE ORDER re: 632 Motion for Protective Order as to Karl Carter (2). Signed by Chief District Judge Julie A Robinson on 10/3/2018. (hl) (Entered: 10/03/2018) |
| 10/03/2018 | 636 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: EVIDENTIARY HEARING as to Karl Carter held on 10/3/2018. Presentation of evidence continues. Court adjourns at 5:27 p.m. and will reconvene on October 4, 2018 at 8:30 a.m. (Court Reporter Kelli Stewart.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 10/04/2018) |
| 10/04/2018 | 634 | | Order for Transportation Funds re: Tanya Treadway. Signed by Chief District Judge Julie A Robinson on 10/4/2018. (hl) (Entered: 10/04/2018) |
| 10/04/2018 | 635 | | ORDER denying 589 Motion for Leave to File Sur–reply as to Karl Carter (2). As stated on the record on October 2, 2018, this motion is denied for failure to follow D. Kan. Rule 15.1. Signed by Chief District Judge Julie A Robinson on 10/4/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ams) (Entered: 10/04/2018) |

| 10/04/2018 | 637 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: EVIDENTIARY HEARING as to Karl Carter held on 10/4/2018. Presentation of evidence continues. Court adjourns at 5:10 p.m. and will reconvene on October 9, 2018 at 8:30 a.m. (Court Reporter Kelli Stewart.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 10/05/2018) |
|---|---|---|---|
| 10/07/2018 | 638 | | STIPULATION by Federal Public Defender as to Karl Carter (Brannon, Melody) (Entered: 10/07/2018) |
| 10/08/2018 | 639 | | MOTION to Exclude *Improper Expert Testimony About Law and Legal Conclusions* by USA as to Karl Carter. (Slinkard, Duston) (Entered: 10/08/2018) |
| 10/08/2018 | 640 | | RESPONSE IN OPPOSITION by Federal Public Defender as to Karl Carter re 639 MOTION to Exclude *Improper Expert Testimony About Law and Legal Conclusions* (Brannon, Melody) (Entered: 10/08/2018) |
| 10/09/2018 | 643 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: EVIDENTIARY HEARING as to Karl Carter held on 10/9/2018. Presentation of evidence continues. The Court takes under advisement 639 Motion to Exclude Improper Expert Testimony About Law and Legal Conclusions by USA. Court adjourns at 5:58 p.m. and will reconvene on October 10, 2018 at 8:30 a.m. (Court Reporter Kelli Stewart.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 10/10/2018) |
| 10/10/2018 | 644 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: EVIDENTIARY HEARING as to Karl Carter held on 10/10/2018. Presentation of evidence continues. Court adjourns at 5:30 p.m. and will reconvene on October 11, 2018 at 8:30 a.m. (Court Reporter Kelli Stewart.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 10/11/2018) |
| 10/11/2018 | 645 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: EVIDENTIARY HEARING as to Karl Carter held on 10/11/2018. Presentation of evidence continues. Court adjourns at 4:13 p.m. and will reconvene on October 12, 2018 at 8:30 a.m. (Court Reporter Kelli Stewart.) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 10/11/2018) |
| 10/12/2018 | 646 | | MOTION for Disclosure *of Materials Under Protective Order* by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 10/12/2018) |
| 10/12/2018 | 647 | | ORDER to Pay Summary Billing Statement for period of September, 2018. Signed by Chief District Judge Julie A Robinson on 10/11/2018. (hl) (Entered: 10/12/2018) |
| 10/12/2018 | 648 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: granting 646 Motion for Disclosure as to Karl Carter (2); EVIDENTIARY HEARING as to Karl Carter held on 10/12/2018. All parties rest on their testimony and evidence. The Court takes the matter under advisement. Discussion regarding production of further discovery. The Court sets a one–hour evidentiary hearing for November 16, 2018 at 9:00 a.m. The Court retains original admitted exhibits. Court adjourns at 4:55 p.m. (Court |

| | | |
|---|---|---|
| | | Reporter Kelli Stewart.) (Attachments: # 1 FPD Exhibit List, # 2 Government's Exhibit List, # 3 Special Master's Exhibit List, # 4 Witness List) (bw) (Entered: 10/12/2018) |
| 10/12/2018 | 649 | NOTICE OF HEARING as to Defendant Karl Carter THIS IS AN OFFICIAL NOTICE FOR THIS HEARING Evidentiary Hearing set for 11/16/2018 at 09:00 AM in KC Courtroom 427 (JAR)before Chief District Judge Julie A Robinson. (One hour set aside for this hearing). (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 10/12/2018) |
| 10/15/2018 | 650 | *** STRICKEN – SEE 682 ORDER*** MOTION to Supplement Record by Tanya Treadway as to Karl Carter. (Treadway, Tanya) (Modified on 10/15/2018 – Document blocked from public view per JAR chambers. (hl)) Modified on 11/5/2018 (hl). (Entered: 10/15/2018) |
| 10/16/2018 | 651 | SEALED TRANSCRIPT as to Karl Carter (ks) (Entered: 10/16/2018) |
| 10/16/2018 | 652 | PARTIAL TRANSCRIPT of Motion Hearing (Testimony of Kenneth Michael "Mike" Warner, Melanie Morgan, Tanya Treadway) (Sealed Transcript Doc. 651 in redacted form) (152 pgs) Volume 8 held 10/11/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon. Volume: 8.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 1/14/2019. (ks) (Entered: 10/16/2018) |
| 10/16/2018 | 653 | ***STRICKEN – SEE 682 ORDER*** AMENDED DOCUMENT re 650 MOTION Supplement Record by Tanya Treadway as to Karl Carter (Treadway, Tanya) Modified on 11/5/2018 (hl). (Entered: 10/16/2018) |
| 10/16/2018 | 654 | SEALED MOTION for Leave to File Under Seal by Federal Public Defender as to Karl Carter. (Attachments: # 1 Proposed Sealed Document)(Bell, Branden) (Entered: 10/16/2018) |
| 10/16/2018 | 655 | ORDER granting 654 Sealed Motion for Leave to File Under Seal. Counsel is directed to file forthwith the requested document(s) with an event from the SEALED DOCUMENTS category as to Karl Carter (2) Signed by Chief District Judge Julie A Robinson on 10/16/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 10/16/2018) |
| 10/16/2018 | 656 | SEALED MOTION by Federal Public Defender as to Karl Carter. (Bell, Branden) (Entered: 10/16/2018) |

| 10/22/2018 | 658 | | SERVICE BY PUBLICATION filed by USA as to Lorenzo Black, Anthon Aiono. Last publication date September 20, 2018. (Attachments: # 1 Attachment 1)(Gurney, Annette) (Entered: 10/22/2018) |
|---|---|---|---|
| 10/22/2018 | 659 | | CERTIFICATE OF SERVICE by USA as to Lorenzo Black, Anthon Aiono re 266 Order on Motion for Forfeiture of Property, 267 Order on Motion for Forfeiture of Property *Served on the United States Secret Service* (Gurney, Annette) (Entered: 10/22/2018) |
| 10/22/2018 | 660 | | CERTIFICATE OF SERVICE by USA as to Lorenzo Black, Anthon Aiono re 266 Order on Motion for Forfeiture of Property, 267 Order on Motion for Forfeiture of Property *Served on the Current Resident* (Gurney, Annette) (Entered: 10/22/2018) |
| 10/22/2018 | 661 | | CERTIFICATE OF SERVICE by USA as to Lorenzo Black, Anthon Aiono re 266 Order on Motion for Forfeiture of Property, 267 Order on Motion for Forfeiture of Property *Served on Jason Hoffman with the Law Offices of Hoffman & Hoffman* (Gurney, Annette) (Entered: 10/22/2018) |
| 10/22/2018 | 662 | | CERTIFICATE OF SERVICE by USA as to Lorenzo Black, Anthon Aiono re 266 Order on Motion for Forfeiture of Property, 267 Order on Motion for Forfeiture of Property *Served on John Jenab with Jenab Law Firm* (Gurney, Annette) (Entered: 10/22/2018) |
| 10/22/2018 | 663 | | CERTIFICATE OF SERVICE by USA as to Lorenzo Black, Anthon Aiono re 266 Order on Motion for Forfeiture of Property, 267 Order on Motion for Forfeiture of Property *Served on Cynthia Dodge with Cynthia Dodge, LLC* (Gurney, Annette) (Entered: 10/22/2018) |
| 10/22/2018 | 664 | | CERTIFICATE OF SERVICE by USA as to Lorenzo Black, Anthon Aiono re 266 Order on Motion for Forfeiture of Property, 267 Order on Motion for Forfeiture of Property *Served on Michael M. Jackson* (Gurney, Annette) (Entered: 10/22/2018) |
| 10/22/2018 | 665 | | CERTIFICATE OF SERVICE by USA as to Lorenzo Black, Anthon Aiono re 266 Order on Motion for Forfeiture of Property, 267 Order on Motion for Forfeiture of Property *Served on David Guastello with Guastello Law Firm* (Gurney, Annette) (Entered: 10/22/2018) |
| 10/22/2018 | 666 | | CERTIFICATE OF SERVICE by USA as to Lorenzo Black, Anthon Aiono re 266 Order on Motion for Forfeiture of Property, 267 Order on Motion for Forfeiture of Property *Served on Kathleen Ambrosio with the Law Offices of Morris, Laing, Evans, Brock, and Kennedy, Ch.* (Gurney, Annette) (Entered: 10/22/2018) |
| 10/26/2018 | 668 | | Supplemental MOTION for Order to Show Cause by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 10/26/2018) |
| 10/30/2018 | 669 | | TRANSCRIPT of Motion Hearing Volume 3 (Pgs 398−699) (302 pgs) held 10/02/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913−735−2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon. Volume: 3.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent** |

| | | |
|---|---|---|
| | | **to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 1/28/2019. (ks) (Entered: 10/30/2018) |
| 10/30/2018 | 670 | TRANSCRIPT of Motion Hearing Volume 4 (Pgs 700–1056) (357 pgs) held 10/03/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon. Volume: 4. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 1/28/2019. (ks) (Entered: 10/30/2018) |
| 10/30/2018 | 671 | SEALED TRANSCRIPT as to Karl Carter (ks) (Entered: 10/30/2018) |
| 10/30/2018 | 672 | TRANSCRIPT of Motion Hearing Volume 5 (Sealed Transcript Doc. 671 in redacted form) (Pgs 1057–1358) (302 pgs) held 10/04/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon. Volume: 5. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 1/28/2019. (ks) (Entered: 10/30/2018) |
| 10/30/2018 | 673 | TRANSCRIPT of Motion Hearing Volume 6 (Pgs 1359–1731) (373 pgs) held 10/09/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript |

| | | | |
|---|---|---|---|
| | | | purchased by: Ms. Melody Brannon. Volume: 6.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 1/28/2019. (ks) (Entered: 10/30/2018) |
| 10/30/2018 | 674 | | TRANSCRIPT of Motion Hearing Volume 7 (Pgs 1732–2067) (336 pgs) held 10/10/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon. Volume: 7.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 1/28/2019. (ks) (Entered: 10/30/2018) |
| 10/30/2018 | 675 | | TRANSCRIPT of Motion Hearing Volume 8 (Pgs 2068–2183) (116 pgs) held 10/11/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon. Volume: 8.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 1/28/2019. (ks) (Entered: 10/30/2018) |
| 10/30/2018 | 676 | | SEALED TRANSCRIPT as to Karl Carter (ks) (Entered: 10/30/2018) |

| | | | |
|---|---|---|---|
| 10/30/2018 | 677 | | TRANSCRIPT of Motion Hearing Volume 9 (Sealed Transcript Doc. 676 in redacted form) (Pgs 2184–2485) (302 pgs) held 10/12/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon. Volume: 9.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 1/28/2019. (ks) (Entered: 10/30/2018) |
| 10/31/2018 | 678 | | AMENDED NOTICE OF HEARING as to Defendant Karl Carter  THIS IS AN OFFICIAL NOTICE FOR THIS HEARING In addition to the evidentiary hearing previously set regarding the discovery production, the Court now sets the Federal Public Defender's Second Supplemental Motion to Show Cause 668 for evidentiary hearing for that same date. Evidentiary Hearing set for 11/16/2018 at 09:00 AM in KC Courtroom 427 (JAR)before Chief District Judge Julie A Robinson. (bw) (Entered: 10/31/2018) |
| 11/02/2018 | 679 | | MOTION for leave to Admit Exhibits by Federal Public Defender as to Karl Carter. (Attachments: # 1 Exhibit 706, # 2 Exhibit 707, # 3 Exhibit 708, # 4 Exhibit 709, # 5 Exhibit 710, # 6 Exhibit 711, # 7 Exhibit 712, # 8 Exhibit 713, # 9 Exhibit 714)(Brannon, Melody) (Entered: 11/02/2018) |
| 11/05/2018 | 682 | | ORDER – FPD's Sealed Motion to Strike Pleadings (Doc. 656 ) is granted. Treadway's Motions to Supplement Record (Docs. 650 and 653 ) are stricken from the record. The Clerk shall remove Treadway's electronic–filing privileges in this case. Signed by Chief District Judge Julie A Robinson on 11/5/2018. (hl) (Entered: 11/05/2018) |
| 11/08/2018 | 683 | | RESPONSE TO MOTION by USA as to Karl Carter re 668 Supplemental MOTION for Order to Show Cause (Clymer, Steve) (Entered: 11/08/2018) |
| 11/09/2018 | 684 | | Unopposed MOTION for leave for the Ethics Bureau at Yale to file brief of amicus curiae in support of Defendant Carter and the Federal Public Defender by Ethics Bureau at Yale, The as to Karl Carter. (Pilate, Cheryl) (Entered: 11/09/2018) |
| 11/09/2018 | 685 | | ORDER granting 684 Unopposed Motion for leave for the Ethics Bureau at Yale to file brief of amicus curiae in support of Defendant Carter (2) and the Federal Public Defender. Signed by Chief District Judge Julie A Robinson on 11/9/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (lml) (Entered: 11/09/2018) |
| 11/12/2018 | 686 | | AMICUS BRIEF of *The Ethics Bureau at Yale as Amicus Curiae in Support of Defendant and the Federal Public Defender* as to Karl Carter by Cheryl Pilate. |

| | | | |
|---|---|---|---|
| | | | (Pilate, Cheryl) (Entered: 11/12/2018) |
| 11/13/2018 | 688 | | MOTION to Intervene by Montgomery Carl Akers. (Attachments: # 1 Attachments, # 2 Envelope)(hl) (Modified on 11/15/2018 to correct motion event used. (hl)) (Entered: 11/15/2018) |
| 11/14/2018 | 687 | | WAIVER of appearance by Karl Carter (Guastello, David) (Entered: 11/14/2018) |
| 11/15/2018 | | | NOTICE OF DOCKET TEXT MODIFICATION by Deputy Clerk to correct docket text in 688 Motion to read Motion to Intervene, not Motion for Joinder. (hl) (Entered: 11/15/2018) |
| 11/16/2018 | 689 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A Robinson: MOTION HEARING held on 11/16/2018. The Court grants 679 Motion for Leave to Admit Exhibits (2). The Court will issue written order. (Court Reporter Kelli Stewart) (Attachments: # 1 Witness List, # 2 Special Master Exhibit List, # 3 Government Exhibit List, # 4 Defendant Exhibit List) (bw) (Entered: 11/20/2018) |
| 11/21/2018 | 690 | | MEMORANDUM AND ORDER: Final Production and Briefing Order. Signed by Chief District Judge Julie A Robinson on 11/21/2018. (bw) (Entered: 11/21/2018) |
| 11/26/2018 | 691 | | ORDER to Pay Summary Billing Statement for period of October 2018. Signed by Chief District Judge Julie A Robinson on 11/26/18. (hw) (Entered: 11/26/2018) |
| 11/27/2018 | 692 | | MOTION to Produce *Documents and Objects Pursuant to Fed. R. Crim. P. 17(b) and (c)* by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 11/27/2018) |
| 11/27/2018 | 693 | | SEALED TRANSCRIPT as to Karl Carter (ks) (Entered: 11/27/2018) |
| 11/27/2018 | 694 | | TRANSCRIPT of Motion Hearing, Volume 10 (Sealed transcript, Doc. 693, in redacted form) (Pgs 2486–2819) (334 pgs) held 11/16/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Mr. Steven Clymer. Volume: 10.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 2/25/2019. (ks) (Entered: 11/27/2018) |
| 11/27/2018 | 695 | | ORDER granting 692 Motion to Produce Documents and Objects Pursuant to Fed. R. Crim. P. 17(b)and(c) as to Karl Carter (2). Signed by Chief District |

| | | | |
|---|---|---|---|
| | | | Judge Julie A Robinson on 11/27/18. (hw) (Entered: 11/27/2018) |
| 12/04/2018 | 696 | | MOTION for Reconsideration by USA as to Karl Carter. (Attachments: # 1 Exhibit, # 2 Affirmation)(Clymer, Steve) (Modified on 12/5/2018 to add link to 690 Memorandum and Order. (hl)) (Entered: 12/04/2018) |
| 12/05/2018 | 697 | | MOTION for Reconsideration *"Correction"* by USA as to Karl Carter. (Attachments: # 1 Exhibits, # 2 Affirmation)(Clymer, Steve) (Entered: 12/05/2018) |
| 12/10/2018 | 699 | | MOTION for Hearing by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 12/10/2018) |
| 12/10/2018 | 701 | | ORDER granting 699 Motion for Hearing as to Karl Carter (2). Motion hearing set for 12/14/2018 at 1:30 p.m. Notice of hearing to follow. Signed by Chief District Judge Julie A. Robinson on 12/10/2018. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 12/10/2018) |
| 12/10/2018 | 702 | | NOTICE OF HEARING ON MOTION as to Karl Carter. THIS IS AN OFFICIAL NOTICE FOR THIS HEARING 572 MOTION for Discovery : Motion Hearing set for 12/14/2018 at 01:30 PM in KC Courtroom 427 (JAR) before Chief District Judge Julie A. Robinson. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(bw) (Entered: 12/10/2018) |
| 12/12/2018 | 703 | | WAIVER of appearance by Karl Carter (Guastello, David) (Entered: 12/12/2018) |
| 12/14/2018 | 704 | | MINUTE ENTRY for proceedings held before Chief District Judge Julie A. Robinson: granting 572 Motion for Discovery as to Karl Carter (2); MOTION HEARING as to Karl Carter held on 12/14/2018. (Court Reporter Kelli Stewart) (bw) (Entered: 12/14/2018) |
| 12/14/2018 | 705 | | ORDER REGARDING RECORDED PHONE CALLS re 572 MOTION for Discovery filed by Federal Public Defender. Signed by Chief District Judge Julie A. Robinson on 12/14/2018. (bw) (Entered: 12/14/2018) |
| 12/19/2018 | 706 | | RESPONSE TO MOTION by Federal Public Defender as to Karl Carter re 697 MOTION for Reconsideration *"Correction"* (Brannon, Melody) (Entered: 12/19/2018) |
| 12/21/2018 | 707 | | ORDER to Pay Summary Billing Statement for period of November, 2018. Signed by Chief District Judge Julie A. Robinson on 12/21/2018. (hl) (Entered: 12/21/2018) |
| 12/26/2018 | 708 | | REPLY TO RESPONSE TO MOTION by USA as to Karl Carter re 697 MOTION for Reconsideration *"Correction"* (Clymer, Steve) (Entered: 12/26/2018) |
| 01/02/2019 | 709 | | NOTICE of Receipt of Information by USA as to Karl Carter (Clymer, Steve) (Entered: 01/02/2019) |
| 01/08/2019 | 710 | | NOTICE of Government's Correction to Notice of Receipt of Information by USA as to Karl Carter (Clymer, Steve) (Entered: 01/08/2019) |
| 01/16/2019 | 711 | | |

| | | | |
|---|---|---|---|
| | | | MOTION for leave to Admit Exhibit by Federal Public Defender as to Karl Carter. (Attachments: # 1 Exhibit 715)(Brannon, Melody) (Entered: 01/16/2019) |
| 01/16/2019 | 712 | | ORDER granting 711 Motion for Leave to Admit Exhibit as to Karl Carter (2). Signed by Chief District Judge Julie A. Robinson on 1/16/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 01/16/2019) |
| 01/25/2019 | 713 | | MEMORANDUM AND ORDER granting in part and denying in part 697 Corrected Motion for Reconsideration re 690 Final Production and Briefing Order as to Karl Carter (2). See Order for additional details and deadlines. Signed by Chief District Judge Julie A. Robinson on 1/25/19. (kao) (Main Document 713 replaced on 1/25/2019 per chambers due to a formatting error within the original pdf document.) (kao). (Entered: 01/25/2019) |
| 01/25/2019 | 714 | | DOCKET ANNOTATION: Document 713 Memorandum & Order was replaced on 1/25/2019 due to a formatting error within the original pdf document. The corrected document has been added to that entry and is attached to this annotation for noticing purposes only. (kao) (Entered: 01/25/2019) |
| 01/28/2019 | 715 | | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Hal D. Meltzer as to Corrections Corporation of America (Meltzer, Hal) (Entered: 01/28/2019) |
| 01/28/2019 | 716 | | Unopposed MOTION for Extension of Time to File Response/Reply as to 705 Order by USA as to Karl Carter. (Slinkard, Duston) (Entered: 01/28/2019) |
| 01/29/2019 | 717 | | ORDER granting 716 Unopposed Motion for Extension of Time to File Response as to Karl Carter (2). The government's deadline to complete its efforts to identify possible CCA calls and derivative information for the list of defendants provided to it by the Federal Public Defender, as set forth in Doc. 705, is extended until and including 2/14/2019. Signed by Chief District Judge Julie A. Robinson on 1/29/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (lml) (Entered: 01/29/2019) |
| 02/01/2019 | 722 | | MOTION for Early Termination of Supervised Release by Lorenzo Black. (Jenab, John) (Entered: 02/01/2019) |
| 02/01/2019 | 723 | | ORDER granting 722 Motion for Early Termination of Supervised Release as to Lorenzo Black (1). Signed by Chief District Judge Julie A. Robinson on 2/1/2019. (heo) (Entered: 02/01/2019) |
| 02/15/2019 | 724 | | Unopposed MOTION for Extension of Time to File *Proposed Findings of Fact and Conclusions of Law* by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 02/15/2019) |
| 02/15/2019 | 725 | | ORDER granting 724 Motion to Extend Deadline. Defendant and Government do not oppose. The Court therefore imposes the following deadlines: Deadline for the Special Master and the Federal Public Defender to submit proposed exhibits is set for March 7, 2019; Deadline for the government and the Federal Public Defender to file proposed findings of fact and conclusions of law is set for March 21, 2019. Signed by Chief District Judge Julie A. Robinson on 2/15/2019. (bw) (Entered: 02/15/2019) |

| 02/20/2019 | 726 | | STATUS REPORT *on Phone Discovery* by Federal Public Defender as to Karl Carter (Brannon, Melody) (Entered: 02/20/2019) |
| 03/05/2019 | 727 | | MEMORANDUM AND ORDER denying Akers' 688 Motion to Intervene. The clerk is directed to reject any future filings made in this proceeding by Mr. Akers as an interested party or in any other capacity. Signed by Chief District Judge Julie A. Robinson on 3/4/2019. Mailed to pro se party Montgomery Carl Akers by regular mail. (heo) (Entered: 03/05/2019) |
| 03/07/2019 | 728 | | MOTION for leave to Supplement Record by USA as to Karl Carter. (Attachments: # 1 Exhibit)(Slinkard, Duston) (Entered: 03/07/2019) |
| 03/07/2019 | 729 | | MOTION FOR LEAVE to file exhibits conventionally, MOTION for Order to Admit Additional Exhibits by David R. Cohen as to Karl Carter. (VanBebber, Alleen) (Modified on 3/8/2019 to correct docket text and filing party; document incorrectly filed as to all defendants. Added second motion to add request to admit additional exhibits. (heo)) (Entered: 03/07/2019) |
| 03/07/2019 | 730 | | MOTION for order Admitting Exhibits by Federal Public Defender as to Karl Carter. (Attachments: # 1 FPD Exhibit Nos. 715A – 724)(Brannon, Melody) (Entered: 03/07/2019) |
| 03/08/2019 | 731 | | ORDER granting FPD's 730 Motion to Admit Exhibits as to Karl Carter (2). The FPD is directed to file an updated Exhibit List reflecting newly admitted Def. Exhibits 715A through 724. Signed by Chief District Judge Julie A. Robinson on 3/8/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ams) (Entered: 03/08/2019) |
| 03/08/2019 | 732 | | ORDER granting the Special Master's 729 Motion for Order to Admit Exhibits; and granting 729 Motion for Leave to File Conventionally Exhibit SM1301 as to Karl Carter (2). The Special Master is directed to file an updated Exhibit List reflecting the newly admitted SM Exhibits 1207 through 1301. Signed by Chief District Judge Julie A. Robinson on 3/8/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ams) (Entered: 03/08/2019) |
| 03/08/2019 | 733 | | ORDER expediting briefing deadlines re 728 Motion for Leave to Supplement Record as to Karl Carter (2). The Federal Public Defender shall respond on or before 3/13/2019; the Government shall file its reply on or before 3/15/2019. Signed by Chief District Judge Julie A. Robinson on 3/8/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (lml) (Entered: 03/08/2019) |
| 03/08/2019 | 734 | | Per the Court's Order Doc. 732 , SPECIAL MASTER'S EXHIBIT LIST re 729 Motion for Order to Admit Exhibits filed by David R. Cohen as to Karl Carter. (bw) (Entered: 03/08/2019) |
| 03/08/2019 | 735 | | EXHIBIT LIST by Federal Public Defender as to Karl Carter (Attachments: # 1 Exhibit List)(Brannon, Melody) (Entered: 03/08/2019) |
| 03/12/2019 | 736 | | RESPONSE IN OPPOSITION by Federal Public Defender as to Karl Carter re 728 MOTION for leave to Supplement Record (Brannon, Melody) (Entered: 03/12/2019) |
| 03/15/2019 | 737 | | REPLY TO RESPONSE TO MOTION by USA as to Karl Carter re 728 MOTION for leave to Supplement Record (Slinkard, Duston) (Entered: |

| | | | |
|---|---|---|---|
| | | | 03/15/2019) |
| 03/18/2019 | 738 | | MOTION to Unseal Document *Exhibit* by USA as to Karl Carter. (Clymer, Steve) (Entered: 03/18/2019) |
| 03/18/2019 | 739 | | ORDER granting 738 Motion to Unseal Exhibit 554 as to Karl Carter (2). This exhibit was admitted under seal at the hearing held on May 16, 2018 477 . Signed by Chief District Judge Julie A. Robinson on 3/18/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 03/18/2019) |
| 03/19/2019 | 740 | | Unopposed MOTION to Unseal Document *(Exhibits)* by Federal Public Defender as to Karl Carter. (Brannon, Melody) (Entered: 03/19/2019) |
| 03/19/2019 | 741 | | ORDER granting 740 Motion to Unseal Exhibits 469, 475, 564, 1181 and 1198 as to Karl Carter (2). Signed by Chief District Judge Julie A. Robinson on 3/19/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 03/19/2019) |
| 03/19/2019 | 742 | | ORDER granting 728 Motion to Supplement the Record as to Karl Carter (2). The Government shall file the supplemental declaration forthwith. The evidentiary record on the issues brought up for hearing on October 2, 3, 4, 9, 10, 11, 12, and November 16, 2018 is now closed. Signed by Chief District Judge Julie A. Robinson on 3/19/2019. (heo) (Entered: 03/19/2019) |
| 03/20/2019 | 743 | | EXHIBIT LIST by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop (Slinkard, Duston) (Entered: 03/20/2019) |
| 03/20/2019 | 744 | | EXHIBITS IN SUPPORT of 743 Exhibit List by USA as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop *Exhibit # 47* (Slinkard, Duston) (Entered: 03/20/2019) |
| 03/21/2019 | 745 | | RESPONSE TO ORDER by USA (titled Government's Proposed Findings of Fact and Conclusion of Law) as to Karl Carter re 690 Order, 713 Order on Motion for Reconsideration (Clymer, Steve) (Modified on 3/22/2019 to correct title. (heo)) (Entered: 03/21/2019) |
| 03/21/2019 | 746 | | STATUS REPORT *on Preservation* by USA as to Karl Carter (Attachments: # 1 Ex. 1, # 2 Ex. 2, # 3 Ex. 3, # 4 Ex. 4, # 5 Ex. 5, # 6 Ex. 6, # 7 Ex. 7, # 8 Ex. 8, # 9 Ex. 9, # 10 Ex. 10, # 11 Ex. 11)(Slinkard, Duston) (Entered: 03/21/2019) |
| 03/21/2019 | 747 | | MEMORANDUM OF LAW (titled FPD Proposed Findings of Fact and Conclusions of Law) by Federal Public Defender as to Karl Carter (Brannon, Melody) (Modified on 3/22/2019 to correct title. (heo)) (Entered: 03/21/2019) |
| 03/29/2019 | 748 | | MOTION for leave to Intervene for Limited Purpose of Gaining Access to Video Recording of Attorney–Client Meeting by Juan Duarte–Tello as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop. (Attachments: # 1 Exhibit A)(Lee, Clinton) (Entered: 03/29/2019) |
| 04/01/2019 | 749 | | MOTION for order Admitting Exhibit Out of Time by Federal Public Defender as to Karl Carter. (Attachments: # 1 FPD Exhibit 725)(Brannon, Melody) (Entered: 04/01/2019) |

| 04/02/2019 | 750 | | ORDER to Pay Summary Billing Statement for period of December, 2018 through March, 2019. Signed by Chief District Judge Julie A. Robinson on 4/2/2019. (heo) (Entered: 04/02/2019) |
|---|---|---|---|
| 04/05/2019 | 751 | | MOTION for Discovery and Return of Seized Property under FRCP (41(g) by Michael A. Garrett. (bw) (Entered: 04/05/2019) |
| 04/16/2019 | 752 | | MOTION for Discovery and Return of Seized Property under FRCP (41(g) by Tywan A. Poole. (Attachments: # 1 Envelope)(hw) (Entered: 04/16/2019) |
| 04/23/2019 | 753 | | NOTICE OF ADDITIONAL AUTHORITIES by Federal Public Defender as to Karl Carter re 747 Memorandum of Law (Brannon, Melody) (Entered: 04/23/2019) |
| 05/21/2019 | 754 | | NOTICE OF WITHDRAWAL OF APPEARANCE by attorney Branden A. Bell as to Federal Public Defender (Bell, Branden) (Entered: 05/21/2019) |
| 05/31/2019 | 755 | | ORDER to Pay Summary Billing Statement for period of April, 2019 through May, 2019. Signed by Chief District Judge Julie A. Robinson on 5/31/19. (hw) (Entered: 05/31/2019) |
| 06/04/2019 | 756 | | TRANSCRIPT of Motion for Discovery Hearing (29 pgs) held 12/14/2018 as to Karl Carter before Judge Julie A. Robinson, Court Reporter Kelli Stewart, 913–735–2334, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Ms. Melody Brannon.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 9/3/2019. (ks) (Entered: 06/04/2019) |
| 08/12/2019 | 757 | | NOTICE of change of address by Tywan A. Poole. (Interested Party) (email to Attorney Admission) (Attachments: # 1 Envelope)(ydm) (Entered: 08/13/2019) |
| 08/13/2019 | 758 | | FINDINGS OF FACT AND CONCLUSIONS OF LAW. Please see Order for details and deadlines. Signed by Chief District Judge Julie A. Robinson on 8/13/2019. (bw) (Entered: 08/13/2019) |
| 08/14/2019 | 759 | | MEMORANDUM AND ORDER denying 751 Motion for Return of Property filed by Michael A. Garrett, and denying 752 Motion for Return of Property filed by Tywan A. Poole. Signed by Chief District Judge Julie A. Robinson on 8/14/2019. (bw) (Entered: 08/14/2019) |
| 08/15/2019 | | | NOTICE Re: Pro Se Mailing. Document 759 Order on Motion for Return of Property, mailed on 8/15/2019 to pro se interested parties Tywan Poole and Michael Garrett by regular mail. (heo) (Entered: 08/15/2019) |

| 08/15/2019 | 760 | | ORDER granting in part <u>748</u> Motion to Intervene for Limited Purpose of Gaining Access to Video Recording of Attorney–Client Meeting as to Lorenzo Black (1), Karl Carter (2) Anthon Aiono (3), Alicia Tackett (4), Catherine Rowlette (5), David Bishop (6). Per the Court's Findings of Fact and Conclusions of Law (Doc. 758 at 165), the video recordings sought by this motion shall be released to the Federal Public Defender for review. Mr. Duarte–Tello's counsel shall meet and confer with the FPD to facilitate the review sought by this motion. Signed by Chief District Judge Julie A. Robinson on 8/15/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ams) (Modified on 8/16/2019 to include defendant Karl Carter per JAR chambers. (heo)) (Entered: 08/15/2019) |
| 08/16/2019 | <u>761</u> | | RECEIPT acknowledge by the Federal Public Defender's office for DVR Drives as to the Black case. (bw) (Entered: 08/16/2019) |
| 08/19/2019 | 762 | | ORDER as to Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, David Bishop: By August 30, 2019, the Government shall file a Status Report on the state of its compliance with the Court's December 14, 2018 Order Regarding Recorded Phone Calls (Doc. 705). The status report shall summarize the Government's production of audio recordings to the Court and FPD since its last status report was filed on February 20, 2019 (Doc. 726), including the date for each production, and whether production is complete or ongoing. Signed by Chief District Judge Julie A. Robinson on 8/19/2019. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (bw) (Entered: 08/19/2019) |
| 08/20/2019 | <u>763</u> | | NOTICE of Joint Submission of Pending Black–Related 2255 Cases by Federal Public Defender as to Karl Carter (Attachments: # <u>1</u> Attachment)(Brannon, Melody) (Entered: 08/20/2019) |
| 08/27/2019 | <u>764</u> | | STATUS REPORT *of Recorded Telephone Call Discovery* by USA as to Karl Carter (Attachments: # <u>1</u> Attachment 1, # <u>2</u> Attachment 2, # <u>3</u> Attachment 3, # <u>4</u> Attachment 4, # <u>5</u> Attachment 5, # <u>6</u> Attachment 6, # <u>7</u> Attachment 7, # <u>8</u> Attachment 8, # <u>9</u> Attachment 9, # <u>10</u> Attachment 10, # <u>11</u> Attachment 11, # <u>12</u> Attachment 12, # <u>13</u> Attachment 13, # <u>14</u> Attachment 14, # <u>15</u> Attachment 15, # <u>16</u> Attachment 16, # <u>17</u> Attachment 17, # <u>18</u> Attachment 18, # <u>19</u> Attachment 19, # <u>20</u> Attachment 20, # <u>21</u> Attachment 21, # <u>22</u> Attachment 22, # <u>23</u> Attachment 23, # <u>24</u> Attachment 24, # <u>25</u> Attachment 25, # <u>26</u> Attachment 26, # <u>27</u> Attachment 27, # <u>28</u> Attachment 28, # <u>29</u> Attachment 29, # <u>30</u> Attachment 30, # <u>31</u> Attachment 31, # <u>32</u> Attachment 32, # <u>33</u> Attachment 33, # <u>34</u> Attachment 34)(Slinkard, Duston) (Entered: 08/27/2019) |
| 09/09/2019 | <u>765</u> | | NOTICE OF APPEAL TO 10CCA by Tywan A. Poole re <u>759</u> Memorandum and Order on Motion for Return of Property. (Attachments: # <u>1</u> Envelope) (ydm) (Entered: 09/09/2019) |
| 09/11/2019 | | | APPEAL FEE STATUS: filing fee not paid re: Notice of Appeal <u>765</u> on behalf of Interested Party Tywan A. Poole. (THIS IS A TEXT ONLY ENTRY–NO DOCUMENT IS ASSOCIATED WITH THIS TRANSACTION) (heo) (Entered: 09/11/2019) |
| 09/11/2019 | <u>766</u> | | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA as to Tywan Poole re <u>765</u> Notice of Appeal. (Attachments: # <u>1</u> Preliminary Record)(heo) (Entered: 09/11/2019) |

| 09/12/2019 | 767 | | APPEAL DOCKETED in 10CCA on 9/11/2019 and assigned Appeal No. 19−3193 re 765 Notice of Appeal filed by Tywan A. Poole. (heo) (Entered: 09/12/2019) |
|---|---|---|---|
| 09/12/2019 | 768 | | NOTICE OF APPEAL TO 10CCA by Dave Zabel re 758 FINDINGS OF FACT AND CONCLUSIONS OF LAW. (Zabel, David) Modified docket text on 9/12/2019 (tvn). (Entered: 09/12/2019) |
| 09/12/2019 | 769 | | NOTICE OF APPEAL TO 10CCA by Kim I. Flannigan re 758 FINDINGS OF FACT AND CONCLUSIONS OF LAW. (Flannigan, Kim) Modified docket text on 9/12/2019 (tvn). (Entered: 09/12/2019) |
| 09/12/2019 | 770 | | NOTICE OF APPEAL TO 10CCA by Terra Morehead re 758 FINDINGS OF FACT AND CONCLUSIONS OF LAW. (Morehead, Terra) Modified docket text on 9/12/2019 (tvn). (Entered: 09/12/2019) |
| 09/12/2019 | 771 | | NOTICE OF APPEAL TO 10CCA by Scott C. Rask re 758 FINDINGS OF FACT AND CONCLUSIONS OF LAW. Filing fee $ 505, Internet Payment Receipt Number AKSDC−4919782. (Rask, Scott) (Modified on 9/13/2019 (heo)) (Entered: 09/12/2019) |
| 09/12/2019 | 772 | | NOTICE OF APPEAL TO 10CCA by Sheri Catania re 758 FINDINGS OF FACT AND CONCLUSIONS OF LAW. (Catania, Sheri) (Modified on 9/13/2019 (heo)) (Entered: 09/12/2019) |
| 09/13/2019 | 773 | | ENTRY OF APPEARANCE on behalf of USA by James A. Brown *as co−counsel* (Brown, James) (Entered: 09/13/2019) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

KARL CARTER,

      Defendant.

Case No. 16-20032-02-JAR

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.    **Introduction** ........................................................................................................ 3

II.   **Procedural Background and Scope of this Decision** ......................................... 8

  A.  Procedural Background: This Case in Three Parts ............................................ 8

  B.  The Scope of this Decision Under the Tenth Circuit's Mandamus Ruling ...................... 19

III.  **Findings of Fact: Failure to Cooperate with the Special Master's Investigation** .......... 23

  A.  Orders to Preserve and Cooperate .................................................................... 23

  B.  The USAO's Failure to Preserve Evidence ....................................................... 30

    1.  The USAO Misconstrued the Court's Early Preservation Orders and Willfully Delayed and Obstructed the Special Master's Preservation Orders ........................................... 30

    2.  The USAO Failed to Preserve the AVPC Hard Drives ................................. 32

    3.  Failure to Implement a Litigation Hold ....................................................... 38

      a.  Delayed Litigation Hold Email ............................................................ 40

      b.  Delayed Formal Litigation Hold and Failure to Inform the Special Master of Formal Litigation Hold Efforts ............................................. 42

      c.  Impact of USAO Litigation Hold Delays ............................................. 47

    4.  The Government Delayed and Obfuscated Its Compliance with the August 15, 2018 Preservation Order ..................................................................... 49

  C.  Failure to Cooperate with Production of Witnesses and Documents ............................. 54

    1.  Failure to Make Key USAO Personnel Available to the Special Master .................... 54

    2.  Failure to Produce Documents Requested by the Special Master ............................. 56

IV.  **Findings of Fact: Possession and Access to Video and Audio Recordings of Attorney-Client Communications at CCA** ..................................................................... 63

  A.  Video Recordings ............................................................................................. 63

    1.  CCA Recording Practices ............................................................................ 63

2. Grand Jury Subpoena in *Black* ................................................................. 66

3. USAO and Agents' Knowledge and Intent ................................................. 67

4. USAO's Use of Videotaped Attorney-Client Meeting ............................... 71

B. Audio Recordings ............................................................................................. 80

1. CCA Recording Practices ......................................................................... 80

2. USAO Methods of Obtaining Recordings of Calls .................................. 88

3. Grand Jury Subpoena in *Black* ............................................................... 90

4. Individual Cases that Came to Light in *Black* ......................................... 91

5. USAO's Knowledge that CCA Audio Recordings Included Recordings of Attorney-Client Phone Calls ................................................................. 101

6. DOJ Directives, Training, and USAO Management Advice ..................... 106

7. USAO Internal Deliberation and Guidance on Audio Calls ..................... 107

   a. Failure to Investigate ...................................................................... 108

   b. Unilateral Determination on Waiver ............................................... 110

   c. Failure to Disclose to the Defense .................................................. 113

   d. No Reasonable Measures to Exclude or Filter Attorney-Client Calls ................. 118

   e. Internal Dysfunction ....................................................................... 120

8. Retention of Attorney-Client Recordings ............................................... 122

**V. Conclusions of Law: Cooperation** .......................................................... **123**

A. Civil Standards .............................................................................................. 124

B. Spoliation ...................................................................................................... 128

1. AVPC ...................................................................................................... 129

2. ESI Lost Under Normal Retention Policies ............................................ 132

C. Non-Spoliation Sanctions ............................................................................. 136

1. Preservation and Impoundment .............................................................. 138

2. Production of Witnesses .......................................................................... 141

3. Production of Documents ........................................................................ 141

4. Non-Spoliation Sanctions for Violations of Court Orders ..................... 143

**VI. Conclusions of Law: Sixth Amendment** .............................................. **145**

A. Governing Law .............................................................................................. 146

1. Supreme Court Standards ........................................................................ 146

2. Tenth Circuit Approach in *Shillinger* .................................................... 154

B. Application .................................................................................................... 162

1. Need for Particularized Findings ............................................................ 162

2. Issues Common to all Claims .................................................................. 163

        a.     Privileged Attorney-Client Communications ...................................................... 163

          i.    Soundless Video Recordings............................................................ 164

          ii.   Audio Recordings and Waiver ........................................................ 166

        b.     Purposeful Intrusion and Legitimate Justification ............................................... 176

          i.    Purposeful Intrusion ....................................................................... 176

          ii.   Legitimate Law Enforcement Justification ..................................... 177

**VII. Roadmap for § 2255 Litigation ......................................................................... 179**

   A.   Posture of the § 2255 Litigation......................................................................... 181

   B.   Reassignment and Consolidation for Discovery.......................................................... 183

**VIII. Conclusion ........................................................................................................... 184**

# I.    Introduction

The Sixth Amendment guarantees an accused the right to assistance of counsel for his or her defense.[1] This right is "indispensable to the fair administration of our adversarial system of criminal justice."[2] It "safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding."[3] The Sixth Amendment right to effective assistance of counsel includes the ability to speak candidly and confidentially with counsel free from unreasonable Government interference.[4] For the adversary system to function properly, any such advice must be shielded from exposure to the government. That bedrock principle is at issue in this case.

The Government initiated a drug-conspiracy investigation in the spring of 2016, targeting detainees and employees of Corrections Corporation of America ("CCA"), a large, private detention facility located in Leavenworth, Kansas.[5] Although the case initially charged six

---

[1] *United States v. Morrison*, 449 U.S. 361, 364 (1981).

[2] *Maine v. Moulton*, 474 U.S. 159, 168 (1985).

[3] *Id.* at 169.

[4] *See Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977) ("One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard.").

[5] The facility has since been renamed CoreCivic. The Court refers to it throughout this opinion as CCA.

defendants with various drug offenses, the Government suspected the conspiracy involved at least 95 inmates and 60 more individuals outside the facility.[6] Facts uncovered after an early discovery conference in this case revealed discovery practices that implicated the Sixth Amendment right to counsel: the Government possessed soundless video recordings of attorney visitation rooms at CCA, and possessed and distributed audio recordings of telephone calls between several detainees and their counsel.

The Court immediately clawed back and impounded the recordings, and conducted several emergency hearings on these issues, prompted in part by the involvement of the Office of the Federal Public Defender's ("FPD"), which was allowed to intervene in this case on behalf of its many clients detained at CCA. At these early hearings, the Court endeavored to find out from the Government the scope of its discovery efforts that potentially intruded on confidential in-person and telephonic attorney-client meetings, but the Government evaded the Court's questions, and denied that its practices implicated the Sixth Amendment or the attorney-client privilege. The Court ultimately appointed Special Master David Cohen to investigate. The Government did not cooperate with his investigation, and its failure to cooperate ultimately resulted in a lengthy delay in this Court's ability to rule on these issues. Finally, despite the delay associated with the Government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in this case in October and November 2018. The Court is now prepared to rule.

Under extant Tenth Circuit law, the purposeful intrusion by the government into the attorney-client relationship, absent a countervailing state interest, constitutes a per se violation of

---

[6]Tr. July 21, 2016 Hr'g, Doc. 75 at 23:2–9.

4

the Sixth Amendment with no need to demonstrate that the defendant has suffered prejudice as a result.[7]  The Supreme Court requires the remedy for a Sixth Amendment violation to be "tailored to the injury suffered" and not "unnecessarily infringe on the competing interests" of the fundamental right to assistance of counsel and respecting society's interest in the administration of criminal justice.[8]  In this case, the Court's attorney-client privilege and Sixth Amendment analysis is necessitated by the FPD's motions under Fed. R. Civ. P. 41(g) for return of property, wherein it asserts the Sixth Amendment rights of clients detained at CCA.  As part of the Sixth Amendment analysis, the Court must necessarily evaluate the Government's lack of meaningful cooperation in the Special Master's investigation because the Government's credibility is directly at issue.

The purpose of the Special Master's investigation was to work with all the parties, and with Securus Technologies, Inc. ("Securus"), the company that provides the telephone-recording equipment to CCA, to determine the extent of the attorney-client communications that were obtained and/or accessed by the Government.  Because the Government did not abide by this Court and the Special Master's preservation and cooperation directives, this opinion discusses evidence of these failures, and considers a remedy.  Although the Court declines to impose spoliation sanctions at this time for the Government's probable destruction of evidence material to the Special Master's investigation, the record in this case may lay the groundwork for specific spoliation claims in individual cases brought under 28 U.S.C. § 2255.  Moreover, the Court easily finds that the Government willfully violated myriad Court orders and Special Master directives, and the Court imposes monetary sanctions for these violations.

---

[7]*Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995).

[8]*United States v. Morrison*, 449 U.S. 361, 364 (1981); *Shillinger*, 70 F.3d at 1142–43.

The Government is correct that the determination of a Sixth Amendment violation must be particularized to each defendant, and that relief must be tailored to the injury suffered. Nonetheless, the Court can narrow the inquiries required in each related § 2255 case because these petitioners all seek similar relief for similar types of intrusions. The Court's findings of fact shine daylight on the Government's practice of obtaining attorney-client communications, and its view that these communications are not protected, and thus, not subject to scrutiny. While the Sixth Amendment requires particularized findings to determine whether an improper intrusion into the confidential relationship with counsel occurred, and if so, the appropriate remedy, this record allows the Court to consider several legal issues that implicate the Sixth Amendment analysis and are common to all affected litigants. These issues include, *inter alia*: (1) the elements required to prove a per se violation of the Sixth Amendment under Tenth Circuit law; (2) whether soundless video recordings constitute protected attorney-client communications; (3) whether the "preamble" language that played at the beginning of Securus telephone calls constituted a waiver of the attorney-client privilege; and (4) whether the Government had a legitimate law enforcement purpose when it procured the recordings at issue in this case.

In the end, this case presents an opportunity to provide a wide-lens view of the Government's conduct implicating the Sixth Amendment inquiry. The culture of the Office of the United States Attorney ("USAO"), particularly in Kansas City, Kansas, directly bears on that analysis. And the USAO's pattern of similar misconduct in other cases is relevant to the Court's determination of witness credibility on the issue of access to the recordings, and of the appropriate remedy for detainees prejudiced by an intentional intrusion into their attorney-client relationship. Likewise, the USAO's delay and obfuscation in the Special Master's investigation

will weigh into fashioning an appropriate remedy in the § 2255 cases. Litigants have been unable to seek or obtain relief in their individual cases or on direct appeal because the evidence necessary to support their claims is either still impounded by this Court, or because the Special Master's investigation was impeded by the Government's machinations. Audio recordings of attorney-client calls obtained by the USAO continue to be produced in August 2019, almost three years after the investigation began. Evidence likely has been lost due to the Government's failure to timely implement a meaningful litigation hold. And the Government's productions to the Special Master and FPD were incomplete and turned over in a manner designed to mask the individual source of production.

The Government's wholesale strategy to delay, diffuse, and deflect succeeded in denying the individual litigants their day in court for almost three years. The strategy continues today, and can be found in the Government's proposed findings of fact and conclusions of law, where it contends that most detainees' communications with their attorneys are not protected, and that the USAO was correct in unilaterally determining that it had a right to access such information. It can also be found in the Government's responses to the pending § 2255 motions, where it contends that these claims do not deserve to be considered on the merits. The day has come to bring this case to a final decision.

This opinion is intended to provide a roadmap for future consideration of the many cases pending on these issues under § 2255. It orders a release of the video recordings to the FPD, which has been appointed by standing order to represent any litigant alleging claims based on the facts surrounding the Special Master's investigation. It will consolidate the habeas cases under one United States Magistrate Judge for discovery and reassign them to the undersigned for a consistent application of the principles set forth in this opinion. It will make clear the common

legal standards that will govern in those proceedings, and what must remain pending for particularized findings in each case.

This opinion begins by setting forth a summary of the complicated and lengthy procedural background in this case, which proceeded in generally three parts, and explains the scope of the Court's opinion. Next, the Court sets forth its findings of fact on the Government's cooperation with the Special Master's investigation and compliance with the Court's orders related thereto, followed by the Court's findings of fact on the merits. Finally, the Court provides conclusions of law on the FPD's requests for sanctions against the Government, and then on the merits of the Sixth Amendment claims. The Court concludes by providing a roadmap for managing the pending litigation under § 2255 that will follow when this case concludes.

## II.      Procedural Background and Scope of this Decision

### A.       Procedural Background: This Case in Three Parts

This case has a lengthy and complicated procedural history that has been recounted in several past orders.[9]  The Court provides the following highly summarized procedural history to explain how this proceeded in generally three parts, and why it culminated in the evidentiary hearing that prompts the Court's Findings of Fact and Conclusions of Law.

Part I of the underlying case[10] proceeded like many other criminal cases.  On April 9, 2016, United States Magistrate Judge Teresa J. James signed a Criminal Complaint wherein Special Agent Jeff Stokes of the Kansas Bureau of Investigation ("KBI") demonstrated probable

---

[9]*See, e.g.*, Docs. 253, 372, 690, 713.

[10]The underlying case is referred to as "the *Black* case" throughout this opinion, in reference to the first named defendant in the Indictment.  The Court continues with this reference, despite the fact that Defendant Lorenzo Black pled guilty and was sentenced on July 18, 2018; the only remaining defendant in this matter is Defendant Karl Carter.

cause to believe that Lorenzo Black, Karl Carter, Anthon Aiono, Alicia Tackett, Catherine Rowlette, and David Bishop (the "*Black* Defendants") conspired to distribute controlled substances inside CCA. An 11-count grand jury Indictment was filed on May 4, 2016. Special Assistant United States Attorney ("SAUSA") Erin Tomasic and Assistant United States Attorney ("AUSA") Christopher Oakley appeared on behalf of the USAO at all proceedings during Part I of this case.

The Court conducted a discovery conference with the parties on July 21, 2016. At that hearing, Tomasic discussed having obtained voluminous video-surveillance footage from video cameras stationed throughout the CCA facility. Tomasic admitted there were cameras in the attorney visitation rooms at CCA for security monitoring purposes but denied that the cameras had recording capability.

By early August 2016, the FPD sought to intervene and filed a motion for return of property under Fed. R. Crim. P. 41(g), arguing that the USAO was in possession of video recordings of the attorney visitation rooms at CCA, which the FPD alleged intruded into privileged, confidential communications of attorneys and clients housed at CCA and violated the Sixth Amendment.[11] The FPD filed an Amended Rule 41(g) motion on August 7, 2016, adding allegations that CCA recorded attorney-client telephone calls and at times provided the content of those calls to the USAO.[12] The *Black* Defendants joined the motion and defendants throughout this District filed similar motions in their respective cases.[13]

---

[11]Doc. 82.

[12]Doc. 85.

[13]During this time, the FPD filed dozens of Rule 41(g) motions in active cases in this District. These motions asked the Court to ensure that defendants and their attorneys could communicate confidentially and asked the Court to order the USAO to identify and return to the defense any recorded communications. These motions were often either denied without prejudice or deemed moot when the defendant entered into a plea agreement or was

The Court held hearings on the FPD's motions on August 9, August 16, and September 7, 2016, in an effort to determine the scope of the alleged Sixth Amendment violations. The USAO appeared by different counsel at these hearings: Debra Barnett, the Criminal Chief for the District of Kansas, and Duston Slinkard, the Topeka Criminal Coordinator. After the August 16 hearing, the Court issued "clawback" and impoundment orders to CCA and the USAO and their agents, for all video and audio recordings of attorney-client communications in their possession.[14]

Part II of the case began on October 11, 2016, when the Court appointed David Cohen as Special Master under Fed. R. Civ. P. 53.[15] The Appointment Order set forth the Special Master's initial duties in two phases: Phase I would determine the feasibility of isolating potentially privileged and confidential attorney-client video and audio recordings from the universe of recordings the USAO obtained from CCA; Phase II would cull the potentially privileged materials and provide progress updates to the Court and the parties.[16] The Court limited the Special Master's duties to those to which the USAO consented at that time, and reserved the right to later expand the scope of his appointment to investigate whether, and the extent to which, the USAO violated the Sixth Amendment and/or Fed. R. Crim. P. 6(e) in this and other criminal cases as requested by the FPD.[17]

The Special Master effectively concluded Phases I and II of his investigation in a March 16, 2017 Report, in which he made certain findings of fact, including a tentative finding that

---

sentenced. *See, e.g.*, *United States v. Perez-Madrigal*, D. Kan. No. 16-20044-JAR, Docs. 18, 66; *United States v. Faustino Soto*, D. Kan. No. 14-20014-12-KHV, Docs. 552, 582.

[14]Docs. 113, 114.

[15]Doc. 146.

[16]*Id.* at 4–5.

[17]*Id.* at 7.

neither the USAO nor law enforcement actually viewed the video recordings of CCA attorney

visitation rooms obtained in May 2016 during the *Black* investigation.[18]  But the extent to which

the USAO or law enforcement obtained recordings of telephone calls made by detainees, and the

extent to which the USAO was not entitled to obtain those recordings, remained open questions

because the Court had not asked the Special Master to issue a report on those concerns.[19]  The

Special Master listed a number of actions for the Court to consider, in order to reach final

conclusions of fact and "mend[] the parties' relationship," including authorizing him to proceed

with a third phase of the investigation into video and audio recordings.[20]

On May 17, 2017, the Court issued an order detailing its findings that justified an

expanded Phase III inquiry, and directed the Special Master "to investigate the actions and

conduct of the government, the USAO attorneys and staff, and the participating investigative

agencies . . . in procuring, obtaining and perhaps using video and audio recordings of attorney-

client meetings and phone calls at CCA."[21]  Phase III would not be funded by the USAO, but

instead the Court would bear the cost from specially appropriated funds.[22]

During the Phase III investigation, additional evidence outside of the Special Master's

investigation came to light.  First, the USAO notified the Court that Tomasic had listened to

attorney-client calls not only in this case, but in a second case before another judge in this

District, *United States v. Herrera-Zamora*,[23] resulting in Tomasic's termination from

---

[18]Doc. 214 at 26 (explaining that his initial investigation suggested that most of the "[defense bar] suspicions of regular incursion into attorney-client communications . . . are groundless.").

[19]*Id.* at 27.

[20]*Id.* at 28–29.

[21]Doc. 253 at 5–6.

[22]*Id.* at 47–48.

[23]Doc. 276; *see* D. Kan. No. 14-20049-CM-1.

employment.  Second, the Court held a two-day evidentiary hearing in the related case of *United States v. Dertinger*,[24] on a motion to dismiss alleging the USAO used attorney-client video recordings obtained in the *Black* case.  Before a decision could be reached in that matter, Dertinger entered into a sentencing agreement in which the parties agreed to a sentence of time served.[25]

The USAO ultimately declined to produce any of the information the Special Master requested during his investigation, and on June 7, 2017, notified him for the first time that the USAO may have a conflict that would require another entity to take responsibility for document production.  On July 14, 2017, the Department of Justice ("DOJ") informed the Court and the Special Master that Steven Clymer, an AUSA in the Northern District of New York, was appointed as Special Attorney to the United State Attorney General to respond to the Special Master's Requests for Information in Phase III.[26]

The Special Master filed a Phase III Status Report on October 20, 2017.[27]  This was his last substantive report to the Court.  In it, he notified the Court that the Government had declined to cooperate further with him by declining to produce documents he had been requesting for months.[28]  The Special Master attached a September 12, 2017 letter from Clymer spanning 24 pages, wherein Clymer "respectfully decline[d] to provide most of the information and

---

[24]D. Kan. No. 14-20067-JAR-6.  The *Dertinger* case was transferred to the undersigned on May 23, 2017, after Dertinger filed motions to withdraw his plea agreement and for release from custody pending sentencing, relating to the issues of fact before this Court in the *Black* case.  Doc. 520.

[25]D. Kan. No. 14-20067-JAR-6, Doc. 558.

[26]The Court refers to the "USAO" regarding conduct and actions preceding Clymer's appointment.  After Clymer's appointment, the Court distinguishes conduct and actions by referring to the "government," and in some cases "DOJ," as Clymer was appointed by the DOJ to represent the government in connection with the Special Master's investigation, and repeatedly represented that he spoke for the government.  *See, e.g.*, Tr. Aug. 14, 2018 Hr'g, Doc. 570 at 13:10–15:20.

[27]Doc. 298.

[28]*Id.* at 7–9.

documents sought" by the Special Master as part of the Phase III investigation.[29]  Clymer set

forth the Government's position that it had authority to preclude production and testimony based

on its housekeeping regulations often referred to as the DOJ *Touhy* Regulations ("*Touhy*").[30]

Thus began Part III of the *Black* case, in which the Special Master's inquiry turned from

an investigation into an adversarial litigation proceeding.  The Court promptly set the case for

hearing, and the FPD moved for an order directing the Government to show cause why it should

not be held in contempt of court for violating the Court's orders to cooperate with the Special

Master.[31]  In advance of the hearing set for January 18, 2018, the Special Master issued an Order

of Production directing Clymer to bring to the hearing certain documents and materials that were

set out in subpoenas duces tecum ("SDTs") he issued; the Special Master also issued testimonial

subpoenas directed at current and former USAO employees.[32]  The FPD and counsel for the

remaining *Black* Defendants also subpoenaed USAO attorneys and other witnesses.[33]  Defendant

Carter moved to dismiss the Indictment on Sixth Amendment and prosecutorial misconduct

grounds.[34]

The USAO moved to quash the subpoenas and terminate Phase III of the Special

Master's investigation,[35]  which the Court denied in a January 12, 2018 Memorandum and

---

[29]Doc. 298-9 at 2.

[30]*Id.* at 2–7 (citing 28 C.F.R. §§ 16.21–16.29); *see United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).  These regulations shield testimony of federal employees under certain circumstances, preventing courts from holding in contempt those DOJ employees and former employees who refuse to answer questions for lack of authority to answer from Department officials.

[31]Doc. 301.

[32]Docs. 317, 336-1.

[33]Docs. 363, 368, 369.

[34]Doc. 333.

[35]Docs. 336, 340, 341, 360, 370.

Order.[36]  The day before the scheduled January 18 hearing—which by that point had expanded to

a motions hearing on the pending motion for order to show cause, motion to dismiss, and Rule

41(g) motions—the Government filed a Petition for Writ of Mandamus with the Tenth Circuit

Court of Appeals as to the Court's January 12 Memorandum and Order.[37]  The following day,

January 18, the Tenth Circuit granted the Government's request to stay the hearing pending its

ruling on the mandamus petition.[38]

On February 26, 2018, the Tenth Circuit granted in part and denied in part the

Government's petition as follows:

> The district court's order directing the Special Master to conduct a
> Phase III investigation authorized specific tasks as they pertain to
> three categories of people: defendants in the case before it;
> defendants with pending motions for relief in the District of
> Kansas which motions are based on certain allegations; and targets
> and subjects of the CCA investigation . . . . We direct the district
> court to limit the scope of investigation and inquiries to matters
> related to defendants before the court in *United States v. Black*, No.
> 16-20032-JAR, and to other parties in *Black* who have filed Rule
> 41(g) motions in that proceeding.[39]

The evidentiary hearing was eventually rescheduled for May 15, 2018.[40]  Again, the

Government moved to quash the subpoenas reissued by the Special Master, which the Court

previously stayed in December 2017.[41]  The Court did not rule on the renewed motions to quash,

and ultimately did not enforce the SDTs given the Government's invocation of *Touhy*.  At the

evidentiary hearing, the Special Master and the parties presented evidence on the scope and

---

[36] Doc. 372.

[37] Doc. 382.

[38] Doc. 387.

[39] Doc. 398.

[40] Doc. 429.

[41] Doc. 461.

extent of alleged Sixth Amendment violations stemming from the video and audio recordings at CCA and the USAO's possession of recorded, privileged, attorney-client communications. The parties called the following witnesses: former CCA Unit Team Manager Leslie West, Special Agent Stokes, AUSA Scott Rask, former SAUSA Tomasic, CCA employee Wayne Bigelow, and CCA Warden Linda Thomas. Clymer made nearly blanket *Touhy* objections to Rask's testimony and partial *Touhy* objections to Tomasic's testimony.[42]

On May 16, 2018, after a full day of evidence, the parties asked the Court to recess the hearing to allow them to work toward an agreed resolution of outstanding issues related to the Special Master's investigation. United States Attorney Stephen McAllister[43] later announced to the Court that his office and the FPD hoped to reach an agreement on a proposed standing order with the help of the Special Master, and that the USAO would seek to dismiss then-remaining Defendants Carter and Bishop.[44] All parties understood that if an agreement did not come to fruition, the hearing would be reconvened. The FPD and USAO proceeded to work toward resolution of matters impacted by this litigation, including a jointly proposed Standing Order approved by this Court that appoints the FPD to represent any District of Kansas defendant who may have a post-conviction Sixth Amendment claim based on video or audio recordings of attorney-client communications by any holding facility housing federal detainees.[45]

---

[42]*See generally* Doc. 482. The transcripts of the May, October and November 2018 evidentiary hearing consist of 12 volumes found at Docs. 482, 483, 651, 652, 669 through 677, and 694 and collectively consist of 2,819 sequentially paginated pages. For convenience, the Court cites to these documents by ECF docket entry number, followed by a reference to the page number in the transcript that appears in the upper right corner of each page.

[43]McAllister was sworn in as United States Attorney for the District of Kansas on January 25, 2018, more than one year after the investigation commenced.

[44]The Court orally granted the Government's motion to dismiss Defendant Bishop on May 18, 2018. The other defendants had entered guilty pleas by that time. Therefore, the only remaining defendant in the *Black* case is Defendant Carter.

[45]D. Kan. Standing Order 18-3 (July 17, 2018), http://www.ksd.uscourts.gov/wp-content /uploads/2018/07/ Standing-Order-18-3-Appointing-FPD.pdf.

On July 30, 2018, the FPD moved to reconvene the evidentiary hearing recessed on May 16, 2018, citing a letter to the Special Master from then-Deputy Attorney General Rod J. Rosenstein dated July 27, 2018, informing the Special Master of the DOJ's position in the *Black* litigation and the Special Master investigation.[46]  The letter explained that the DOJ would not approve blanket sentencing reductions absent evidence of particularized harm, and would either negotiate or litigate each claim individually.[47]

The Court set the evidentiary hearing to reconvene on October 2, 2018,[48] and soon after granted an FPD motion for yet another preservation order for audio recordings of telephone calls by District of Kansas detainees requested or obtained by the USAO, and for derivative information related to those recordings.[49]  On August 17, 2018, the Special Master served the Government with a new SDT, aimed at eliminating the Government's *Touhy* objections.  The Government neither objected nor moved to quash the new SDT, but the Court granted its request for an extension to produce until September 21, 2018.[50]

The hearing recommenced on October 2, 2018, almost one year after it was originally set.  The Court heard evidence from the Special Master, FPD, and the Government over the course of seven days.  The following witnesses testified: Tomasic, United States Secret Service ("USSS") Special Agent John Seubert, AUSA Jabari Wamble, defense attorney Christian Cox, Captain Jared Schechter, Butler County Detention Facility Capt. Toby Stewart, USAO Litigation Support Specialist Pauletta Boyd, USAO IT Manager David Steeby, AUSA David Zabel, defense

---

[46]Doc. 536; *see also* Ex. 555 at 1.

[47]Ex. 555 at 2.

[48]Doc. 562.

[49]Doc. 569.

[50]Doc. 586.

attorney Carlos Moran, AUSA Lanny Welch, AUSA Emily Metzger, Securus attorney Joshua

Martin, CCA employee Wayne Bigelow, Assistant FPD Rich Frederico, AUSA Sheri Catania,

Professor Peter Joy, defense attorney Justin Gelfand, forensic expert Tami Loehrs, AUSA Leon

Patton, Oakley, AUSA Terra Morehead, former First Assistant United States Attorney Mike

Warner, former AUSA Tanya Treadway, defense attorney Melanie Morgan, defense attorney

Christopher Joseph, AUSA Trent Krug, AUSA Tristan Hunt, AUSA Kim Flannigan, AUSA

Barnett, defense attorney Tom Haney, AUSA Scott Rask, and AUSA Tom Beall.[51]

    Current and former USAO employees testified within the scope of their *Touhy*

authorizations at the hearing, with Clymer offering guidance to each witness about whether

answering a question was outside the scope of the authorization. Compared to the May hearing,

the witnesses invoked *Touhy* more narrowly and less often during the October hearing, and

Clymer often advised the witnesses that they could proceed to answer questions that they were

initially reticent to answer based on their authorizations.

    The Government did not fully produce documents responsive to the Special Master's

SDT by the September 21 deadline. Instead, it produced responsive documents on a rolling

basis, up to, during, and well after the hearing.[52] It being evident that the Special Master,

Defendant Carter, the FPD, and other interested parties were denied an opportunity to fully

consider the Government's discovery responses during the course of the October hearing, the

Court kept the record open and ordered a further evidentiary hearing for November 16, 2018, to

---

[51]Before McAllister's appointment as United States Attorney, Beall served as acting United States Attorney and First Assistant United States Attorney; Beall was serving in those capacities at the time the *Black* investigation commenced.

[52]*See, e.g.*, Docs. 728, 749.

"figure out whether the production is complete, all other concerns about production, [and] any requests for remedies about production."[53]

On November 16, 2018, the Court heard more evidence. The Special Master and FPD recalled Steeby, Beall, and Metzger to answer questions about late-produced documents, and the Special Master testified as a rebuttal witness. Further evidence was presented about the USAO's litigation hold, and the timing and transparency of the USAO's request for recusal by the DOJ. The Government continued to take the position that the disclosures that it had made in response to the SDTs were made voluntarily, not because of any court order or rule of law, since the disclosures went beyond those required by Fed. R. Crim. P. 16. On November 21, 2018, the Court issued a Final Production Order detailing steps the Government must take to fully comply with the SDT, including providing a privilege log for documents it withheld under *Touhy* or other privileges.[54]

The Government filed a motion seeking reconsideration, which included a request for disqualification of the Special Master under 28 U.S.C. § 455.[55] In a lengthy Memorandum and Order filed on January 25, 2019, the Court largely denied the Government's motion to reconsider its Final Production Order.[56] The Court denied the Government's request to disqualify the Special Master and terminate Phase III of the investigation. But the Court modified the production portion of its November 21 Order, allowing the FPD and Special Master to move for admission of any additional exhibits identified through the Government's production pursuant to the SDTs and accelerating the briefing schedule for proposed findings of fact and conclusions of

---

[53] Doc. 677 at 2482:23–25.

[54] Doc. 690.

[55] Doc. 697.

[56] Doc. 713.

law.  The Court made clear that this modification was not intended to excuse the Government's

noncompliance with its production obligations.  It explained that further remedies, if any,

associated with the Government's failure to cooperate with Phase III of the Special Master's

investigation were under advisement and would be addressed in this Order.  The Court also noted

that there were then 66 pending § 2255 motions that raised potential Sixth Amendment

violations, where there could be no dispute that both the Federal Rules of Evidence and Rules of

Civil Procedure apply.[57]

In accordance with the Court's January 25 Memorandum and Order, the FPD and Special

Master submitted additional exhibits for the Court's consideration on March 7, 2019.[58]  The FPD

and the Government filed Proposed Findings of Fact and Conclusions of Law on March 21,

2019.[59]  Also on March 21, the Government filed a "Post-Hearing Status Report on

Preservation," providing previously undisclosed information about its preservation efforts since

August 2018.[60]

### B.  The Scope of this Decision Under the Tenth Circuit's Mandamus Ruling

The Tenth Circuit's ruling on the Government's mandamus petition permitted the

"investigation and inquiries [in]to matters related to" two categories of parties: (1) "defendants

before the court in *United States v. Black*" and (2) "other parties in *Black* who have filed Rule

---

[57]The FPD has advised there is the potential for more than 100 additional 2255 petitions involving audio recordings. *See, e.g.*, *United States v. Phommaseng*, D. Kan. No. 15-20020-JAR-5, Doc. 583 (stating that FPD investigations have revealed at least 76 recorded attorney-client phone calls between Petitioner and his counsel were accessed and obtained by the USAO during the course of his prosecution; at least 13 of those attorney-client calls exceeded two minutes in duration; there are at least two documented production requests for Petitioner's phone calls made by the USAO; and the USAO had been in possession of Petitioner's recorded CCA phone calls and surrendered those to the Court in the *Black* proceedings).

[58]Docs. 734, 735.

[59]Docs. 745, 747.

[60]Doc. 746.

41(g) motions in that proceeding."[61]  As described above, in line with this directive, the Court eventually reset an evidentiary hearing for May 15, 2018, to address (1) the Special Master's Phase III Report; (2) the FPD's Motion to Show Cause and Supplemental Motion for Order to Show Cause; (3) the FPD's pending Rule 41 motions in *Black*; and (4) Defendant Carter's Motion to Dismiss Indictment.  These motions unmistakably fall within the scope of the Tenth Circuit's mandate.

In his motion to dismiss, Defendant Carter argues for dismissal of the charges against him based on Fifth and Sixth Amendment violations and as a sanction for the Government's abusive litigation practices during the Special Master's investigation.  Although the Government has stipulated that Defendant Carter's charges may be dismissed, the motion remains pending.[62]

The FPD's Rule 41(g) motions allege Sixth Amendment violations related to video and audio recordings of its many clients detained at CCA.  The FPD explained in its Amended Rule 41(g) motion the magnitude of its stake in the issues before the Court: "at least two of our clients were named in the body of the complaint, Robert Buress and Jermaine Rayton.  We currently represent about 75 clients who are housed at CCA pending trial or sentencing."[63]  The Government argues that these motions are moot because it has returned all recordings to FPD clients.  But for reasons explained fully in this opinion, the Court is not convinced that all property has been returned—there have been repeated cycles in this case of the Government representing that it has returned or impounded all recordings at issue, only for the Court to find out later that there are more.  Moreover, the Court has not yet ruled on the Sixth Amendment allegations in the Rule 41(g) motions.  Therefore, the Court properly considers in this opinion the

---

[61] Doc. 398 at 2.

[62] Doc. 478.

[63] Doc. 85 at 2.

allegations raised in the FPD's Rule 41(g) motions, and the evidence presented at the hearing relating to the FPD's many clients housed at CCA.

The original evidentiary hearing was prompted in part by the Special Master's Phase III Status Report on October 20, 2017, which documented the USAO's decision not to cooperate with the Special Master after the Phase III investigation began.[64]  The FPD's Motion to Show Cause, and two supplemental Motions to Show Cause, were filed in response to that report. Those motions also fall within the scope of the Tenth Circuit's mandate.[65]  They ask the Court to require the Government to show cause why it should not be held in contempt for failing to cooperate with the Special Master's investigation.

The Tenth Circuit's mandamus order permitted Phase III of the investigation to proceed with respect to the two categories of parties discussed above.  But long before the mandamus ruling, this case had pivoted away from an investigation into an adversarial posture.  By July 2017, the USAO made clear to the Special Master that it did not intend to produce internal emails captured by previously-negotiated search terms.  Also in July 2017, the DOJ assigned Clymer to represent the Government in connection with the Special Master's investigation. Clymer's first order of business was to inform the Special Master and the Court that the Government would not produce documents requested by the Special Master during the previous year of his investigation.[66]  These letters triggered the Special Master's October 2017 Report and the FPD's initial Motion to Show Cause.  Those filings, along with the still-pending Rule 41 motions, led the Court to set this matter for hearing and the Special Master and FPD to issue SDTs.

---

[64]Doc. 298.

[65]Docs. 301, 585, 668.

[66]Doc. 298-9.

Despite the many false starts—and the Court's dashed hope that the FPD and USAO could work out a reasonable settlement of remedies for the remaining defendants in this case and with the many habeas corpus petitioners impacted by this investigation—the evidentiary hearing finally concluded on November 16, 2018.  The Court heard ten days' worth of evidence.  This evidence was required for the Court to understand, among other issues: (1) the scope of video and audio recordings captured by CCA and Securus during the relevant time period; (2) the methods by which the USAO obtained attorney-client recordings before and after August 2016; (3) the custom and practice of the USAO in obtaining and listening to attorney-client audio recordings; (4) how to determine witness credibility in the face of conflicting testimony and contradictory evidence; (5) the degree to which the USAO cooperated with the Special Master during his investigation; and (6) the degree to which the Government preserved and produced evidence pursuant to Special Master's and Court's directives.  All of these inquiries were necessary for the Court to conclude its investigation into Sixth Amendment violations at CCA with respect to the *Black* Defendants and the detainees represented by intervening party FPD, and to rule on pending motions filed by these parties.

The Court's forthcoming findings of fact and conclusions of law necessarily discuss defendants prosecuted by the USAO in other cases within this district, such as Juan Herrera-Zamora, Michelle Reulet, Mendy Forbes, and Brenda Wood.  The Government did not object to evidence about these cases on the basis of relevance or scope.  When discussing these other cases, the Court is careful in its findings to explain the nexus between those cases and the relevant inquiries in this case, including the USAO's knowledge and intent in accessing recordings that included attorney-client communications.  In so doing, the Court finds that evidence of the USAO's conduct in those cases is directly relevant to the questions presented in

this case as to: (1) "defendants before the court in *United States v. Black*" and (2) "other parties in *Black* who have filed Rule 41(g) motions in that proceeding."[67]

## III. Findings of Fact: Failure to Cooperate with the Special Master's Investigation

The Court makes the following findings of fact relevant to allegations by the Special Master, FPD, and Defendant Carter that the Government willfully failed to cooperate with the Special Master's investigation in this matter. Although these allegations were first set forth in the parties' 2017 filings, they were supplemented during the lengthy delay between those original filings and the evidentiary hearing in May, October, and November 2018, as further evidence of the USAO's conduct came to light. Revelations about the USAO's failure to preserve documents material to the investigation continued up to the parties' deadline for submitting proposed findings of fact and conclusions of law. Thus, the Court's findings cover the following aspects of the Government's non-cooperation over the course of this lengthy period of time: (1) failure to abide by the Court's discovery orders by failing to preserve evidence, including the so-called AVPC hard drives, and (2) failure to timely and fully cooperate with the Special Master by actively discouraging timely cooperation by key USAO personnel and by failing to timely and completely produce material documents.

### A. Orders to Preserve and Cooperate

The Court made several early orders both orally and in writing with respect to the impoundment and preservation of evidence that is material to the Sixth Amendment inquiries in this case. On August 9, 2016, at the first emergency hearing on the FPD's Rule 41(g) motions, the Court ordered the Government to turn over to the Court's custody the six hard drives, or "DVRs," containing the CCA video-recording footage produced to Tomasic in May 2016

---

[67] Doc. 398 at 2.

pursuant to grand jury subpoena.[68]  On August 10, 2016, the Court entered a Memorandum and

Order memorializing this ruling, and directing all detention facilities in Kansas and Missouri that

house District of Kansas detainees, including CCA, to cease and desist video and audio recording

of attorney-client meetings, phone calls, and videoconference calls.[69]

     At the August 16 hearing, the Court heard evidence that Defendants in the *Black* case had

received audio recordings in discovery that included their own attorney-client phone calls, the

attorney-client phone calls of their co-defendants, as well as attorney-client phone calls of CCA

detainees not charged in *Black*.[70]  The Court orally clawed back the audio recordings in the

USAO's possession after acknowledging that the Government's discovery of attorney-client

communications potentially raised "hundreds of Sixth Amendment violations" since "every

person has their own right."[71]

     The clawback orders were memorialized in writing on August 18, 2016, but were not

strictly limited to clawback and impoundment.[72]  The order pertaining to video recordings

extended the August 10, 2016 order, and directed CCA to provide to the USMS all originals and

copies of recordings of the attorney visitation rooms; the USMS was directed to immediately

deliver those recordings to the Court.[73]  The clawback order pertaining to audio recordings

provided, in part: "the Court Orders the preservation and protection of any and all audio

---

[68]Tr. Aug. 9, 2016 Hr'g, Doc. 104 at 114:19–115:25.

[69]Doc. 102.

[70]For example, the *Black* Defendants received audio recordings of phone calls placed by CCA detainee Lamar Steele to his counsel, Chris Joseph.  Lamar Steele was not a defendant in *Black*.  The FPD prepared a chart based on its limited knowledge at the time, identifying several CCA detainees whose audio recordings were disseminated in discovery in *Black*.  Ex. 449.

[71]Tr. Aug. 16, 2016 Hr'g, Doc. 118 at 24:23–26:12, 64:21–65:3.

[72]Docs. 113, 114.

[73]Doc. 114.

recordings of attorney-client communications at [Corrections] Corporation of America (CCA)."[74]
Thus, the Court's August 18 clawback and impoundment order of "any and all audio recordings"
was not expressly limited to audio recordings of defendants in the *Black* case. As for the
discovery that included audio calls in *Black*, the Court ordered the USAO to provide a list of all
persons or entities to whom these recordings had been disseminated and to refrain from
accessing or listening to them. The Court further ordered that the USAO "return all recordings
and derivative information, such as transcripts, notes, or reports concerning these recordings, to
the Court."[75]

On September 2, 2016, the Court was advised for the first time in a filing by the FPD that
"the Kansas City office of the USAO may be in the cyclical process of replacing computers and
perhaps other electronic equipment."[76] Indeed, on August 30, 2016, FPD Melody Brannon
emailed then-USAO Criminal Chief Debra Barnett, advising that she had heard that the USAO
was to undergo a cyclical replacement of its computers and demanding that the USAO maintain
all existing computers, including hard drives and other media that could contain data related to
the video recordings as "we want to make sure nothing is lost in the transfer."[77] At the
September 7, 2016 evidentiary hearing, the Court orally ordered that the USAO's computer hard
drives "be held on to until further order of the Court."[78] AUSA Slinkard advised the Court:

> Mr. Slinkard: So we will communicate with [IT Coordinator
> David Steeby] that we need to retain the hard drives from the
> Kansas City office, unless the Court orders more broadly, retain
> the hard drives from the Kansas City office, as well as the ability to
> access the laptop hard drives from the Kansas City office, if that's

---

[74]Doc. 113 at 1.

[75]*Id.* at 2.

[76]Doc. 130 at 48.

[77]Ex. 589.

[78]Tr. Sept. 7, 2016 Hr'g, Doc. 135 at 54:22–55:14.

acceptable.[79]

In the October 11, 2016 Appointment Order, the Court ordered all parties to "provide full cooperation to the Special Master . . . and observe faithfully the requirements of any orders of the Court and rulings by the Special Master."[80]  In addition to setting forth the Special Master's duties in Phase I (feasibility) and Phase II (culling and segregating any arguably privileged video and audio recordings), the Order warned that the Court may later expand the scope of the Special Master's duties to a Phase III, which may include a determination of

> whether and how the Government has used or attempted to use protected material in *any* investigation, grand jury proceeding, or litigation, regardless of whether the use or attempted use was disclosed to the Court or to the parties; and whether the Government did or attempted to interfere with a defendant's attorney-client relationship, such as requesting attorney fees or alleging conflicts of interest.[81]

On October 25, 2016, the Special Master entered a Discovery Conference Order.[82] Because the Court's Appointment Order "contemplated the possibility of later directing [him] to pursue 'additional investigative duties,'" he directed the USAO, CCA, and the United States Marshals Service ("USMS") to

> *identify and preserve* all information and sources of information relevant to the matters listed on pages 7-8 of the *Appointment Order* (docket no. 146). This obligation includes preserving all emails (regardless of the device used to send or receive them) and other documents related to video- and audio-recording at CCA-Leavenworth or any other detention facility.
>
> In addition, the Special Master specifically ORDERS the Office of the United States Attorney to immediately make a forensic image of the personal computers of Erin Tomasic, Kim Flannigan, and Pauletta Boyd, and also of any computer used to view the video-

---

[79] *Id.* at 56:11–23.

[80] Doc. 146 at 13.

[81] *Id.* at 8 (emphasis added).

[82] Doc. 155.

recordings produced in this case by individuals affiliated with the OUSA.[83]

On November 18, 2016, the Special Master filed another Preservation Order, ordering preservation by Securus and the USSS, of the same materials identified in his previous order.[84] In a footnote to the November Preservation Order, the Special Master made clear that:

> The obligation imposed by this Order and the *Discovery Conference Order* includes: suspension of routine destruction of information; guarding against deletion; preservation of data and metadata in native form; preservation of information on workstations, servers, laptops, online accounts, and all other sources; and preservation of information in the custody of others that is subject to the obligee's direction or control.[85]

Under the terms of the Appointment Order, the Special Master's preservation orders were deemed orders of the Court since neither party lodged objections.[86]

The Court conducted a discovery conference with the parties and the Special Master on October 28, 2016, during which the Court stressed that the scope of the preservation directives necessarily went beyond the Defendants in the *Black* case in light of the many Rule 41 motions pending in other cases. The Court pointedly asked the Government if it understood the scope of the directive:

COURT: . . . . So with respect to this directive to preserve any

---

[83]*Id.* at 5–6 (emphasis in original). The information and sources of information listed on pages 7–8 of the Appointment Order include information that proved to be relevant and responsive to later Requests for Information by the Special Master, requests for production by the Special Master, as well as SDTs issued by the Special Master and the FPD. For example, the list includes information concerning how the USAO came into possession of recordings in this case or in the past and identifying the person(s) who obtained and/or possessed recordings. The list includes information concerning whether the USAO's possession was inadvertent, intentional, or knowing with respect to protected communications. And the list includes whether the USAO had used or attempted to use such protected communications and the identity of any parties affected by the USAO's breach of any privilege, confidence, statutory rights, Constitutional rights, or ethical obligations. *See* Doc. 146 at 7–8.

[84]Doc. 180.

[85]*Id.* at 2 n.1.

[86]The Government filed a Motion for Reconsideration of the Court's Appointment Order on October 27, 2016, challenging the scope of the Special Master's duties. Doc. 163. The Court denied that motion on November 29, 2016. Doc. 182.

records of acquisition or production is what it really says, any records of production by CCA or Securus of video and audio recordings, that these be preserved, has that been complied with?

BARNETT: . . . .What I will tell the court is we understand right now nothing in our office as related to obtaining information from CCA should be destroyed or gotten rid of in any way.  So within our office we have, I guess, put a lockdown, so to speak, on information or records that we would currently have.

THE COURT: And you do understand that it goes beyond the bounds of the *Lorenzo Black* case?

MS. BARNETT: Yes.  Yes.[87]

The Court went on to note, "as you know, there are Rule 41 motions pending in dozens and dozens of other cases in this district in this division and in other divisions, and so all of this is relevant to that as well."[88]

In its May 17, 2017 Phase III Order, the Court expanded the Special Master's investigation to include, among other things:

[W]hether the USAO and investigative agencies (including individual prosecutors, USAO staff and/or investigative agents) purposefully, intentionally, unintentionally or inadvertently, procured, obtained, relied upon, used in any manner, and/or disseminated to anyone, video and/or audio recordings of attorney client communications as described above, or attempted to do so . . . .[89]

The Special Master was also directed to "[i]nspect and copy files, documents, communication, and electronic data of any pretrial holding facility, the USMS, and the government as necessary to complete the above duties."[90]  The Order made clear that it did not modify the parties' duty to

---

[87]Tr. Oct. 28, 2016 Hr'g, Doc. 172 at 7:10–9:24.

[88]*Id.* at 9:25–10:4.

[89]Doc. 253 at 45 ¶ 3.

[90]*Id.* ¶ 9.

provide full cooperation to the Special Master.  Although the Order provided for Court funding

of Phase III, it warned:

> Although the Court relieves the government from bearing the cost
> of the Special Master's investigation going forward, there is one
> exception. If the government does not cooperate regarding the
> inspection and copying described in Section VIII. (9) above, or
> otherwise litigates the production of materials and information
> necessary for the Special Master to pursue his investigation, then
> the fees, costs, and expenses associated with that noncooperation
> will be paid by the government.[91]

No further preservation directives were issued by the Court or the Special Master until

August 2018, when new information came to light about the potential scope of recorded

telephone calls between attorneys and their clients detained at CCA that the USAO continued to

possess.[92]  On August 15, 2018, after the settlement negotiations between the FPD and the

USAO reached an impasse, the Court filed yet another preservation order, this time for any

recordings of phone calls made or received by a person while in District of Kansas custody that

was requested or obtained by the USAO, as well as any related documents such as emails,

written requests, and communication with defense counsel.[93]  This order granted an oral FPD

motion that was prompted in part by evidence presented during the May 2018 hearing that

despite the Court's earlier clawback order, the USAO still possessed many audio recordings of

attorney-client phone calls procured outside of the *Black* investigation, and that the USAO

routinely requested recordings of phone calls by detainees without formal documentation.[94]

---

[91]*Id.* at 48 n.60.

[92]On June 7, 2018, the Court entered an order granting the FPD's request to prohibit the USAO from
requesting or accessing recorded calls between the FPD and their clients at CCA.  Doc. 490.

[93]Doc. 569.

[94]These same revelations prompted the FPD to file a motion on August 20, 2018, to discover the names and
recordings of all detainees whose recordings were in the possession of the USAO.  Doc. 572.

Specifically, the FPD learned in May 2018 that there were 1338 instances of recorded calls between the FPD and its clients detained at CCA between 2011 and 2013.[95]

## B.     The USAO's Failure to Preserve Evidence

### 1.     The USAO Misconstrued the Court's Early Preservation Orders and Willfully Delayed and Obstructed the Special Master's Preservation Orders

While the USAO complied with the Court's August 18, 2016 video clawback order by turning over the DVRs containing video recordings from CCA, USAO management narrowly interpreted the order to only require impoundment of the physical hard drives obtained from CCA.  Despite the clear language in the Court's August 18, 2016 video clawback order, the USAO continued to maintain copies of the video recordings on Litigation Support Specialist Pauletta Boyd's AVPC computer.[96]  And at the *Dertinger* hearing on June 20, 2017, Special Agent Stokes testified that he kept a copy of the video recordings that he had previously downloaded to his laptop computer.[97]  He testified that he kept this laptop at home or locked in his car.

Moreover, despite having knowledge that it had obtained recordings of attorney-client telephone calls for defendants not named in *Black*, and despite the broad language of the Court's August 18, 2016 audio preservation and clawback order, the USAO chose to narrowly interpret that order to include only those recordings obtained in the *Black* case.  On August 19, 2016, the day after the Court's order, Beall, Barnett, Metzger, Slinkard, Rask, Oakley, Tomasic, and

---

[95]Doc. 484 at 1.  In 2017, Ashley Huff and Gregory Rapp filed a putative class action lawsuit against CCA and Securus, alleging violations of various wiretap statutes.  *See Huff v. CoreCivic, Inc.*, D. Kan. No. 17-2320-JAR-JPO.  The FPD obtained the information cited in its May 2018 request through the discovery in that civil matter.  *See* Doc. 484.

[96]Ex. 508 at 264:20–21.

[97]*Id.* at 137:3–25.

Flannigan met to discuss the scope of the clawback order on audio recordings. Contrary to the testimony of Barnett and Metzger, there was not a consensus during this meeting that the scope of the Court's clawback order was narrowly limited to the calls obtained in the *Black* discovery. On that same date, AUSA Carrie Capwell opined in an email to Tomasic that the Court's order could be broadly read to apply to all cases.[98] Also on that same date, there was an email conversation between Oakley, Metzger and Boyd, on which Beall, Barnett, Flannigan, Rask and Tomasic were copied.[99] Metzger expressed concern that the Court's clawback language was broad, such that with respect to phone recordings that were on the shared discovery drive, they should "delete them from the drive," or "lock them down" and give the Court notice of that.[100] The USAO ultimately did neither.

Tomasic and Flannigan testified that they informed Barnett that there were phone recordings in other cases, including *United States v. Rapp*,[101] that were separately obtained in the CCA investigation and that should be within the scope of the clawback order as well.[102] Tomasic pressed Barnett by email on September 13, 2016, about whether phone calls obtained in other investigations should be impounded under the clawback order in *Black*.[103] On September 14, 2016, Barnett directed Tomasic to seek clarification from the Court on what to do with phone recordings from other investigations.[104] On September 22, there was an email exchange between

---

[98]Ex. 1247.

[99]Ex. 1143.

[100]*Id.*

[101]D. Kan. No. 14-20067.

[102]*See* Ex. 1174.

[103]Ex. 1257.

[104]*Id.*

Metzger and Barnett.[105]  Metzger again expressed concern that the Court's order should be applied to calls that were obtained in other cases.[106]  Yet neither Tomasic, Barnett, nor Metzger ever sought clarification from the Court.   And while by this point Barnett had directed Tomasic to secure these other calls and prepare a chart identifying the affected detainees,[107] these and all other calls in the USAO's possession remained in the shared discovery drive, accessible to all AUSAs, without notice to the Court or the parties.  According to the USAO's March 21, 2019 status report, documents on the USAO's shared discovery drive exist until deleted, and "[n]o discovery drive data related to any case has been approved for deletion after the Court's blanket preservation directive of November 21, 2018."[108]  Thus, it appears based on this recent status report that recordings pertaining to non-*Black* defendants were not only accessible to all AUSAs, but were also subject to deletion by any AUSA until November 2018 under the USAO's interpretation of the August 18, 2016 audio preservation order.

### 2.     The USAO Failed to Preserve the AVPC Hard Drives

In April 2016, USAO management was placed on notice that the entire USAO office for the District of Kansas would undergo a cyclical replacement of its computers in August and September 2016.[109]  On August 31, 2016, the day after receiving Brannon's August 30 email demanding that the USAO maintain its existing computers and hard drives, Barnett forwarded Brannon's email to Beall, Slinkard, and Metzger.[110]  The substance of the subsequent discussion in this email string demonstrates that these USAO managers recognized the significance of

---

[105]*Id.*

[106]Ex. 1174.

[107]Ex. 1261.

[108]Doc. 746 at 4 n.3.

[109]Ex. 1201.

[110]Ex. 1176.

preserving the data on the computers.  Metzger noted that since the video recordings were impounded by the Court, she did not understand Brannon's concern unless it was "some type of metadata on the videos?"[111]  That, of course, would be one compelling reason to preserve the computers, particularly any computer from which someone had accessed or viewed video recordings.  Metzger later testified that she understood at the time that there was an issue about who had viewed the video recordings.  In this August 31 email string, Metzger also noted that it was her understanding that "we have locked it down on our computers," and that Boyd could probably verify whether the computer that housed their discovery was being replaced or not.[112]  Metzger further recognized the need to confirm with USAO IT personnel Boyd and Steeby that "nothing will be lost."[113]  Slinkard weighed in with the suggestion, "[c]heck with David to make sure, but I understood that we would be retaining all hard drives from the old computers."[114]

It is undisputed that neither Beall, Barnett, Metzger, nor Slinkard conveyed this information to Steeby, nor sought confirmation from USAO IT personnel that *all* computers would be maintained and the data on the computers preserved before the planned cyclical replacement.  By August 31, the Wichita and Topeka divisions were already undergoing or completing their cyclical replacements, something Barnett and Metzger, who worked in Wichita, and Beall and Slinkard, who worked in Topeka, knew.  But the cyclical replacement had not yet commenced in the Kansas City division.  Steeby testified that because users could lose data on their computers if they did not take certain steps, he gave repeated notice to users and made sure

---

[111]*Id.*

[112]*Id.*

[113]*Id.*

[114]*Id.*

to inform them of the actual date on which their computers would be replaced, giving them instructions to leave their computers on overnight.[115]

Barnett testified that she had never been involved with a litigation hold and thought that Metzger or Slinkard would tell Steeby to preserve all hard drives. Barnett offered that she had no supervisory authority over Steeby, but neither Metzger nor Slinkard had supervisory authority over Steeby either. Metzger testified that she understood Barnett was asking for guidance on how to respond to Brannon's August 30, email, but that she did not understand that she was expected to follow up with Steeby. In sum, no USAO manager took responsibility for this critical issue of preserving the data and computers during the cyclical replacement and refresh. Yet Beall, as the United States Attorney, Barnett as the lead attorney in the *Black* case, and Metzger, as the USAO Litigation Hold Attorney, all had direct responsibility to ensure that the computers were preserved.[116]

On September 6, 2016, Steeby completed the cyclical replacement of all but one computer in the Kansas City division.[117] He did not replace a desktop computer called the AVPC, which was assigned to and under the control of Boyd for litigation and discovery

---

[115]*See* Ex. 1200 (providing DOJ-directed protocol for cyclical replacement and refresh of computers that includes repeated and detailed instructions to users so that they will not lose files or data). Steeby complied with the DOJ's protocol requiring that he give users notice seven days before the scheduled migration, advising that they may not have access to their system for an entire day and giving instructions on how to back up their data to ensure nothing was lost in the process. *See id.*

[116]On September 2, 2016, the FPD filed a Memorandum of Law-Reply on the scope of the Special Master's appointment, advising the Court of the USAO's planned cyclical replacement of its computers and of its demand that the USAO not destroy ESI relevant to the Sixth Amendment issues in the process. Doc. 130 at 48. No one in the USAO spoke to Steeby about this document either.

[117]This entailed removing the hard drives from the laptop chassis of every laptop computer assigned to Kansas City users. As a result of removing the hard drives, the data on the hard drives is now only accessible if the hard drive is reconnected to its original chassis, and if the user of that old laptop accesses it with a user password. Exhibit 1203 is the August 16, 2016 Daily Deployment List of PC Refresh, which provided Steeby with the necessary information to match laptops and chassis so that the data can be read.

support.[118]  Boyd had previously downloaded the proprietary PELCO player software on the AVPC, software required for USAO personnel to view the CCA video recordings.  That software was loaded under Boyd's login and only she could directly access it.  Any metadata identifying who, when, and how the PELCO player software was used to view the CCA videos resided on the hard drives of this AVPC computer.  Instead of replacing the AVPC, Steeby kept it in service, reformatted its two hard drives, and installed the Windows 10 operating system.  Steeby testified that had someone shared Brannon's August 30 email with him, he would not have "refreshed in place" the AVPC computer, because he understood that the installation of the new operating system would overwrite data on the hard drives.[119]

The next day, Boyd returned to her office, and to her chagrin, found that the hard drives from the AVPC had been "wiped" such that she could not access any files, data, ongoing work projects, the PELCO player, or video recordings.[120]  Boyd testified that while she received instructions before her laptops were replaced, she had not received instructions for desktop computers, so she had not backed up her data.  Had Steeby notified Boyd that she would lose data on her AVPC, she could have backed up the data and in that process, preserved the video recordings, the PELCO player, and any associated metadata.

The Court credits the testimony of Tami Loehrs, a forensic computer expert, whose opinion was unrefuted.  Loehrs testified that the only reason to have two hard drives on a computer is to use one hard drive for the operating system and one to store data.  Steeby testified that each of the AVPC's two hard drives housed the operating system and data, a nonsensical

---

[118]Boyd testified that this special computer was issued by the DOJ to each district and is used exclusively to play video or audio files.  Doc. 670 at 985:2–9.

[119]Doc. 672 at 1138:1–1140:11.

[120]Doc. 670 at 1035:4–1036:20 ("Well, the hard drive, in order to do a re-image, gets completely wiped and the new image is put on that drive.").

practice in Loehr's opinion. If the AVPC had one hard drive devoted to data and one to the operating system, the PELCO player and video recordings would have been stored on the data hard drive and the installation of Windows 10 on the operating system hard drive, which would not have compromised the PELCO player and video recordings. Loehrs credibly and persuasively opined that there was no reason for Steeby to install Windows 10 on both drives and risk overwriting data, unless the objective was to destroy the data. Nonetheless, Loehrs could not opine as to how much data, if any, was overwritten on the AVPC between the time it was reformatted and when it was taken out of service on November 7, 2016, about two months later. She did not conduct a forensic examination of the computer and could not opine that the data, including any logging information that may have existed, was completely lost.[121] Loehrs and Steeby both testified that a forensic evaluation of the AVPC's unallocated space would show how much data was overwritten.[122]

Beginning on September 7, 2016, in a host of internal email communications, USAO management repeatedly sought confirmation from Steeby that he had preserved data on the Kansas City division computers.[123] Shortly before the September 7 hearing where the Court ordered the old USAO hard drives preserved, Steeby assured Slinkard that the laptops had been preserved, labeled, and stored, but did not expressly mention the desktops and did not mention that the AVPC hard drive was reformatted.[124] Steeby later testified that he did not mention the AVPC because Slinkard's questions were about the hard drives, although he acknowledged that the AVPC had hard drives, just like the laptops did. At the September 7 hearing, Slinkard

---

[121] Doc. 674 at 1859:4–21; *see also* Doc. 672 at 1135:9–24.

[122] Doc. 674 at 1853:4–12, 1859:4–21; *see also* Doc. 672 at 1106:5–8.

[123] Ex. 1199.

[124] Ex. 556.

conveyed Steeby's assurances to the Court.  When the Court directed that the laptop hard drives

and chassis be stored until further order, Slinkard immediately emailed Steeby during the hearing

to advise him of that order.  The following day, September 8, 2016, Beall emailed Steeby,

reiterating the Court's directives.  Beall expressly and pointedly advised Steeby that the Court

order regarded all Kansas City office computers.  Steeby responded that he had preserved the

laptops; but Steeby did not expressly respond to Beall's directive that this applied to *all*

computers.[125]

On October 27, 2016, Slinkard emailed Steeby about the preservation of computers in

the Topeka office, and stated that the preservation order applied to all hard drives for all

computers replaced during the refresh.[126]  At a hearing the following day, October 28, 2016,

Slinkard again advised the Court that all hard drives and chassis had been preserved.  Slinkard

further advised that the AVPC and its hard drives had not been replaced and were still in service.

The Court stated that while it wanted all hard drives impounded and stored by the USAO, it did

not want to impound the computer that was still in service.  Barnett assured the Court that all

computers were preserved and maintained.  Neither Barnett nor Slinkard advised the Court that

the AVPC hard drives were not preserved and maintained, nor did they advise the Court that the

AVPC computer housed the video recordings and PELCO player software.

Three days after the hearing, on October 31, Slinkard emailed Steeby, copying Beall,

Metzger, and Barnett, and asked how best to preserve Boyd's computer that was not replaced.[127]

Slinkard asked if they could remove the hard drive and install a new hard drive.  Steeby

responded, stating that "it didn't cross my mind at the time, but one of the three workstations

---

[125]*Id.* at 7 ¶ 5.

[126]*Id.* at 8–9 ¶ 6.

[127]*Id.* at 11–12 ¶ 11.

under Pauletta's control was upgraded in-place, overwriting everything on the local hard drive in the process."[128]  Someone from the USAO apparently conveyed this to the Special Master because on November 3, the Special Master asked USAO management for an explanation of what had happened to the AVPC, prompting an internal email discussion among the USAO management team about how to respond.[129]  Then in a November 5 letter to the Special Master, Slinkard advised that he did not know until Steeby told him on October 31 that the AVPC had been refreshed in place.[130]  Finally on November 7, Barnett directed Steeby to "lock down that PC."[131]  Steeby powered off the AVPC computer and took it out of service.[132]  He placed it in the USAO vault in December 2016.

### 3. Failure to Implement a Litigation Hold in Compliance with Early Preservation Orders

At the local level, the USAO has an electronic, shared file-retention system called ProofPoint that on a daily basis rolls documents over into an automatic archival system managed and controlled centrally by the Executive Office of the United States Attorneys ("EOUSA"). This ProofPoint system only houses email and documents attached to email; it has no connection to network drives or other repositories.  The emails and attached documents are archived in the ProofPoint system under EOUSA's control for three years.   During the three-year retention period, users can access their own individual archive email but cannot add, delete, or edit archived materials.  After three years, the emails and attachments are purged and forever irretrievable.

---

[128]*Id.* at 12 ¶ 12.

[129]Ex. 1168.

[130]Ex. 556.

[131]Ex. 1147.

[132]*Id.*

The ProofPoint email archive system has no connection to nationally-controlled network drives, including shared discovery drives that reportedly house scanned discovery documents and other network drives that reportedly house Word documents. According to Steeby, Boyd, and Tomasic, some of these drives, including discovery drives, are shared and accessible to all USAO attorneys who have permission to add, modify, update, and delete data from those drives. Data on the discovery drives is locally backed up on a daily basis, and there is a six-month restoration period for any data or documents that are modified or deleted. After six months, those modifications or deletions cannot be restored. Steeby testified that although he does not recommend such, users can keep materials on drives that no one else can access, such as local drives.

As discussed above, the USAO knew in August 2016 that the Special Master's investigation into possible Sixth Amendment violations surrounding its procurement of video and audio recordings was imminent. As early as August 11, 2016, Beall suggested in an email to Metzger, Barnett, and Slinkard that they needed to put a litigation hold in place.[133] Even if the USAO was unsure in August about its preservation duties, it certainly knew by October that the Special Master had ordered preservation. Yet, Metzger did not issue a litigation hold for local repositories of paper documents, records, and files, nor for local repositories of ESI in August 2016, or for several months thereafter. Nor did Metzger take steps to initiate a national litigation hold for documents no longer controlled locally.

---

[133]Ex. 1207.

### a.     Delayed Litigation Hold Email

In October 2016, the Special Master believed that "the lit hold had been put on by virtue of my order."[134]  He was first introduced to Metzger, the USAO Litigation Hold Coordinator, on November 22 by email, to work on the specific terms of the litigation hold email that Metzger was preparing to send to USAO staff.  Metzger did not inform him that there existed a formal process through the DOJ for instituting a litigation hold, which included a standard litigation hold form.  The Special Master had previously sent Barnett a Preservation List consisting of nineteen categories of information that should be covered by the USAO's litigation hold, and he worked with Metzger to utilize that list in crafting the litigation hold email.[135]

On December 19, 2016, Metzger finally sent the litigation hold directive by email to all USAO staff.[136]  Metzger's email directed USAO staff to preserve documents from January 1, 2011 through the present and continuing, including ESI.[137]  It further directed them to

> immediately retain, preserve and prevent any destruction, deletion or purging of any and all written and electronic materials (including files, work product, pleadings, memoranda, subpoenas, administrative requests, handwritten notes, calendar items, e-mails, phone records, tasks and any other electronic records), wherever located or recorded (please note that this includes ceasing purging of closed files that contain any such materials), and regardless of when created, that may contain information about any of the items set forth at the end of this e-mail.[138]

Metzger included the Special Master's Preservation List at the end of the email.  She further directed the recipients to forward the email to any agent with whom they had worked within the

---

[134]Doc. 694 at 2748:3–14.

[135]Ex. 1267.

[136]Ex. 1214.

[137]*Id.*

[138]*Id*

last five years and who may have responsive information and direct them to also preserve such

materials.  The email cautioned that "attorney-client communication" means "any

communication between an attorney and client, whether or not it is believed to be or may be

privileged."[139]  Metzger's email also instructed that

> this preservation hold is not limited to the *Black* case and covers
> any and all such information that is in the possession of this office.
> Further this litigation hold is **mandatory**, not discretionary, and
> applies to each and every employee of the United States Attorney's
> Office for the District of Kansas.[140]

Metzger instructed USAO staff to acknowledge receipt and review of her email and to advise her

if they possessed responsive information.  She provided no deadline for sending her a receipt or

response.

Contrary to the Special Master's belief, the evidence presented at the hearing makes clear

that before Metzger sent this December 19, 2016 email, USAO staff did not receive any directive

from management to preserve ESI or paper records.  Metzger's stated reason for the delay was

that she was "negotiating" with the Special Master the terms of the litigation hold.  But this

explanation is not credible given that the Preservation List and the language in the email were

largely the work of the Special Master.  Metzger's main contribution was to add language to the

email that advised USAO staff that the directive was for preservation but not production at the

time; she sent the Special Master that language on November 22.  On December 6, Barnett sent

an email to Rask, Metzger, and AUSA Annette Gurney, suggesting a meeting "with the criminal

AUSAs this Thursday, at 1 p.m. to talk about the preservation email."[141]  Barnett acknowledged

in that email that the Special Master wanted the preservation email sent out "yesterday," but

---

[139]*Id.*

[140]*Id.* (emphasis in original).

[141]Ex. 1213.

hoped it could wait until they met. This evidence suggests that the lengthy delay was not attributable to a good-faith negotiation with the Special Master over the terms of the email.

Moreover, Metzger made little effort to enforce the December 19, 2016 email after it was finally sent out. Beginning on January 31, 2017, DOJ policy established a 30-day deletion policy for documents in the USAO "M" drive, which housed scanned documents. Metzger notified all staff on January 30, 2017 of the new policy taking effect the next day and advised them that any documents in the M drive that fell within the scope of the litigation hold should be moved, printed, or otherwise retained.[142]

 By late February 2017, many USAO staff had still not even responded to her email to advise whether they had responsive materials, causing further delay. In fact, Metzger waited until February 20, 2017, to send a follow-up email, asking the 63 staff members who had not responded to the December 2016 email to respond by February 21, 2017.[143] She sent another follow up email on February 27 to those who still had not responded, directing responses by the following day.[144]

### b. Delayed Formal Litigation Hold and Failure to Inform the Special Master of Formal Litigation Hold Efforts

Metzger's testimony at the October 2018 hearing was entirely focused on the December 19, 2016 litigation hold email. Her testimony strongly suggested that this was the only attempt to implement a litigation hold pursuant to the Court's and Special Master's preservation orders. In fact, when asked whether there "[w]ere there other preservation directives that you have not

---

[142]Ex. 1278.

[143]Ex. 1164. Among the nonrespondants were Beall, Boyd, Catania, Hunt, Krug, Morehead, Patton, Slinkard, Wamble, and Zabel.

[144]Ex. 1215.

yet described," Metzger responded, "I don't believe so, that I recall."[145]  As far as the Special

Master knew, the December 19, 2016 email was the only litigation hold effort by the USAO.[146]

　　　　　Evidence presented at the November 2018 hearing shows that on May 19, 2017, two days

after the Court's Phase III Order, Metzger notified USAO staff that they should complete

Attachment 1 of the standard DOJ litigation hold form, entitled "User Litigation Hold Notice and

Certification Form," which is routinely used to implement a litigation hold on both local and

national repositories.[147]  The form required each user to check boxes for the locations where

responsive information "may exist," including categories for both electronic and hard copy

documents.  In answering an email question from Barnett about this form on May 22, 2017,

Metzger explained: "[o]f course, we are retaining and preserving already; this is just extra

precautionary back-up on the national server."[148]  Metzger directed USAO staff to each complete

and return the Attachment 1 form to her by May 31, 2017.  Their signatures certified that they

had followed the preservation directives explained on the form, and that they had identified all

potential repositories with responsive materials.  The next step was for Metzger, as the Litigation

Hold Coordinator, and Steeby, as the Systems Manager, to sign and certify Attachment 4 for

each user, entitled "USAO Lit Hold Coordinator/Systems Manager Certification."[149]  There is no

---

[145]Doc. 672 at 1331:12–19.

[146]See Doc. 694 at 2669:8–2672:12 ("Q. And you didn't even tell him that you issued the May 17th lit hold?  A. [Metzger] I don't believe so. I don't think it came up that I recall, no."), 2748:11–16 (Q. Did Ms. Metzger ever tell you that there was, in fact, a form lit hold notice that she was required to send out by the U.S. Attorney's procedures manual and had not sent it out by December the 19th? A. [Cohen] I didn't know anything about that form until today.").

[147]Ex. 1196.

[148]Ex. 1223.  The USAO should have produced all of its litigation hold forms because they were responsive to the Special Master's August 17, 2018 SDT.  See Doc. 582-1, Request Nos. 1, 2, 3, 4.

[149]See, e.g., Ex. 1228.  The Court lacks fully completed Attachments 1 and 4 for any user.  None of the Attachment 4 forms in evidence were signed by Metzger, including her own user form.  Ex. 1290.  And most of those Attachment 4 forms lack a corresponding Attachment 1.

evidence that this step was fully accomplished. Although Steeby signed many of the forms, with a signature date as late as August 2, 2017, none of the Attachment 4 forms in evidence were signed by Metzger in her capacity as the Litigation Hold Coordinator.

According to Steeby's November testimony, his receipt of the litigation hold forms allowed him to submit a ticket to the Network Operations Center to stop the ordinary three-year roll-off of email messages for that user. Presumably, Steeby's ticket also would have stopped ordinary document destruction of any non-email category of documents that a user checked on the form.[150] Not until the ticket was submitted and processed would the normal deletion process stop—emails from 2014 were being deleted each day until the ticket was processed.[151]

There was ample testimony about the scope of materials AUSAs routinely maintained for their cases that likely should have been preserved. At the October 28, 2016 hearing, Barnett testified that prosecutors maintained paper files and that the USAO had internal policies on what must be retained when a case or investigation is closed.[152] AUSA Wamble testified about the types of case-related documents he kept routinely, including the majority of the case file, except he might discard "scratch notes."[153] AUSA Oakley testified that he preserved ESI and notes in both electronic and paper format that were responsive to the issues in *Black*. AUSA Morehead acknowledged in a March 9, 2017 email to Barnett and Rask that she had dozens of files in the past five years that were closed and in archives, and that she "expect[ed] the way we purge out files that any forms that once existed are no longer there, but are we expected to search them,

---

[150]Steeby testified that data on the network drive is not subject to a three-year retention policy. If a user does not take specific action to delete or modify, it is never lost because that data is backed up to an offsite location. Doc. 694 at 2536:16–2537:3.

[151]*Id.* at 2534:7–2535:1.

[152]Tr. Oct. 28, 2016 Hr'g, Doc. 172 at 96:2–97:4

[153]Doc. 670 at 898:1.

too?"[154]  And Tomasic testified that she "knew people were recording [internal USAO] phone calls [and] I knew people were printing out e-mails every night and taking them home in binders because they did not trust the people they worked with."[155]

Despite this evidence, of the few Attachment 1 forms produced by the Government, only AUSAs Krug, Metzger, Flannigan, and Treadway indicated that repositories other than Microsoft Outlook "Email Messages" likely held responsive information.[156]  Only Krug and Metzger identified hard copy/paper documents as a repository of responsive information.  There is no evidence that Metzger certified any such forms as part of this process, a prerequisite to Steeby's ability to obtain a ticket and implement the hold.

At the November 16, 2018 hearing, Steeby testified that Metzger's December 19, 2016 email did nothing to prevent archived documents from being permanently deleted, or to halt the DOJ's automatic rolling purge of the contents of its email and other repositories.  Metzger knew in December 2016 that her email did nothing to preserve centrally-held ESI.  As she stated in a November 16, 2016 email transmitting a draft of the litigation hold email to Barnett, Beall, Slinkard, Rask, and the IT staff:

> Please note that this hold does not reference the national network or back-up system because that will be beyond the capability of local staff.  As soon as we have identified staff who may have responsive information, David Steeby and I will work to implement a litigation hold through the national litigation hold coordinator to ensure proper electronic retention."[157]

---

[154]Ex. 1282.

[155]Doc. 669 at 550:17–22.

[156]*Compare* Ex. 1196 (Krug) *and* Ex. 1287 (Metzger) *with* Ex. 1228 (Catania, Wamble, Treadway).

[157]Ex. 664.

But that did not happen until sometime after May 2017, if at all. And when Metzger finally initiated that process in May, she advised Rask and Administrative Officer Randy Miller that it was just an "extra backup step of locking down the national servers."[158]

Thus, the Court finds that the December 19, 2016 email was a superficial litigation hold because it did nothing to formally accomplish a freeze pursuant to the USAO's local or national document retention policies.[159] Metzger was fully aware that documents may be lost without the formal litigation hold. The day after Metzger sent the December 19, 2016 email, AUSA Jackie Rapstine, the Civil Coordinator in the Topeka division, emailed Metzger to caution that emails are officially retained for only three years, and that Rapstine was "not sure everyone understands that leaving old things in the archive does not necessarily result in retention after a certain point."[160] Metzger responded that she was aware of the retention issue, and that she was "going to prepare lit hold forms for all criminal folks who respond they might have something and ask Bonnie Curtin to issue a formal electronic hold. I know we are losing some stuff in the interim, but it would be very dated and there is a formal process."[161]

Steeby could not recall exactly when, but he believes he sent a batch of 20 to 30 tickets to the Network Operations Center sometime between May 30, 2017 and July 26, 2017.[162] Steeby also acknowledged that by July 2017, he had still not sent in tickets for all users. There is very little to corroborate Steeby's vague recall that he sent a batch of tickets to the National

---

[158]Ex. 1285.

[159]Metzger was well versed in the standard practice for litigation holds, having served as Litigation Hold Coordinator for many years, and having just applied DOJ's standard process that same year in *Meraz v. United States*, D. Kan. No. 16-2441-CM-GLR. *See* Ex. 1219 (explaining that Metzger previously sent incorrect litigation hold form for the *Meraz* case). The *Meraz* case included a claim of malicious prosecution by a USAO prosecutor brought by a former District of Kansas defendant whose case was dismissed.

[160]Ex. 1214.

[161]*Id.*

[162]Doc. 694 at 2534:7–2535:24.

46

Operations Center in 2017, and there is no evidence about which users were included in that batch. On May 22 and June 5, 2017, James Moore, a network analyst at the Network Operations Center, emailed Steeby a list of USAO users, advising that he had "completed the Litigation Hold Procedures" for those users.[163] But there is no evidence that this email was sufficient to implement a national litigation hold on those users' emails or other documents. In fact, other evidence suggests the opposite—on June 5 and 13, Randy Miller sent emails to USAO management indicating that he had not received Attachment 1 forms for several users, including many of the same names on the list Moore sent Steeby on May 22.[164]

There is evidence that the USAO reached out to Bonnie Curtin at the National Preservation Office, an arm of EOUSA, because on June 13, 2017, Curtin sent Metzger, Steeby, and Miller a Litigation Hold number, and detailed instructions. Notably, Curtin offered to assist the USAO should they seek to recover old paper records from the Federal Records Center and further advised that the USAO could segregate pertinent materials on the EOUSA's litigation hold server for safekeeping.[165] But there is no evidence that Metzger or anyone else from the Government ever followed through on those avenues to preserve and/or obtain records for production.

### c.    Impact of USAO Litigation Hold Delays

The current record makes it very difficult for the Court to surmise exactly what has and has not been preserved by the USAO—its shifting explanations and failure to transparently and truthfully inform the Special Master and the Court of its preservation efforts created gaps and

---

[163]Ex. 1226.

[164]Ex. 1227.

[165]*See* Ex. 1225.

inconsistencies in the evidentiary record.[166]  For example, the Court cannot find from the record

that all USAO users understood the scope of their preservation duties in the *Black* case, and thus

preserved evidence material to the litigation beginning in 2016.  USAO management unilaterally

interpreted the Court's early preservation orders as pertaining only to recordings involved in the

*Black* case, despite representing to the Court on the record that it understood its preservation

duties extended beyond *Black*, and despite telling USAO staff in the December 19, 2016

preservation email that their duties extended beyond the *Black* case.  And the USAO waited

seven months after the Appointment Order to begin the formal litigation hold process, with full

knowledge that documents would be lost in the interim under the USAO's normal retention

policies.

At best, the USAO willfully delayed its formal preservation duties for months, allowing

evidence to be deleted or removed in the interim.  Such evidence may have been relevant to the

items on the Special Master's Preservation List, or to the many cases that have since been filed

under 28 U.S.C. § 2255.  Giving full credit to Steeby's testimony that he sent tickets to the

Network Operations Center in the summer of 2017 for 20 to 30 users, there is no record of which

users.  And even this hold was inadequate because most users, despite testifying that they

routinely kept handwritten notes and other electronic documents in their case files, only indicated

in their DOJ form that they possessed relevant evidence in the form of emails and in a few

instances network documents.  Giving the USAO credit that it provided EOUSA with the

information it needed to put a litigation hold on these users' electronic repositories, emails for

these users that predated May of 2014 are forever lost because no centralized hold was put in

---

[166]Undoubtedly, the failure to timely produce documents about the formal litigation hold made it
impossible for the Special Master or FPD to develop an adequate record about the USAO's compliance with it in the
fall of 2018.

place before May 2017 at the earliest. Such evidence may have been relevant to the Special

Master's preservation order in the *Black* case, or to the many cases that have since been filed

under 28 U.S.C. § 2255.

Complicating the Court's findings on this issue is the USAO's dilatory status report filed

on March 21, 2019, well past the time when any witness could testify and explain its contents.

This filing acknowledges prior preservation efforts yet fails to set forth what those efforts

entailed at the national level prior to October 2018. According to that filing, the ordinary three-

year retention period on email was not halted until November 6, 2018, "such that no [email] data

post January of 2016 will be lost through normal retention practices."[167]

Also making this Court's fact finding difficult, as described more fully below, is the

manner of the Government's production before and during the October 2018 evidentiary hearing.

The Government neither bates stamped the electronically-stored documents, nor identified the

repository from which each document originated. Therefore, the Court cannot ascertain who

produced what, nor the volume that a particular person produced. What is clear is that only with

respect to two former prosecutors—Tomasic and Treadway—did the Government produce any

paper records or any volume of ESI. Notably, the production of their records revealed that

Tomasic and Treadway had knowingly and intentionally listened to attorney-client phone calls in

one or more of their cases.[168]

### 4.     The Government Delayed and Obfuscated Its Compliance with the August 15, 2018 Preservation Order

While the August 15, 2018 Preservation Order did not require production, a few days

after it was filed the FPD moved for discovery regarding audio recordings still in the USAO's

---

[167] Doc. 746 ¶ 6a.

[168] *See infra* Section IV.B.4.

possession that had not been turned over to the Court after the August 2016 clawback order.[169]
The FPD's motion asked that the Government identify each case in which the USAO or its
agents sought or obtained recorded phone calls of detainees at CCA or any other federal holding
facility, so that the FPD could identify and evaluate potential Sixth Amendment violations for
purposes of seeking relief through § 2255 petitions or otherwise.  The parties engaged in a
lengthy negotiation period over this motion, expressly asking the Court to refrain from ruling at
the time of the evidentiary hearing.[170]

At the November 16, 2018 hearing, Steeby testified about the Government's document-
retention policies for its network drives and backup files.  Based on this testimony, which
suggested that some of the documents and audio recordings could be subject to destruction, the
FPD requested that the Court order the Government to cease and desist any destruction of those
files.  The Court orally granted that motion, emphasizing that Steeby should inform his national
contact at DOJ that there should be "no destruction."[171]  The Court's Final Production and
Briefing Order included yet another preservation directive in paragraph 1:

> Immediately preserve all documents on the USAO network,
> including shared, individual, national, and local drives to avoid any
> further destruction of documents, including documents that were
> deleted by the user and any earlier versions of modified
> documents.  The government is to construe this preservation order
> in the broadest terms possible, to ensure that no documents of any
> age or nature are destroyed, purged, or otherwise rendered
> inaccessible. The Court may issue a more detailed preservation
> order at such time as the USAO provides further information about

---

[169]Doc. 572.

[170]The FPD also filed a motion in August 2018 that is still pending, seeking information about the USAO's
decision to upgrade in place the AVPC, and about the amount of allocated and unallocated space on that computer.
Doc. 573.  The parties advised the Court at the beginning of the October hearing that this motion was potentially
moot; that they were working on a resolution, yet the Court was never updated on the progress of this resolution.  As
a practical matter, the Court finds that the majority of the information sought by this motion is moot, given that it
sought information to aid the FPD's expert retained for the October 2018 hearing.  The Court will deny the motion
without prejudice to refiling in the individual § 2255 cases.

[171]Doc. 694 at 2815:2–15.

its local and national systems.[172]

In a December 5, 2018 filing, the Government represented to the Court that it "ha[d] complied with paragraph 1 of the production order."[173]

At the FPD's request, the Court set for hearing on December 14, 2018, the discovery motion requesting audio recordings and derivative information in the Government's possession that the parties had been negotiating since August.  First, the Court heard from the parties on production issues related to attorney-client telephone recordings.  The Government and the FPD presented areas of substantial agreement as to the production of the requested phone recordings, although they differed on a few issues.  The FPD had presented the Government with a list of approximately 100 names of clients still in custody whose calls Securus records confirmed were accessed; the FPD's own records suggested that these calls included attorney-client calls.[174]  By the time of the hearing, the Government had identified approximately 26 cases for which it possessed recorded calls, although it did not concede that the calls included attorney-client calls.  The Government still required time to investigate the other approximately 75 detainees identified by the FPD.  At the conclusion of the hearing, the Court granted the FPD's motion for discovery, and ordered the USAO to provide the sought-after phone recordings and derivative evidence in two stages, with deadlines on January 7 and 28, 2019.[175]

On February 20, 2019, the parties filed a joint status report on the phone discovery directed by the Court's December 14 order.[176]  The parties agreed that the Government complied

---

[172] Doc. 690 at 8.

[173] Doc. 697 at 38 n.19.

[174] By this time, the FPD had been appointed to represent all litigants impacted by the Sixth Amendment inquiries in this case for purposes of 28 U.S.C. § 2255, even if the FPD did not represent those litigants in their underlying criminal cases.

[175] Doc. 705.  The January 28 deadline was extended to February 14, 2019.  *See* Doc. 717.

[176] Doc. 726.

with the Court's December 14 Order as to the 100 clients still in custody, whose calls were obtained and suspected to include attorney-client calls. The FPD advised that it had provided the Government with an additional list of about 380 names of defendants in the District of Kansas, many of whom are no longer in custody. The parties agreed that within 60 days, the Government would conduct a preliminary examination of the list of 380 names and propose a timeline to identify, collect, and produce discovery related to them. Between January 7 and August 2, 2019, the Court received and impounded in its vault seven batches of discovery from the Government pursuant to this agreement; copies were also provided to the FPD. The Court has not received a copy of the timeline contemplated by the parties' most recent status report on this issue and, thus, has no reason to believe that this discovery is complete.[177]

Second, at the conclusion of the December 14, 2018 hearing, Slinkard updated the Court as to its preservation efforts since the November hearing:

> We continue to work with the data system staff at—computer system staff, computer information staff at the Executive Office of U.S. Attorneys. I think that's been productive. . . . I do think in the not-too-distant future we'll be in the position to report back to the court about the various types of information, categories and—and what the abilities and what steps are taken on that. So we're not ready to—to update on that today, but there has been progress. And I just wanted to make the court aware so you could anticipate sooner rather than later some sort of status report on—on that.[178]

In fact, the status report on preservation was filed much "later" than "sooner." On March 21, 2019, the same day that the parties' proposed findings of fact and conclusions of law were due, the Government filed its Post-Hearing Status Report on Preservation.[179] This report outlines

---

[177]The Court understands from the discovery correspondence that the more recent batches involve out-of-custody defendants, but there has been no representation made to the court that the Government's review is complete.

[178]Tr. Dec. 14, 2018 Hr'g, Doc. 756 at 27:1–14.

[179]Doc. 746.

the Government's efforts to comply with the Court's August 2018 preservation order, including, for the first time, a table of categories of USAO repositories, the ordinary retention period for each repository, and the action taken to preserve documents in each one. The filing is confusing at best. On the one hand, the report states that the USAO's December 19, 2016 litigation hold "remains in place," that "older e-mail data that was already subject to an existing preservation directive, whether in this matter, or any other matter, would also continue to be retained," and that in December 2018, members of the Government's team met to discuss preservation issues needed "in addition to the preservation directives that had been conveyed to all USAO employees throughout the pendency of the litigation."[180] Yet the rest of the report suggests that the USAO met with EOUSA about halting the Government's ordinary retention policies for the first time in October 2018—two months after the Court's August order was entered.

This document conclusively demonstrates that the Government did not immediately comply with the Court's August 2018 preservation order; indeed, it waited until October to even meet with EOUSA about imposing a national litigation hold on the documents at issue. It was not until November 2018 that EOUSA extracted and protected email archives from January 1, 2016 to November 6, 2018.[181] Therefore, it took three months for the Government to fully comply with this Court's preservation directive as to email archives stored nationally. Also, the report makes clear that Clymer continued to meet with USAO employees and EOUSA representatives until at least December 11, 2018, to identify and address preservation efforts, despite representing to the Court on December 5 that the Government had fully complied with its November preservation order.[182]

---

[180]*Id.* at 1 n.1, 2–3.

[181]*See id.* at 2.

[182]*See* Doc. 697 at 38 n.19.

C. **Failure to Cooperate with Production of Witnesses and Documents**

1. **Failure to Make Key USAO Personnel Available to the Special Master**

The USAO also thwarted the Special Master's investigation by failing to provide him access to USAO personnel who had relevant information. The Special Master testified that when he was appointed in October 2016, he adopted an open-door policy, inviting the USAO as well as the defense bar to share with him information they thought relevant. He did not issue testimonial or document subpoenas. He did not seek to depose anyone. He did not demand interviews. His view was that the parties were motivated to get to the truth and to help him determine the circumstances of any recordings between detainees and their attorneys. The Special Master let USAO management, in particular Barnett, know at the outset that this was his approach. Barnett visited with the Special Master, answered his questions, and provided information on a number of occasions. But Barnett's willingness to share information with the Special Master did not translate into a willingness to allow other USAO personnel to share information with him or to respond to his questions.

Early on, the Special Master told Barnett and Beall that he wanted to speak with Tomasic, Flannigan, and Boyd. The Special Master expressed an interest in talking to Tomasic because she was the lead prosecutor in the *Black* case, had procured the video and audio recordings, and was also involved in the *Dertinger* matter. The Special Master expressed an interest in talking to Flannigan because she was Tomasic's immediate supervisor and was also involved in the *Dertinger* matter. And the Special Master expressed an interest in talking to Boyd for a number of reasons. Boyd was the USAO's litigation support coordinator, and the Special Master was not yet aware of Steeby nor Miller. Moreover, the Special Master knew Boyd had access to the PELCO player software, the knowledge to play the video recordings, and perhaps had information about others accessing the video recordings.

54

Both Flannigan and Tomasic testified that they were eager speak to the Special Master. Tomasic testified that from the time of the Special Master's appointment in October 2016, she repeatedly told USAO management that she wanted to speak with him. But Barnett specifically directed Tomasic not to speak to the Special Master. By then Barnett was avoiding speaking to Tomasic directly, so she conveyed this prohibition indirectly, through Rask. Barnett expressed to Rask at the time, and reiterated in her testimony, that she did not want Tomasic or Flannigan speaking to the Special Master because of their disrespectful behavior and because of complaints she was getting about Tomasic. When the Sixth Amendment allegations in this case first arose, Tomasic, Flannigan, and several other Kansas City prosecutors were highly critical of Barnett and USAO management's representation of the USAO in the hearings the Court conducted in August, September, and October 2016.[183]

Both Flannigan and Tomasic testified that USAO management did not tell them that the Special Master was specifically asking to speak to them. It was Special Agent Stokes who conveyed to Flannigan that the Special Master was asking to speak to her. Flannigan testified that she told Metzger that she was willing to talk to the Special Master, and Metzger said she would pass this information on, but nothing ever happened after that. The Special Master never interviewed Flannigan, although he did have the opportunity to examine her at the *Dertinger* hearing on June 20, 2017.

USAO management finally gave the Special Master access to Boyd in February 2017. Barnett acknowledged in an email to Rask and Beall that as early as October 2016, the Special

---

[183]There were email strings among some of the Kansas City prosecutors particularly critical of Barnett because she would not file a memorandum of law that they collaboratively wrote challenging the Rule 41 motions. *See, e.g.*, Exs. 1239, 1240, 1245. Some of these same prosecutors testified in the October 2018 evidentiary hearing and were similarly critical of Barnett and USAO management.

Master had asked to speak to Boyd.[184]  Not until February 2017, when the Special Master

actually spoke with Boyd, did Tomasic learn from Boyd that the Special Master also wanted to

speak to her.  In turn, Tomasic soon told management that she wanted to speak to the Special

Master.  Tomasic testified that Rask told her that he felt the Special Master was untrustworthy,

that Tomasic was finally showing maturity in putting the USAO's interests ahead of her own,

and that he wanted her to think about that when she spoke to the Special Master.  According to

Tomasic, Rask instructed both Flannigan and Tomasic to not "air their laundry" to the Special

Master.[185]  Meanwhile, Metzger sent Tomasic an email expressing her concerns about Tomasic

talking to the Special Master.[186]  Nonetheless, Tomasic finally submitted to an interview with the

Special Master in May 2017, shortly after the USAO terminated her employment.

### 2.  Failure to Produce Documents Requested by the Special Master

Beginning in the Fall of 2016, the Special Master expended considerable time and money

negotiating search terms with Metzger, Barnett, and Steeby for the purpose of running searches

on USAO staff emails and other repositories.[187]  The goal of using search terms was to automate

the process of producing relevant documents in a less burdensome fashion than requiring the

Government to review every document.  Securus and CCA produced requested documents to the

Special Master well before his March 2017 report.  The KBI and the USMS also responded

quickly and thoroughly to the Special Master's Requests for Information and documents during

the first phases of the investigation.  In contrast, the Special Master was growing frustrated by

the USAO's failure to produce documents; instead, its staff continued to "tweak" iterations of his

---

[184]Ex. 1171.

[185]Doc. 669 at 570:25.

[186]Ex. 1008.

[187]*See, e.g.*, Doc. 298-2; Exs. 1146, 1156, 1158, 1159, 1275, 1279.

proposed search terms.[188]  The Special Master repeatedly met with Steeby beginning in December 2016, sometimes several times per week, collaborating on search terms to run against the USAO's ProofPoint archive email system, and later, with appropriate syntax adjustments, to run against other USAO repositories.  The Special Master made clear that he expected to run these search terms, and by February 17, 2017, he asked Steeby and Metzger to use the search terms to run searches on the repositories of at least ten USAO employees.[189]

On June 5, 2017, frustrated by the USAO's inaction in commencing searches, the Special Master directed the USAO to run a search on Tomasic's document repositories and produce responsive documents as soon as possible.[190]  The USAO responded by raising issues they had not raised with him before: (1) unresolved internal personnel matters with Tomasic might necessitate another entity taking responsibility for reviewing her documents; and (2) the USAO needed to review Tomasic's documents for relevance, national security, and privacy issues.  In a June 7, 2017 email to USAO management, the Special Master suggested that the USAO perform an initial privilege review to identify specific concerns, and then either submit the materials in camera to this Court or another judge or submit a privilege log for the Court's consideration.[191] In that email, the Special Master also assured the USAO that before he filed any report, he would allow the USAO to review and identify any findings that should be redacted.  The USAO ignored the Special Master's suggestions and refused to produce Tomasic's documents.[192]

---

[188]*See* Doc. 298 at 2–3.

[189]Ex. 1279.

[190]Ex. 1157.  By this time, Tomasic was no longer employed by the USAO.

[191]Ex. 1184.  Much later Clymer told the Court that the Government would not submit a privilege log under any circumstances.

[192]The Special Master received some of Tomasic's documents through another channel.  In the summer of 2017, after Tomasic was terminated, she provided a binder of printed emails and selected other documents to the Special Master of her own accord at the time of her interview.  Doc. 670 at 772:7–777:16.

As an additional basis for withholding production, the USAO advised the Special Master for the first time in late June 2017 that it was awaiting word on its request that the USAO recuse and that DOJ assume control of the *Black* litigation. At the October 2018 hearing, it was revealed that this request was made one day after the Court's October 11, 2016 Appointment Order,[193] and approximately one month after the Court directly asked Barnett on September 7, 2016, if the USAO had consulted with its appropriate counterparts at DOJ to determine whether it could continue to handle the *Black* case in light of actual or potential conflicts of interest arising from already-serious allegations of prosecutorial misconduct. Barnett responded that the office had consulted "with the appropriate personnel," and that the USAO would remain on the case and would allow Tomasic and Oakley to answer questions from the Court at the hearing.[194] When the USAO sought intervention from DOJ one month later, it did not inform the Court or Special Master, despite the Court's earlier inquiry.

Metzger testified that while the USAO did not need DOJ approval with respect to all production, it did need DOJ approval to invoke the *Touhy* regulations or to invoke privilege as a bar to production. Beall testified that he lacked authority to search for and produce documents pending DOJ's decision on the October 12, 2016 recusal request. In any event, Beall testified that he did not recall ever asking DOJ for approval to produce anything the Special Master requested during the time the USAO was still handling the *Black* investigation. Instead, the USAO stalled production, frustrating the Special Master's work.

The Special Master testified that had he known that the USAO would stall and refuse production, he would not have expended considerable time and money working on search terms

---

[193]Ex. 660A.

[194]Tr. September 7, 2016 Hr'g, Doc. 135 at 11:14–12:7.

and repeatedly requesting production. Instead he would have issued subpoenas or sought a Court order for production. The USAO's inaction led the Special Master to seek some of the documents he expected the USAO to produce from other investigative agencies. Using the same search terms the Special Master and the USAO agreed to, the KBI and USMS quickly searched their repositories and produced responsive documents to the Special Master. In contrast, the USSS, like the USAO, stalled and ultimately followed the USAO's lead in refusing to produce.[195]

On July 10, 2017, the Special Master sent Requests for Information to Beall, asking for responses as soon as reasonably possible.[196] On July 14, 2017, the DOJ issued a letter to the Special Master announcing the appointment of Clymer.[197] The letter further advised that the USAO had not been recused from the underlying *Black* case and would continue to be responsible for the case and the investigation.

As the Court previously noted, this began the adversarial chapter and effective conclusion of the Special Master's investigation in this matter. Clymer responded to the Special Master's July 10, 2017 Requests for Information in a letter dated September 12, 2017, in which he "respectfully decline[d] to provide most of the information and documents sought."[198] Among the reasons cited by Clymer to decline production was that the Government's internal files are protected from discovery under the *Touhy* regulations.[199]

---

[195] Doc. 298 at 5–7.

[196] Doc. 298-7.

[197] Doc. 298-5.

[198] Doc. 298-9.

[199] Doc. 298-9 at 2–7.

As already described, the Special Master eventually issued SDTs on August 17, 2018, expressly excepting from the scope of the subpoenas any documents the Government deemed undiscoverable by virtue of the *Touhy* regulations.[200]  The Government did not move to quash these subpoenas.  Despite the Court granting a three-week extension, the Government did not adhere to the September 21 deadline to produce documents ahead of the two-week evidentiary hearing commencing on October 2, 2018.  Instead, the Government produced selective documents on a rolling basis.  After timely producing thumb drives on September 17 and 18 that contained a total of 14.16 gigabytes of data, the Government untimely produced on September 25, 27, and 30 thumb drives that contained a total of 15.38 gigabytes, another thumb drive of 0.32 gigabytes on October 9, and a thumb drive of 0.06 gigabytes on October 11, the day before the evidentiary hearing concluded on October 12.[201]  The Government took the position that it had no duty to comply with the subpoenas and no duty to produce a privilege log, but that it would "voluntarily" produce certain documents of its own choosing.[202]

These untimely and large disclosures placed the Special Master and the parties at a decided disadvantage; they simply were not able to use the late-produced materials in their witness examinations during the October hearing.  Much of what the Government produced were duplicative emails, or duplicative full or partial email strings, that were also duplicative of the binder of printed emails that Tomasic had provided to the Special Master in 2017.  Moreover, the manner of production masked whose repositories were produced, making it impossible to tell the source of much of the materials.

---

[200]*Id.*

[201]Ex. 1194.

[202]Doc. 587; *see also* Doc. 694 at 2802:5–16.

Furthermore, rather than use the agreed search terms that the Special Master and USAO had spent so much time developing in 2017, the Government chose to have each USAO employee cull and produce ESI from their own repositories. There is no assurance that the production was complete, much less the product of objective review. Yet during a meeting on June 19, 2017, between the Special Master, Rask, and others, Rask assured the Special Master that EOUSA would need to approve and perform the search of USAO emails and other repositories and that the review would be done by EOUSA, not by the individual AUSAs who owned the various repositories.[203]

As noted earlier, a number of AUSAs—including Tomasic, Krug, Wamble, Morehead, and Barnett—testified that they kept paper files, notes, and records. Yet other than Krug's and Tomasic's voluntary partial production of paper documents,[204] the only other paper documents the Government "voluntarily" produced were certain paper documents of retired AUSA Tanya Treadway from the case *United States v. Reulet*.[205] As discussed in detail in the Court's findings of fact on the audio recordings, those paper documents included handwritten notes prepared by Treadway as she listened to multiple recordings of phone conversations between Reulet and three of Reulet's attorneys while Reulet was detained at CCA. This is not only direct evidence that Treadway knowingly listened to attorney-client phone recordings, it is evidence that Treadway lied to United States District Judge Daniel Crabtree about whether she had listened to Reulet's attorney-client phone calls. The failure to produce any other paper documents is certainly no assurance that there were no relevant paper documents responsive to the SDTs.

---

[203]Ex. 725. The Court grants the FPD's motion for leave to file this exhibit out of time (Doc. 749).

[204]Tomasic voluntarily produced hard copy documents to the Special Master. On the day of Krug's testimony, the Government produced hard copy documents preserved by Krug pursuant to the *Black* preservation directive.

[205]D. Kan. No. 14-40005-3-DDC.

On the last day of the October hearing, after Clymer could still not say whether the USAO would produce more information,[206] the Court kept the record open and ordered a further evidentiary hearing for November 16, 2018. Clymer offered the excuse that the Government needed approval of the Deputy Attorney General to produce any documents, presumably including ESI and paper documents. But that is no explanation for the Government's dilatoriness. The Government had been on notice of the agreed search terms as early as December 2016. Clymer also stated that the Government had no duty to produce a privilege log, which he deemed "simply impractical."[207] Clymer instead asserted that the Special Master and parties were "just going to have to rely on trust in the U. S. Attorney's Office that it is complying with what it said it's going to do."[208]

The Court heard further evidence in November, which triggered its decision to enter the Final Production Order on November 21, ordering the Government to: (1) use the search terms negotiated with the Special Master to run a document search on the ProofPoint email archive system files and on all other electronic repositories, individual or shared, for every current or former USAO employee who has testified at any hearing in this case, and produce all documents resulting from these searches and identify the source of each document; (2) search all non-electronic repositories for every USAO current or former employee who has testified in this case, using a team of neutral, uninterested searchers, and produce all documents from those searches; (3) produce every completed and signed response to the May 19, 2017 litigation hold notice; and (4) produce a production log for withheld information of any type.[209] The Government was

---

[206] Doc. 677 at 2477:13–2478:24.

[207] Doc. 669 at 418:19–25.

[208] *Id.* at 419:4–7.

[209] Doc. 690 at 9–10.

ordered to comply with these directives within sixty days of the order. Instead, it moved to reconsider in December, advising that even if the Court denied its motion, the DOJ "likely will respectfully decline to comply with the production order if it remains in place as presently drafted."[210] Thus, in its January order denying the motion to reconsider, the Court acknowledged that requiring further production was "an exercise in futility" and modified its briefing schedule to prepare to close the record. But the Court cautioned:

> [T]he Court does not suggest the government will never have to produce these documents and information. Indeed, AUSA Clymer has argued in at least three briefs filed in these proceedings that the "appropriate mechanism" for investigation of any Sixth Amendment violations is 28 U.S.C. § 2255, even though some defendants have sought relief for Sixth Amendment violations in pending criminal cases. The Court will leave the production matter for another day, as there are currently sixty-six pending § 2255 motions that raise potential Sixth Amendment violations, where there can be no dispute that both the Federal Rules of Evidence and Rules of Civil Procedure apply.[211]

## IV. Findings of Fact: Possession and Access to Video and Audio Recordings of Attorney-Client Communications at CCA

Despite the limitations on the record due to preservation and production issues, the Court issues the following findings of fact.

### A. Video Recordings

#### 1. CCA Recording Practices

CCA is a detention facility that contracts with the USMS to house federal detainees.[212] CCA is remote; it is located in Leavenworth, Kansas, over thirty miles from either the Topeka or Kansas City, Kansas federal courthouse. CCA houses defendants during the pendency of district

---

[210] Doc. 708 at 20–21.

[211] Doc. 713 at 35–36 (footnotes omitted).

[212] CCA houses federal detainees in cases filed in Kansas, Missouri, Nebraska, and Iowa.

court litigation, including trials, sentencings, and revocation proceedings. In-person and phone conversations between attorneys and their clients at the facility are necessary for attorneys to provide legal representation and discuss legal matters. Including travel time, an in-person visit with a CCA client takes up nearly half a workday.[213]

CCA used a PELCO multi-camera video system to record throughout the facility. The PELCO system allowed prison personnel to monitor and record activity using approximately 154 video cameras throughout the facility. The input from these cameras was recorded onto a total of six different DVR hard drives. Each DVR drive held, at most, about three months' worth of video, with new video replacing old video in a looping fashion. Since 2008, CCA video-recorded in-person meetings between attorneys and clients in five of the nine designated attorney visitation rooms, where attorneys met with clients to give legal advice and discuss legal strategy. CCA provided no notice to either defense attorneys or detainees that the cameras in the attorney visitation rooms were recording—defense attorneys believed these cameras were in place for security-monitoring purposes only.

CCA video recordings did not include sound, but visually captured meaningful communication between attorneys and clients. CCA's Video Recording Procedures require designated employees to be trained to record. This included training on "Use," "Focusing," and "Zoom function." Former-U.S. Deputy Marshal Matthew Cahill testified about viewing some of the video recordings in areas other than the attorney visitation rooms, and indicated that while the picture quality was poor, the camera operator at times zoomed in on certain parts of the picture.[214] Cahill did not personally view any of the video recordings of the attorney visitation

---

[213]*See* Ex. 459, Joseph Aff. ¶ 2.

[214]Tr. Sept. 7, 2016 Hr'g, Doc. 135 at 120:12–22.

rooms; but this Court did, in camera, at the conclusion of the *Dertinger* hearing. This Court has already made findings about the good quality of the recordings of the attorney visitation rooms based on this in camera review. The Court found it "could easily observe non-verbal communications, including the communicants' use of their hands, fingers, and other body language."[215] The Court incorporates by reference its previous findings that "non-verbal communication can provide an observer a wealth of information about the communicants."[216]

The USAO submitted an eleventh-hour declaration by CCA Chief of Security Roger D. Moore, Jr., asserting that the attorney visitation room cameras "were contained in 'bubbles,' and were not capable of panning, tilting or zooming."[217] The Court gives little weight to this declaration. It was signed on July 20, 2018, yet the USAO failed to submit Moore live for questioning during the October 2018 hearing. In contrast, other witnesses who testified live on the same issues were subject to cross-examination. To the extent the Moore declaration conflicts with or is cumulative of live witness testimony, the Court credits these live witnesses and disregards the Moore Declaration. The Court also sustains the FPD's foundation objection to this declaration. There is no indication in the declaration that Moore has personal knowledge of the intake procedures to which he attests—he never states that he was present when detainees at CCA were given the materials about which he declares. Moreover, even if CCA guards could not pan, tilt, or zoom the camera at the time of the recording, the evidence has established that it is possible to zoom in using the PELCO software when viewing the video recordings later.

---

[215] Doc. 253 at 24.

[216] *Id.*; *see also* Exs. 437, 535 at 25:5–27:7.

[217] Ex. 47 (filed on March 20, 2019; signed on July 20, 2018).

## 2.   Grand Jury Subpoena in *Black*

A subpoena is not necessary to obtain video from CCA.  Tomasic explained that "[t]ypically, when only particular and limited video recordings are requested . . . CCA burns those recordings to a disc."[218]

Tomasic testified that the USAO did not routinely obtain video recordings of spaces inside the CCA facility.  During the investigation in *Black*, the USAO decided to obtain video recordings of spaces inside CCA that might depict contraband smuggling, transactions, or conspiratorial conduct.  On April 12, 2016, a few weeks after receiving information from a cooperating individual detained at CCA that there were video cameras that recorded the attorney visitation rooms, Tomasic issued a broad grand jury subpoena for "[a]ll video footage or still images currently retained by Corrections Corporation of America (CCA) depicting any internal or external surveillance video or still image taken between July 2014 and April 12, 2016 at the CCA facility in Leavenworth, Kansas."[219]  On May 17, CCA produced voluminous video recordings from the entire facility, including the attorney visitation rooms, on six DVR hard drives.  USSS took initial custody of the video recordings and provided a copy of the six hard drives to the USAO on June 1.  On June 6, USSS advised the USAO what equipment it would need to play the recordings.  On June 10, CCA produced to the USAO an index to the hard drives, which itemized the locations depicted on each of the six hard drives.  This one-page index clearly identified that included on DVR #5 was the "Low Custody Attorney" room and included on DVR #6 were seven attorney visitation rooms.[220]

---

[218] Doc. 133 at 8.

[219] Ex. 475.

[220] Ex. 439.

The six hard drives contain video recordings made between November 24, 2015 and May 16, 2016. The Court accepts the Special Master's finding that the mechanics of the PELCO video system make it very difficult to isolate recordings from a given camera.[221] This means it would be challenging and expensive to extract from DVR #6 only those recordings from the 21 cameras not recording in attorney visitation rooms.[222] It would also be challenging and expensive to extract and isolate footage of each attorney-client meeting given the split-screen functionality of the PELCO player.

Because the video recording equipment at CCA had limited storage capacity, the system would overwrite old video recordings with new video recordings. The Special Master reviewed a sample of footage from 30 attorney visits from the seven cameras on DVR #6 for the period of February 20 to May 16, 2016. He found that every attorney-client meeting he viewed that took place in an attorney visitation room that held a video camera was listed on the attorney visitor log and was, in fact, recorded.[223] Extrapolating from the attorney visitor logs for that twelve-week period, a total of over 700 attorney visits were recorded.[224]

### 3. USAO and Agents' Knowledge and Intent

In March 2016, a CCA detainee who was cooperating in another of Tomasic's cases in this District, *United States v. Rapp*,[225] advised Tomasic that there were cameras in the attorney visitation rooms. AUSA Kim Flannigan was co-counsel with Tomasic on the *Rapp* case, but

---

[221]*See* Doc. 193 at 4.

[222]In addition to video from the seven cameras that recorded attorney visitation rooms, DVR #6 also holds video from 21 other cameras in CCA. These other cameras, which are in the kitchen, parking lot, recreation yard, and so on, did not record privileged or confidential information. The USAO has agreed not to use video footage from these 21 other cameras. *Id.*

[223]"[C]ertain time periods were not recorded. For example, there are no recordings on DVR #6 (from *any* cameras) from April 27-28, 2016." Doc. 193 at 5 n.5.

[224]Doc. 193 at 5.

[225]D. Kan. Case No. 14-20067-CM-1.

denies any awareness of the cooperator's statement. Based on the cooperator's information, Tomasic admittedly considered conducting a controlled purchase of contraband in an attorney visitation room, where the transaction could be video recorded, but ultimately decided not to.

USSS Agent John Seubert testified that he originally drafted the grand jury subpoena in the *Black* case for video recordings from specific areas where there was suspicion of contraband trafficking in the *Black* case. While Seubert testified at the *Dertinger* hearing that there was evidence that the attorney visitation rooms were used for contraband trafficking and that contraband had been recovered from those rooms, he did not recall whether he knew this at the time the subpoena was drafted in *Black*.[226] Rather, he testified that it was Tomasic who redrafted the subpoena to include video recordings of all areas of CCA, without his knowledge. In other words, Seubert blamed Tomasic and claimed to be an unwitting participant in the subpoena of video recordings of attorney visitation rooms.

At the July 21, 2016 discovery conference, the Court asked Tomasic whether there were video recordings of the attorney visitation rooms. Tomasic told the Court that the attorney visitation rooms were monitored for security, but not recorded:

> [N]o—there are [sic] no audio in attorney/client unless someone at CCA, an employee, took it upon themselves to turn on the audio. But I don't believe it's recorded. It's just that it would allow a particular CCA employee to listen in without recording if—if the employee believes something was afoot that he needed to be aware of.[227]

It is clear that at this point no attorney or detainee was aware that their attorney-client meetings were being video recorded, nor were they aware that CCA had the ability to record meetings in

---

[226] Doc. 670 at 823:5–24.

[227] Tr. July 21, 2016 Hr'g, Doc. 75 at 11:25–12:6.

the attorney visitation rooms.[228]

Whether or not Seubert's testimony about his unwitting role is credible, the evidence shows that at the time Tomasic issued the subpoena on April 12, 2016, she was aware that there were cameras in the attorney visitation rooms that video recorded. Indeed, Seubert's testimony that at some point the USAO was aware that the attorney visitation rooms were the situs of conspiratorial activity is borne out by another investigator's email to Boyd. On July 12, 2016, Stokes emailed Boyd to ask, "[d]id we get in video from the attorney visitation rooms, law library, and pods at CCA?"[229] Seubert testified that only he and ultimately Tomasic decided what to request in the subpoena for CCA video and that he did not tell Stokes that the video would include attorney visitation rooms.[230]

At the September 7, 2016 hearing, the Court specifically asked Tomasic at what point the Government came to know that the video recordings included attorney-client communications. Tomasic responded, "the government had a good-faith basis to believe that the CCA video recordings contained attorney-client meetings at the time the issue—the subpoena was issued."[231] Tomasic further stated to the Court that she did not recognize, think, or consider that the subpoena would include attorney visitation rooms until the Court's questions "triggered" her memory at the July 21, 2016 hearing and she realized there might be a problem with the breadth of the subpoena.[232] The Court does not credit Tomasic's testimony that she forgot about what she characterized as the cooperator's "lengthy" proffer, which provided an "overwhelming

---

[228]*See* Ex. 1009.

[229]Ex. 1004.

[230]Doc. 670 at 830:3–15.

[231]Tr. Sept. 7, 2016, Hr'g, Doc. 135 at 13:10–14.

[232]*Id.* at 13:14–14:1–6; 15:5–13.

amount" of information, only weeks before she drafted the subpoena to ask for all video recordings from CCA.[233]  Rather, the evidence compels the Court to find that Tomasic knew that her broad subpoena would result in CCA providing video recordings of the attorney visitation rooms and did nothing to exclude or avoid access to these recordings.  Based on this knowledge, the Court also finds that Tomasic did not respond with candor to the Court's question at the July 21 discovery conference about whether there were video recordings of the attorney visitation rooms.

Even if Tomasic had forgotten what the cooperator told her and she was unaware of what the investigators knew about the attorney visitation rooms, there is evidence that she should have known the video recordings included the attorney visitation rooms before the July 21, 2016 discovery conference.  On June 10, 2016, the USAO had the index of CCA cameras that identified attorney visitation rooms.[234]  By June 13, 2016, Tomasic was prepared to begin "downloading the surveillance footage" to give to *Black* defense counsel.[235]  Tomasic knew about this index at the July 21 discovery conference when she advised the Court and defense counsel that the USAO would soon disseminate the video recordings and assured the defense that although the video footage was voluminous, "we actually created the index for defense counsel, and for some time defense counsel has been aware that there is an index."[236]  If Tomasic had reviewed this one-page index before the July 21 hearing, she did not speak with candor when she told the Court the rooms were only video monitored.  But even if Tomasic had not seen the index before July 21, she could have looked at the index after the hearing and corrected her statement

---

[233]*Id.* at 14:18–19.

[234]Ex. 502 at 7.

[235]Ex. 446 at 3.

[236]Tr. July 21, 2016 Hr'g, Doc. 75 at 5:10–12.  The index was disseminated on July 25, 2016.  Ex. 1231.

to the Court to clarify that the video recordings included the attorney visitation rooms. Tomasic made no such correction or clarification.

### 4.      USAO's Use of Videotaped Attorney-Client Meeting

Just two weeks after the July 21 discovery conference, Tomasic sent an email to the Court and defense counsel in the *Black* case, expressing uncertainty about whether the attorney visitation rooms were recorded, but assuring the Court and counsel that if they were, the USAO would not review the video recordings of the attorney visitation rooms until the defense's concerns could be resolved.[237]   This email is significant for several reasons; most importantly, it is irrefutable evidence that Tomasic did not speak with candor to the Court and opposing counsel. To understand how Tomasic's email was intended to mislead the Court and counsel, one must understand the chronology of events between August 2 and the afternoon of August 5, when this email was sent.

Beginning in late July, Tomasic and Flannigan called and emailed defense attorney Jacquelyn Rokusek to request that she meet with them at the USAO concerning her client from another criminal case—Richard Dertinger.  According to Rokusek, Tomasic and Flannigan told her at their August 2, 2016 meeting that based on two proffers from cooperators in the *Black* case, they had learned that Rokusek had allegedly provided a document containing a proffer statement to Dertinger that Rokusek had acquired in discovery in yet another case, *United States v. Phommaseng*,[238] which Dertinger was sharing with CCA detainees.[239]  This, they told her, had jeopardized their investigation in the CCA contraband case and they intended to pursue an

---

[237]Doc. 445.

[238]D. Kan. No. 15-20020-JAR-5.

[239]Doc. 104 at 34:1–9, 12–15.  Tomasic later testified that she did not recall whether they told Rokusek that she handed Dertinger a document or if she just tipped him off that the inmates were under investigation.  Doc. 669 at 659:1–12; *see* Doc. 133 at 16 (detailing cooperators' proffers).

obstruction charge.[240]  Rokusek testified she told Tomasic and Flannigan that she had not yet

received any proffer statements in the *Phommaseng* case, but Tomasic and Flannigan asserted

that this still presented a conflict of interest for Rokusek's continued representation of Dertinger.

According to Rokusek, near the end of the conversation with Tomasic and Flannigan, "I was

informed by Ms. Flannigan that they had a case agent on the case who was reviewing attorney-

client meetings from CCA to determine whether or not this document had been provided to

Richard Dertinger, which I told them it had not."[241]

Rokusek left the meeting alarmed not only by the prosecutors' allegations against her, but

also because they told her they were reviewing video recordings of her meeting with her client to

determine whether or not the document had been provided to him.[242]  This prompted Rokusek to

take several actions.  She sent an email to Tomasic and Flannigan, to memorialize what they had

told her at the August 2 meeting:

> I've been contemplating how to move forward concerning the
> potential conflict of interest you discussed with me at your office
> yesterday.  You mentioned that you were reviewing video of my
> visits with Mr. Dertinger at CCA.  I would like an opportunity to
> view the same video footage before making a final decision.
> Would that be something I could review within the next few days?
> I will wait for your response and continue as I continue (sic) to
> research the potential issue.[243]

Tomasic responded:

> The agent looking through the video for your visits said he has
> located the time/date of your visits but has not paired those dates
> up to the video yet.  That agent is on vacation this week and is
> preparing for a hearing next week.  If you want him to pull the

---

[240] Doc. 104 at 34:10–11.

[241] *Id.* at 35:4–8.

[242] *Id.* at 35:3–24; *see* Ex. 523, Rokusek Aff.

[243] Ex. 441.

video for you, it might take a while, but we are willing to do so.[244]

Flannigan responded in a separate email, urging Rokusek to come right away to "try to find the video."[245]  Notably, in their email responses to Rokusek, neither Tomasic nor Flannigan denied or challenged Rokusek's statement that they were reviewing video of her visits with Dertinger; in fact, Tomasic's response reiterated that the agent was working on locating the video of Rokusek's visit with Dertinger.

Rokusek also shared her concerns with Laura Shaneyfelt, the CJA Panel discovery coordinator, as well as with FPD Brannon.  This prompted Brannon to email Barnett and Slinkard to advise that the FPD had learned that CCA records, not just monitors, the attorney visitation rooms.[246]  Barnett in turn asked the USMS to find out if this was true.

The USMS received inconsistent responses from CCA personnel.  The CCA warden, who was newly assigned to that facility, investigated.  She testified that she went into one of the attorney visitation rooms, saw no camera, and responded to the USMS that there was no video recording of the attorney visitation rooms.  But, as she later acknowledged in her testimony, had she checked the other attorney visitation rooms, she would have discovered that six of the nine rooms had cameras and were video recorded.  In any event, based on the information received from CCA and the USMS, Barnett advised the FPD and others that there was no video recording.  Meanwhile, the FPD heard from a deputy marshal that the marshal knew that there was video recording, so their concerns were not allayed.

In the midst of this exchange of inconsistent information were Tomasic, Flannigan, and Stokes.  Instead of candidly telling the Court and defense counsel that there were video

---

[244]*Id.*

[245]*Id.*

[246]Ex. 453.

recordings of the attorney visitation rooms, Tomasic sent the August 5 email to the Court and counsel claiming that in light of the warden's statement, Tomasic was now uncertain whether there were video recordings of the attorney visitation rooms.[247]  Tomasic further misled the Court and counsel by suggesting that a defense attorney was reviewing video footage at the attorney's request or own initiative:

> Defense counsel has concerns that CCA's former surveillance system, which was in place prior to the new Warden's tenure, may have captured video and/or audio recordings in attorney/client rooms.  As such, one defense attorney requested in writing that counsel for the USAO, nor any party acting on the USAO's behalf, view any attorney/client footage provided by CCA until the issue is resolved. Counsel for the USAO agreed that no one acting on behalf of the USAO will view the footage until the matter is resolved.  This same defense attorney is beginning review of the CCA surveillance footage today.  Thus, the USAO is not certain at this point whether any of the surveillance footage turned over by CCA in response to a subpoena by the USAO issued in US v. Black contains video footage of the attorney/client rooms, but based on the Warden's statements, counsel for the USAO now believes the information provided by the cooperator was incorrect. Further, because the USAO has agreed to not review that footage, this matter will not be resolved until defense counsel has completed their review of the surveillance footage.  If, in fact, the USAO is not in possession of any surveillance footage in the attorney/client rooms, then the USAO will resume its review of the surveillance footage and any concerns by defense counsel should be alleviated.  If, however, the USAO is in possession of such footage, counsel for the USAO intends to coordinate with defense counsel to identify whether to use a taint team to review any such footage would alleviate those concerns.[248]

Tomasic sent this email at 2:57 p.m.  At that very moment, Rokusek and her investigator were looking at video recordings of the attorney visitation rooms trying to locate a recording of Rokusek's meeting with Dertinger, during which the USAO alleged Rokusek had improperly

---

[247]Ex. 445.

[248]*Id.*

provided a proffer statement or other information to Dertinger.  Rokusek testified that while locating the video recording of her meeting with Dertinger, she inadvertently opened multiple windows at one point that exposed her to video recordings of attorney-client meetings between other attorneys and detainees.[249]

Tomasic and Flannigan later denied knowing whether there were video recordings of the attorney visitation rooms, denied threatening Rokusek, and denied directing Stokes to look for the attorney-client video.[250]  Instead, they claimed that Stokes was going to merely view the video of the residential pod to see who Dertinger talked to immediately after his meeting with Rokusek and how Dertinger and others were acting.[251]  Stokes also testified that he was not going to view video of the attorney visitation rooms, but that he was going to view video of Dertinger after he left his meeting with Rokusek to see what Dertinger did in the pod.[252]

None of this testimony is credible.  First, the Court credits Rokusek's description of what Tomasic and Flannigan told her the agent was going to view, and the fact that neither Tomasic nor Flannigan challenged that description in Rokusek's email to them.  From the prosecutors' account, Rokusek would have had no basis to know that there was any attorney-client video. Moreover, Rokusek immediately contacted the FPD to ask about video recordings of attorney-client meetings at CCA, which prompted Brannon to contact Barnett.  This course of events can only be explained by Tomasic and Flannigan making the threat to Rokusek.

Notably, at the September 7, 2016 hearing, Tomasic attributed her knowledge that the attorney visitation rooms were video recorded to a cooperator but claimed she did not intend to

---

[249]Doc. 253 at 34.

[250]*See, e.g.*, Ex. 504 at 15 (Flannigan: "I didn't know we had attorney-client videos, I meant pod videos" when talking to Rokusek); Doc. 677 at 2265:2–25.

[251]*See, e.g.*, Doc. 669 at 667:1–668:10.

[252]Ex. 508 at 123:18–123:25.

obtain the video because she had forgotten or not realized the subpoena would capture the attorney visitation rooms.  She went on to state:

> I don't remember the exact moment. It could've been possibly one of two things triggered my memory; the concerns about Richard Dertinger obtaining information through his attorney at any attorney-client room may have spurred, oh, I think we probably have that, given what I know based on what the cooperator says, and I got all surveillance footage . . . .[253]

Tomasic's statement confirmed what she, Flannigan, and Stokes were looking for, as borne out by the existence of a video recording of Rokusek meeting with Dertinger.

Second, Stokes' testimony does not ring true.  Stokes had a copy of the videos on his KBI computer and a PELCO player to view those recordings at his home.[254]  Although Stokes testified that he was unaware of the video recordings until August 2016, he specifically asked Boyd on July 12, 2016, if the USAO had received video recordings of the attorney visitation rooms.[255]  Stokes admitted that when he viewed the videos he had the CCA index with him, which Boyd had provided to him by email on July 12.[256]  Stokes further admitted that he loaded either disks #3, #5, or #6 on the PELCO player and that he saw thumbnail views of multiple empty rooms.[257]  Stokes admitted to watching approximately an hour to an hour-and-a-half of recorded CCA video.[258]  And in an August 20, 2016 email to Tomasic, Oakley, and other agents, Stokes admitted that when he viewed the video recordings, there were 16 camera views on the

---

[253]Tr. Sept. 7, 2016 Hr'g, Doc. 135 at 13:19–14:3.

[254]Ex. 502 at 10, 48; Ex. 508 at 4; Doc. 482 at 62:2–4.

[255]Ex. 1004.

[256]Ex. 508 at 123:13–15.

[257]*Id.* at 131:7–25.

[258]Doc. 482 at 74:2–5.

screen, including views of attorney visitation rooms.[259]  To see this, Stokes had to be looking at

DVR #6, which the index shows included attorney visitation rooms but no pods.  Stokes also

admitted that they had information that Rokusek had purportedly given a written document of

some kind to Dertinger that compromised the *Black* investigation.[260]  Viewing the video

recording of Rokusek's interaction with Dertinger inside the attorney visitation room would have

confirmed whether or not Rokusek provided a document to Dertinger as the cooperator had

reported.  If Stokes was looking for Dertinger as he walked back to his pod to see "everyone's

reactions," as the USAO contends, DVR #6 was the wrong disk; if he was looking to see whether

Rokusek handed documents to Dertinger, DVR #6 was the right disk.

Third, the Court considers that if Tomasic and Flannigan had no ill intention, it made no

sense for Tomasic to feign uncertainty to the Court about the existence of such video recordings

in her August 5 email.  It makes more sense that if Tomasic and Flannigan believed that Rokusek

had improperly provided a proffer statement to Dertinger as the cooperator claimed, Tomasic

would have been open about their need to view Rokusek and Dertinger interacting in the attorney

visitation room, perhaps by having a taint team review the video to see if Rokusek had in fact

handed a document to Dertinger.  Tomasic testified that she planned to employ a taint team to

review law library computers and written materials seized from detainees' cells during a search

---

[259]Ex. 611. Although AUSA Oakley was co-counsel in the *Black* case, he testified that he did not see the subpoena for all video surveillance prior to its issuance, was unaware that the cooperator had provided Tomasic with information that the attorney visitation rooms were video recorded, and had he known he would not have issued a subpoena for all CCA video recordings because he understood that the USAO should not acquire recordings of attorney-client conferences. Doc. 674 at 1900:19–24; 1902:3–6.  Although none of the emails between Tomasic, Flannigan, and Rokusek indicate that Oakley was informed about their communications, the Court finds notable that in a pleading filed on September 6, 2016, to address allegations that the USAO had viewed video recordings of attorney-client communications, Oakley stated that Stokes only viewed one such room, minimizing Stokes's statement in the August 20 email that he had seen 16 camera views that included multiple views of attorney visitation rooms.  Ex. 489 at 12.

[260]Ex. 508 at 149:1–150:3.

warrant executed at CCA on April 8, 2016, understanding that there might be privileged attorney-client communications in those materials.[261]  But instead of using a taint team to ascertain whether the cooperator's information about Rokusek was correct, she chose to use Stokes to review the video recordings.

After the firestorm that ensued when Rokusek brought to light the existence of the video recordings of the attorney visitation rooms, multiple defense counsel began filing Rule 41(g) motions and demanding a hearing.  Flannigan and Tomasic then changed their story to a new narrative.  Flannigan claimed that she did not know there were video recordings of the attorney visitation rooms until she read Tomasic's statements in the July 21, 2016 transcript.[262]  And Tomasic claimed that she had no certainty about the video recordings until August 5, sometime after she sent the 2:57 p.m. email to Court and counsel.[263]  Tomasic testified that after she sent this email, but while Rokusek was still viewing the video, Boyd brought her the CCA index, which showed there were recordings of the attorney visitation rooms.[264]  But Tomasic admittedly did not send another email to the Court or counsel advising that the index showed that the attorney visitation rooms were video recorded.[265]  Moreover, Tomasic and Flannigan changed their account of their meeting with Rokusek, testifying that they had merely suggested to her that Stokes was viewing Dertinger after he left the meeting, and that Rokusek should view the videos to see *if* there was video of her meeting with Dertinger.[266]

---

[261] Doc. 669 at 681:14–682:12.

[262] *Id.* at 2197:6–16.

[263] Doc. 670 at 738:15–23.

[264] Doc. 669 at 504:18–505:1.

[265] *Id.* at 505:2–12.

[266] *Id.* at 660:11–661:24; Doc. 677 at 2266:2–11.

Tomasic and Flannigan's testimony contradicts not only the testimony of Stokes, Rokusek's statements, and their email interactions with Rokusek, but also what they told Barnett when she interviewed them in September 2016 about the video recordings.  Barnett testified that based on a meeting that she, Slinkard, and Beall had with a number of defense counsel on August 8, and her understanding of the evidence that would be presented by the defense at the August 9 hearing, she did not have confidence that Tomasic and Flannigan were giving her complete and accurate information about the video recordings.[267]  Barnett further testified that during case reviews with Tomasic, Flannigan, and others on September 28, 2016, Barnett made notes that reflect Tomasic knew about the video recording of the attorney visitation rooms but did not tell everyone.[268]  Tomasic acknowledged to Barnett that the cooperator had told her the rooms were recorded, and that she had made a mistake in drafting such a broad subpoena that would include attorney visitation rooms.[269]  Further, Tomasic admitted to Barnett that she told Rokusek they were locating the attorney-client video recordings; they did *not* say that Stokes was merely going to view video of the pods to watch Dertinger's behavior and interactions with other detainees.  It is also notable that when Barnett was attempting to investigate the allegations concerning the video recordings in August, Stokes refused to speak with Barnett, something Barnett complained about to the KBI.[270]  The Court finds Barnett's testimony consistent with its other findings.

In sum, the Court finds that when Tomasic issued the subpoena for 22 months of all video footage from CCA, she knew it would include video of attorney visitation rooms and did

---

[267] Doc. 677 at 2340:22–2341:10.

[268] *Id.* at 2347; Ex. 691.

[269] *Id.* at 2358:14–2359:4.

[270] Ex. 1059.

nothing to exclude or avoid these recordings. The USAO kept the video recordings in its possession for over two months, accessible in the Kansas City office, redistributed them to other law enforcement agencies, and was preparing to distribute them in discovery to other defense counsel in the *Black* case when the Court issued its clawback order. The USAO used the attorney-client video to attempt to gain a strategic advantage over a defendant. And as detailed in Section III.B.2, *supra*, the USAO failed to preserve the AVPC hard drives that could have provided information about access to the recordings.

## B.     Audio Recordings

### 1.     CCA Recording Practices

Access to confidential attorney-client communications by phone was particularly important given CCA's remote location. CCA provided phone service to detainees by making available 121 pay-telephones installed and maintained by Securus. Whether calls to a particular number would be recorded was left to the "sole discretion" of CCA.[271] Per the terms of the contract between CCA and Securus, CCA recorded all outgoing phone calls unless the call was to a number that was "privatized." Defense attorney phone numbers qualified for privatization. Prior to October 2016, an attorney must request that his or her phone number be privatized by sending a facsimile to CCA on office letterhead that included contact information and a signature. Successful privatization should have prevented Securus from recording phone calls by any detainee to the privatized number. Additionally, no call to an FPD phone number was permitted to be recorded, pursuant to a contract.[272] Counsel could also request a "legal" call with a client, whereby the client could call from a counselor or case manager's office phone, which

---

[271]Doc. 673 at 1375:1–15.

[272]Ex. 636 at 3.

was not maintained by Securus. For these "legal" calls, a CCA Unit Manager remained present in the office listening to the detainee's side of the call in person. The calls were still recorded.[273]

The record in this case demonstrates that calls between defense attorneys and clients at CCA were routinely recorded even when the attorney properly requested privatization. Calls to the FPD were recorded repeatedly and without notice, even though the FPD followed the CCA protocol to privatize its phone numbers, including attorney cell phone numbers, and despite the agreement between the FPD and CCA that none of its calls were to be recorded.

Although CCA promised confidential attorney-client communications without qualification on its website and in its written policy, it did not advertise to attorneys that they must ask CCA in writing not to record calls with their clients.[274] Before October 2016, the privatization protocol was not posted at the facility, on CCA's website, or otherwise published in any manner that notified counsel that calls were recorded unless this specific protocol was followed. Nor was the policy included in the phone billing records CCA sent to attorneys.[275] Therefore, many seasoned defense attorneys who regularly represent clients housed at CCA testified or submitted affidavits stating that they were unaware of the privatization process prior to the allegations in the *Black* case.[276] Those attorneys believed that attorney-client calls were

---

[273]*See* Ex. 469, attach. ¶ 4.

[274]Ex. 435 at 2 (displaying screenshot dated August 9, 2016 from CCA's website); Ex. 475 at 5–6 (stating that detainees will be able to have confidential contact with their attorneys).

[275]In contrast, Sedgwick County Adult Detention Facility, another Securus client, posted a notice in plain view of attorneys and detainees, and directly notified attorneys of actions necessary to ensure the confidentiality of attorney-client communications. *See, e.g.*, Ex. 595.

[276]While there was evidence that a handful of attorneys were aware of the privatization process, most who testified or submitted affidavits on this issue were not aware. As but one example, defense attorney Robert Calbi swore that "[i]n 31 years of practicing criminal law I have never been informed by a client at the CCA or any other facility in which my clients informed me that they were instructed by the facility that our calls with them were being recorded unless I proactively contacted the facility and informed them not record these calls and took steps with the facility to stop these recordings." Ex. 459, Calbi Aff. ¶ 4.

not recorded and so advised their clients.[277]  They believed that if an attorney-client call was

inadvertently encountered, no one would listen.[278]

Likewise, prior to October 2016, CCA did not consistently advertise to detainees how to

privatize their attorneys' phone numbers, and detainees were not allowed to initiate CCA's

privatization protocol; only attorneys could request privatization.  On October 26, 2016, after this

litigation ensued, CCA began offering detainees the option of initiating privatization of attorney

phone numbers by submitting an official request form.  Upon privatization, the detainee would

receive confirmation that privatization had been completed.[279]

There was evidence about various forms of notice provided by CCA to detainees and

attorneys about its telephone call recording policy.  Joshua Martin, General Counsel for Securus,

testified that a recorded message plays at the beginning of all calls placed on Securus phones.[280]

This message is audible to both the call recipient and the detainee, and for non-private calls

includes the following language: "[t]his call is subject to recording and monitoring" (hereinafter

"preamble").[281]  The Special Master found that the message is slightly different depending on

---

[277]*See, e.g.*, Ex. 459, Joseph Aff. ¶¶ 3–4; Ex. 520, Bartee Aff. ¶ 6 and Bell Aff. ¶ 6.

[278]Ex. 459, Joseph Aff. ¶ 4.

[279]Ex. 1052.

[280]Doc. 673 at 1401:13–20, 1422:17–1423:11; 1460:10–16; 1467:20–1468:8.

[281]Doc. 214 at 19–20 & n.15. The Special Master indicated during his cross-examination of Martin that he had called different attorney numbers using a Securus phone and "heard different admonishments, depending on the number that I was calling," which Martin could not explain.  Doc. 673 at 1423:4–11.  The Special Master did not elaborate on these differences during his testimony, but in his report, he explained his test phone calls further:

> For calls made to numbers marked "Private," it appeared the pre-recorded message did not state the call may be monitored or recorded. For calls made to numbers not marked "Private," the pre-recorded message was sometimes the one detailed in the text above (stating the call may be monitored or recorded), and sometimes instead only asked the called party whether she wanted to set up an account to pay for and receive future calls – the call itself was never actually connected.  Partly because of lack of time, the Special Master was unable to come to a full understanding of which prerecorded message was played for which type of phone call.

whether the detainee calls collect or uses a prepaid calling card, but the statement that the "call is

subject to recording and monitoring" is always the same.[282]  If the detainee chooses to hear

dialing instructions in Spanish, the prerecorded message is played in Spanish, and the preamble

translates to "this call may be recorded and is subject to being monitored."[283]  A more literal

translation is, "this call may be recorded or monitored."[284]

Detainees were sometimes presented with an "Intake Booking Packet" when they arrived

at CCA, which included a form that they must sign, acknowledging that CCA

> reserves the authority to monitor (this includes recording)
> conversations on any telephone located within its institutions, said
> monitoring to be done to preserve the security and orderly
> management of the institution and to protect the public. An
> inmate's use of institutional telephones constitutes consent to this
> monitoring.  A properly placed phone call to an attorney
>
> is not monitored. You must contact your unit team to request an
> unmonitored attorney call.
>
> I have read or had read to me (cross out one) the above notification
> on the monitoring of detainee telephone calls. I understand that
> telephone calls I make from institution telephones may be
> monitored and recorded.[285]

Detainees were also supposed to be issued an Inmate Handbook near the time of their

arrival that included instructions, advice, and information about dozens of issues, including

instructions on telephone use and monitoring:

> Access to telephone: Telephones are provided for detainees/detainees
> in the housing unit dayroom. Dayroom telephones are subject to
> monitoring. . . .
>
> Procedures for telephone use include:

---

Doc. 214 at 20 n.16.

[282]*Id.* at 20 n.15.

[283]Ex. 656 ¶ 6.

[284]*Id.*; Ex. 656A.

[285]Doc. 214 at 15–16; Ex. 1.

. . . .

> 6. Your attorney may request of our facility that calls to their office not be recorded to ensure Attorney/Client privilege. They may request this by way of sending CCA/LDC a fax on their office letterhead. This request must include contact information and signature. They may fax it to (913)727-2231. **IT IS YOUR RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF THIS PROCEDURE; THEIR TELEPHONE CALLS ARE SUBJECT TO BEING RECORDED IF THEY DO NOT REQUEST THEY BE RESTRICTED**.[286]

But former CCA Unit Manager Leslie West testified that it was common for detainees to never receive the Inmate Handbook. Even when the handbook was available, distribution could be delayed for the first three to six days—a critical time for attorney-client communications. West testified: "You were more likely to talk to an inmate who didn't have a handbook than one that did."[287] Moreover, the content of the handbook was not reviewed with the detainee during intake, nor did the intake officer explain how to "properly place" a call to an attorney. And the handbook did not explain how an unmonitored legal call could be placed.

There was some signage near Securus telephones at CCA. A small sign on each Securus telephone entitled "Dialing Instructions," states: "Calls are subject to monitoring and recording."[288] CCA has posted its own signs near at least some of the Securus telephones. One example is an engraved plastic sign that says, "ALL CALLS MAY BE RECORDED/ MONITORED."[289]

Defense counsel's experience with the preamble varied. Several experienced defense attorneys attested that they never heard the preamble during their phone conversations with CCA

---

[286]Ex. 2 (emphasis in original).

[287]Doc. 482-1 at 41:13–14.

[288]Exs. 4–6.

[289]Ex. 3.

detainees.[290]  Others attested that they sometimes heard the recording.[291]  Christopher Joseph, who has represented clients at CCA since 2003, attested that he or a member of his staff hears the preamble on every call they answer.  He attested that he is "not aware of any way to have telephone communication with a client that does not involve the recorded statement that 'calls may be monitored or recorded.'"[292]  Defense attorneys testified that typically their staff answers the phone, so they often do not hear any prefatory pre-recorded message.  And several testified live or by affidavit that they did not believe the presence or absence of the preamble language determined whether their call was recorded—they believed that calls between attorneys and clients were never subject to recording.  In particular, those attorneys who were familiar with the privatization process reasonably believed that submitting their telephone numbers for privatization was the only requirement to ensure nonrecording—so the preamble did not alert them that the privatization request had failed.

The Securus Call Platform is a web-based interface that allows users such as CCA personnel to access information related to calls made on Securus telephones.  Users located at a given prison normally have access only to information regarding Securus telephones at that site.  As the Special Master reported, Securus preserves recorded calls for a set period of time, during which a person with access to the Securus Call Platform may, among other things: (1) extend the time the call is preserved on the Securus system; (2) listen to the recorded call; and/or (3) download the call, thereby preserving it outside of the Securus system.

---

[290]Ex. 459, Ambrosio Aff. ¶¶ 2–3, Calbi Aff. ¶¶ 2–4, Vermillion Aff. ¶¶ 2–3, Haney Aff. ¶¶ 2, 4, and Johnson Aff. ¶¶ 2–3.

[291]Ex. 459, Jenab Aff. ¶ 2 and Dodge Aff. ¶ 4.

[292]Ex. 459, Joseph Aff. ¶ 2.

CCA's recording retention period was five years under its contract with Securus. Securus maintained recordings of all non-privatized calls and detailed data relating to every call, including whether any party outside of the facility accessed it. These details could be produced on a spreadsheet called a Call Detail Report. Securus kept records of which calls were accessed, when they were accessed, and how they were accessed, i.e., by play-back (listened to but not copied), by download to another platform, or by copying to another medium. The data was tracked on recording access logs.

Even when an attorney correctly submitted a privatization request, there was no assurance that his or her clients' phone calls to that number would not be recorded. CCA admitted that "due to human oversight," calls would sometimes be recorded anyway, although CCA denied that they were used or disclosed to any third party.[293] Martin testified that a number may not have been privatized after an attorney made a privatization request for several reasons: (1) CCA input the wrong phone number; (2) CCA delayed inputting the phone number; (3) CCA input the name in different formats, for example, CCA input "Brenda Wood," and "Wood Brenda" for the same detainee; (4) CCA privatized the number for calls placed from only certain areas at CCA, such as the bank of jail phones, or the phones in the case managers' offices; or (5) CCA privatized an attorney's number for calls from a subpopulation "site level" at CCA, rather than calls from any and all detainees at CCA.

CCA employee Wayne Bigelow testified about the site level issue. Bigelow's job duties at CCA included privatizing phone numbers in the Securus Call Platform. When CCA received a privatization request, the facility was required to pick from one of four "site level" lists from which any given number would be privatized: (1) the entire facility; (2) USMS inmates; (3)

---

[293]Ex. 47 ¶ 15.

county inmates; and (4) Maryland DOC inmates.[294]  If a number was privatized for only USMS inmates, for example, calls from USMS detainees to that number would not be recorded, but calls from Maryland DOC or county inmates would be recorded.  The default selection on this field is the entire facility; the CCA employee inputting information must affirmatively choose a different site level from a dropdown box in order to select a site level other than the entire facility.

Bigelow routinely marked the wrong site level box on the Securus Call Platform because he mistakenly believed that selecting any site level in the site level dropdown field would privatize the number for the entire facility.  Instead of privatizing the number for the entire facility, Bigelow routinely selected a site level subset that privatized the number only for some clients of that attorney, but not others.  Neither Bigelow nor any other CCA employee ever told attorneys that there were different levels of privatization.  This created, for example, the incongruous result presented at the hearing by the FPD: its main Kansas City office phone number was privatized for Wyandotte County inmates at CCA, but not for USMS inmates.[295] Thus, a phone call from a county inmate would be privatized and not recorded, while a call from a USMS client later that day to the same phone number was recorded.  Thus, even if an attorney had been placed on notice of the need to privatize, the attorney never knew or had the ability to ask to be privatized for specific site levels.

The Special Master found that as of December 15, 2016, CCA's list of attorney numbers marked "Private" contained 528 telephone numbers, compared with the roughly 18,500 "Known Attorney Telephone Numbers" belonging to attorneys in the Kansas/Missouri/Nebraska area that

---

[294]Doc. 214 at 23 n.21.

[295]*See, e.g.*, Ex. 564 (Call Detail Report showing FPD phone number ending in 6712 recorded in some instances and not in others); Doc. 638.

the Special Master compiled.[296]  Nicholas Harris, a digital forensic analyst and software developer for Digital Strata, testified that based on his work to date as an expert retained in *Johnson v. CoreCivic*,[297] a class action lawsuit against Securus filed in the Western District of Missouri, there were significant numbers of calls to privatized attorney telephone numbers recorded, including calls to the District of Kansas FPD's office.[298]

## 2.      USAO Methods of Obtaining Recordings of Calls

It was typical for the USAO to obtain audio recordings placed by CCA detainees in a wide variety of criminal cases.[299]  Prosecutors, including AUSAs Catania, Morehead, Hunt, Wamble, and Oakley testified that they obtained such recordings for a variety of reasons: (1) for voice comparisons to aid in identifying voices on wiretaps or consensual recordings; (2) to see if the defendant had made any inculpatory statements, particularly if the case was going to trial; (3) to investigate whether a detainee is continuing to engage in conspiratorial or otherwise criminal conduct; or (4) to investigate whether a detainee was violating a court-imposed no-contact order with other detainees or with witnesses.  Tomasic testified that Hunt, one of the AUSAs who trained her, advised that she should always get calls if the case is going to trial.

It is impossible, however, to identify or even quantify the number of calls obtained in other cases investigated or prosecuted by the USAO.  First, the USAO and/or agents obtained recordings from CCA in several ways: grand jury subpoena, administrative subpoena, USMS

---

[296]Doc. 214 at 24.

[297]W.D. Mo. No. 16-cv-00947-SRB.

[298]Harris testified that based on Securus data, he identified 7914 calls to numbers that were identified as attorney numbers through privatization requests, 203 of which were recorded after privatization had been requested. *See* Ex. 561 ¶ 19.  Securus privatization records revealed 161 unique records of attorney numbers that were numbers on the Special Master's lists and 1627 phone calls recorded after privatization was requested.  *See id.* ¶¶ 29–30.  Harris further testified that based on CCA data, there were 546 unique numbers on the privatization reports, 356 of which were on the Special Master's list, and 9438 calls were made to those numbers, 2413 of which were recorded after the attorney had submitted a privatization request.  *See id.* ¶¶ 21–25.

[299]*See* Ex. 501.

form request, email request to USMS, telephonic request to USMS, email request to CCA,[300] and USMS telephonic request to CCA. Some of these requests were fully documented, such as subpoenas and USMS form requests, which identified the name of the detainee, the date and time of the request, the temporal scope of the request, and perhaps the name of the agent and/or prosecutor making the request. But some written requests contained only partial information. In May 2013, the USMS implemented a policy requiring that requests be documented on a request form that included language that stated attorney-client calls are excluded from the request.[301] Nevertheless, there was evidence that prosecutors and agents continued to request and obtain recordings through oral requests or by email.

Second, once requested, prosecutors and/or agents received recordings in several ways. Sometimes CCA burned the calls to a disk and delivered the disc to the USMS or to the USAO by jail transport van. Other times, recordings were attached to an email and the prosecutor and/or agent would access the recordings through a link to CCA or the Securus system, which gave them a 24-hour period in which to access the calls, and either listen to or download them for access on their own server.[302] If the requesting party obtained the recordings by physical delivery from the jail transport van, there was no documentation of that, although there was at least one example of a prosecutor signing a receipt for a delivered disc.[303] When the requesting party accessed the recordings through the electronic link, there was no complete documentation of that. In fact, in some instances, the only documentation that recordings were requested or received was an email from an agent complaining that CCA's electronic link to download the

---

[300]Ex. 608.

[301]Ex. 715B-008.

[302]*See* Ex. 715B-010.

[303]Ex. 715B-035.

documents was not working.  As discussed above, however, the Government's failure to preserve

means that documents, including emails, may not be recoverable.[304]  These varied procedures

often resulted in no paper trail about who requested the calls, when, or why.  As discussed

throughout this opinion, it is difficult to trace whether the USAO has attorney-client calls in a

particular case, absent written documentation.

The record is clear, however, that upon receiving recordings, prosecutors and their agents

reviewed the calls.  After the first hearing in the *Black* case, AUSA Rask asked Barnett in an

email,

> Deb,
>
> Because there is no evidence that any attorney-client telephone
> calls from CCA have been obtained and because those calls are
> automatically not recorded by the CCA technology as attorneys
> provide their telephone numbers and because there is a taint-team
> process in place and because this issue has been vetted through our
> criminal PRO and PRAO and because this was not an issue during
> yesterday's hearing, may the prosecution team continue with their
> review of the tens of thousands of calls obtained?[305]

As the Court discusses in detail below, Rask was wrong on almost every point but one—the

USAO and its agents routinely relied on CCA recorded calls and reviewed those calls.

### 3.    Grand Jury Subpoena in *Black*

The USAO obtained more than 48,000 recorded detainee calls associated with

approximately 40 detainees in its investigation of contraband smuggling at CCA.[306]  It was

understandable that the USAO obtained phone calls in the *Black* case, given that it was

investigating not only contraband smuggling within the walls of CCA, but also a conspiracy that

---

[304]*See supra* Section III.A.3.c.

[305]Ex. 1054; *see also* Ex. 505.

[306]Doc. 107 at 3.

involved those outside of CCA who supplied the contraband and CCA employees who participated in or aided and abetted the contraband smuggling.

The USAO used a grand jury subpoena to obtain "all CCA-Leavenworth inmate recorded calls" "from July 1, 2014 until notified recorded calls are no longer needed" for seventeen inmates.[307]  The time span was later expanded by informal request.[308]  Tomasic also emailed CCA directly, asking for all calls made by *Black* Defendant Stephen Rowlette; "calls made by any inmate" to a list of specific phone numbers; and a "reverse" search on other numbers.[309]  In her testimony, Tomasic placed the number of defendants whose calls were collected at 40.[310]  When Tomasic subpoenaed the calls in *Black*, she did not exclude any attorney numbers.[311]  The agents reviewed the calls and tracked them on a spreadsheet.[312]  The calls were then distributed in discovery to *Black* defense counsel and various law enforcement agencies.  Derivative reports were made, which were later subject to the Court's clawback order.  The calls from these 40 defendants included at least 74 attorney-client calls.[313]

### 4.    Individual Cases that Came to Light in *Black*

Individual cases that came to light during the *Black* investigation illustrate the USAO's practice with respect to collecting, saving, and accessing attorney-client calls from CCA:

---

[307]Ex. 161.

[308]Tr. Sept. 7, 2016 Hr'g, Ex. 490 at 27:6–20.

[309]Ex. 465.

[310]Tr. Sept. 7, 2016 Hr'g, Ex. 490 at 29:16–21.

[311]Ex. 471 (sealed).

[312]Exs. 1002, 1003.

[313]Ex. 449.

### *United States v. Birdsong*[314]

Tomasic testified that soon after she arrived in the USAO in 2013, she encountered an attorney-client call of defendant Jerome Birdsong and sought advice from then-First Assistant United States Attorney Mike Warner.[315]  Tomasic followed Warner's advice by disclosing to Birdsong's attorney that she had accessed attorney-client calls, apologizing, and using a filter team.[316]

### *United States v. Rapp*[317]

Tomasic was the prosecutor in the *Rapp* case, which included Dertinger as a co-defendant.  As previously discussed, that case overlapped with the *Black* case; cooperators in the *Rapp* case provided Tomasic with information about Dertinger and the CCA investigation.[318]  In 2016, Agent Stokes informed Tomasic that he heard two attorney-client calls between defendant Gregory Rapp and defense counsel Rick Johnson.[319]  Tomasic sought advice from Metzger and AUSA Lanny Welch about how to proceed.  Welch, who had been an AUSA for 29 years and the Professional Responsibility Officer ("PRO") for the USAO for 19 years, told Tomasic, "it makes me nervous to exploit without waiver."[320]  Welch initially advised Tomasic to disclose the calls to the court and counsel, to get a firm decision of whether the privilege was waived.  After Tomasic told him that she did not intend to use the calls at trial or sentencing, Welch advised her the safest approach was to disclose the calls to counsel with no need to involve the court at that

---

[314]D. Kan. No. 15-20045-JAR.

[315]Ex. 583.

[316]Exs. 582, 583.

[317]D. Kan. No. 14-20067-CM-1.

[318]*See infra* Section IV.A.3.

[319]Ex. 1003.

[320]Ex. 33.

time.[321]  When Tomasic notified Johnson that Agent Stokes had discovered his calls with Rapp, she characterized it this way: "CCA inadvertently included at least three calls between you and your client," dismissing it as an anomaly.[322]

### United States v. Huff[323]

Defendant Ashley Huff was a co-defendant in the *Rapp* case.  When Tomasic was prosecuting the *Huff* case, she listened to a call involving Huff's mother's "lawyer friend."  She conferred with Flannigan and Oakley, who advised her that the calls were arguably not privileged because there were third parties present on the call.  Tomasic thereafter affirmatively sought by email request recordings of all detainee calls to the phone number for the mother's "lawyer friend."[324]  After Huff filed a Rule 41(g) motion, the Government agreed to a time-served 36-month sentence on the condition that Huff withdraw her pending motions.[325]

### United States v. Forbes[326]

Oakley, one of the prosecutors in the *Black* case, Wamble, and IRS Special Agent Henry Herron encountered a call between defendant Mendy Forbes and criminal defense attorney Kurt Kerns, who was not then Forbes' counsel of record.  Oakley acknowledged in an email exchange with Wamble and agents that Forbes and Kerns could have been engaged in a protected attorney-client communication, even though he was not yet counsel of record.[327]  Although Oakley did

---

[321]Ex. 641.

[322]Ex. 10.

[323]D. Kan. 14-20067-CM-9.

[324]Ex. 513.

[325]D. Kan. No. 14-20067-CM-9, Doc. 481.

[326]D. Kan. No. 13-20041-KHV-1; D. Kan. 12-20099-KHV-1.

[327]Ex. 716.

not listen to the substance of the call, neither he nor Wamble notified counsel;[328] nor did they divest the USAO's possession of those calls until January 7, 2019.[329]

Nevertheless, the AUSAs proceeded to request Forbes' calls by email request on five subsequent occasions during 2015 and 2016 and did not notify Kerns or exclude his phone number or the phone numbers of Forbes' two counsel of record, Deb Vermillion and Shazzie Naseem.[330] In all, the USAO obtained 32 attorney-client calls of Forbes.[331]

### United States v. Wood[332]

Wamble, who was one of the prosecutors on the *Forbes* case, was the lead prosecutor in *Wood*, a wide-ranging fraud case. Wamble testified, and an email from his legal assistant to the USMS corroborates, that when he encountered an attorney-client call, he immediately contacted the USMS and asked them to provide him with a "clean" set of calls that did not include attorney-client calls. Wamble also had Cox's phone number privatized, but without notice to Cox.[333] He did not, however, disclose or disgorge the recording to Wood's attorney Christian Cox.

Wood subsequently filed a Rule 41(g) motion in her criminal case, seeking return of the recordings.[334] Wamble testified that he told his supervisor, Rask, that he possessed Wood's attorney-client calls. Neither Rask nor management directed Wamble to turn over the calls in

---

[328] Ex. 717.

[329] Ex. 715C at 2.

[330] Exs. 715B-11, 715B-13, 715B-15, 715B-16.

[331] Exs. 604A, 607A.

[332] D. Kan. No. 14-20065-JAR-1.

[333] Doc. 670 at 936:3–13.

[334] D. Kan. No. 14-20065-JAR-1, Doc. 107. Wood unsuccessfully attempted to intervene in the *Black* case.

response to the Rule 41(g) motion; instead he was directed to preserve the calls.[335]  The USAO

eventually delivered to the FPD on February 23, 2018, six discs with recorded phone calls, and

explained:

> 1. Disc labeled "Brenda Wood jail calls" This disc may contain
> calls that were inadvertently included phone recordings of Brenda
> Wood's previous attorney, Christian Cox.  Upon hearing the voice
> of who I believed to be Mr. Cox, I stopped listening to the calls
> and requested calls from the Marshals Service that did not include
> Cox's phone number. Additionally, when I heard what I thought to
> be Mr. Cox's voice, I contacted Mr. Cox to alert him to this
> possibility and informed him how he could seek to have his calls
> not recorded at CCA.[336]

However, Cox testified that Wamble never told him that he had obtained, inadvertently or

otherwise, recordings of Cox's calls with Wood or that Wamble had possession of any attorney-

client recordings.[337]  Cox further testified that if he had known of Wamble's actions, he would

have proactively protected the communication.[338]

Wamble admitted in the *Black* hearing that he did not tell Cox that he actually possessed

the recordings.[339]  Wamble also admitted he did not know how CCA privatization worked.[340]

And he admitted that he never produced the calls during discovery to either Cox or Brannon,

Wood's subsequent counsel.

The facts ultimately demonstrated that (1) Wood's calls to Cox had been recorded, with

at least 13 calls exceeding four minutes;[341] (2) Wamble directly contacted CCA by email to

---

[335]Doc. 670 at 895:5–23.

[336]Ex. 571.

[337]Ex. 570; Doc. 670 at 935:4–11.

[338]Doc. 670 at 936:3–13.

[339]*Id.* at 895:1–4.

[340]*Id.* at 886:12–14.

[341]Exs. 563, 573, 657.

request Wood's CCA calls, making no exception for attorney calls;[342] and (3) Wamble did not disclose his possession of the calls to either Cox or the FPD, but instead kept them for over three years. After the FPD entered an appearance in March 2015, Wamble requested Wood's calls another four times, without making an exception for the FPD.[343]

Wood was facing up to 78 months' imprisonment, but after filing a motion to dismiss based on Wamble's procurement and possession of video and audio recording of attorney-client communications, the Government agreed to reduce her sentence to time served, approximately 50 months.[344]

### United States v. Herrera-Zamora[345]

Tomasic and AUSA David Zabel prosecuted *Herrera-Zamora*. Carlos Moran, an attorney from Kentucky, represented Herrera-Zamora. After a contentious trial, Moran moved on February 20, 2017, to discover whether the USAO had listened to his communications with his client.[346] Tomasic and Zabel were indignant, and pressured Moran into withdrawing his motions.[347] Moran described his reaction to later learning that the USAO had in fact obtained and reviewed his communications:

> I—I was pretty offended because I really believed that—when they assured me that they wouldn't. And, you know, to accuse another member of the bar is not an easy thing or is not a very pleasant thing to do. And then when I—when I learned that, in fact, they did, I don't know, it's even worse.[348]

---

[342]Exs. 607-15, 607-16.

[343]Exs. 607-12, 607-17, 607-19, and 607-22; Doc. 670 at 885:1–23.

[344]D. Kan. No. 14-20065-JAR-1, Docs. 222, 236, 237.

[345]D. Kan. No. 14-cr-20049-CM-1.

[346]*Id.*, Doc. 135; *see* Ex. 576.

[347]Ex. 580 at 2–3.

[348]Doc. 672 at 1219:2–7.

Tomasic issued a subpoena requesting CCA to provide all detainee calls to Moran's specific phone number.[349]  Tomasic testified that Moran had advised the court that CCA detainees whom he did not represent had been calling him, so she and Zabel were concerned that Moran was speaking with detainees represented by other counsel.  They obtained recordings of all detainee calls to Moran, including calls from Herrera-Zamora to Moran, even though their stated purpose in obtaining the calls did not justify their obtaining calls between Herrera-Zamora and Moran.

Before Tomasic subpoenaed the recordings of detainee calls to Moran, she sought advice from Welch, who in turn sought advice from DOJ's Professional Responsibility Advisory Office ("PRAO").  Tomasic's request for advice first assured Welch that her research had confirmed that the detainees had waived their attorney-client privilege.  The PRAO, which expressly does not give advice, responded to Welch's inquiry about Tomasic's question, noting that *if* the privilege was waived, as Tomasic represented her research conclusively established, then she should employ a taint team to review the recordings.

Tomasic asked Hunt to serve as a filter attorney, along with a Spanish-speaking DEA agent, since the conversations between Herrera-Zamora and Moran were in Spanish.[350]  When the DEA agent could not assist them, Tomasic, who speaks Spanish, decided to listen to the calls herself but had difficulty understanding them.  Sara Gardner, a contract interpreter, testified that Tomasic asked her to listen to and translate the recordings.[351]  Gardner stated that Tomasic also asked her to come to the USAO during trial to listen to and provide oral summaries of conversations between Herrera-Zamora and Moran to learn defense strategy and so Tomasic and

---

[349]Exs. 509, 537.

[350]Ex. 581 at 1.

[351]Ex. 546 at 1; Exs. 547, 554.

Zabel could impeach the defendant should he testify in his defense.[352]  Gardner was so alarmed

by this request that she informed AUSA Catania, who reported Gardner's concerns to

Metzger.[353]

On May 10, 2017, Tomasic informed Rask that she had listened to a call or calls between

Moran and his client.[354]  The USAO terminated Tomasic shortly thereafter.  The USAO did not

bring Tomasic's May 10, 2017 admission to the attention of the Court and parties in *Black* until

June 19, 2017, when it filed a Notion of Correction of Record.[355]  After Tomasic's misconduct

came to light, the USAO agreed to recommend that the court vacate Herrera-Zamora's 420-

month sentence and impose instead a sentence of time served.[356]

### *United States v. Reulet*[357]

AUSA Tanya Treadway, who retired before the October 2018 hearing, was the USAO's

Senior Litigation Counsel and served as a primary filter, or taint, attorney for the USAO.[358]  The

responsibility of the filter attorney position demanded adherence to the highest ethical

standards.[359]

---

[352]Ex. 556.

[353]Exs. 628, 670.

[354]Ex. 585.

[355]Doc. 276.  Zabel denies any knowledge that Tomasic listened to Herrera-Zamora's and Moran's calls before Tomasic's admission on May 10, 2017.  Zabel also claims he was unaware that Tomasic asked Gardner to listen to and prepare oral summaries of the attorney-client conversations before trial.  As lead counsel on the case, it defies logic that Zabel did not know what Tomasic was up to, especially in light of Tomasic and Gardner's contrary testimony. The Court finds Zabel's credibility lacking.

[356]D. Kan. No. 14-20049-CM-1, Doc. 233.

[357]D. Kan. 14-40005-DDC-3.

[358]Doc. 669 at 602:14–15 and 646:15–18 ([Tomasic:] "before it came out that Tanya Treadway had been listening to attorney calls, she met with me and everyone in the *Black* case because she was our filter attorney"); Doc. 669 at 692:5–6; Doc. 675 at 2162:21–25 (Q: "Tanya Treadway, a senior litigation counsel, was often involved in the filter—in filter teams in the District of Kansas; is that accurate? A. [Hunt:] Yes.").

[359]Doc. 669 at 2163:1–14.

Treadway prosecuted Reulet, who had attorney-client relationships with four attorneys during the course of her prosecution: (1) Andino Reynal, her criminal defense attorney; (2) Melanie Morgan, her second criminal defense attorney;[360] (3) Mark Metzger, who represented her in a pending DUI case in Texas; and (4) Richard Grimes, who represented her in a pending child custody dispute between Reulet and her husband, who was a codefendant in the criminal case in this district.

Reulet appealed the magistrate judge's decision to revoke her bond to District Judge Daniel C. Crabtree, and appealed his decision affirming the magistrate judge to the Tenth Circuit Court of Appeals.[361]  Issues pertaining to her pending DUI and her attempts to gain custody of her child were raised in the litigation over the bond revocation.

It is undisputed that Treadway listened to and took extensive notes of Reulet's conversations with Reynal, Metzger, and Grimes as they discussed the criminal case, the pending bond revocation litigation, the DUI case, and the child custody case, all of which had overlapping issues.  Treadway's notes of these conversations comprised 106 pages of a legal pad.[362]  The notes include discussions about defense trial strategy, plea negotiations, risk-benefit assessment of trial versus plea, and estimates of the sentence Reulet faced.

Defense attorney Melanie Morgan testified in a compelling account of how Treadway exploited the information she gained from these calls in negotiating a plea with Reulet.[363] Morgan testified that Reulet was very motivated to gain custody of the child she shared with her

---

[360]For some period of time, both Morgan and Reynal represented Reulet in her criminal case in this district. At all times Reynal also represented Reulet in a pending civil forfeiture case in Texas that arose out the criminal case.

[361]*United States v. Reulet*, 658 F. App'x 910, 913 (10th Cir. 2016).

[362]Ex. 592 (Bates stamped pages 592-001 through 592-107).

[363]Doc. 652 at 146:22–148:25.

co-defendant husband, and that Reulet was strongly opposed to her husband having custody of the child. This is something Treadway learned from listening to Reulet's conversations with Grimes, who represented Reulet in the pending child custody proceeding. Morgan testified that Treadway offered Reulet a binding plea agreement under Fed. R. Crim. P. 11(c)(1)(C), with the assurance that if she was sentenced to the negotiated prison term, she would finish her sentence before Reulet's husband finished his sentence. Morgan testified that this plea offer was attractive to Reulet, who wanted to ensure that she gained custody of her child before her husband could. So Reulet and the USAO entered into the binding plea agreement proposed by Treadway. Morgan further testified that perhaps as an act of retribution, after Reulet was sentenced, Treadway struck a plea agreement with Reulet's husband to a sentence of time-served, thus allowing Reulet's husband to seek custody of the child, as Reulet was still in prison.[364]

Treadway's handwritten notes are conclusive evidence that she actually listened to Reulet's attorney-client calls. But Treadway lied about listening to the calls in a court proceeding before Judge Daniel D. Crabtree.[365] Answering defense counsel's accusation that she had listened to the calls, she emphatically denied doing so.[366] Treadway's misrepresentation was

---

[364]Notably, although Reulet's husband cooperated with the USAO, his only cooperation was to testify against Reulet in her bond revocation hearing. Doc. 652 at 148:17–21.

[365]D. Kan. 14-cr-40005-DDC-3.

[366]Doc. 652 at 96:24–25–97:1–2 ("[Judge Crabtree] is asking me if I've listened to the calls between Ms. Reulet and Mr. Grimes, and I said, 'Except to identify them and identify who was present and that was it. Same thing with Mr. Metzger.'"); Doc. 652 at 54:17–23 ([Morgan:] "The Court specifically asked her, 'You're telling me as an officer of this court that you have not listened to the calls between Ms. Reulet and Mr. Grimes?' And she responded, 'Except to identify them and identify who was present.' And then [Judge Crabtree] asked the same thing about her attorney, Mr. Metzger, and the response was the same."); Doc. 652 at 63:18–25–64:1–6 ("Q. The degree of content described in these calls, is that consistent with what Ms. Treadway represented to you and the Court about how she had listened to the calls between Mr. Metzger, Mr. Grimes and Ms. Reulet? A. [Morgan:] Absolutely not. Q. Were you ever told that someone had taken down this amount of content or listened to this amount of the calls between Ms. Reulet and her attorneys? A. [Morgan:] No. The understanding that we had, which she said repeatedly 'as an officer of the court'—I think 'officer of the court' was a term that was used multiple times in that hearing, was that all she had done was listen to identify who the speaker was in that conversation.").

100

not discovered in the *Reulet* litigation; rather, it surfaced later during the *Black* investigation. Days after Treadway's testimony in *Black*, Judge Crabtree signed an agreed order vacating Ms. Reulet's sentence.[367]

### 5.    USAO's Knowledge that CCA Audio Recordings Included Recordings of Attorney-Client Phone Calls

For years, prosecutors in the Kansas City division had received, or knew others had received, attorney-client calls when they made a general request for all of a detainee's calls from CCA.  The prosecutors' exposure to attorney-client calls was neither infrequent nor uncommon. The individual cases set forth above illustrate prosecutors' knowledge that attorney-client calls were available from CCA and instances where prosecutors listened to those calls.  There was no written policy in the USAO at the time that prevented or discouraged this practice.[368]

There is also circumstantial evidence that prosecutors, both individually and collectively, were aware or should have been aware that a general request for detainee calls at CCA might well yield attorney-client calls.  First, some of the Kansas City prosecutors repeatedly discussed the issue of how to treat attorney-client calls obtained from CCA.  Through these discussions, they were aware that others had encountered such calls even if they personally had not.  These discussions were often prompted by Tomasic's questions and concerns.  Tomasic testified that after she encountered the *Birdsong* attorney-client calls, she discussed the issue of how to handle attorney-client phone calls with what she referred to as the "lunchroom group" in the Kansas City USAO.  She testified this group was comprised of five to eight prosecutors who would meet in the lunchroom on occasion.  Although she declined to specifically name members of the group, Tomasic did not include Patton, Oakley, Krug, Wamble, or James Ward as members of

---

[367]D. Kan. 14-cr-40005-DDC-3, Doc. 261.

[368]Doc. 669 at 650:17–651:16.

the lunchroom group. As detailed later in this opinion, Tomasic continued to raise her concerns with the lunchroom group about attorney-client calls throughout her tenure at the USAO.

The second type of circumstantial evidence is the sheer volume of jail calls the prosecutors obtained over the years and the number of known attorney-client calls they received. Procuring attorney-client calls happened with enough frequency that the USAO knew, or should have known, that its practice resulted in possession of attorney-client communications.

The FPD conducted an analysis of call data to identify CCA inmates whose attorney-client calls were recorded, requested, accessed, or obtained by the Government. This analysis is detailed in Exhibit 562, dated October 8, 2018. As AFPD Rich Federico testified, he was not able to quantify these numbers but instead was only able to offer a sampling, for a variety of reasons. First, despite Clymer's proclamations that the Government was willing to resolve pending Rule 41(g) motions by turning over audio recordings to the FPD, that did not begin until January 2019. Federico did not have possession of the actual recordings at the time of the hearing and could not do a quantitative analysis of the calls themselves. Instead, Federico conducted a comprehensive and exhaustive review of Securus and CCA call data to identify CCA detainees whose attorney-client telephone calls were recorded, requested, accessed, or obtained by the USAO.[369] The data he analyzed primarily derived from information acquired by the Special Master, CCA (both directly and from the Special Master), Securus, court exhibits, docket information, and the Bureau of Prisons.[370] The analysis took several months and hundreds of hours to complete. Federico reviewed information relating to over 1600 defendants.

---

[369]Exs. 562, 562A.

[370]See Ex. 562 at 4–11. The FPD's primary methodology consisted of five steps: Step 1. Catalog all known USAO requests to CCA to produce recorded detainee phone calls; Step 2. Narrow the Securus list of all CCA detainees who had calls recorded and accessed; Step 3. Obtain Securus call access logs, which were produced on a rolling basis of 40-50 names per "batch"; Step 4. Identify attorney-client phone calls that were accessed from the Securus call access logs; and Step 5. Consolidate and analyze all call information. Id.

The data from Securus and CCA was incomplete.  Harris, the forensic analyst for Digital Strata, testified that based on his work to date as an expert retained in the related class action lawsuit against Securus in the Western District of Missouri, it is clear that the Securus data includes accessed calls not captured in the CCA data, and vice versa.[371]  Harris also testified that the Special Master's report on the number of recorded calls to attorney numbers is understated, because Harris identified more known attorney numbers than the Special Master was able to identify.[372]

There were several limitations to Federico's analysis that led to underreporting of the USAO's accessing of attorney-client communications.  Because many of the USAO's requests were made orally—by phone calls to the USMS and/or CCA—and because the USAO failed to preserve and produce electronic and paper records from its own repositories, it is certain that Federico did not obtain all evidence or documentation of every USAO request for production of a CCA detainee's phone calls.[373]  Federico encountered an incomplete if not scant paper trail on requests and fulfillments of requests for jail calls, which prevented any complete quantitative analysis based on documentation of calls requested or received.  Thus, Federico's analysis was limited to "known" requests.

---

[371] *See* Ex. 561.  For example, Harris testified that Securus data showed 18,759 recorded calls placed to 567 attorneys on the list of known attorney numbers compiled by the Special Master.  CCA data shows that through June 2017, there were 197,757 recorded calls placed to 913 known attorney numbers compiled by the Special Master, of which 398 numbers were in the CCA data only and 52 numbers were in the Securus data only.  *See* Ex. 561 at ¶¶ 7–9.

[372] Harris testified that based on numbers identified in bar directories from the four-state area that CCA services, rather than the Special Master's compiled list of known attorney numbers from the same area, Harris determined that based on CCA data, there were 38,243 calls to attorneys, of which 13,315 were calls to the 580 numbers not on the Special Master's compiled list.  *See* Ex. 561 at ¶¶ 11–12.

[373] In fact, as of at least early 2019, the Government was still producing to the FPD hundreds of recorded phone calls in response to production orders and for purposes of pending and potential § 2255 actions.  *See, e.g.*, Ex. 715B.

Second, Federico chose to limit his review to data for FPD clients in the District of Kansas who were detained at CCA and still in custody at the time of his analysis in October 2018.[374]  The parameters of Federico's analysis were thus confined to: (1) inmates previously in custody at CCA; (2) charged with a federal criminal offense in the District of Kansas; (3) who were still in custody; (4) whose recorded telephone calls were accessed on the Securus telephone platform from January 1, 2010 through August 1, 2017; and (5) whose accessed calls contained at least one attorney call.[375]  Federico used the call record data of CCA and Securus, which identified calls accessed by the detainee PIN of the person placing the outgoing call, the phone number of the person called, and the time, date, and duration of the call.[376]  Federico found that there were 1,615 CCA detainees still in CCA custody whose calls were recorded and accessed during the given time period, 723 of whom had cases pending in this district, 372 of whom remained in custody on October 8, 2018, and 104 of whom had calls to their attorneys accessed.[377]

Despite the limitations in the data and analysis, Federico's findings are significant.  Every time the USAO made a general request for all recorded calls, there was a 27.96% chance that the calls would include attorney-client calls.  This statistic—that prosecutors had a greater than one-in-four chance of encountering attorney-client calls—is consistent with the USAO having repeated discussions about attorney-client calls, albeit at the initiation of Tomasic.  Moreover, according to Federico's analysis, if these numbers are extrapolated to all FPD clients during the relevant time period, to include both those in custody and those no longer in custody, the USAO

---

[374]The FPD chose to limit its analysis to detainees still in custody for purposes of prioritizing which detainees' § 2255 actions were the highest priority.

[375]Ex. 562 at 1.

[376]*Id.* at 1–4.

[377]*Id.* at 1.

accessed 1,429.21 attorney-client calls, of which 202.15 were FPD clients.[378]  Acquisition of attorney-client calls was neither rare nor an anomaly.

And the violations compound.  Exhibits 600 through 609A prepared by the FPD are critical on this point.  Each is a partial compendium of known call requests by individual AUSA, followed by a chart identifying known requests that resulted in collection of attorney-client calls.[379]  Because this analysis of individual AUSAs is limited to known requests and District of Kansas detainees still in custody in October 2018, the Court finds that the number of call requests in the exhibits underrepresents instances of  individual AUSAs accessing attorney-client calls.  Nonetheless, this partial analysis of incomplete data demonstrates that individual prosecutors should have known they had obtained attorney-client calls and that a general request for calls would yield attorney-client calls.

For example, AUSA Morehead denied any awareness of attorney-client calls.[380] Federico's research revealed that between May 24, 2013 and September 27, 2016, Morehead requested calls at least 33 times for 28 different defendants.[381]  In at least nine of those cases, attorney-client calls were recorded.[382]  Yet Morehead never excluded any attorney numbers from her requests.[383]  Likewise, AUSA Catania testified that she had never encountered any attorney-client calls.[384]  Federico's partial analysis showed that Catania received calls of 15 defendants

---

[378]*Id.*  Federico testified that as of August 2018 there were about 191,000 rows of Securus data that the FPD was engaged in analyzing. Doc. 673 at 1511:23–1512:1.

[379]*See* Exs. 600–608A (providing lists of call requests by Catania, Flannigan, Krug, Morehead, Oakley, Rask, Tomasic, Wamble, and Zabel).

[380]Doc. 674 at 2022:1–5.

[381]Ex. 603.

[382]Ex. 603A.

[383]Doc. 674 at 2020:23–2021:1–25.

[384]Doc. 673 at 1714:20–25.

between the period of June 28, 2013 to July 17, 2015, including attorney-client calls in at least

six of those cases, without excluding any attorney numbers from her requests.[385]  And records

"voluntarily" produced by the USAO in January 2019 showed that Catania obtained 76 attorney-

client calls in the *Phommaseng* case.[386]

In sum, the individual cases and the empirical data together support a finding that the

USAO prosecutors had both individual and collective knowledge that attorney-client calls were

available through a general request for detainee calls from CCA.

### 6.    DOJ Directives, Training, and USAO Management Advice

A 2014 DOJ policy memorandum on "Electronic Surveillance Procedures within the

Federal Prison System" required that prosecutors obtain recorded phone calls of detainees only

by grand jury or trial subpoena, and with prior approval, "any such request must be in writing

and endorsed by a United States Attorney, or, in matters being handled by a Department

litigating section, the Section Chief."[387]  This memo also cautioned that "[pr]isoner

communications with attorneys are not within the scope of this memorandum."[388]  The memo

further refers to the earlier "Weld" memo, which provided that without prior judicial approval,

prison officials may monitor and use detainee telephone conversations except for calls between a

prisoner and his or her attorney.[389]  This memo put USAO prosecutors on notice that they could

obtain jail recordings under certain restrictions but could not obtain attorney-client recordings.

The client law enforcement agencies had similar proscriptions.[390]  There is no evidence that

---

[385]Exs. 600, 600A.

[386]Exs. 715B-020, 715B-032, 715B-035.

[387]Ex. 1300.

[388]*Id.* at 4 n.3.

[389]*Id.*

[390]*See, e.g.*, Exs. 1134, 1135.

106

prosecutors in the *Black* case obtained such prior approval before obtaining audio calls in discovery.

The DOJ's PRAO office published a July 2008 Memo on "Filter Teams-Guidance on Use of Filter Teams to Avoid Ethical Problems," citing to a number of cases, and generally advising that attorney-client privilege issues should be disclosed to defense and unless resolved, litigated for a judicial determination.[391] Notably, this memo stresses that filtering can be done by a filter team, Special Master, or magistrate judge, and that the prosecution should seek court approval of the filter procedures. There is no evidence in this case that the USAO sought court approval of any filter procedures.

USAO management consistently advised that prosecutors must disclose to the defense that they had possession of attorney-client calls. Barnett testified that she considers calls privileged until there is a judicial determination otherwise. Welch and Barnett testified that the proper steps were to set up a filter team, then notify the defense if any attorney-client calls were found; if the privilege issue could not be resolved between prosecution and defense, the matter should then be submitted to the court for a judicial determination.[392] Welch testified that as the USAO PRO, prosecutors could have consulted with him about how to proceed on this type of professional responsibility issue, but confirmed that there was no written policy in place at the USAO at that time for how to proceed when a prosecutor encountered an attorney-client call.[393]

### 7. USAO Internal Deliberation and Guidance on Audio Calls

Without factual support or accurate legal analysis, and contrary to DOJ directives, training, and USAO management advice, the Kansas City prosecutors, as well as Treadway,

---

[391]Ex. 677 (under seal).

[392]Doc. 672 at 1251:8–1253:4; Doc. 677 at 2196:11–2197:3.

[393]Doc. 672 at 1236:12–1237:4.

unilaterally determined that recorded attorney-client calls were available for review, without approval from the court or notice to the defense.  The prosecutors' unilateral determination that the preamble constitutes a waiver if the attorney decides to engage in conversation thereafter, coupled with their lack of research and investigation about the CCA phone system, led to their exploitation of vulnerabilities stemming from CCA's flawed system of recording practices.  The USAO's surreptitious practice of collecting and saving, but not disclosing, attorney-client calls allowed the practice to perpetuate for years.  It was only when the inexperienced and unsupervised Tomasic disseminated a voluminous batch of phone calls in discovery in the *Black* case that the USAO's practices come to light.

### a.      Failure to Investigate

Despite knowing they were getting attorney-client calls when they obtained all audio recordings of detainees housed at CCA, none of the Kansas City prosecutors knew how or under what circumstances CCA recorded calls that detainees placed to attorneys.  Without exception, the Kansas City prosecutors testified that before the issue arose in the *Black* case, they had no confirmed knowledge of how the system worked.[394]  They thought that CCA had a process to block calls to attorneys, but they did not know what that process was.  They did not know how a detainee or attorney would request or receive privatization of their calls.  They did not know whether detainees received notice that they needed to request privatization, and they did not know that CCA would not accept such requests from the detainees, but only from their attorneys.  They did not know that CCA affirmatively represented to the public that attorney-client calls

---

[394]AUSAs Hunt, Zabel, Tomasic, Oakley, and Flannigan all testified that they did not know how the system worked, how privatization worked, or whether defendants or attorneys knew about privatization, and if so, how they knew.

were treated as confidential.[395]  They did not know that CCA did not inform attorneys that they must request privatization, nor what CCA's process for requests entailed.  They did not know that many experienced defense counsel in the District of Kansas were utterly unaware that they must request privatization.[396]  They did not know whether CCA's system worked to privatize calls after a request was made.[397]  They did not know that there was a delay in privatization after a request; and that despite privatization requests, some calls were never privatized.[398]  They were not certain what the preamble said, in English or Spanish, nor whether it was consistently the same preamble.[399]  They did not know whether the preamble played on every call.  They did not know whether the preamble was played on calls that were privatized or when there had been an attempt to privatize.  They did not know the advice defense attorneys were giving their clients concerning the legal effect of the preamble.

In fact, only after these issues arose in the *Black* case did the USAO consider investigating the facts.  When Barnett appeared at the August 9 and August 16, 2016 hearings, she could not answer the Court's questions about how CCA recorded attorney-client calls.  On August 17, 2016, Flannigan emailed Barnett, Metzger, Beall, Rask, Tomasic, and Oakley advising that they should contact CCA to find out how attorney calls are blocked.[400]  Before then, none of them knew or tried to determine any of the salient facts.  Indeed, the Special

---

[395]Doc. 672 at 1182:24–25–1183:1–3.

[396]Ex. 459.

[397]*See, e.g.*, Doc. 669 at 631:11–14.

[398]*See, e.g.*, Doc. 672 at 1187:4–23.

[399]For example, AUSA Zabel testified "[i]t says this call is being recorded." *Id.* at 1197:5–10.  In fact, the English preamble states "this call is subject to recording and monitoring."  Doc. 214 at 19–20.

[400]Ex. 1020.

Master determined the answers to these questions in Phase II of the investigation, speaking with CCA and Securus employees, and obtaining certain records.[401]

### b.     Unilateral Determination on Waiver

Nor did the USAO research the law about waiver.  Several prosecutors admitted in their testimony that the issue of whether the attorney-client privilege has been waived is dependent on salient facts.  Zabel testified that these facts matter in the application of the privilege and that he had no knowledge of the facts about the CCA recording practices discussed above.[402]  Hunt testified that whether the privilege was been waived depends, as "[f]acts mean everything."[403]  Wamble described it as an individual determination.[404]  Morehead testified that the waiver must be knowing and intelligent, which is a factual determination.[405]  Yet the Kansas City prosecutors, as well as Treadway in Topeka, took the position before and during the *Black* litigation that their view of the law was that all CCA detainees waived their attorney-client privilege when they placed calls to attorneys over the CCA phones because there is a preamble played on the calls and signage around the phones that says calls are subject to monitoring.  But the prosecutors who testified were emphatic that they did not actually listen to these non-privileged calls.  Indeed, at the October 2018 evidentiary hearing, virtually all of the prosecutors similarly testified that even though the calls were not privileged, they did not listen, repeating to the effect, "just because you can doesn't mean you should."[406]

---

[401]*See* Doc. 214 .

[402]Doc. 672 at 1180:24–1188:12.

[403]Doc. 675 at 2166:13–17.

[404]Doc. 670 at 905:11–20.

[405]Doc. 674 at 2032:18–2033:8.

[406]*See, e.g.*, Doc. 673 at 1651:8–11; Doc. 675 at 2157:9–16; Doc. 677 at 2270:1–3.

There were a few exceptions. Patton, the longest-serving prosecutor in the Kansas City office, testified that attorney-client calls are generally privileged, and that prosecutors may not listen to them, including calls placed from CCA.[407] Krug likewise testified that when an agent encountered a call in one of his cases, Krug understood that he should contact his supervisor and PRAO because "I have ethical obligations."[408] And Welch advised Tomasic in the *Rapp* case that

> it would make me nervous to try to exploit these calls unless I'm convinced there's a waiver. One way to make sure is to notify defense counsel and the Court that you have these calls, have not listened to them, but you think you could given *Hatcher* and ask the Court for a ruling. That gets the issue out of the way before trial and will give you a firm answer.[409]

But Tomasic testified that in her discussions with the Kansas City prosecutors, in particular with the lunchroom group, the consensus was that the privilege was waived. Tomasic testified that whenever she shared with the lunchroom group the advice she received from Warner, Metzger, Welch, and the PRAO, the group roundly dismissed the advice as wrong, telling her that calls placed by detainees at CCA to their attorneys were not privileged because they were on notice that the call was recorded because of the recorded preamble. Tomasic testified that in 2016, she discussed the calls in the *Huff* case with Oakley and Flannigan, who advised her that the calls were not privileged. Tomasic further testified that Oakley told her about his experience with attorney-client calls in *Forbes*, and she understood from that discussion that such calls were "fair game."[410]

---

[407] Doc. 674 at 1869:14–17, 1870:1–11.

[408] Doc. 675 at 2111:1–5.

[409] Ex. 33; Doc. 672 at 1259:5–12.

[410] Doc. 670 at 789:14–790:3.

Moreover, the Kansas City prosecutors repeatedly broadcasted to one another that caselaw supported their position.  The USAO was an echo chamber of sorts on the matter, perpetuating the notion that they were on firm legal ground.  Yet none of the AUSAs had ever litigated this issue in the District of Kansas or the Tenth Circuit; and none of them was aware of any District of Kansas or Tenth Circuit case supporting their position that CCA detainees had waived their attorney-client privilege for calls.[411]  Zabel testified that the case law supported their position, but he could not point to any specific cases.[412]  Flannigan testified that the *Hatcher* case in the Eighth Circuit supported their position, but she did not know what position the USAO had taken in that case.[413]  Hunt testified that a Tenth Circuit case supported this position, but he could not name the case; he also referenced the *Hatcher* case in the Eighth Circuit, a First Circuit case, and a case in the Western District of Missouri.[414]  Oakley testified that the case law was "overwhelming,"[415] though in 2012 he advised agents in the *Forbes* case that any conversation between an attorney and client is subject to privilege, even if the person is not represented by the attorney at that time.[416]  And at a hearing in *Reulet* in December 2016, Treadway argued to Judge Crabtree that the law is clear that these jail calls are not privileged because of the preamble.[417]

Thus, the Kansas City prosecutors operated under the theory that "the law is clear that CCA's preamble warning the call was being recorded made the call non-privileged[.]"[418]  Once

---

[411] *See, e.g.*, Doc. 672 at 1189: 25–1190:3 (Zabel's testimony that he was unaware of any District of Kansas or Tenth Circuit decision on the issue).

[412] Doc. 672 at 1188:24–1189:5.

[413] Doc. 677 at 2226:21–2227:16.

[414] Doc. 675 at 2167:1–17.

[415] Doc. 674 at 1940:4–12.

[416] Ex. 40.

[417] Ex. 592H at 17:2–22.

[418] Doc. 672 at 1177:8–11; Doc. 675 at 2156:18–2157:23 (acknowledging that opinion that calls were not privileged was widely shared in the USAO); Ex. 650.

the *Black* investigation turned adversarial, both USAO management and rank alike took this litigation posture, consistent with the position previously taken by most Kansas City prosecutors before, that the attorney-client privilege is waived.[419]  As discussed *infra* in Section VI.B.2.a.ii, however, this unilateral determination that the recorded calls were conditioned on a knowing waiver of attorney-client confidentiality was made without factual support or accurate legal analysis.

### c. Failure to Disclose to the Defense

Prosecutors who made the unilateral determination that all CCA detainees waived their attorney-client privilege intentionally avoided any judicial determination of this issue by not disclosing to defendants that they had obtained their attorney-client calls.  Numerous defense counsel stated that they had never received an attorney-client call in discovery.[420]

Historically, the AUSAs did not disclose that they had any jail calls, including non-attorney-client calls.  After Tomasic returned from the DOJ National Advocacy Center ("NAC") in early 2017, she told the lunchroom group that she had learned that jail calls must be turned over to defendants in discovery, pursuant to Fed. R. Crim. P. 16.[421]  Tomasic testified that at NAC "it was discussed at length that inmate calls are property of the government because we contract with the jails or we directly supervise them and, therefore, they're Rule 16 statements of

---

[419]Ex. 1053; Doc. 133 at 29–31.

[420]*See, e.g.*, Ex. 459, Jenab, Calbi, Dodge, Vermillion, Rokusek, Johnson, and Joseph Affs.

[421]Doc. 669 at 601:1–19.  Rule 16(b) requires that

Upon a defendant's request, the government must disclose to the defendant . . .

(i) any relevant written or recorded statement by the defendant if:

- the statement is within the government's possession, custody, or control; and
- the attorney for the government knows—or through due diligence could know—that the statement exists.

the defendant and must be turned over."[422]  Tomasic testified that Zabel, Rask, and others in the lunchroom group rejected this position, and that Rask dismissed the DOJ trainer as not being knowledgeable on this subject.

Barnett testified that the Kansas City office engaged in the narrowest reading of Rule 16 possible.  Flannigan testified that while Rule 16 requires disclosure of any recorded statement of a defendant upon the defendant's request, she disclaimed knowledge of whether the District of Kansas's standard pretrial order states that the defendant has been deemed to have requested his or her recorded statements.  The Court takes judicial notice that the pretrial order does require that.[423]  The Court further finds that by taking the position that they need not disclose detainee phone calls in the regular course of Rule 16 discovery, the USAO's acquisition and access to attorney-client calls was easier to hide.[424]

Even if they disclosed that they had CCA calls, most prosecutors did not disclose that they had attorney-client calls, ensuring that there would be no judicial determination on the issue in any given case.  There were exceptions; but in those rare instances when a prosecutor disclosed that they had an attorney-client call, the evidence shows that the prosecutor described it as inadvertent, or in some way conveyed that their possession of an attorney-client call was rare or exceptional, in a manner designed to alleviate defense concerns.[425]

---

[422]Doc. 669 at 465:16–20; *see* Tr. Aug. 9, 2016 Hr'g, Doc. 104 at 55:17–22 (CCA employee Michelle Jensen-Schubert testifying that because CCA contracts with the USMS, the recordings are USMS property).

[423]Pretrial and Criminal Case Management Order,  http://www.ksd.uscourts.gov/index-php/forms/?open=CriminalForms.  This is the same pretrial order that Barnett and Tomasic acknowledged was roundly criticized by some prosecutors in the Kansas City office.  Barnett testified that those prosecutors were extremely resistant to the pretrial order's encouragement of early disclosure and discovery.

[424]The Court need not determine at this time whether the Government violated Rule 16 by failing to disclose detainee phone calls.

[425]*See* Ex. 10.

But the USAO's regular practice was to not disclose to defense counsel that they had acquired and/or accessed attorney-client calls. Tomasic testified that Oakley advised her that he had heard an attorney-client call but did not disclose because of "litigation risk" and "hassle."[426] Tomasic further testified that the lunchroom group repeatedly said that if defense attorneys were "stupid enough" to talk to their clients over the phone, they had no obligation to tell them that their calls were recorded.[427] This is consistent with Warner's testimony that the culture in the Kansas City office was to treat the defense bar as the enemy,[428] and Barnett's testimony that as Criminal Chief, she repeatedly received complaints from the defense bar about abusive treatment by the Kansas City prosecutors.[429] This practice also failed to follow the advice of the DOJ's PRAO as well as advice from USAO management.[430]

The prosecutors' position was that if they did not "use" the attorney-client calls—meaning use as evidence at trial—they were under no obligation to disclose the calls to the defendant, even if they or their agents heard the calls.[431] Prosecutors unilaterally determined that they had not "used" the calls; they did not disclose their possession of the calls to the defendant so that defendant could evaluate the content of the calls and/or seek a judicial determination of prejudice. One only need read Treadway's copious handwritten notes of the attorney-client phone calls in *Reulet* to see that a prosecutor gleans information from the content of attorney-

---

[426] Doc. 669 at 471:13–20.

[427] *Id.* at 470:16–25.

[428] Doc. 652 at 20:23–21:3.

[429] Doc. 677 at 2341:19–2342:10, 2383:2–2384:1.

[430] Ex. 677 (under seal).

[431] *See* Doc. 182 at 12–13 (discussing the USAO's argument that since they were not going to "use" the video recordings as evidence at trial, there was no need to review the video to determine if their content was attorney-client protected communications).

client calls that has utility to the prosecutor, whether or not the calls are going to be evidence at trial.

And that is certainly the pitch Zabel made in his email to Rask and others on March 6, 2017, arguing that they did not need to disclose the defendant's calls to Moran in *Herrera-Zamora* because they had not used the calls to prove guilt or for sentencing purposes, the calls were not relevant as inculpatory or exculpatory evidence, and the calls were not discoverable under Rule 16 unless the defendant requested them.[432]  Zabel strived hard not to disclose in *Herrera-Zamora*, despite the pendency of *Black* and being on clear notice that detainees and attorneys lacked knowledge of the recordings.  Zabel's reluctance to disclose is consistent with Tomasic's testimony that on several occasions in *Herrera-Zamora*, Zabel told her they did not have to disclose calls if they were not going to use them, and that Zabel rejected her suggestion that they follow the advice she received in national training that the recordings must be disclosed under Rule 16.[433]  Tomasic further testified that Zabel told her not to tell Rask, who by then was the Kansas City Criminal Coordinator, that Zabel had told Tomasic not to disclose or that she had Gardner listen to calls.[434]  Zabel denied Tomasic's allegations.[435]

In fact, this narrow definition of "use" governed prosecutors' disclosure of other types of discovery, including *Brady* and *Giglio* materials.[436]  Tomasic testified that the lunchroom group took the position that while they must disclose *Brady* and *Giglio* information, they did not

---

[432]Ex. 494.

[433]Doc. 669 at 600:5–601:25.

[434]Doc. 270 (under seal).

[435]Doc. 672 at 1178:22–1179:17; *see* Doc. 670 at 791:1–24.

[436]*Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) govern the Government's discovery disclosure obligations under the Due Process Clause regarding exculpatory evidence, including evidence relevant to impeachment.  *See, e.g., United States v. Gonzalez-Montoya*, 534 F.3d 643, 649 (10th Cir. 1998).

believe in disclosing this information early, or even before negotiating plea agreements.  Barnett and Tomasic testified that this group of prosecutors was vehemently opposed to the Court's new pretrial order, which established a general rule of early disclosure of this and other types of discovery.  Warner testified that during his tenure, some of the Kansas City prosecutors engaged in heavy-handed, unfair prosecutorial practices, including discovery practices such as late disclosure of *Brady* and *Giglio* information and evidence relevant to sentencing issues,[437] and were "extremely oppositional" to management's attempts to adopt standard discovery policies in Kansas City that were consistent with how discovery was handled in the Topeka and Wichita offices.[438]  Warner identified Morehead, Rask, Catania, Flannigan, and Zabel as most resistant to management's attempts to adopt policies addressing abusive prosecutorial practices in discovery, retaliatory use of § 851 sentencing enhancements, abusive charging practices in drug cases, and "bait and switch" § 5K1.1 agreements, all of which Warner testified "reeked of ambush prosecution."[439]  Barnett echoed how resistant some Kansas City prosecutors were to management's efforts to bring the Kansas City office's practices into conformity with the other two offices.

---

[437]*See United States v. Orozco*, 916 F.3d 919, 924–26 (10th Cir. 2019) (affirming finding of violation of Sixth Amendment right to present a defense but remanding for reconsideration to tailor remedy imposed).  The Court takes judicial notice that in the underlying proceedings, the Court found that Morehead had turned over *Brady* information shortly before trial and steadfastly refused to admit that it was *Brady* information, arguing that she did not know what the defense was so she could not ascertain whether the evidence was potentially exculpatory.  *See United States v. Orozco*, D. Kan. No. 15-20074-JAR, Doc. 121 at 2–3.

[438]Warner testified that it was widely known that these problems resided in the Kansas City office, and he referenced Judge John Lungstrum remarking during a sentencing hearing in a Topeka case that the prosecution practices in the Kansas City office were markedly different.  Doc. 652 at 10:12–20.

[439]*Id.* at 18:1–10.

### d.   No Reasonable Measures to Exclude or Filter Attorney-Client Calls

Federico's data demonstrates that individual AUSAs repeatedly requested phone calls without taking any precautions to avoid attorney-client calls.  This was true even when individual AUSAs who had obtained attorney-client recordings in one case would subsequently request recordings in other cases.[440]  And this was true even when the AUSA collected attorney-client calls in a case and subsequently requested more calls *in that same case*, thus knowing that attorney-client calls had been captured once before.[441]

There are several precautionary measures the USAO could have taken to avoid obtaining or accessing attorney-client calls, including asking CCA if phone numbers for a particular attorney had been privatized, reviewing Securus Call Detail Reports to identify attorney numbers before reviewing calls, or notifying defense counsel and the Court if they discovered those calls. Several prosecutors made efforts to exclude known attorney numbers, which is evidence that they knew that a request for calls could yield attorney-client calls.  After the *Black* case commenced, Jared Maag, a prosecutor in the Topeka office, asked CCA in writing to exclude from a call request calls to two attorney phone numbers.[442]  Treadway did the same in the *Reulet* case, asking specifically that certain numbers assigned to defense counsel Morgan be excluded.[443]  And Wamble, upon receiving recordings in *Wood* that included her calls to attorney

---

[440]Despite the language on the USMS request form that a request for calls excluded attorney-client calls, prosecutors should have known from these repeated requests that CCA did not exclude such calls from production. Sometimes USMS emails also included language that attempted to exclude attorney-client calls from the request. *See e.g.,* Ex. 715B-048 (USMS Troy Schuster email to CCA, ending with "AS ALWAYS EXCLUDING ANY PRISONER ATTORNEY CALLS").

[441]*See* Exs. 606, 607.

[442]Ex. 720.

[443]Ex. 721.  Of course, Treadway did not exclude the numbers of Reulet's other three attorneys, and she extensively listened to those many attorney-client calls.

Cox, sent an email to the USMS, specifically asking that CCA send him recordings that excluded calls to Cox. Other than these exceptions, there is no real dispute the Kansas City prosecutors took no steps to exclude calls by providing the attorneys' number(s) to the USMS or CCA.

Another precautionary measure available to the USAO was the use of a taint team.[444] As noted, the DOJ had issued specific guidelines on the use of taint teams. USAO management was aware that they could utilize taint attorneys or taint teams to review privileged materials. USAO managers and Hunt testified that the selected taint attorney must be someone who adheres to ethical requirements and acts with integrity.[445] They designated Treadway to serve as taint attorney in the *Black* case.

Further, despite Rask's protestations to Barnett in August 2016 that prosecutors should be able to proceed with reviewing audio recordings because they had a taint team in place, there is no evidence that the USAO routinely used taint teams for CCA recordings or sought court approval of any filter procedures.[446] In *Herrera-Zamora*, Tomasic proceeded to listen to some of Moran's calls herself despite the designation of Hunt to serve as taint attorney in that case.[447] And in the *Black* case, Tomasic clearly understood the importance of assembling a taint team to review materials seized from detainees' cells during execution of the search warrant, as well as to review law library computers that detainees could access to draft letters to their attorneys. But she took no steps to have a taint team review the audio recordings, even though she knew from past experience that these thousands of recordings likely would include attorney-client calls.

---

[444]The Court acknowledges the FPD's position that the use of taint teams or taint attorneys is not a legally sufficient way to treat potentially privileged materials and does not rule on that issue at this time.

[445]*See* Ex. 1204.

[446]Ex. 1054.

[447]Ex. 583.

Notably, Beall issued a comprehensive policy in May 2017 that is largely curative of many of the issues that came to light in the *Black* case.[448]  The USAO procedure includes a requirement that prosecutors make their requests for CCA calls in writing on request forms and provides for a filter team procedure.  On May 26, 2017, Beall emailed to everyone in the USAO the "Revised Procedure for Requesting and Using Recorded Detainee Phone Calls."[449]  The cover email states that this policy should be implemented immediately and that the policy is consistent with the DOJ's 2014 Memorandum regarding Electronic Surveillance Procedures within the Federal Prison System.  Beall testified that this revised procedure was mandatory.  Yet in their testimony during the October 2018 hearing, both Flannigan and Oakley testified that they knew of no policy on attorney-client calls.

### e.     Internal Dysfunction

The record illustrates how deeply the Kansas City prosecutors distrusted current and past management, to the point of insubordination.  Warner described the Kansas City division as essentially an "inmates-run-the-jail" type office.[450]  There was also evidence that some prosecutors blamed or finger-pointed at others.  Tomasic testified that it was a "Lord of the Flies" environment, with prosecutors recording their conversations with others from the office and keeping files and notes at home.  Catania, for example, recorded her side of the conversation when she called Metzger to report Gardner's statements that Zabel and Tomasic wanted her to give oral summaries of attorney-client calls during the *Herrera-Zamora* trial.

While this internal dysfunction is largely irrelevant to the matters before this Court, the Court notes these findings for several reasons.  First, to the extent that prosecutors have

---

[448]Ex. 1181 (under seal).

[449]Exs. 695 and 1198 (attachment admitted under seal).

[450]Doc. 652 at 25:15–20.

contradicted one another in their accounts of certain events, the Court has endeavored to look to other corroborating evidence before finding one account true and the other not true.

Second, the USAO argued that Tomasic was a lone rogue prosecutor. The USAO's strategy necessarily changed to a theme of two rogue prosecutors during the October 2018 hearing after the FPD admitted Treadway's handwritten notes into evidence. But the Court does not discredit all of Tomasic's testimony as the Government urges. In fact, as detailed throughout these findings of fact, the Court credits most of Tomasic's testimony because it is corroborated by other credible evidence, including emails, documents, and the testimony of Warner, Barnett, and others that the Court finds to be credible on the particular facts in issue. Notably, Warner testified that early in Tomasic's tenure, she was earnest and endeavored to do the right thing, seeking his advice on attorney-client calls and other issues. Over time, however, Warner perceived that she succumbed to the peer pressure of the AUSAs in the Kansas City Division whom he believed to be bad influences. Indeed, Warner and Tomasic testified that Warner specifically directed Tomasic not to seek advice or counsel from Catania, Morehead, Rask, or Flannigan, whom Warner believed engaged in heavy-handed prosecutorial practices. But, Warner testified, in time Tomasic started aligning herself with some of those prosecutors and "we lost her."[451]

Third, this evidence of dysfunction and strife illustrates that USAO management, or at least Beall, Metzger, Barnett, and Warner, repeatedly sought to address discovery abuses and other abusive prosecutorial practices. This dysfunction resulted in Kansas City prosecutors either (1) failing to disclose to management that they had recordings of attorney-client communications, or (2) in most cases where they did disclose to management, failing to follow

---

[451]*Id.* at 25:1–11.

management's advice not to listen to calls, engage a taint team, to inform the defense, or inform the Court if there were issues to litigate.

Finally, this evidence is relevant to findings the Court previously made about USAO management's failures to preserve evidence, as well as USAO management and then Clymer's failures to search and produce documents identified through the Special Master's search terms. Management was well aware that there was a serious problem in the Kansas City office, yet management decided to delay and obstruct the Special Master's investigation and ultimately the Court's efforts to have the parties proceed with discovery and an evidentiary hearing on the Sixth Amendment issues. Management refused to search and produce any repositories other than those of Tomasic and Treadway. Management knew it had a problem with at least some of the prosecutors in the Kansas City office, yet delayed search and production of any active AUSA's repositories until Clymer took over. Then, under his direction, management defied the Court's orders and directives, continued to fail to preserve such that years of documents were potentially lost, and then only produced what they chose to produce.

## 8. Retention of Attorney-Client Recordings

Both the FPD and individual defendants filed Rule 41(g) motions in this case and numerous other pending criminal cases in this district, seeking return of both video and audio recordings. The individual defendants' motions were either denied without prejudice or terminated after the respective defendant was sentenced. The Government has only recently confirmed that dating back to 2011, the USAO kept recorded calls from CCA, including attorney-client calls, during the duration of the case rather than returning or destroying them.[452]

---

[452] *See* Doc. 711 (FPD's Motion to Admit Exhibit (Ex. 715)) (the Government's written inventory of CCA phone calls and derivative evidence from thirty-two individual cases in its possession and surrendered to the Court on January 7 and 11, 2019).

By January 2019, the USAO was still in possession of recordings of attorney-client phone calls. To date, the USAO has turned over recordings for over 100 defendants to the Court and FPD, and production is ongoing.[453]

## V.   Conclusions of Law: Cooperation

The FPD's Motion to Show Cause, as supplemented, asks the Court to require the Government to show cause why it should not be held in contempt for failing to cooperate with the Special Master's investigation based on the following conduct: (1) spoliation of evidence; (2) defiance of Court orders, including orders directing the USAO to preserve evidence; (3) delay in providing statements by key USAO employees to the Special Master; (3) failure to act with candor and transparency with the Court and the Special Master; (4) recalcitrance in failing to timely correct the record in *Black* with the information about Tomasic's conduct in *United States v. Herrera-Zamora*; and (5) changing course in September 2017 when Clymer was appointed in this matter, by asserting that privilege justified the Government withholding information it had previously agreed to provide to the Special Master.  The FPD also seeks fees and costs as a sanction for contempt, and for unreasonably and vexatiously multiplying the proceedings under 28 U.S.C. § 1927.[454]

The Government maintains: (1) neither the spoliation doctrine nor Fed. R. Civ. P. 37 apply here because this is a criminal case; (2) there is no legal duty requiring it to justify the documents it withheld from production during the investigation, or in advance of the hearing,

---

[453]*See* Ex. 715; Doc. 726.  See Section III.B.4 *supra* for a discussion of the Government's 2019 production of CCA telephone recordings.

[454]On October 26, 2018, after the October evidentiary hearing, the FPD supplemented its Motion for Order to Show Cause, asking the Court to consider five additional grounds for sanctions based on facts that developed since the time of its original filing.  *See* Doc. 668.  The Court confines its analysis to the general allegations for which the Government was on notice to show cause at the October hearing: preservation, spoliation, and failure to produce documents and witnesses.

because it had no duty to produce documents in the first place; (3) the USAO had no obligation

to impose a litigation hold or otherwise preserve documents not subject to the Court's clawback

orders prior to August 2018; (4) mere negligence is insufficient to demonstrate spoliation; and

(5) the USAO did not violate any of the Court's discovery orders nor otherwise fail to cooperate

in the Special Master's investigation. The Court first addresses why civil standards apply to the

imposition of sanctions associated with the Government's conduct during the Special Master's

investigation. Next, the Court addresses the issue of spoliation of the AVPC and information

subject to preservation directives. Then, the Court addresses grounds for non-spoliation

sanctions.

### A.     Civil Standards

The Court finds that the investigation into wide-ranging Sixth Amendment violations

within this criminal case was civil in nature, and thus civil discovery standards guide the remedy

for the Government's failure to cooperate with discovery and abide by court orders during the

course of the investigation. The triggering event for the August and September 2016 hearings

regarding the Government's possession of attorney-client recorded communications was the

FPD's Motion for Return of Property under Fed. R. Crim. P. 41(g), filed on August 5, 2016. The

FPD filed an amended motion on August 7, 2016, after learning that phone calls between

detainees and their attorneys were being recorded. The FPD did not and does not represent the

Defendants named in the *Black* Indictment; it filed these motions as an intervening party on

behalf of its many clients whose calls and meetings with their attorneys were potentially

recorded and/or possibly produced to Defendants named in the *Black* investigation. And under

the Court's Standing Order 18-3, the FPD is appointed to represent all petitioners alleging Sixth

Amendment violations based on evidence uncovered during this investigation under 28 U.S.C. § 2255.[455]

The Court appointed the Special Master to investigate the Sixth Amendment allegations made in the FPD's Rule 41(g) motions.  The Tenth Circuit has held that for purposes of Fed. R. App. P. 4, a motion brought under Fed. R. Crim. P. 41(g) is civil in nature, triggering the notice of appeal filing period for civil cases.[456]  It is the "essential nature of the action, not the underlying proceeding it arose from, that determines whether it is civil or criminal."[457]  The Tenth Circuit held that Rule 41(g) motions are civil in nature because they "represent a means by which a criminal defendant can determine her rights in property, and not a part of the trial and punishment process that is criminal law."[458]  Here, the Rule 41(g) motions were filed by intervening parties on behalf of detainees whose property was swept up by the Government during its investigation in *Black*.  It is collateral to the underlying criminal case.

Moreover, the Court appointed the Special Master under Fed. R. Civ. P. 53 and its inherent authority.  Rule 53(a)(1)(A) states that the court may appoint a Special Master to "perform duties consented to by the parties."  In addition, under Rule 53(a)(1)(C), the court may appoint a Special Master to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."  Phase I of the Special Master's investigation was consented to by the parties and involved a feasibility analysis. Phase II involved pretrial matters—the scope of potential attorney-client recordings captured during the *Black* investigation—that could not be effectively addressed by the undersigned in

---

[455]Standing Order 18-3 (July 17, 2018), http://www.ksd.uscourts.gov/wp-content /uploads /2018/07/ Standing-Order-18-3-Appointing-FPD.pdf.

[456]*In re Special Grand Jury 89-2*, 450 F.3d 1159, 1169 (10th Cir. 2006)

[457]*Id.* at 1167 (citing *United States v. Holland*, 214 F.3d 523, 526 (4th Cir. 2000)).

[458]*Id.* (quoting *United States v. Madden*, 95 F.3d 38, 39 n.1 (10th Cir. 1996)).

individual cases.  It is not uncommon for special masters to be employed by federal district courts in criminal cases under this rule to help determine privilege issues during discovery where the likelihood is high that the discovery contains communications protected by the Sixth Amendment.[459]

Before the Court appointed the Special Master, the Court and parties recognized the potential scope of Sixth Amendment violations at stake based on the allegations made in the Rule 41(g) motions and the evidence presented at those early hearings.[460]  At that point, dozens of defendants in other cases had also filed motions for return of property on the basis that they were detained at CCA during the period that the Government obtained video recordings as part of the *Black* investigation, or because they had reason to believe phone calls between themselves and their attorneys had been recorded.  The Government was on notice that these issues would be raised in the context of 28 U.S.C. § 2255 litigation well before May 2018, when the parties announced their intention to negotiate a resolution in this matter that would include both prospective relief and "some possible additional retrospective relief."[461]  Indeed, the basis for the DOJ's decision not to support the parties' settlement proposal was its position that each motion under § 2255 must be evaluated separately.  As of this date, the FPD has filed 110 § 2255

---

[459]*See, e.g.*, *In re Grand Jury Subpoenas*, 454 F.3d 511, 524 (6th Cir. 2006) (reversing district court's decision to employ government taint team to conduct a privilege review of documents seized pursuant to a grand jury subpoena; mandating district court utilize a special master to perform an initial segregation of documents); *United States v. Abbell*, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master to review materials seized during execution of search warrants at law offices); *United States v. Gallego*, No. CR-18-01537-001-TUC-RM (BPV), 2018 WL 4257967, at *3 (D. Ariz. Sept. 6, 2018) (same; explaining exceptional circumstances present where Sixth Amendment rights are at stake); *United States v. Stewart*, No. 02 CR 396 JGK, 2002 WL 1300059, at *6–7 (S.D.N.Y. June 11, 2002) (collecting cases articulating relative advantages of using special masters instead of government taint teams to review documents seized from law offices).

[460]*See, e.g.*, Tr. Aug. 16, 2016 Hr'g, Doc. 118 at 64:21–65:3.

[461]Doc. 483-1 at 325:18–20.

petitions and represents that "more are coming."[462]  Of course, any discovery granted in these habeas cases will be governed by the Federal Rules of Civil Procedure.[463]

The Government insists that it was only bound by the Fifth Amendment's Due Process clause in preserving evidence in this criminal case.[464]  The Due Process clause governs the spoliation inquiry in criminal cases—it is the criminal defendant's burden to demonstrate materiality, and in the absence of materiality, that potentially useful evidence was destroyed in bad faith.[465]  But only Defendant Carter remains in this criminal case, and the Government does not oppose his dismissal.

Other than Defendant Carter, the Special Master's investigation pertains to potentially hundreds of CCA detainees not charged in the *Black* case.  While perhaps those detainees would be required to submit to a Due Process analysis in their individual criminal cases in the context of a motion to dismiss the charges against them, that is not the posture in which the Sixth Amendment issues are presented here.  One purpose of the Special Master's investigation was to determine how to return each detainee's confidential communications to the extent they exist.  Some of those detainees have sought return of their recordings directly through Rule 41(g) motions in their underlying cases, through motions to intervene in this case, and through post-conviction petitions for relief under 28 U.S.C. § 2255.  The evidence these litigants require to move forward with their direct challenges either is impounded by the Court in this case, has been destroyed, or is controlled by the Government.  Except for Defendant Carter, the evidence obtained through the Special Master's investigation is entirely ancillary to the *Black* case.  As

---

[462]Doc. 747 at 100; *see also infra* Section V.C.1.

[463]R. 6(a) Governing § 2255 Proceedings.

[464]*See California v. Trombetta*, 467 U.S. 479, 488–89 (1984).

[465]*Id.*; *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

such, the Court finds that this matter is civil in nature and proceeds to apply civil standards to questions of spoliation and compliance with preservation duties and orders that were issued as part of the Special Master's investigation.[466]

### B.    Spoliation

The seminal case of *Zubulake v. UBS Warburg LLC* defines spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[467]  Spoliation sanctions are appropriate where there is a duty to preserve, and "the adverse party was prejudiced by the destruction of the evidence."[468]  There must be a showing of actual, not theoretical, prejudice.[469]  "[I]f the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith."[470]  "Bad faith involves dishonest conduct and implies wrongdoing or some motive of selfinterest. . . .  However, mere negligence in losing or destroying records is not enough because 'it does not support an inference of consciousness of a weak case.'"[471]

In the case of electronically stored information, or "ESI," Rule 37(e) governs and provides two tracks for spoliation sanctions:

> (e)  If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

---

[466]*Cf. United States v. Hood*, 615 F.3d 1293, 1301 (10th Cir. 2010) (finding no plain error in district court's failure to apply civil discovery doctrine in the criminal context where issue was not raised by defendant below).

[467]229 F.R.D. 422, 430 (S.D.N.Y. 2004) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).

[468]*E.E.O.C. v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 964 (10th Cir. 2017) (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009)).

[469]*Turner*, 563 F.3d at 1150.

[470]*Id.* at 1149.

[471]*F.T.C. v. Affiliate Strategies, Inc.*, No. 09-4104-JAR, 2011 WL 2084147, at *6 (D. Kan. May 24, 2011) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997)).

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.[472]

To impose sanctions under either subsection of Rule 37(e), the Court must find that three prerequisites are met: "(1) the ESI should have been preserved, (2) a party failed to take 'reasonable steps' to preserve it, and (3) it cannot be restored or replaced."[473]  Once these three requirements are met, the Court must determine whether there has been a showing of intent to deprive the opposing party of information for use in the litigation, which could trigger the severe sanctions provided under Rule 37(e)(2), including a presumption of prejudice.[474]  If the moving party is unable to demonstrate intent, but does demonstrate prejudice, then lesser sanctions may be imposed no greater than necessary to cure that prejudice.[475]

### 1.    AVPC

As described in the Court's findings, the AVPC was the only computer on which USAO staff could view the video recordings obtained from CCA.  With the exceptions of Boyd and Stokes, all Government witnesses denied watching the videos.  Boyd testified that although she drafted a "cheat sheet" to help attorneys operate the PELCO player on the AVPC, the attorneys

---

[472]Fed. R. Civ. P. 37(e) (effective Dec. 1, 2015).

[473]*Stovall v. Brykan Legends, LLC*, No. 17-2412-JWL-JPO, 2019 WL 480559, at *2 (D. Kan. Feb. 7, 2019).

[474]*Id.*

[475]*Id.*

required her help to load and view the videos and no other attorneys asked for her assistance. This testimony is corroborated by Rokusek's testimony that she needed to coordinate with Boyd's schedule in order to find a time to watch the video of her meeting with Dertinger on August 5, 2016.  It is also corroborated by this Court's experience—the Court required Boyd's assistance in order to perform an in camera review of the *Dertinger* video in June 2017.

The Special Master hoped that the AVPC's metadata would conclusively demonstrate when the videos were accessed and by whom, but he learned soon after his appointment in late October 2016, that the AVPC's hard drives had been reformatted and the computer "refreshed in place" during the USAO's cyclical upgrade on September 6, 2016, despite the USAO's repeated representations that it had  "locked down" the office's computer hard drives.  After it was reformatted and the new operating system loaded, Boyd continued to use the AVPC until November 7, 2016, at which point the hard drives were removed and eventually placed in the USAO vault.

In a past order, this Court referred to the USAO's failure to preserve the AVPC hard drives as "troubling," and cited it as one of the many reasons to proceed with the Phase III investigation.  Now, the FPD asks the Court to sanction the Government for its failure to preserve the AVPC.  To the extent the FPD seeks spoliation sanctions, the inquiry is governed by Rule 37(e) because the alleged metadata constitutes ESI.

Although the Court easily concludes that the USAO had a duty to preserve the AVPC hard drives based on the August 2016 Rule 41(g) motions and Brannon's August 30, 2016 email,[476] there was insufficient evidence presented at the evidentiary hearing to support a finding

---

[476]In the Tenth Circuit, a party has a common law duty to preserve evidence if the party "knew, or should have known, that litigation was imminent."  *E.E.O.C. v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 964 (10th Cir. 2017) (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2008)).  A party need not understand "the precise nature of the specific litigation at issue" in order for a duty to preserve to be triggered.

that the logging data on the AVPC cannot be restored, to the extent it existed in the first place. "This factor does not require that [the FPD] pursue every possible avenue for replacing or restoring the ESI, but it must show that it made some good-faith attempt to explore its alternatives before pursuing spoliation sanctions."[477]

At the evidentiary hearing, the Court heard from Steeby and Loehrs on this issue. Counsel for the Special Master asked Steeby if there was "any way to get back the data that was on that AVPC on September 5th, 2016," to which Steeby responded, "I'm not a forensic expert; however, I would be interested in—in looking at the unallocated space on that hard drive if I were asked to try to get the data back."[478] Loehrs, who is a computer forensics expert, further explained the concept of unallocated space on the hard drive and opined that data on a hard drive that has been reformatted is not necessarily unrecoverable.[479] When asked if "it [is] common to recover either partial or entirely intact files from unallocated space," Loehrs replied, "[d]o it every day."[480]

There is no evidence that establishes whether metadata resided on the AVPC hard drive showing information about users' access to the PELCO player other than Boyd. And there is no record that any party asked Loehrs to conduct a forensic analysis of the AVPC to determine

---

*Zbylski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1160 (D. Colo. 2015). The Court looks to "facts such as the likelihood that a certain kind of incident will result in litigation; the knowledge of certain employees about threatened litigation based on their participation in the dispute; or notification received from a potential adversary." *Id.* at 1163 (citing *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004)). An internal investigation can trigger the duty to preserve, for example. *Id.* (citing *Marcum v. Scioto Cty., Ohio*, No. 1:10–cv–790, 2013 WL 9557844, at *7 (S.D. Ohio. Nov. 21, 2013)).

[477] *Steve & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 109 (E.D. Va. 2018); *see also Stovall*, 2019 WL 480559, at *3 ("[T]o the court's knowledge, neither party has engaged a computer specialist for the purpose of locating the video on defendant's computer hard drive or back-up system. In the end, the court concludes plaintiff has not proven the video cannot be replaced or restored.").

[478] Doc. 672 at 1106:3–8.

[479] Doc. 674 at 1836:9–14; 1837:3–23.

[480] *Id.* at 1853:6–8.

whether the logging data, if it exists, sought by the Special Master and the FPD could be restored.  And even if some of the data was overwritten during the period that the AVPC continued to be used before being taken out of service by the USAO, Loehrs testified that some of the data may be recoverable.[481]  Loehrs testified that she would charge "5 to $10,000 tops" to search for the missing data on the AVPC.  The Court does not discount the high cost of conducting a forensic analysis, but no party retained Loehrs to conduct this evaluation, and no party sought a court order to require the Government to conduct this analysis either.[482]  Under these circumstances, the Court cannot make a finding that metadata or logging information, to the extent it existed in the first place, cannot be restored.  Thus, spoliation sanctions are not available under Rule 37(e) for the destruction of information on the AVPC on this record.

### 2.    ESI Lost Under Normal Retention Policies

As already explained, the Government had a duty to preserve evidence surrounding the USAO's practice of requesting and obtaining audio and video recordings of meetings between federal detainees and their attorneys in early August 2016.  When the FPD filed its Rule 41(g) motions, and certainly when Brannon sent the August 30, 2016 email demanding that the USAO hold onto computers and hard drives that would otherwise be replaced during the cyclical refresh, USAO management knew that the allegations raised in the FPD's motions would result in imminent litigation.  The Court's August 18, 2016 audio clawback order also included a broadly-worded preservation directive that many prosecutors understood went beyond evidence

---

[481]*Id.* at 1854:4–22.

[482]*See Jenkins v. Woody*, No. 3:15cv355, 2017 WL 362475, at *16 (E.D. Va. Jan. 1, 2017) (finding the data could not be restored where "the Court allowed the Plaintiff to 'attempt to copy or mirror image the hard drive' of the video surveillance cameras in the RCJC because [Defendant] had been unable to recover the Video Data. . . . Plaintiff's attempt failed."); *E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 478 (E.D. Va. 2011) (describing expert testimony summarizing deleted files that were overwritten, and thus inaccessible, on hard drives).

discovered in the *Black* case.  USAO management decided not to seek clarification of that order,

but instead insisted on a narrow interpretation of the USAO's duties and affirmatively disclaimed

any obligation to issue a litigation hold.  Certainly, by the time of the Special Master's discovery

orders in October and November 2016, there could be no doubt about the Government's

obligation to preserve evidence that might be relevant to a potential Phase III investigation.

  The Court also can easily find that the USAO did not take reasonable steps to preserve at

the time the duty arose.  "[W]hether a party has honored its obligation to preserve evidence turns

on reasonableness, which must be considered in the context of whether 'what was done—or not

done—was *proportional* to that case and consistent with clearly established applicable

standards.'"[483]  Generally, "when a company or organization has a document retention or

destruction policy, it 'is obligated to suspend' that policy and 'implement a "litigation hold" to

ensure the preservation of relevant documents' once the preservation duty has been triggered."[484]

The purpose of the litigation hold is "to avoid the loss of evidence through intentional or

negligent actions, or even through routine document management."[485]  An organization is not

required to preserve "every shred of paper, every e-mail or electronic document, and every

backup tape."[486]  Instead, a party must preserve "any documents or tangible things (as defined by

---

[483]*Zblyski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1164 (D. Colo. 2015) (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010)) (emphasis in original); *see also Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 522–23 (D. Md. 2010) (describing reasonableness and proportionality standards).

[484]*Victor Stanley, Inc.*, 269 F.R.D. at 526 (quoting *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 511 (D. Md. 2009)); *Browder v. City of Albuquerque*, 187 F. Supp. 3d 1288, 1295 (D.N.M. 2016).

[485]*Heiget v. City of Hays*, No. 13-2228-KHV-KGG, 2014 WL 1308893, at *3 (D. Kan. Mar. 31, 2014).

[486]*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Heathcare Servs.*, No. 1:12-cv-00526 MV/GBW, 2017 WL 3535293, at *3 (D.N.M. Aug. 16, 2017) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)).

Rule 34(a)) made by individuals likely to have discoverable information that the disclosing party

may use to support its claims or defenses."[487]

It is not enough to simply put in place a litigation hold to ensure preservation:

> the litigant must also oversee compliance with the hold by
> monitoring the litigant's "efforts to retain and produce the relevant
> documents." Counsel must communicate with the litigant to ensure
> "(1) that all sources of relevant information [are] discovered, (2)
> that relevant information is retained on a continuing basis; and (3)
> that relevant non-privileged material is produced to the opposing
> party."[488]

As documented in the Court's findings of fact, the USAO: (1) delayed issuing a litigation hold

email to USAO staff until December 19, 2016, four months after the duty arose; (2) failed to

enforce the December 19, 2016 litigation hold email; (3) delayed issuing a formal litigation hold

that suspended normal document retention policies; and (4) delayed and obfuscated compliance

with the Court's August 2018 preservation order.

As the Court noted in its findings of fact, the Government's misrepresentations, delays,

and lack of transparency about the state of its preservation efforts in this matter make it

impossible to conclude with certainty what information has been lost and cannot be restored.

However, the Court can draw the following conclusions from this record that may be relevant to

discovery in the upcoming § 2255 litigation: (1) there is ample evidence that prosecutors in the

District of Kansas routinely maintain case files in both hard-copy and electronic format that may

be relevant to the Sixth Amendment issues in a given criminal case, including handwritten notes,

recorded phone calls, and potentially formal or informal requests to a detention facility for

---

[487] *Id.*

[488] *F.T.C. v. Affiliate Strategies, Inc.*, No. 09-4104-JAR, 2011 WL 2084147, at *2 (D. Kan. May 24, 2011) (quoting *School–Link Techs., Inc. v. Applied Res., Inc.*, No. 05–2088–JWL, 2007 WL 677647, at *5 (D. Kan. Feb. 28, 2007)) (footnotes omitted); *see also Browder*, 187 F. Supp. 3d at 1295.

detainee phone recordings; (2) there is no assurance on this record that all prosecutors preserved relevant information within the scope of the Special Master's October 2016 preservation directive or Metzger's December 2016 email; (3) prior to November 6, 2018, there is no clear record that a central litigation hold was in place for ESI, which means that ordinary retention policies applied to ESI prior to that date—in the email context that means that any email from before January 1, 2016, may have been deleted; (4) although Steeby testified that he transmitted litigation hold tickets for some users in the summer of 2017, which would have stopped ordinary retention for certain categories of information for those users, at best those litigation hold tickets would have preserved emails dating back to May 2014 only for those unspecified users; and (5) aside from Metzger, Tomasic, Treadway, and Krug, there is no evidence that prosecutors in the USAO preserved hard-copy documents.

The Court also concludes that the Government acted with intent to deprive the Special Master and the FPD of evidence in this investigation. The Court found that the USAO willfully misconstrued the Court's early preservation orders to avoid impounding and preserving evidence outside of the discovery and defendants at issue in the *Black* case. Despite several prosecutors' recognition that the Court's orders went beyond evidence in the underlying *Black* case, USAO management decided not to seek clarification from the Court, and proceeded with a narrow construction of the orders.[489] The Court also found that the USAO purposefully delayed issuing a formal litigation hold until May 2017, and withheld all information about the formal litigation hold from the Special Master and the Court until the November 2018 hearing in this matter. There is direct evidence that Metzger, as the Litigation Hold Coordinator, made these decisions

---

[489]It is true that Barnett told Tomasic by email that she could seek court guidance, but Barnett did not direct Tomasic to file a motion. By this point, Barnett was in charge of the case and had largely shut out Tomasic.

with full knowledge that she was "losing some stuff in the interim."[490]  To the extent a litigant

can show that information relevant to his or her case was lost during the course of these various

litigation hold delays and cannot be restored, this record supports an argument that Fed. R. Civ.

P. 37(e)(2) should be invoked, potentially triggering sanctions that may include adverse

inferences.[491]

### C.    Non-Spoliation Sanctions

The FPD's show cause motions also seek sanctions based on the Government's violations

of preservation and production orders issued by the Court and the Special Master.  The

Government reiterates a previously-made argument that it was not required to comply with the

Special Master's orders or his SDT, because they are unlawful under Fed. R. Civ. P. 53 and the

separation of powers doctrine.  The Court discussed and rejected these arguments in its January

25, 2019 Memorandum and Order denying the Government's Motion to Reconsider the Court's

Final Production Order, and in its January 12, 2018 Memorandum and Order denying the

Government's motion to terminate Phase III of the investigation and quash subpoenas.  The

Court declines to revisit its previous rulings and incorporates them here by reference.[492]

Civil remedies for failure to comply with court orders on discovery are governed by Fed.

R. Civ. P. 37(b).  Rule 37(b) lists several permissible sanctions for such violations, including

dismissal and contempt.  Civil contempt sanctions may be appropriate "to compel future

compliance with a court order," or to compensate an opposing party for failure to comply.[493]

---

[490]Ex. 1214.

[491]Under Fed. R. Civ. P. 37(e)(2), if the moving party can show intent, there is no requirement to show prejudice.  *See* Rule 37(e) advisory committee notes.

[492]Docs. 713 at 42–49; 372 at 14–16.

[493]*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–29 (1994).  In contrast, criminal contempt sanctions are designed to "punish defiance of a court's judicial authority."  *Dartez v. Peters*, 759 F. App'x 684, 690 (10th Cir. 2018).

Both the criminal and civil subpoena rules provide that civil contempt may be the remedy for a witness who disobeys a subpoena without just cause.[494]  To prove civil contempt, the FPD must show by clear and convincing evidence that: (1) a valid court order existed; (2) the Government had knowledge of the order; and (3) the Government disobeyed the order.[495]

Additionally, the Court has inherent authority to "fashion an appropriate sanction for conduct which abuses the judicial process."[496]  "Because of their very potency, inherent powers must be exercised with restraint and discretion."[497]  Although the Court's discretion includes the ability to dismiss as a sanction for severe cases of misconduct, the lesser sanction of attorneys' fees against counsel may be imposed for actions taken "in bad faith, vexatiously, wantonly, or for oppressive reasons."[498]  An award of attorneys' fees is permissible if the moving party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order."[499]

The Court discusses below the various ways the Government knowingly violated the Court's and Special Master's orders in this matter.  It then discusses the appropriate sanction for these violations.

---

[494] Fed. R. Crim. P. 17(g); Fed. R. Civ. P. 45(g).

[495] See, e.g., Phone Directories Co. v. Clark, 209 F. App'x 808, 813 (10th Cir. 2006); FTC v. Kuykendall, 371 F.3d 745, 756–57 (10th Cir. 2004).

[496] Goodyear Tire & Rubber Co. v. Haeger, 137 S. Ct. 1178, 1186 (2017) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991)).

[497] Chambers, 501 U.S. at 44 (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980)).

[498] Id. at 45–46 (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258 (1975)); Sun River Energy, Inc. v. Nelson, 800 F.3d 1219, 1228 (10th Cir. 2015).

[499] Chambers, 501 U.S. at 46 (footnote omitted) (quoting Hutto v. Finney, 437 U.S. 678, 689 n.14 (1978)).

### 1.    Preservation and Impoundment

As described in its findings of fact, soon after the Court learned about the existence of video and audio recordings possessed by the USAO and its agents, it entered a series of orders: (1) an oral clawback order of the DVRs containing the CCA video recordings on August 9, 2016;[500] (2) a written clawback and cease and desist order on August 10, 2016, addressing video recordings;[501] (3) written preservation and clawback orders for both audio and video recordings on August 18, 2016;[502] (3) the Special Master's Appointment Order on October 11, 2016, requiring "full cooperation";[503] and (4) the Special Master's October 25, 2016 Discovery Conference Order, as supplemented by his November preservation order, which included his order to suspend routine destruction of information.[504]  Later, due to new evidence suggesting that the USAO continued to possess attorney-client telephone recordings for detainees not involved in the *Black* litigation, the Court entered yet another preservation order on August 15, 2018.[505]  Finally, the Court included a preservation directive in its November 21, 2018 Final Production Order.[506]

The Government violated these preservation orders repeatedly.  Two examples are most notable.  First, as the Court has documented, the USAO unilaterally decided to narrowly construe the Court's August 18, 2016 orders as pertaining only to information directly related to the *Black* litigation, despite the presentation of evidence at these early hearings that recordings were also

---

[500]*See* Tr. Aug. 9, 2016 Hr'g, Doc. 104 at 114:19–115:14.

[501]Doc. 102.

[502]Docs. 113, 114.

[503]Doc. 146 at 13.

[504]Doc. 155; Doc. 180 at 2 n.1.

[505]Doc. 569.

[506]Doc. 690.

obtained of detainees in other cases.  While the record shows that the USAO internally decided to misconstrue the Court's orders, prosecutors represented to the Court that they were fully aware of their preservation duties and had taken the appropriate steps to preserve.  Notably, Barnett told the Court on October 28, 2016 that her office had "put a lockdown" on information and records, and that she understood that the obligation to preserve went beyond the bounds of the *Black* case given the many Rule 41(g) motions pending in other cases.  Second, in violation of the Court's second written video clawback order, the USAO maintained copies of the video recordings even after turning over the original CCA DVRs to the Court in August 2016.  The USAO maintained a copy on Boyd's AVPC, and Stokes maintained a copy on his laptop computer.

Even assuming that the Court's August 2016 Orders were ambiguous, the Special Master's preservation orders were not.  He made clear the categories of information that he expected would be preserved, which were based in part on the possibility that the Court would expand his mandate into a Phase III investigation.  Metzger knew that the preservation orders extended beyond *Black* yet delayed sending a preservation directive to USAO staff until December 19, 2016.  And by early December, USAO management knew that the Special Master expected the litigation hold email to be sent "yesterday."  Yet, the office delayed for another three weeks.  Metzger could have sent out a more generic email in August 2016, or at the latest October 2016, directing a litigation hold.  Had she done that and immediately utilized DOJ's standard litigation hold process, USAO staff would have been guided to consider and identify all the possible repositories where they might have responsive material.  Instead, Metzger's dilatory email merely directed USAO staff to preserve, but not to identify to her what responsive material they might have, nor did she provide them with a deadline to take action.  This evidence suggests

that the Government decided to engage in a minimal, superficial attempt at preservation of materials, with full knowledge that information could be lost.

The Government's argument that the Special Master expressed satisfaction with the December 2016 litigation hold email ignores the obvious: Metzger misled and lulled the Special Master into believing that she had implemented a full preservation hold on all repositories of information. He testified that he believed his October 2016 preservation order had been immediately implemented and that the December 19, 2016 email was intended to be a more specific and detailed directive. He did not know about the DOJ litigation hold process because no one in the USAO educated him that a central litigation hold would be required. That information was never provided to the Special Master, despite the Court's clear mandate in its Appointment Order that the USAO cooperate with him in the investigation. In sum, the evidence clearly and convincingly shows that the USAO willfully failed to cooperate with the Special Master in achieving preservation of information in this matter, and violated myriad preservation orders in the process.

Additionally, the Government delayed compliance with the August and November 2018 preservation orders. As documented in the Court's findings, the Court learned in March 2019 that the Government did not meet with EOUSA to fully implement a litigation hold until October 2018—around the time of the final evidentiary hearing. The Government did not inform the Court or the Special Master about this meeting, despite the many colloquies with the Court during the hearing about the Government's preservation and production duties. Finally, on November 6, EOUSA was able to extract and preserve email archives dating back to January 1, 2016. These developments were not shared with the Court at the October or November evidentiary hearing sessions. Indeed, according to the Government's March 21, 2019 status

report, the Government continued to meet with EOUSA to fully implement the Court's preservation order in mid-December 2018, despite representing to the Court in an earlier filing that it had fully complied.

### 2. Production of Witnesses

The Court's Appointment Order required the parties to fully cooperate with the Special Master. As described in the Court's findings of fact, the USAO impeded the Special Master's ability to meet with key Government witnesses Boyd, Flannigan, and Tomasic. As the Court found, the Government directed that Flannigan and Tomasic not speak with the Special Master and failed to inform them that he had repeatedly asked to meet with them. The Special Master never was able to interview Flannigan, other than through cross-examination at the *Dertinger* hearing. Tomasic finally met with the Special Master after her termination. Additionally, it took repeated requests for the Special Master to meet with Boyd, and this meeting was not accomplished until February 2017. This conduct constitutes a clear violation of the Court's order to cooperate.

### 3. Production of Documents

Finally, the Court finds that the Government failed to cooperate with the Special Master by delaying and avoiding document production. As the Court set forth in a previous order, the record demonstrates several failures by the USAO to meet its production obligations during the Special Master's investigation over a two-year period-of-time. Notably, (1) individuals that allegedly engaged in wrongdoing culled their own documents instead of a neutral reviewer; (2) despite the year-long process of developing agreed search terms with the Special Master, the USAO's production in the fall of 2018 did not utilize those search terms; and (3) the Government

refused to create and provide a log for materials withheld on the basis of privilege, *Touhy*, and the Privacy Act.[507]

Moreover, the production that the USAO finally made in response to the August 2018 SDT can only be characterized as an incomplete "document dump."[508]  After further motions practice in which the Government asserted it had no duty to produce and informed the Court it would not comply with any further production directives, the Court concluded that in light of the protracted history of these proceedings, and in order to avoid further delay and waste of judicial resources, it would decline to compel further production and closed the record.  The Court warned the Government that this did not mean the Government would not have to produce these documents.  Instead, the Government would be required to further produce discoverable material in the context of each § 2255 case—an avenue the Government has argued on many occasions is the "appropriate mechanism" for determining whether individual Sixth Amendment violations occurred.[509]  To the extent those documents no longer exist, or have been withheld due to a claim of privilege, the Government would be subject to the federal rules governing spoliation and privilege.

For substantially the same reasons discussed in the Court's January 25, 2019 order denying the Government's motion to reconsider the Court's Final Production Order, the Court rejects the Government's challenges to the Special Master's authority to compel production. Moreover, the Government never moved to quash the most recent SDTs issued before the

---

[507]*See* Fed. R. Civ. P. 45(e)(2) (requiring a privilege log); Fed. R. Crim. P. 17(c)(2) (requiring witness to move to modify or quash a subpoena if compliance would be unreasonable or oppressive); Doc. 694 at 2793:2–25 (Clymer advising the Court that the Government withheld documents on the basis of deliberative process, attorney-client, and work product privileges).

[508]Doc. 694 at 2798:3–2800:20.

[509]Docs. 336 at 18, 554 at 7, 697 at 41–42.

October 2018 hearing.  It has thus waived the ability to argue that those SDTs are unreasonable or oppressive.  In sum, the Government lacks a valid basis for delaying and providing incomplete production to the FPD and the Special Master in this matter.  In the end, these Government tactics fit into a pattern revealed throughout this record to frustrate the efforts of the Special Master, the Court, and the FPD to discover the extent and scope of any Sixth Amendment violations committed by the USAO.  Although any order to further produce has been left for another day, the Government's tactics, when viewed in the context of this entire record, are also relevant to issues of the credibility of USAO prosecutors that are squarely before the Court.

### 4.    Non-Spoliation Sanctions for Violations of Court Orders

The elements necessary for a finding of contempt are clearly met.  Sanctions for civil contempt may be used for two purposes: "(1) to compel or coerce obedience to a court order . . . ; and (2) to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance[.]"[510]  The USAO had knowledge of the Court's preservation and cooperation orders yet disobeyed them.  The Court cannot compel compliance at this point.  The preservation directives that were violated cannot be undone—it is unlikely that documents destroyed by the failure to preserve can be recovered.  And given that the Special Master has been excused, future compliance with witness and document production is moot.

The FPD requests a compensatory award in its supplemental motion to show cause, and the Special Master suggested compensation is warranted in his final report.[511]  Indeed, the Court warned the Government in its May 17, 2017 Phase III Order that if it failed to cooperate, the

---

[510]*O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (alteration in original) (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983)).

[511]Doc. 585.

Court would reevaluate its decision to relieve the Government from bearing the cost of the investigation.[512]

The Court agrees that a compensatory award is in order, either as a remedy for contempt or for abuse of the judicial process under the Court's inherent authority. In order to impose a contempt fine, "the amount of the fine must be based upon the complainant's actual losses sustained as a result of the contumacy."[513] Likewise, to impose a sanction of fees and costs under the Court's inherent authority, there must be a "but-for" causal link between the litigant's bad conduct and the legal fees incurred by the opposing party:

> That means, pretty much by definition, that the court can shift only those attorney's fees incurred because of the misconduct at issue. Compensation for a wrong, after all, tracks the loss resulting from that wrong. So as we have previously noted, a sanction counts as compensatory only if it is "calibrate[d] to [the] damages caused by" the bad-faith acts on which it is based. A fee award is so calibrated if it covers the legal bills that the litigation abuse occasioned. But if an award extends further than that—to fees that would have been incurred without the misconduct—then it crosses the boundary from compensation to punishment. Hence the need for a court, when using its inherent sanctioning authority (and civil procedures), to establish a causal link—between the litigant's misbehavior and legal fees paid by the opposing party.[514]

Any award of fees and costs must be calibrated to the contumacy involved here—failure to preserve and failure to cooperate with witness and document production.

The FPD's motion for fees and costs focuses on different conduct; namely, it identifies fees and costs associated with the failed settlement negotiated in the summer of 2018. Although the Court is cognizant of the needless delay associated with the fruitless settlement attempt last

---

[512] Doc. 253 at 48 n.60.

[513] O'Connor, 972 F.2d at 1211 (quoting *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 810 (2d Cir. 1981)).

[514] *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (quoting *Mine Workers v. Bagwell*, 512 U.S. 821, 834 (1994)) (footnote omitted).

year, its findings in this order do not address violations tied to that conduct.  Because the FPD did not address the causation showing required for misconduct tied to the Government's preservation and production obligations, the Court cannot determine from this record the scope of any fees and costs award that should be awarded.[515]

Instead, under its inherent authority, the Court will award fees and costs borne by the FPD in line with the causation requirements of *Haeger*.  Because this issue was not fully briefed by the parties, the Court directs the FPD to submit an application for attorneys' fees and costs, addressing both its entitlement to fees and costs and the amount, by September 24, 2019.   The Government may respond by October 15, 2019.  The parties' briefs shall not exceed 40 pages in length.

## VI.   Conclusions of Law: Sixth Amendment

The FPD's Rule 41(g) motions allege Sixth Amendment violations related to the video and audio recordings at issue on behalf of its many clients currently or formerly detained at CCA.[516]  The parties vigorously dispute what is required to establish a violation of the Sixth Amendment.  The FPD contends that Tenth Circuit law in *Shillinger v. Haworth*[517] compels the Court to find a per se Sixth Amendment violation based on the Government's collection and retention of both video and audio recordings that it knew would, or were likely to, include attorney-client communications, without a showing of prejudice.  The FPD seeks global relief for any defendant whose attorney-client communications at CCA were obtained by the Government,

---

[515]The Court certainly cannot find that the entire evidentiary hearing in October 2018 would not have occurred but for the Government's misconduct.

[516]Defendant Carter also moves to dismiss the Superseding Indictment due to the Government's unlawful recording and monitoring of privileged calls and video recordings between Carter and his attorneys in violation of his Sixth Amendment rights.  Doc. 333.  Although it does not concede a Sixth Amendment violation occurred in his case, the Government has indicated it does not oppose Carter's motion.  Accordingly, the Court does not reach this issue with respect to Carter and will grant his motion as unopposed.

[517]70 F.3d at 1132 (10th Cir. 1995).

regardless of whether the Government looked at, listened to, or used those communications.  The FPD seeks dismissal with prejudice as the appropriate remedy for the Government's widespread "purposeful, systematic, and surreptitious" misconduct.  Alternatively, the FPD seeks a 50% reduction of sentences for all affected clients who remain in custody.

The Government maintains that this Court should confine its authority to individual cases and that the inquiry should focus on whether there was a Sixth Amendment violation with respect to an individual detainee by an individual AUSA.  The Government argues that: (1) there is no evidence that any particularized video or phone call contains privileged information; (2) the evidence is insufficient to determine whether any particular detainee waived the attorney-client privilege with respect to outgoing recorded calls to counsel; (3) there is no evidence to determine that any particular detainee was prejudiced by the USAO's possession of the recordings at issue; and (4) *Shillinger* has no application here because there is no evidence that any AUSA or agent watched or listened to any recording of an attorney-client communication involving any claimant in this case and the Government had a legitimate purpose for obtaining the calls and videos.

The Court first addresses Supreme Court governing law applicable to the Sixth Amendment and the attorney-client privilege and the Tenth Circuit approach in *Shillinger*.  Next, the Court addresses application of those standards to the issues before the Court and explains which issues must be determined on an individualized basis and which are common to all detainees and recordings stemming from the Special Master's investigation.  Finally, the Court addresses the procedure for moving forward in the pending individual § 2255 cases.

### A.    Governing Law

#### 1.    Supreme Court Standards on the Sixth Amendment and the Attorney-Client Privilege

The attorney-client privilege is "the oldest of the privileges for confidential

communications known to the common law."[518]  Courts view its "central concern as one 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'"[519]  "A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed."[520]  "In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client."[521]  Under federal common law, the attorney-client privilege applies

> (1) where legal advice is sought (2) from a professional legal advisor in his capacity as such, (3) communications made related to that purpose, (4) made in confidence (5) by the client, (6) are permanently protected (7) from disclosures by the client or the legal advisor (8) unless the privilege is waived.[522]

The Sixth Amendment guarantees an accused the right to assistance of counsel for his or her defense.[523]  "The Sixth Amendment right to counsel is personal to the defendant . . . ."[524] There are three general components to the right to counsel: (1) the absolute right to be

---

[518]*United States v. Zolin*, 491 U.S. 554, 562 (1986) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

[519]*Id.* (quoting *Upjohn Co.*, 449 U.S. at 389).

[520]*United States v. Merida*, 828 F.3d 1203, 1209 (10th Cir. 2016) (quoting *Foster v. Hill*, 188 F.3d 1259, 1264 (10th Cir. 1999)).

[521]*Id.* (quoting *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998)) (emphasis omitted).

[522]*Violetta v. Steven Bros. Sports Mgmt., LLC*, No. 16-1193-JTM-GEB, 2017 WL 3675090, at *11 (D. Kan. Aug. 24, 2017) (citing Fed. R. Evid. 501; *Leftwich v. City of Pittsburg, Kan.*, No. 16-2112-JWL-GLR, 2017 WL 1338838, at *1 (D. Kan. Apr. 12, 2017)); 8 WIGMORE ON EVIDENCE § 2292 (McNaughton rev. 1961).

[523]*United States v. Morrison*, 449 U.S. 361, 364 (1981).  The Sixth Amendment right to counsel has attached to persons detained at CCA who have either been charged with or convicted of a federal offense and are held pending critical proceedings in their case, such as trial, sentencing, revocation, or appeal. *See, e.g., Jae Lee v. United States*, 137 S. Ct. 1958, 1964 (2017) (holding that Sixth Amendment guarantees counsel at critical stages of criminal proceeding, including when defendant enters a guilty plea); *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (holding that Sixth Amendment counsel rights attach when "judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1922))).

[524]*Texas v. Cobb*, 532 U.S. 162, 171 n.2 (2001); *United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995) (explaining the Sixth Amendment right to counsel is a personal right).

represented by counsel in a criminal proceeding that could result in imprisonment; (2) the

qualified right to counsel of one's choice; and (3) the right to effective assistance of counsel.[525]

The Sixth Amendment right to effective assistance of counsel includes the ability to speak

candidly and confidentially with counsel free from unreasonable government interference.[526]  A

violation of the right to effective assistance of counsel "generally requires a defendant to

establish prejudice."[527]  Without "at least a realistic probability of injury to [the defendant] or

benefit to the State, there can be no Sixth Amendment violation."[528]

 While courts have not recognized the attorney-client privilege as a right guaranteed by

the Sixth Amendment, the government violates the Sixth Amendment right to effective counsel if

it deliberately interferes with the confidential relationship and that interference prejudices the

defendant.[529]  In the seminal case of *Weatherford v. Bursey*,[530] the Supreme Court recognized

that under some circumstances, a defendant's Sixth Amendment rights may be violated by the

state's intrusion into the attorney-client relationship.  In that case, Weatherford, who was an

undercover law-enforcement agent, along with Bursey and two others, vandalized a local office

of the Selective Service.[531]  In order to maintain his undercover status, Weatherford was arrested

and charged along with Bursey.[532]  Prior to trial, Weatherford met with Bursey and his attorneys

---

[525]*United States v. Nichols*, 841 F.2d 1485, 1496 n.7 (10th Cir. 1988) (citations omitted).

[526]*See Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977) ("One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard.").

[527]*United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006) (citations omitted).

[528]*Weatherford*, 429 U.S. at 549.

[529]*Morrison*, 449 U.S. at 365; *see Weatherford*, 429 U.S. at 557–58.

[530]429 U.S. 545 (1977).

[531]*Id.* at 547.

[532]*Id.*

to discuss Bursey's defense.[533]  At no time did Weatherford discuss with his superiors or the prosecutor any details or information he obtained from the meetings.[534]  Weatherford testified at Bursey's trial and, following his conviction, Bursey filed a civil-rights action alleging that Weatherford had communicated confidential defense information to his superiors and the prosecutor, depriving him of his Sixth Amendment right to the assistance of counsel.[535]

The Supreme Court rejected the Fourth Circuit's per se rule that "whenever conversations with counsel are overheard the Sixth Amendment is violated and a new trial must be had" as more restrictive than necessary to vindicate the Sixth Amendment interests at stake.[536]  The Court explained that, "[u]nless [the agent] communicated the substance of the [attorney-client] conversations and thereby created at least a realistic possibility of injury [to defendant], or benefit to the State, there can be no Sixth Amendment violation."[537]  Accordingly, "[a]s long as the information possessed by Weatherford remained uncommunicated, he posed no substantial threat to Bursey's Sixth Amendment rights."[538]  Given the district court's finding that Weatherford had not communicated anything about the defense meetings to anyone, there was no "realistic possibility of injury to Bursey or benefit to the State."[539]

But the Court identified four factors that are relevant in determining whether a Sixth Amendment violation has been established: (1) whether the government purposely intruded into the attorney-client relationship; (2) whether any evidence offered at trial was obtained directly or

---

[533] *Id.* at 547–48.

[534] *Id.* at 548.

[535] *Id.* at 549.

[536] *Id.* 550–51.

[537] *Id.* at 558.

[538] *Id.* at 556.

[539] *Id.* at 558.

indirectly from the intrusion; (3) whether the prosecutor obtained any details of the defendant's trial preparation or defense strategy; and (4) whether the overheard conversations were used in any other way to the substantial detriment of the defendant.[540]  In *Weatherford*, the government did not violate the defendant's Sixth Amendment rights because "[n]one of these elements [were] present."[541]

Notably, the Court also emphasized both the absence of purposefulness in the prosecutor's intrusion and the legitimate investigative justification—"the necessity of undercover work and the value it often is to effective law enforcement."[542]  The Court did not consider, however, whether a per se Sixth Amendment violation can be established where an intentional prosecutorial intrusion lacks any legitimate law-enforcement justification.

In *United States v. Morrison*,[543] the Supreme Court addressed the appropriate remedy for such a Sixth Amendment violation, where the government's deliberate intrusion into the attorney-client relationship clearly lacks any legitimate justification.  In that case, DEA agents met with the defendant without defense counsel's knowledge or permission and, while seeking her cooperation, disparaged her retained attorney and threatened her with more severe penalties if she did not cooperate.[544]  Defendant did not cooperate or provide the agents with any incriminating information and maintained her relationship with her counsel.[545]  The Third Circuit held that the defendant's right to counsel was violated irrespective of any allegation or proof of prejudice to her case, and that the only appropriate remedy was dismissal of her case with

---

[540]*Id.* at 552–57.

[541]*Id.* at 555–56.

[542]*Id.* at 557 (citations omitted).

[543]449 U.S. 361, 363–64 (1981).

[544]*Id.* at 362–63.

[545]*Id.*

prejudice.[546]  The Supreme Court reversed, but declined to address the government's argument that the Sixth Amendment violation could not be established without "some [defense] showing of prejudice." [547]  Instead, the Court assumed the government had violated the Sixth Amendment, but the remedy imposed below was incorrect because it was not "tailored to the injury suffered."[548]  The Court stated that the "premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense," and that "[a]bsent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding."[549]

Significantly, *Morrison* "left open the question of whether intentional and unjustified intrusions upon the attorney-client relationship may violate the Sixth Amendment even absent proof of prejudice."[550]  The federal appellate courts are divided on the issue in cases where the prosecution intentionally obtained, without any legitimate justification, confidential attorney-client information.[551]  The Second,[552] Sixth,[553] and Eighth[554] Circuits place the burden on the

---

[546]*Id.* at 363.

[547]*Id.* at 364.

[548]*Id.* at 364–65.

[549]*Id.*

[550]*Shillinger v. Haworth*, 70 F.3d 1132, 1140 (10th Cir. 1995).

[551]*See Cutillo v. Cinelli*, 485 U.S. 1037 (1988), *cert. denied* (White, J., dissenting; joined by Rehnquist, C.J, O'Connor, J.) (noting conflicting approaches within the Circuits in cases where the Sixth Amendment violation involves the transmission of confidential defense strategy information).

[552]*United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985).

[553]*United States. v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted." (citing *Morrison*, 449 U.S. 365–66))).

[554]*United States v. Johnson*, 47 F.3d 272, 275 (8th Cir. 1995) (holding that dismissal was improper because even assuming the government intentionally violated the defendant's Sixth Amendment rights, he had failed to "demonstrate a nexus between the intrusion and any benefit derived by the prosecution" (citing *United States v. Davis*, 646 F.2d 1298, 1303 (8th Cir. 1981)); *Clark v. Wood*, 823 F.2d 1241, 1249–50 (8th Cir. 1987).

defendant to establish prejudice, even where the government intentionally intrudes in the attorney-client relationship.  The Third,[555] Tenth,[556] and District of Columbia[557] Circuits have found the intentional intrusion into the defendant's attorney-client relationship producing privileged communications constitutes a per se Sixth Amendment violation, with no need to demonstrate that the defendant has suffered prejudice as a result of the intrusion.  And the First[558] and Ninth[559] Circuits have taken a middle position, holding that once the defendant has shown that confidential defense strategy was transmitted to the prosecution, the burden shifts to the government to show there was no prejudice to the defendant from the disclosure.

---

[555]*United States v. Costanzo*, 740 F.2d 251, 254–55 (3d Cir. 1984) (holding Sixth Amendment violation follows from finding of prejudice); *United States v. Levy*, 577 F.2d 200, 209–10 (3d Cir. 1978) (holding that "the inquiry into prejudice must stop" where defense strategy material is actually disclosed to the prosecution or the government intentionally sought such confidential information).

[556]*Shillinger v. Haworth*, 70 F.3d 1132, 1141–42 (10th Cir. 1995) (holding that an intentional intrusion into the attorney-client relationship "must constitute a *per se* violation of the Sixth Amendment," and that if the government "lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed").

[557]*Briggs v. Goodwin*, 698 F.2d 486, 494–95 (D.C. Cir. 1983), *vacated on other grounds*, 712 F.2d 1444 (D.C. Cir. 1983) (holding when the privileged communication contains details of the defendant's trial strategy, the defendant is not required to prove he was prejudiced by the governmental intrusion, but prejudice may be presumed).

[558]*United States v. Mastroianni*, 749 F.2d 900, 907–08 (1st Cir. 1984) (noting that "[l]ike the District of Columbia and Third Circuits, we believe that placing the entire burden on the defendant to prove both disclosure and use of confidential information is unreasonable," but "[l]ike the Ninth Circuit, however, we believe that there are certain circumstances in which the revelation of confidential communications by the informant is harmless"); *United States v. DeCologero*, 530 F.3d 36, 64 (1st Cir. 2008) ("'[T]he government's intrusion into the attorney-client relationship' is not a *per se* Sixth Amendment violation; there must also be some demonstration of resulting prejudice.  Because such intrusions pose a serious risk to defendants' constitutional rights, and because it would be unreasonably difficult for most defendants to prove prejudice, we only require defendants to make a prima facie showing of prejudice by 'prov[ing] that confidential communications were conveyed as a result' of the government intrusion into the attorney-client relationship.  The burden then shifts to the government to show that the defendant was not prejudiced; that burden is a demanding one." (quoting *Mastroianni*, 749 F.2d at 907–08)).

[559]*United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003) (rejecting a per se rule of prejudice; rather the defendant bears the initial burden of making "a prima facie showing of prejudice" by demonstrating the government "acted affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged information;" once a *prima facie* showing has been made, the burden shifts to the government to show there has been no prejudice to the defendant as a result of these communications).

Under *Morrison*, the remedy for a Sixth Amendment violation must be "tailored to the injury suffered" by the defendant and should not "unnecessarily infringe on competing interests."[560]  Those competing interests are: (1) the constitutional right to the assistance of counsel, "fundamental to our system of justice to assure fairness in the adversary criminal process," and (2) society's interest in the administration of criminal justice.[561]  Thus, the Supreme Court emphasized in *Morrison* that its preferred approach "has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial."[562]

*Morrison* further held that dismissal of the indictment is a "drastic" form of relief.[563]  Other cases suggest that dismissal of the indictment is appropriate only where the injury is irreparable.[564]  And the Tenth Circuit recently counseled that *Morrison* requires that courts rule out "more narrowly tailored remedies" before resorting to the "extraordinary remedy" of dismissing an indictment.[565]  Notably, the *Morrison* Court suggested that a more severe remedy might be appropriate even in cases where the harm is not irreparable, but where there is a "pattern of recurring violations" by the government.[566]

---

[560] 449 U.S. 361, 364 (1981); *Shillinger*, 70 F.3d at 1142–43.

[561] *Morrison*, 449 U.S. at 364 (citations omitted).

[562] *Id.* at 365.

[563] *Id.*

[564] *See State v. Robinson*, 209 A.3d 25, 55–57 (Del. 2019) (collecting cases).

[565] *United States v. Orozco*, 916 F.3d 919, 925 (10th Cir. 2019).

[566] *Morrison*, 449 U.S. at 365 n.2 (noting the record did "not reveal a pattern of recurring violations by investigative officers that might warrant the imposition of a more extreme remedy in order to deter further lawlessness"); *see also Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993) (while "not presented with such a situation here[,] . . . [o]ur holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict"); *Robinson*, 209 A.3d at 57–59 (discussing *Morrison*).

## 2.    Tenth Circuit Approach in *Shillinger*

Under Tenth Circuit law, the government's purposeful intrusion into the attorney-client relationship with no legitimate law enforcement justification constitutes a per se violation of the Sixth Amendment, with no affirmative showing of prejudice necessary.  In *Shillinger*, the defendant's attorney arranged to hold preparatory sessions in the courtroom, but because the defendant was incarcerated, a deputy sheriff was present at all times.[567]  During trial, it was revealed that the deputy had been relaying privileged information he was privy to from trial preparation sessions to the prosecutor.[568]  The Tenth Circuit concluded that the prosecutor violated the defendant's Sixth Amendment rights and remanded the case to the district court for consideration of the appropriate remedy.[569]  The court held,

> [b]ecause we believe that a prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a *per se* violation of the Sixth Amendment.[570]

The court further explained that "when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed."[571]  The court reasoned that "no other standard can adequately deter this sort of misconduct," and that "prejudice in these circumstances is so likely that case-by-case inquiry

---

[567]70 F.3d 1132, 1132–34 (10th Cir. 1995).

[568]*Id.* at 1134–35.

[569]*Id.* at 1143.

[570]*Id.* at 1142.

[571]*Id.*

154

into prejudice is not worth the cost."[572]  The court explained that its holding "subsumes the

state's argument that harmless error analysis should apply to this sort of Sixth Amendment

violation because our *per se* rule recognizes that such intentional and groundless prosecutorial

intrusions are never harmless because they 'necessarily render a trial fundamentally unfair.'"[573]

The court observed that "dismissal of the indictment could, in extreme circumstances, be

appropriate."[574]  The court clarified, however, that this per se rule "in no way affects the analysis

to be undertaken in cases in which the state has a legitimate law enforcement purpose for its

intrusion."[575]  Such cases would require proof of prejudice, or "'a realistic possibility of injury to

[the defendant] or benefit to the State in order to constitute a violation of a defendant's Sixth

Amendment rights.'"[576]

As the *Shillinger* court recognized, prejudice under these circumstances is difficult to

prove.[577]  Demonstrating that a governmental intrusion into the attorney-client relationship is

prejudicial can be problematic, as the information needed to so demonstrate often rests within the

exclusive control of the prosecution and is not necessarily apparent to the defendant or reviewing

court:

> In cases where wrongful intrusion results in the prosecution
> obtaining the defendant's trial strategy, the question of prejudice is
> more subtle.  In such cases, it will often be unclear whether, and
> how, the prosecution's improperly obtained information about the
> defendant's trial strategy may have been used, and whether there
> was prejudice.  More important, in such cases the government and
> the defendant will have unequal access to knowledge.  The
> prosecution team knows what it did and why. The defendant can

---

[572]*Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984)).

[573]*Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 577 (1986)).

[574]*Shillinger*, 70 F.3d at 1143 (citations omitted).

[575]*Id.* (citing *Weatherford v. Bursey*, 429 U.S. 545, 557 (1977)).

[576]*Id.* (quoting *Weatherford*, 429 U.S. at 558).

[577]*Id.* at 1142.

only guess.[578]

"The prosecution makes a host of discretionary and judgmental decisions in preparing its case. It would be virtually impossible for an appellant or a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions."[579]

In a footnote, the Government questions whether *Shillinger* is good law in light of the Supreme Court's view in *Weatherford* and *Morrison* that prejudice must be demonstrated to substantiate a Sixth Amendment violation of the kind alleged here, and a presumption falls short of this demonstration.[580] But the Tenth Circuit analyzed and distinguished *Weatherford*, noting that the Supreme Court "emphasized both the absence of purposefulness in the prosecutor's intrusion and the legitimate law enforcement interests at stake."[581] The *Shillinger* court concluded, unlike in *Weatherford*, that "the intrusion here was not only intentional, but also lacked a legitimate law enforcement purpose."[582] The court also explained that *Morrison* "left open the question of whether intentional and unjustified intrusions upon the attorney-client relationship may violate the Sixth Amendment even absent proof of prejudice."[583] As previously discussed, *Morrison* never reached the prejudice question, "holding only that even if the

---

[578]*United States v. Danielson*, 325 F.3d 1054, 1070 (9th Cir. 2003) (adopting burden-shifting analysis for Sixth Amendment claims alleging governmental interference with attorney-client relationship; defendant must make prima facie showing of prejudice that government affirmatively intruded to obtain privileged information about trial strategy; burden then shifts to government to show there has been no prejudice to defendant as a result of these communications).

[579]*Id.* at 1071 (quoting *Briggs v. Goodwin*, 698 F.2d 486, 494–95 (D.C. Cir. 1983), *vacated on other grounds*, 712 F.2d 1144 (D.C. Cir. 1983)).

[580]*See* Doc. 745 at 133 n.97.

[581]*Shillinger*, 70 F.3d at 1138–39.

[582]*Id.* at 1139.

[583]*Id.* at 1140.

defendant's Sixth Amendment rights were violated, dismissal of the indictment was an inappropriate remedy in that case."[584]

The Tenth Circuit has since reaffirmed *Shillinger*. In *United States v. Singleton*, the court rejected a Sixth Amendment claim in defendant's § 2255 proceeding, even though the prosecution had obtained attorney-client privileged communication, because the prosecutors had not seen the privileged communications and had implemented a taint team.[585] The defendant in that case claimed that a pretrial search of his jail cell and removal of all correspondence made him unwilling to communicate with his attorney in writing and he was thus prejudiced by the government's conduct.[586] Citing *Shillinger*, the court did not decide whether a per se Sixth Amendment violation occurred because it was undisputed that the trial team of prosecutors was shielded from access to any privileged information obtained through the use of a taint team to review all the items seized.[587] Notably, a magistrate judge acting as a special master reviewed the seized documents and conducted an evidentiary hearing, and found that the taint team shielded any privileged information from the USAO.[588] The court concluded,

> even assuming that the government intruded into Mr. Singleton's attorney-client relationship without legitimate justification, thereby giving rise to a per se Sixth Amendment violation, the appropriate remedy was provided by the use of a separate government [taint] team to review the documents and the special master's hearing to assure that the trial prosecution team had been shielded from any privileged information seized. Absent any showing by Mr. Singleton that despite these measures the government's conduct intruded into his relationship with his counsel and affected either his subsequent decision to plead guilty or his later sentencing

---

[584] *Id.*

[585] 52 F. App'x 456, 458–59 (10th Cir. 2002).

[586] *Id.* at 459.

[587] *Id.*

[588] *Id.* at 459–60.

proceeding, there is no basis for imposing a remedy at this time.[589]

District court cases decided subsequent to *Shillinger* are few but informative.  For example, in *United States v. Zajac*, the defendant argued that the government improperly intruded on the attorney-client relationship and violated his Sixth Amendment rights by reviewing recorded conversations between the defendant and his counsel.[590]  In that case, prisoners housed at the Weber County Jail were required to make long-distance telephone calls collect; the jail did not allow an attorney to call his client directly.[591]  Thus, if a prisoner wanted to call his attorney, he was required to make a collect call.[592]  Jail policy also required that collect calls from the jail be recorded, including legal calls, with the exception of calls made to the FPD's office.[593]  At the beginning of each collect telephone call, a pre-recorded statement told the caller that the call may be monitored or recorded.[594]  The defendant claimed that the recorded phone calls in his case included conversations with his defense attorneys that directly pertained to his defense, i.e., "his representation and concerns in the case and information concerning the development of the defense of the case."[595]

At the outset of the case, the government subpoenaed the defendant's jail calls because "it had reason to believe that Defendant had made incriminating statements to the press and family members."[596]  "As a matter of business practice," the jail did not and could not separate

---

[589]*Id.* at 460; *see Reali v. Abbott*, 90 F. App'x 319, 322–23 (10th Cir. 2004) (acknowledging "in certain Sixth Amendment contexts, courts will presume a party suffered prejudice (citing *Shillinger*, 70 F.3d at 1139–42)).

[590]No. 2:06CR811DAK, 2008 WL 1808701, at *3 (D. Utah Apr. 21, 2008).

[591]*Id.*

[592]*Id.*

[593]*Id.*

[594]*Id.*

[595]*Id.* at *4.

[596]*Id.*

telephone calls and provided the government with a list that contained only telephone numbers.[597]  ATF agents and the USAO in the District of Utah identified those calls made to telephone numbers of the defendant's counsel and "purposefully did not review or listen to the telephone phone calls made to attorneys because they could have contained attorney-client communications."[598]  Further, "to fully comply with discovery rules, the government provided the incriminating calls as well as the other calls made by the defendant" to the defendant's counsel—the entire record that was provided by the jail.[599]  "While the government took care not to review any privileged material, it did not exclude those potentially privileged conversations from defense counsel when it provided discovery."[600]  Although the discovery included material that referenced telephone call records, it did not provide any summary of the conversations.[601]  The government represented that "both it and [the ATF Special Agent] made every effort not to review any telephone recordings which appeared to have any type of attorney-client conversations even though Defendant's representation changed repeatedly during the pretrial process."[602]

Citing *Shillinger*, the defendant asserted a presumption of prejudice in his case.[603]  The defendant argued that, like *Shillinger*, he had no alternative to confidentially communicate with counsel and the information from the calls was passed on to the prosecutor.[604]  The court rejected

---

[597] *Id.*

[598] *Id.*

[599] *Id.*

[600] *Id.*

[601] *Id.*

[602] *Id.*

[603] *Id.* at *5.

[604] *Id.*

this argument because it "fails to recognize that defense counsel in this district routinely visit their clients in jail and have face-to-face meetings with respect to privileged matters."[605]  The court found that, unlike in *Shillinger*, where the prosecutor proceeded for the purpose of determining the substance of defendant's conversations with his attorney and the communications were actually disclosed, the prosecutors had a legitimate investigatory reason for subpoenaing the defendant's telephone records from the jail.[606]  "When the jail was unable to separate which calls were to attorneys, the government then employed means for identifying which telephone numbers belonged to Defendant's counsel and protecting any of the telephone calls that were made to those attorneys."[607]  The court further found that the defendant failed to provide any specific communication, transcript, or documentation that demonstrated that the government obtained any evidence or content from these conversations or listened to the conversations.[608]  The court concluded that the defendant "provides conclusory and speculative accusations that the government engaged in egregious and outrageous illegal conduct," and that there was no basis for presuming prejudice.[609]

In *United States v. Johnson*, the prosecution obtained attorney-client material through Pre-Sentence Report ("PSR") disclosures in a separate case where the defendant was granted statutory-use immunity with the understanding that the USAO in the District of Utah would not have access to the material.[610]  The court found that the prosecution implemented a taint team,

---

[605]*Id.*

[606]*Id.*

[607]*Id.*

[608]*Id.*

[609]*Id.*

[610]No. 2:11-cr-00501-DN-PMW, 2016 WL 297451, at *1 (D. Utah Jan. 22, 2016).

and none of the assigned prosecutors viewed any privileged communications.[611]  The court

further found that "the PSR materials were obtained for the sole purpose of turning them over as

part of the prosecution's discovery obligations," which constitutes a "legitimate justification" for

obtaining the privileged materials.[612]  The court stressed that "more importantly, the substance of

the materials was *never disclosed to the prosecutors*," except for one AUSA who "ceased review

once she was aware it might be attorney-client privileged communication and she did not review

any further documents."[613]  Thus, the *Shillinger* test was not met and the court declined to

dismiss the indictment.

These post-*Shillinger* cases suggest that "purposeful intrusion" into the attorney-client

relationship does not occur "merely by the prosecution obtaining the privileged materials; rather,

it is what the prosecution does with the materials *after obtaining them* that determines whether

there has been a Sixth Amendment violation."[614]  In each of these cases, the government took

precautions to shield the protected information, by use of a taint team or similar mechanism, and

disclosed the protected communications to defense counsel in discovery.  In each of these cases,

there was no dispute that prosecutors had not seen or listened to the privileged

communications.[615]

---

[611]*Id.* at *5.

[612]*Id.*

[613]*Id.* (emphasis in original).

[614]*Id.* (emphasis in original) (citing *United States v. Singleton*, 52 F. App'x 456, 458–59 (10th Cir. 2002); *United States v. Zajac*, No. 06CR811DAK, 2008 WL 1808701, at *5 (D. Utah Apr. 21, 2008)).

[615]*Id.*

B.      **Application**

1.      **Need for Particularized Findings**

The FPD urges that *Shillinger* compels the Court to conclude that the Government's purposeful intrusion into CCA detainees' attorney-client relationships by collecting and saving recorded communications that it knew would, or were likely to, include attorney-client communications constitutes a per se violation of the Sixth Amendment, and thus prejudice must be presumed.  The FPD asserts: (1) the USAO knew it would obtain video recordings of attorney-client communications as a result of the grand jury subpoena and its failure to target or limit its collection is evidence of purpose; and (2) the USAO's systematic collection of all recorded telephone calls, with no exception for attorney-client calls or other cautionary measures, was a purposeful and massive invasion of attorney-client communications.  The Government argues that the Court cannot make such generalized Sixth Amendment findings in the context of the Rule 41(g) motions before it, but instead must make particularized findings in the individual § 2255 proceedings.  The Court reluctantly agrees.

Under *Shillinger*, a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[616]  Once these elements are established, prejudice is presumed.[617]

The attorney-client privilege is not recognized as a right guaranteed by the Sixth Amendment.  A Sixth Amendment claim arising from the alleged government intrusion into the

---

[616]*Shillinger v. Haworth*, <u>70 F.3d 1132, 1142</u> (10th Cir. 1995).

[617]*Id.*

162

recordings at issue will not lie unless the communications in the videos or calls are privileged or confidential.[618]  Thus, a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.  Once a claimant has shown the privilege is applicable, the Court must determine whether the government became privy to those attorney-client communications because of its purposeful intrusion into the claimant's attorney-client relationship.  Such individualized determinations cannot be made on the record before the Court.[619]  Because both the attorney-client privilege and the Sixth Amendment are personal to the defendant, any generalized application of the limited record before the Court to establish blanket Sixth Amendment violations would be both inappropriate and premature.[620]

### 2. Issues Common to all Claims

The parties dispute the governing law on common issues that overlap in the individual Sixth Amendment claims.  Although the Court cannot apply the governing law to Sixth Amendment claims in this case, it provides the following analysis on issues common to all affected § 2255 litigants to be applied going forward.  These rulings are not conclusions of law on the merits of petitioners' individual claims.

### a. Privileged Attorney-Client Communications

The FPD argues that the weight of the evidence favors the conclusion that each video of a documented attorney-client meeting contained protected attorney-client communication, without

---

[618]*Id.* (describing Sixth Amendment violation as occurring when "the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship").

[619]As discussed *infra* in Section VII, the § 2255 litigants must also defeat collateral waiver and procedural-default challenges raised by the Government prior to a determination on the merits of the Sixth Amendment claims.

[620]*See, e.g.*, *U.S. Nat. Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) ("[A] federal court [lacks] the power to render advisory opinions." (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975))).

review of individual detainee recordings. Likewise, it argues that the content of the phone calls was constitutionally protected communication because the purpose of the phone calls was to discuss matters pertaining to legal representation and the calls were necessary to ensure adequate representation. But a party claiming the attorney-client privilege has the burden to show its applicability. "[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege."[621] Rather, the "communication between a lawyer and client must relate to legal advice or strategy sought by the client."[622]

Thus, particularized findings must be made with respect to each claimant asserting the attorney-client privilege, which requires review of the recordings and a minimal threshold showing by the § 2255 litigants on the applicability of the privilege to their individual case. As detailed below, this showing will vary for video and audio recordings.

### i.       Soundless Video Recordings

The Government continues to challenge the third element of the privilege, arguing that the soundless communication in the videos is "too rudimentary for an observer to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communications."[623] This Court has previously concluded, however, that both verbal and non-verbal communication "falls within the ambit of privileged, confidential attorney-client communications."[624] Non-aural communication can be valuable to the observer, as evidenced by this Court's in camera review of the video recording between Dertinger and Rokusek in one of

---

[621]*Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550–51 (10th Cir. 1995).

[622]*United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998) (citing *Motley*, 71 F.3d at 1550–51); *see In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010).

[623]Doc. 745 at 115.

[624]Doc. 253 at 25.

the attorney visitation rooms at CCA.[625]  In that case, the prosecution valued knowing whether there was a document exchange between Dertinger and Rokusek, which would be reflected on the video recording.  Other detainees whose meetings were recorded may have been preparing for release hearings, evaluating evidence, negotiating a plea, or deciding whether to go to trial.  The value of knowing a defendant is angry, reviewing documents, speaking to counsel without an interpreter, or even refusing to talk or review documents may not have apparent value to an outside observer, but as demonstrated in these proceedings, can grant a tactical advantage to a prosecutor.  The Court adopts its previous findings that soundless video can constitute privileged attorney-client communication.

The Court agrees that given the subjective nature of the content of the videos, its value or significance would not necessarily be apparent to the Court or an outside viewer.  Nevertheless, a threshold showing that the privilege applies must be made before concluding that each video recording contains protected attorney-client communication.  The FPD has attempted to identify potential clients who fall under Standing Order 18-3 by cross-comparing CCA calendars and visitation logs.[626]  This initial evaluation can be further verified by review of the individual detainee recordings to determine: (1) that the video of the attorney-client meeting exists, and (2) that the quality of the non-verbal communication is sufficient to confirm communication between the detainee and counsel.  The Court will **grant** the FPD's Rule 41(g) motion and turn over the six DVRs impounded by the Court to the FPD for review.  Any further review of the video recordings will be facilitated according to a court-ordered process in the pending § 2255

---

[625]*Id.* at 24.

[626]Ex. 585.

proceedings and the parties will be given the opportunity to weigh in on the procedure for review, e.g., determination by the Court in camera or review by a neutral Government party.

Further, while there was testimony from various defense counsel in these proceedings regarding the nature of the meetings with their clients at CCA, an affidavit from defense counsel in each individual case is necessary to confirm that the nature and purpose of the meeting(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery. This threshold showing does not require the petitioner to reveal the substance of the conversation. Review of the videos and/or the submission of this affidavit will not constitute a waiver of any individual defendant's privilege under Fed. R. Evid. 502.

### ii.      Audio Recordings and Waiver

Likewise, threshold showings must also be made on the audio recording claims that: (1) telephone recordings exist, and (2) a given call contains protected attorney-client communication, i.e., communication that relates to legal advice or strategy sought by the client. These requirements will be verified by the FPD's review of the individual detainee recordings to determine the nature of the calls. As with the videos, this threshold showing does not require the petitioner to reveal the substance of the conversation. Rather, an affidavit from defense counsel in each individual case is sufficient to confirm the nature and purpose of the call(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery. Any further review of these calls will be facilitated in the pending § 2255 proceedings and the parties will weigh in on the appropriate procedure for review, e.g., determination by the Court in camera or review by a neutral Government party.

Submission of the affidavit and/or review of the substance of the calls will not constitute a waiver of any individual defendant's privilege under Fed. R. Evid. 502.

Although not a threshold showing requirement, attorney-client privilege determinations with respect to recorded calls will also necessarily establish whether the detainee knowingly and intelligently waived the right to confidential attorney-client communications. The FPD urges the Court to conclude as a matter of law that neither the preamble warning at the beginning of CCA-recorded phone calls, nor the signage near the Securus phones at CCA, were sufficient to allow for a knowing waiver of any CCA detainee's Sixth Amendment right to confidential communications with counsel. The FPD also urges the Court to conclude that it was unreasonable for the Government to internally and unilaterally determine that it need not disclose these phone calls to defense counsel, or otherwise take measures to protect them, based on the view that the detainees waived their right to confidential communications by engaging in a conversation with counsel on CCA telephones. The Government argues that the Court cannot determine on this record whether the Sixth Amendment right to confidential communications with counsel was waived because such a showing must turn on the particularized facts of each recording. Ironically, the Government also contends that USAO prosecutors reasonably believed that if detainees spoke to their attorneys on a CCA phone they waived the attorney-client privilege, and thus, they need not take measures to safeguard phone recordings of CCA detainees and their attorneys. In other words, according to the Government, prosecutors reasonably believed that there was a blanket waiver of the attorney-client privilege by detainees at CCA when they used CCA telephones, but the Court should not reach a blanket waiver determination in this matter because the analysis requires a particularized inquiry.

"A waiver of the Sixth Amendment right to counsel is valid only when it reflects 'an intentional relinquishment or abandonment of a known right or privilege.'"[627]  The criminal defendant must '"kno[w] what he is doing' so that 'his choice is made with eyes open.'"[628]  Confidentiality of an attorney-client communication "will be 'lost if the client discloses the substance of an otherwise privileged communication to a third party.'"[629]  "Where disclosure to a third party is voluntary, the privilege is waived."[630]  But under Fed. R. Evid. 502(b), an inadvertent disclosure to a third party does not operate as a waiver if "the holder of the privilege . . . took reasonable steps to prevent disclosure[] and [] the holder promptly took reasonable steps to rectify the error."[631]

The Government contends that at least some detainees at CCA waived their attorney-client privilege because calls were made from an institutional phone at CCA, which played a preamble warning that the call was subject to recording and monitoring, and which was surrounded by signage warning that the call may be recorded.  The Government argues that waiver may apply to vitiate an individual detainee's privilege claim if it is shown that: (1) the detainee was provided with the Inmate Handbook; (2) the detainee was not "mistakenly advised that their conversations with counsel were private by defense lawyers who relied on faulty CCA-Leavenworth representations"; and/or (3) if a the Government has a "colorable fact-based

---

[627]*Patterson v. Illinois*, 487 U.S. 285, 292 (1988) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

[628]*Id.* (alteration in original) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

[629]*United States v. Ary*, 518 F.3d 775, 782 (10th Cir. 2008) (quoting *In re Quest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006)).

[630]*Id.* (citing *In re Quest*, 450 F.3d at 1185).

[631]To the extent the Government continues to rely on the case of *United States v. Lentz*, 419 F. Supp. 2d 820 (E.D. Va. 2005), a district court decision holding that the inadvertent disclosure of an attorney-client communication can result in waiver, that case was abrogated by Rule 502(b), which was amended in 2007.

argument that" case law finding waiver applies.[632]  The Government suggests that because these facts turn on the circumstances of each individual call, the Court cannot rule on the issue of waiver in this context.

While the ultimate conclusion about whether a particular detainee waived the attorney-client privilege must be decided on a case-by-case basis, the record in this case allows the Court to make findings on several common issues.  The Court previously found that: (1) detainees cannot place unmonitored calls unless their attorney's number is privatized;[633] (2) CCA failed to advise attorneys about the existence and particulars of the privatization process before August 2016;[634] and (3) the privatization process was ineffective, as even privatized numbers were sometimes recorded.[635]  The Court has made additional findings on this record, and reaches the following conclusions based on those findings.

Many if not all CCA detainees lacked the information and means to knowingly and intelligently waive their attorney-client privilege when they called their attorneys on institutional phones at CCA.  CCA failed to adequately inform detainees that their calls to attorneys would be recorded unless they used the privatization process.   First, the signage near the phones generally warned that the calls were subject to being recorded but did not specifically inform detainees that attorney-client calls were also subject to being recorded.  Moreover, due to CCA's failure to properly administer the privatization protocol, detainees were often misled to believe that their calls to attorneys were not subject to recording and monitoring, despite these signs.

---

[632] Doc. 745 at 128–29.

[633] Doc. 253 at 17.

[634] *Id.* at 20.

[635] *Id.*

Second, the Intake Booking Packet did not sufficiently inform detainees about how to ensure confidential communications with their attorneys through the privatization process. The booking packet advised that "[a] properly placed phone call to an attorney is not monitored. You must contact your unit team to request an unmonitored attorney call."[636] But this language fails to explain how to accomplish a "properly placed phone call to an attorney." And there was no way for a detainee to place an unmonitored call to an attorney absent the privatization procedure; calls placed in the Unit Team Office were monitored because the Unit Team manager remained in the office during the phone call.

Third, the Inmate Handbook also failed to adequately or effectively inform detainees of their right to private calls with their attorneys and how to accomplish such. No one reviewed the handbook with detainees, nor advised the detainees that because the phones were monitored or recorded, prosecutors could hear or receive recordings of their attorney-client conversations. The handbook included information about registering an attorney phone number to avoid recording, but detainees could not initiate the privatization process until October 2016. Rather, they were required to instruct their attorney to accomplish this, and apparently had to provide this directive through a monitored phone call, either by placing a nonprivate call to the attorney or by using the unit team office. And information about call recording was buried in this lengthy handbook, which also included information about numerous subjects of pressing interest to someone who had just been taken into custody—rules on behavior, food, recreation, and visitation, for example.[637]

---

[636]Ex. 1.

[637]Ex. 2.

Importantly, detainees routinely were not provided with the Inmate Handbook. Unit Manager Leslie West testified that it was common that detainees did not receive a handbook and that twice during her tenure, management could not get access to the handbook at all because they had been pulled from the facility for revision. West further testified that even when the handbook was available, it was sometimes three to six days after intake before a detainee received it—a critical time for attorney-client communications. Even if the detainee received a handbook at the time he or she arrived at CCA, this was typically before he or she had consulted with an attorney. There is no evidence that any defense attorney had an opportunity to review the handbook with his or her client.

Fourth, if the detainee heard the preamble when he or she placed an outgoing call to a non-private attorney phone number, that preamble provided no meaningful notice that the call would be recorded. Both the English and Spanish versions of the preamble were equivocal; they stated that the call may be recorded and was subject to monitoring, not that the call would be recorded. Furthermore, a detainee could not distinguish which calls were subject to recording and which were not based on the preamble. As the Court has found, the privatization protocol did not work as designed at CCA because the incorrect site level was routinely selected by CCA staff when an attorney number was privatized. Thus, the preamble may or may not play for calls to the same attorneys depending on the detainee's subpopulation and which subpopulation CCA staff affirmatively input into the system when privatizing the attorney number. The site-level distinction was neither advertised nor explained to detainees or attorneys. Compounding that grave error, some attorneys testified or averred that they assured their clients that their phone conversations were private and protected, and that if a call was inadvertently encountered, no one would listen. And West testified that sometimes detainees approached her because they thought

their attorneys had accomplished privatization, yet the detainees still heard the preamble.  In those instances, West either referred the detainees to the handbook or, on a couple of occasions, emailed defense counsel and asked them to make sure they had "blocked" their numbers.[638]  All of these facts counsel against a blanket finding that a CCA detainee waived the right to confidential communications with his or her attorney with "eyes wide open."  Instead, detainees and defense attorneys were provided with incorrect, misleading, and inconsistent information about how to accomplish a confidential phone call at CCA.

The Government relies on four cases addressing government access to recorded phone calls made by incarcerated individuals to support its claim that at least some CCA detainees waived their attorney-client privilege.  These cases are all distinguishable.  Two of the Government's cases found waiver where there was sufficient evidence that the clients knew their conversations were being recorded.  In *United States v. Hatcher*,[639] the Eighth Circuit reversed a district court's decision that recordings of detained co-conspirators and their attorneys were protected by the attorney-client the privilege, and thus not discoverable.[640]  "Because inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private.  The presence of the recording device was the functional equivalent of the presence of a third party."[641]

---

[638] Doc. 482 at 36:19–37:19.

[639] 323 F.3d 666 (8th Cir. 2003).

[640] *Id.* at 674.

[641] *Id.*  In a concurring opinion, Judge Bye disagreed with the majority's waiver ruling, finding insufficient evidence about whether the facility had a policy that excepted attorney-client calls from the recording policy, and whether the co-conspirators knew about that policy.  *Id.* at 675 (Bye, J., concurring).

Similarly, in *United States v. Mejia*,[642] the Second Circuit relied in part on *Hatcher* in finding that the defendant's knowledge that a phone conversation with his sister was being recorded constituted a waiver of the attorney-client privilege.[643] There, it was undisputed that the defendant was aware that his calls were recorded when he discussed his desire to plead guilty with his sister.[644] The court also determined that Bureau of Prisons regulations allowed the defendant to place an unmonitored call to an attorney.[645] The court thus found no clear error in the district court's decision that there was no reasonable expectation of confidentiality given the defendant's knowledge of the recording, in addition to the absence of evidence that "he could not have contacted his attorney directly without being monitored."[646]

Scores of defense counsel who testified or submitted affidavits in this case stated that they were unaware that their conversations with CCA detainees were being recorded. Moreover, the evidence shows that detainees regularly did not have reason to believe their conversations with attorneys were being recorded given evidence that the handbook was routinely unavailable, that the privatization protocol was not reviewed with detainees at orientation, and that detainees could not initiate the privatization procedure prior to October 2016. Unlike in *Mejia*, there was no option for a detainee at CCA to "request an unmonitored call with an attorney," as the orientation materials misleadingly suggested. The only way to invoke the privatization protocol

---

[642] 655 F.3d 126 (2d Cir. 2011).

[643] *Id.* at 133.

[644] *Id.*

[645] *Id.*

[646] *Id.* at 134. Likewise, in *United States v. Eye*, both the inmate and the attorney knew that calls were being recorded. No. 05-00344-01-CRW-ODS, 2008 WL 1701089, at *12 (W.D. Mo. Apr. 9, 2008). The record in that case established that every inmate at the CCA facility received a copy of the Inmate Handbook, and that the CCA facility had a privatization procedure whereby calls to a privatized number were not recorded. *Id.* at *3. Notably, the FBI's subpoena of telephone calls in that case excepted out the defense counsel's phone number "or any other phone number deemed to be an attorney-client call." *Id.* at *4.

prior to October 2016 was for the attorney to submit information to the facility.  Yet, there was no method by which CCA allowed a detainee to make that request unmonitored—even requesting a phone call on a non-Securus phone required the presence of a guard who would monitor the phone conversation.

Unlike *Hatcher* and *Meija*, this Court has before it a robust record demonstrating that CCA affirmatively misrepresented to defense attorneys that attorney-client calls were exempt from CCA's recording policy.  With few exceptions, defense counsel were not made aware of the privatization protocol before the events giving rise to the Special Master's investigation in this case.  Moreover, even those attorneys who followed the privatization protocol were often recorded because CCA routinely failed to properly input into its system the names of attorneys who did avail themselves of the privatization protocol, including the FPD.[647]

The Government also relies on two cases that deal with inmate phone call recordings that do not include attorney-client communications and do not consider waiver of the attorney-client privilege.  In *United States v. Faulkner*,[648] the Tenth Circuit considered whether calls recorded by CCA and admitted as evidence at trial violated the Federal Wiretap Act given the signage, preamble language that telephone calls "may be monitored and/or recorded for security reasons," and inmate handbook language.[649]  The question in that case was one of statutory construction—how broadly to construe the consent exception to the Wiretap Act's prohibition of intentional

---

[647]*Cf. United States v. Novak*, 531 F.3d 99, 103 (1st Cir. 2008) (finding consent to monitoring phone recordings under the Fourth Amendment where the attorney's number was erroneously excluded from the prison privatization list, but noting that although "[t]he monitoring of these calls, made between an attorney and a client who is seeking legal advice, is troubling . . . we do not decide whether, or to what extent, calls between attorneys and clients made from prison can be monitored consistently with the requirements of the Sixth Amendment.").

[648]439 F.3d 1221 (10th Cir. 2006).

[649]*Id.* at 1222–23.

interception of wire communications, including telephone calls.[650]  The court joined several other circuit courts in broadly construing the statute's consent exception, and found that CCA detainees impliedly consented to the recording of their phone conversations by choosing to use a monitored phone after receiving numerous warnings that the calls may be recorded.[651]  In *United States v. Verdin-Garcia*,[652] the Tenth Circuit reiterated that the Wiretap Act's consent exception can be satisfied absent express consent and that consent can be inferred from the circumstances.

Again, the Government's cases are inapposite.  Obviously, these cases apply the Wiretap Act, rather than deciding any question under the Sixth Amendment or the attorney-client privilege.  And even if these cases had any bearing on the legal questions before the Court, they are factually distinguishable.  First, they do not address attorney-client communications; the calls at issue in those cases were placed by detainees to non-attorneys with undoubtedly non-private phone numbers.[653]  The preamble thus played for each call, and the generic warnings about non-attorney phone calls clearly applied.  Thus, the Tenth Circuit's conclusion in both cases that the defendants impliedly consented to recording by knowingly using a telephone that is monitored does not apply to attorney-client calls implicating the privatization process at issue on this record.

In sum, while the Government may be able to demonstrate facts in individual cases that a detainee knowingly and intelligently waived the right to confidential attorney-client communications, the record developed after the Special Master's two-year investigation in this

---

[650]*Id.* at 1224.

[651]*Id.* at 1225.

[652]516 F.3d 884, 594–95 (10th Cir. 2008).

[653]The Government represented to the Court during the evidentiary hearing that these cases involved attorney-client calls.  The Government conceded this error in its Proposed Findings of Fact and Conclusions of Law but continues to assert that they apply here.

case calls into doubt the Government's ability to establish waiver based on the orientation packet, inmate handbook, preamble, and signage, particularly in the face of evidence that defense attorneys advised their clients that their calls would not be recorded. *Shillinger* itself stands for the proposition that it takes more than the mere presence of a third party for a person to waive their Sixth Amendment right to confidential attorney-client communications. There, the presence of the deputy did not vitiate the privilege. Similarly, the mere fact that CCA warned detainees in various ways that their calls would be subject to recording and monitoring is not enough, standing alone, to waive the privilege given the many other facts in the record that detainees and their attorneys were led to believe these warnings did not apply to them.

### b. Purposeful Intrusion and Legitimate Justification

### i. Purposeful Intrusion

The FPD argues that the USAO purposefully intruded into attorney-client relationships by collecting and saving recordings that it knew or should have known included protected communications. The Government argues that a "purposeful intrusion" under *Shillinger* requires evidence that an AUSA or agent actually listened to or viewed the recordings.

The Tenth Circuit explained that prejudice must be presumed when the government becomes "privy to" protected communications because of its purposeful intrusion.[654] "Privy to" is an idiom used to describe being knowledgeable about something secret or private.[655] As previously discussed, post-*Shillinger* cases suggest purposeful intrusion requires more than mere possession of privileged attorney-client communication. The FPD appears to argue that disclosure is not necessary as it would be subsumed by a presumption of prejudice. But this

---

[654]*Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995).

[655]Merriam-Webster, https://www.merriam-webster.com/dictionary/privy%20to?src=search-dict-box

argument conflates purposeful intrusion with prejudice, which requires injury to the defendant or benefit to the government from the improperly obtained information—such injury or benefit means the recordings necessarily would have had to be disclosed.

Not surprisingly, the AUSAs and their agents deny watching or listening to the recordings. The record shows the USAO had access to both the video and audio recordings, under circumstances where they knew or should have known the material would include attorney-client communications, with no precautions to exclude or avoid learning the content of these recordings or use of a filter or taint team. The record also shows the USAO kept recordings of telephone calls between detainees and their attorneys for years without disclosing them to defense counsel. But determining whether the USAO became "privy to" particular recordings is not possible on this record. Ultimately, in the context of individual § 2255 actions, the Court will consider the USAO's explanation or assessment of the circumstances surrounding its access to and review of the particular recordings. The Court will also consider the findings in this record, including: widespread production and cooperation issues; lack of transparency with respect to the video recordings; and surreptitious practices with respect to audio recordings. This circumstantial evidence raises serious questions about the Government's credibility on the extent of its access to and disclosure of the recordings. Whether the USAO became privy to protected communications because of its purposeful intrusion in a particular detainee's case will be decided in each § 2255 action.

### ii.        Legitimate Law Enforcement Justification

The Court is able to make findings on this record that there was no legitimate law-enforcement purpose in the USAO's acquisition of video recordings of attorney visitation rooms. The USAO's intent in obtaining the video recordings was, in part, to investigate contraband

trafficking at CCA.[656]  The Government contends that Tomasic and Oakley drafted the grand jury subpoena to obtain *all* of the CCA video evidence included in the 22-month time frame "because of concern that the video would be periodically overwritten and thus lost, and they were uncertain about what video would later become relevant to their investigation and prosecution."[657]  It further asserts that Tomasic promptly notified defense counsel that the video was available for discovery, disclosed to the Court and defense counsel at a hearing that there were cameras in the attorney visitation rooms, and arranged for a filter team to safeguard any privileged materials found during a search of the CCA law library, "suggesting her fidelity to the privilege."[658]

While a targeted request for video or the crime fraud exception would be examples of legitimate law-enforcement activity, the Court finds that the USAO's large-scale non-specific collection in this case cannot be justified.  Any legitimate concern by the prosecutors that the video might be overwritten and lost was negated by Tomasic's prior knowledge that such a broad subpoena would capture attorney visitation rooms, with no steps to target or limit access to such privileged communications.  Contrary to the Government's position, Tomasic's use of a filter team for the search of the law library illustrates that she was well aware of the proper procedure to employ to avoid accessing these privileged materials; any so-called "fidelity" to the attorney-client privilege clearly did not extend to the video recordings of the attorney visitation rooms.

The Court finds the Government's broad justification for obtaining recordings of detainees' attorney-client calls similarly lacking.  The Government contends the calls were acquired as a result of attorney-client calls being "commingled" with recordings of the inmates'

---

[656] Doc. 482 at 62:2–4.

[657] Doc. 745 at 140.

[658] *Id.*

other outgoing telephone calls.[659]  Contrary to the facts in *Shillinger*, the Government argues,

there was no evidence of a deliberate effort to obtain privileged information.  But again, any

general legitimate justification by the prosecutors that all of a detainees' calls were needed is

negated by the individual and collective prior knowledge of the USAO that such a broad

subpoena would or was likely to capture attorney-client calls, with no steps to target or limit

access to such privileged communications.  Although the Court rejects this general commingling

justification as legitimate, it withholds ruling on whether there was any other legitimate law-

enforcement purpose with respect to particular litigants.

## VII.    Roadmap for § 2255 Litigation

This Court noted the likelihood of habeas litigation at the first hearing in this case on

August 16, 2016, and more recently assessed the record this way:

> I understood from the very beginning that there were going to be
> people that filed 2255s and claim prosecutorial misconduct.
> Rightly or wrongly, that litigation was going to happen.  There was
> never any question about it.

> So I viewed this Special Master investigation in this case as a
> way—as a way of developing a record, not only with respect to the
> people indicted in this case but with respect to the investigation
> that was this case that went far beyond just the few people that
> were indicted.

> And so I don't view that every 2255 is going to have its own
> unique and separate record.  To be sure . . . it's going to be
> particularized in the 2255 litigation to what recordings, if any, did
> the government obtain with respect to this particular defendant.

> But all of the circumstances leading up to obtaining that and how
> they were used and—and if they were and—and why that, you
> know, mattered and whether there was prejudice, all of those
> questions I think are going to be related to, you know, the wider-
> scale Phase III investigation and the record that's developed as a
> consequence of that.

---

[659]*Id.* at 141.

> So this is not something that can be sliced and diced into little bitty 2255s that are all unrelated.  They're all related in that sense.  There's a strong evidentiary connection between all of these cases.[660]

Thus, while the Court directed a broad investigation and record development on issues common to all detainees and recordings, it always anticipated individual relief for particular defendants.

Phase III of the Special Master investigation was meant to streamline discovery in the individual § 2255 proceedings.  But as the first half of this Order details, that is not what happened here.  Almost immediately after the Court authorized Phase III, the Government turned recalcitrant and adversarial, ironically resulting in a considerable record for the litigants to utilize in the § 2255 litigation.  The extensive record on the USAO's retention, preservation, and production of materials related to the *Black* investigation—its failure to cooperate with the Special Master to preserve and produce this material—may lead to discoverable issues on the individual § 2255 petitioners' Sixth Amendment claims, given that the USAO obtained some of those recordings through its investigation in *Black*.[661]

Likewise, the extensive evidentiary record will inform the individualized determinations in the § 2255 litigation.  There is specific evidence regarding the USAO's knowledge, access, use, and mishandling of the video recordings and AVPC.  General evidence regarding phone call recordings that came to light in the *Black* case may support an individual Sixth Amendment claim depending on how the claimant's recordings were handled.  Despite the USAO's attempts to portray Tomasic as a lone rogue prosecutor, later modified to include Treadway, the record is replete with evidence of the USAO's systematic practice of purposeful collection, retention, and exploitation of calls from CCA detainees to their attorneys.  It was only through the wide-lens

---

[660]Tr. Aug. 16, 2018 Hr'g, Doc. 570 at 39:20–40:22.

[661]Exs. 585, 715A.

view of the *Black* investigation that the extent of the Government's conduct came into focus. Findings and conclusions regarding the USAO's routine and systematic collection of all recorded phone calls from CCA with no exception for attorney-client calls or any other precautionary measures—as evidence of a pattern of purposeful and large-scale intrusion into attorney-client relationships—are directly relevant to § 2255 petitioners' claims that similar misconduct occurred in their cases.  The USAO's repeated conduct is relevant to witness credibility on a host of issues, including the extent of its access to and exploitation of the recordings.  And in tailoring any individual relief, both prejudice and a pattern of recurring violations by the Government are relevant to the Court's determination of an appropriate remedy.

The DOJ and the USAO have repeatedly urged that the "appropriate mechanism" for investigation of any Sixth Amendment violations is through § 2255 litigation.  This Court foreshadowed that in taking that position, and in refusing to cooperate with the Special Master and with the Court's final production order in this case, the Government would be required to produce outstanding documents and information in habeas proceedings.  That time has come.

### A.    Posture of the § 2255 Litigation

The FPD began filing § 2255 petitions on August 13, 2018, as authorized by Standing Order 18-3.  The Court takes judicial notice of the 110 petitions filed to date seeking relief based on the Sixth Amendment violations and prosecutorial misconduct discovered in the *Black* case.[662]  The first cases were filed on August 13, 2018, in the wake of the settlement collapse; the most recent was filed July 23, 2019.

---

[662]Fed. R. Evid. 201; *see Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1219 n.2 (10th Cir. 2011) (holding a court may take judicial notice of other courts' files and records from the Electronic Court Filing system).

The majority of the cases filed to date involve video recordings. The latest cases set forth more specific allegations in support of the individual litigants' Sixth Amendment claims, detailing the number of visits with counsel and the date the visits took place, including that the attorney-client meeting took place on the same the day that Tomasic instructed Special Agent Stokes to locate and review recordings of the attorney visitation rooms.[663] The FPD and § 2255 litigants did not have access to these recordings until today, as set forth in this opinion.

In addition, the Government has only recently produced audio recordings of CCA calls dating back to 2011.[664] To date, the FPD has filed 21 habeas actions based on the 2019 production of phone calls, with more expected. Thus, unlike the video recordings, there is no established universe of potential defendants impacted by the conduct of the USAO with respect to audio recordings. These petitioners allege that the Government intentionally obtained, accessed, and possessed specific phone calls between petitioners and counsel placed while petitioners were confined at CCA.[665]

Notably, several petitioners characterized by the USAO in the *Black* case as examples of "inadvertent" review of attorney-client calls now allege that the USAO made further broad production requests and received more attorney-client calls were *after* it reviewed attorney-client communications.[666] Other recent filings involve allegations against AUSAs who testified at the *Black* evidentiary hearing that they had never encountered attorney-client calls.[667] And several

---

[663]*See, e.g.*, *United States v. Orduno-Ramirez*, D. Kan. No. 14-20096-JAR-7.

[664]Ex. 715A.

[665]*See, e.g.*, *United States v. Phommaseng*, D. Kan. No. 15-20020-JAR-5, Doc. 583 (76 calls); *United States v. Matthew Spaeth*, D. Kan. No. 14-20068-CM-6, Doc. 486 (8 calls).

[666]*See, e.g.*, *United States v. Birdsong*, D. Kan. No. 15-20045-JAR, Doc. 39; *United States v. Rapp*, D. Kan. 14-20067-CM-1, Doc. 690.

[667]*See, e.g.*, *United States v. Dixon*, D. Kan. No. 14-20130-JAR, Doc. 259; *United States v. Phommaseng*, D. Kan. No. 15-20050-JAR-5, Doc. 584.

petitioners submit affidavits from defense counsel regarding their understanding of call recording practices at CCA and stating that they informed their clients that the calls made to and from CCA to counsel were confidential.[668] One such petitioner, Petsamai Phommaseng, has moved for leave to conduct discovery, which the Government opposes.[669]

The Government has raised the defenses of collateral waiver and procedural default in every response filed, asking the Court to dismiss on procedural grounds rather than reach the merits of whether each litigant has a valid claim under the Sixth Amendment.[670]  The Government also continues to argue that the recordings are not privileged attorney-client communications, that *Shillinger* is inapplicable, that the record is devoid of any evidence showing a violation, and that petitioners must show prejudice.  The Government has not responded to all of the § 2255s and has obtained extensions of time pending this Court's ruling in *Black*.  To date, the FPD has not replied to any of the Government's responses, pending a ruling from this Court in the *Black* case.

### B.      Reassignment and Consolidation for Discovery

The numerous § 2255 petitions filed to date incorporate the record and evidence from the *Black* investigation and have many issues common to all litigants.  Accordingly, in the interest of judicial economy, and to avoid further unnecessary cost and delay, the Court reassigns the pending § 2255 habeas cases filed by the FPD pursuant to Standing Order 18-3 to the undersigned, to the extent they are not already pending before this Court, for determination of the merits of petitioners' Sixth Amendment claims and the Government's defenses consistent

---

[668] *See, e.g.*, *United States v. Clark*, D. Kan. No. 14-20130-JAR-2, Doc. 256-1.

[669] *United States v. Phommaseng*, D. Kan. No. 15-20020-JAR-5, Doc. 584.   The Court will issue a separate order on this motion, which also addresses collateral waiver and procedural bar defenses raised by the Government, concurrently with this opinion.

[670] *See, e.g.*, *id.* Doc. 593; *United States v. Cloyd*, D. Kan. No. 14-20118-JAR, Doc. 125.

with this opinion.[671]  Pursuant to Fed. R. Civ. P. 42(a), the cases will be consolidated for

discovery to be overseen by Chief Magistrate Judge James O'Hara.  Once reassigned, the Court

will hear from the parties on how to triage the cases and determine how to efficiently decide

common issues, including but not limited to: (1) collateral waiver and procedural default; (2)

threshold privilege determinations, including a procedure for review of recordings; (3) waiver of

audio recordings; and (4) good cause for discovery under Rule 6 of the Rules Governing Rule

§ 2255 Proceedings.

## VIII.   Conclusion

In adopting its per se rule, the *Shillinger* court found compelling the dissent in the

underlying Wyoming state court opinion:

> Competent prosecution is faced by perhaps one or, at the most, two
> acquittals with at least every hundred criminal charges where nine
> out of ten are resolved by plea and the remaining trials favor
> conviction.  Within these few cases, fairness, honesty and morality
> are not an undue burden on accomplished justice.[672]

The FPD is correct—there is no template for this case, where the fairness of the adversary

system is called into question by systemic prosecutorial misconduct of the type alleged here.

The allegations of surreptitious incursion into attorney-client communications that triggered the

Special Master's investigation in this case have far reaching implications in scores of pending

§ 2255 cases.  Yet the Government responded by minimizing the seriousness of its conduct and

delayed and obfuscated that investigation.

---

[671] *See* Rules Governing Section 2255 Proceedings, Rule 4(a) (outlining procedure for assigning motion to a specific judge).

[672] *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Haworth v. State*, 840 P.2d 912, 919 (Wyo. 1992) (Urbigkit, J., dissenting)).

The Government has steadfastly denied any misconduct with respect to the USAO's practice of obtaining and accessing attorney-client communications.  As evidence of a pattern of misconduct emerged in the *Black* case, the Government continued to argue that any misconduct was limited to two errant prosecutors and that the issues surrounding its conduct were beyond this Court's remit.  At the same time, it forestalled any finding of Sixth Amendment violations by approving reduced sentences for defendants in other cases who had pending Rule 41(g) motions or where it had listened to, procured, or used video and audio recordings of attorney-client communications.[673]  And while urging discrete litigation in individual § 2255 litigation, it continues its attempt to forestall any finding on the merits by arguing individual petitioners' Sixth Amendment prosecutorial misconduct claims are waived or procedurally defaulted, despite the fact that the recordings have yet to or only recently been made available to the FPD.

Although the Court does not make particularized findings of Sixth Amendment violations on this record, it bears noting the FPD's request for a global remedy.  The FPD urges the Court to hold the Government accountable for the USAO's systematic practice of surreptitiously collecting and saving protected attorney-client communications and attempts to thwart the inquiry of the Special Master and this Court.  The FPD asks the Court to consider the outcome of

---

[673]*See, e.g.*, *United States v. Herrera-Zamora*, D. Kan. No. 14-20049-CM-1, Doc. 233 (after SAUSA Tomasic's misconduct came to light, Government agreed to recommend the district court vacate defendant's 420-month sentence and impose instead a sentence of time served); *United States v. Dertinger*, D. Kan. No. 14-20067-JAR-6, Docs. 396, 558 (after evidence revealed that Government procured, viewed, and used video of defendant communicating with his counsel, the government made a time-served offer to defendant contingent on him withdrawing his Rule 41(g) and other motions); *United States v. Uriarte*, D. Kan. No. 15-20043-JAR-1, Docs. 156, 153 (after filing Rule 41(g) motion and seeking to join that motion with all similarly related motions and proceedings pending in *Black,* defendant pled to one count of misprision of a felony and sentenced to time served); *United States v. Huff*, D. Kan. No. 14-20067-CM-9, Doc. 481 (after defendant filed Rule 41(g) motion, Government agreed to functionally time-served 36-month sentence on condition that defendant withdraw her pending motions); *United States v. Wood*, D. Kan. No. 14-20065-JAR-1, Docs. 236, 237 (defendant was facing up to 78 months' imprisonment, but after filing motion for relief based on Government's procurement and possession of video or audio recordings of attorney-client communications, Government agreed to reduce defendant's sentence to time served (approximately 50 months); *United States v. Reulet*, D. Kan. No. 14-40005-DDC-3, Doc. 1262 (defendant was originally sentenced to 60 months' imprisonment, but after AUSA Treadway's testimony at the October 2018 hearing in *Black*, Government agreed to reduce defendant's sentence to time served).

defendants like Reulet, where AUSA Treadway's misconduct was only discovered as part of the *Black* inquiry; once the misconduct came to light, it was quickly remedied without any admission of a Sixth Amendment violation.  It cites the USAO's attempted global resolution as well as other examples of global settlements for systematic governmental misconduct for the Court to draw on.  In many of these cases, however, the government acknowledged the impact of the systemic problems and fully cooperated with establishing eligible defendants; a global settlement or remedy was typically not implemented until logistical or evidentiary hurdles made it impossible for the multiple defendants impacted by the government's misconduct to proceed on an individual basis.[674]  That is not yet the case here, where individual § 2255 litigants still have a path to relief through *Shillinger* and the anticipated unresolved discovery and production issues.

The *Black* investigation will soon reach the three-year mark.  Over 100 § 2255 litigants continue to serve their sentence without the opportunity to present their Sixth Amendment claims, due in large part to the Government's tactics and delay.  While the Court cannot make a broad Sixth Amendment violation determination nor grant the sweeping remedy the FPD seeks on this record, it has endeavored in this opinion to create a comprehensive record and establish legal standards and threshold procedures that will give individual § 2255 litigants the opportunity to finally obtain efficient, fair, and consistent relief without further delay.

---

[674] *See, e.g.*, *Comm. for Pub. Counsel Servs. v. Attorney Gen.*, 108 N.E.3d 966, 987–89 (Mass. 2018) (misconduct of lab technicians called into question testing results for tens of thousands of criminal cases, coupled with state's attorney's withholding exculpatory evidence, prompted the court to adopt global remedy for all eligible defendants; district attorneys' offices cooperated with identifying eligible defendants, but opposed scope of relief); *Bridgeman v. Dist. Attorney for Suffolk Dist.*, 30 N.E.3d 806, 811 (Mass. 2015) (in lab technician misconduct case, court declined to impose global remedy and instead adopted protocol through which eligible defendants would be appointed counsel and could seek to vacate their convictions; defendants not granted a presumption that egregious government misconduct occurred, but bore the burden of proving prejudice in attempt to withdraw plea agreements).

**IT IS THEREFORE ORDERED BY THE COURT** that:

(1)     The FPD's Motion to Admit Exhibit Out of Time (Doc. 749) is **granted**;

(2)     The FPD's Motion for Discovery (Doc. 573) is **denied without prejudice**;

(3)     The Government's Motion to Exclude Improper Expert Testimony About Law and Legal Conclusions (Doc. 639) is **moot**;

(4)     The FPD's Motion for Order to Show Cause (Doc. 301), Supplemental Motion for Order to Show Cause (Doc. 585), and Second Supplemental Motion for Order to Show Cause (Doc. 668) are **granted in part and denied in part**;

(5)     The FPD's Motions for Return of Property under Fed. R. Crim. P. 41(g) (Docs. 82, 85) are **granted**; and

(6)     Defendant Karl Carter's Motion to Dismiss Indictment (Doc. 333) is **granted as unopposed**.  Defendant Carter is hereby **dismissed with prejudice**.

**IT IS FURTHER ORDERED BY THE COURT** that the FPD shall submit an application for attorneys' fees and costs, addressing both its entitlement to fees and the amount, by September 24, 2019.  The Government may respond by October 15, 2019.  Each party's brief shall not exceed 40 pages.

**IT IS FURTHER ORDERED BY THE COURT** that **within ten (10) days of the date of this Order**, the parties shall jointly submit a list of pending § 2255 cases filed pursuant to Standing Rule 18-3 or otherwise raising Sixth Amendment claims related to the *Black* case; upon filing of the list, the Clerk is directed to reassign the cases to the undersigned, to the extent they are not already pending before this Court, and Chief Magistrate Judge James P. O'Hara, at which time they will be consolidated for discovery pursuant to Fed. R. Civ. P. 42(a).

**IT IS SO ORDERED.**

Dated: August 13, 2019

                                             s/ Julie A. Robinson
                                             JULIE A. ROBINSON
                                             CHIEF UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 16-CR-20032-JAR** |
| | ) | |
| KARL CARTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## NOTICE OF APPEAL

David P. Zabel, in his individual capacity, gives notice that he appeals to the United

States Court of Appeals for the Tenth Circuit from this Court's Findings of Fact and Conclusions

of Law (Doc. 758), entered in this action on August 13, 2019.

Respectfully submitted,

/s/ *David P. Zabel*
David P. Zabel
500 State Avenue, Suite 360
Kansas City, Kansas 66101
T: 913-551-6708
F: 913-551-6541
E-mail: david.zabel@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on the 12th day of September 2019, this Notice of Appeal was electronically
filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of
electronic filing to all counsel of record.

/s/ *David P. Zabel*
David P. Zabel